1  ROBBINS GELLER RUDMAN
     & DOWD LLP
2  SHAWN A. WILLIAMS (213113)
   DANIEL J. PFEFFERBAUM (248631)
3  ARMEN ZOHRABIAN (230492)
   PATTON L. JOHNSON (320631)
4  Post Montgomery Center
   One Montgomery Street, Suite 1800
5  San Francisco, CA  94104
   Telephone:  415/288-4545
6  415/288-4534 (fax)
   shawnw@rgrdlaw.com
7  dpfefferbaum@rgrdlaw.com
   azohrabian@rgrdlaw.com
8  pjohnson@rgrdlaw.com

9  Lead Counsel for Plaintiffs

10

11                          UNITED STATES DISTRICT COURT

12                        NORTHERN DISTRICT OF CALIFORNIA

13                            SAN FRANCISCO DIVISION

14  LOGAN HESSEFORT, Individually and on      )  Lead Case No. 3:18-cv-00838-JST
    Behalf of All Others Similarly Situated,   )
15                                              )  CLASS ACTION
                              Plaintiff,        )
16                                              )  SECOND AMENDED CONSOLIDATED
            vs.                                 )  CLASS ACTION COMPLAINT FOR
17                                              )  VIOLATION OF THE FEDERAL
    SUPER MICRO COMPUTER, INC.,                 )  SECURITIES LAWS
18  CHARLES LIANG, HOWARD HIDESHIMA,)
    PERRY G. HAYES and WALLY LIAW               )
19                                              )
                              Defendants.       )
20  _____)
                                                   DEMAND FOR JURY TRIAL
21

22

23

24

25

26

27

28

4825-1376-7834.v1

**TABLE OF CONTENTS**

**Page**

SUMMARY OF ACTION...............................................................................................1

RECENT DEVELOPMENTS ........................................................................................2

INTRODUCTION ...........................................................................................................5

JURISDICTION AND VENUE ....................................................................................11

THE PARTIES...............................................................................................................11

BACKGROUND ...........................................................................................................14

    Before the Class Period Super Micro Twice Misses SEC Filing Deadlines and
    Implements New Accounting System to Improve Internal Controls................................14

FALSE AND MISLEADING STATEMENTS ISSUED DURING THE CLASS
PERIOD ........................................................................................................................16

    Super Micro Announces 4Q16 and FY16 Financial Results and Files Form 10-K...........16

    Super Micro Announces 1Q17 Financial Results and Files Form 10-Q ..........................22

    Super Micro Announces 2Q17 Financial Results and Files Form 10-Q ..........................24

    Super Micro Announces 3Q17 Financial Results and Files Form 10-Q ..........................26

    Super Micro Announces Preliminary 4Q17 Financial Results ........................................27

    Super Micro Requests 15-Day Extension to File Form 10-K...........................................31

    Super Micro Fails to Meet Extended Deadline to File Form 10-K and Announces
    Audit Committee Review ................................................................................................32

    Super Micro Reveals Premature Revenue Recognition; Fails to File 1Q18 Form
    10-Q ..............................................................................................................................33

    Super Micro Announces Departure of Senior Executives and Cannot State if Its
    Historical Financial Statements Are Accurate; Audit Committee Investigation
    Results in Further Inquiry and Delay.............................................................................38

POST-CLASS PERIOD EVENTS AND DISCLOSURES............................................40

    Super Micro Subject to Delisting by NASDAQ ............................................................42

    Super Micro Fails to File 3Q18 Form 10-Q...................................................................43

    Super Micro Fails to Meet Filing Deadline; NASDAQ Suspends Trading......................47

    Super Micro Announces Need to Restate and Material Weaknesses ...............................53

    Super Micro Restates and Amends Financial Results for Five Year Period ....................56

SUPER MICRO'S FINANCIAL STATEMENTS WERE MATERIALLY MISSTATED AND ITS INTERNAL CONTROLS HAD MATERIAL WEAKNESSES ...................................64

    Defendants Have Restated Super Micro's Financial Statements.......................................64

    Super Micro's Restatement Is an Admission of Falsity.................................................66

    Defendants' GAAP Violations Required Restatement of Its Financial Statements ..........67

    Defendants Had Material Weaknesses in Internal Controls and Ineffective Disclosure Controls During the Class Period ...................................71

    Defendants' Material Weaknesses in Revenue Recognition Accounting.........................73

    Defendants' Material Weaknesses in the Five Internal Control Components Established by the COSO Framework ...................................73

    Defendants' Material Weaknesses in Information Technology General Controls ............77

    Super Micro's Remediation Plans for Its Material Weaknesses in ICFR.........................77

    Defendants' GAAP Violations and Restatement Were Material......................................79

    Defendants' Violations of SEC Regulations Related to Super Micro's Inadequate Internal Controls ...................................82

ADDITIONAL SCIENTER ALLEGATIONS..............................................................83

LOSS CAUSATION AND ECONOMIC LOSS ..........................................................89

NO SAFE HARBOR ...................................................................................................90

APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET..........91

CLASS ACTION ALLEGATIONS .............................................................................92

    COUNT I ...........................................................................................................93

    COUNT II ..........................................................................................................94

PRAYER FOR RELIEF .............................................................................................95

JURY DEMAND ........................................................................................................95

1      1.      Lead Plaintiff New York Hotel Trades Council & Hotel Association of New York City, Inc. Pension Fund ("Plaintiff" or "New York Hotel Pension Fund"), individually and on behalf of all others similarly situated, by Plaintiff's undersigned attorneys, alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and upon information and belief as to all other matters based on the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of Super Micro Computer, Inc.'s ("Super Micro" or the "Company") press releases, United States Securities and Exchange Commission ("SEC") filings, analyst reports, media reports and other publicly disclosed information about the Defendants.[1]  Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## SUMMARY OF ACTION

2.      This is a securities fraud class action alleging violations of the anti-fraud provisions of the federal securities laws on behalf of all purchasers of the common stock of Super Micro between August 5, 2016 and January 30, 2018, inclusive (the "Class Period").  The claims asserted herein are brought against Super Micro; Charles Liang ("Liang"), the Company's President, Chief Executive Officer ("CEO") and Chairman of the Board (Principal Executive Officer); Howard Hideshima ("Hideshima"), former Senior Vice President and Chief Financial Officer ("CFO") Perry G. Hayes ("Hayes"), Senior Vice President-Investor Relations; and Wally Liaw ("Liaw"), former Sr. Vice President of International Sales and former member of the Board of Directors.

3.      During the Class Period, Defendants violated §§10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder, 17 C.F.R. §240.10b-5, by making false and misleading statements and omissions concerning the Company's accounting, internal controls, operations, financial performance and prospects, and by engaging in a fraudulent scheme, acts, practices and course of business that deceived investors.

---

[1]    As defined below.

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS - 3:18-cv-00838-JST

4825-1376-7834.v1

- 1 -

**RECENT DEVELOPMENTS**

4.      On September 24, 2018, Plaintiff filed the Consolidated Class Action Complaint for Violation of the Federal Securities Laws ("Consolidated Complaint," ECF No. 51) including allegations related to post-Class Period developments concerning Super Micro's continued inability to file its Fiscal Year ("FY") 2017, FY17 Form 10-K resulting in its delisting from the NASDAQ.  On November 15, 2018, before any Defendant responded, the Company announced that its FY15-FY17 financial results could no longer be relied upon and would be restated (the "Restatement Announcement").

5.      On January 22, 2019, by stipulation and order (ECF No. 60), Plaintiff filed the First Amended Consolidated Class Action Complaint for Violation of the Federal Securities Laws ("FAC") incorporating the Restatement Announcement and related allegations.  ECF No. 61. Defendants moved to dismiss the FAC (ECF Nos. 62-63) and Plaintiff opposed the motions (ECF No. 68); no reply briefing was filed.

6.      On May 17, 2019, after more than 20 months of delay, Super Micro filed its FY17 Form 10-K, and three amended Forms 10-Q (collectively, the "Restatement"), restating or "adjusting" its financial results for a five year period from FY13-FY17 – two years longer than previously indicated.  By stipulation and order (ECF No. 70), Plaintiff hereby files this Second Amended Consolidated Class Action Complaint for Violation of the Federal Securities Laws incorporating the Restatement and related allegations.

7.      The Restatement contains numerous admissions demonstrating a flagrant disregard for accounting rules, deliberate revenue recognition manipulations and a pervasive lack of ethical conduct at the highest levels of the Company.  According to the FY17 Form 10-K:

> *[SuperMicro] had a culture of aggressively focusing on quarterly revenue without sufficient focus on compliance. . . .  The Company did not sufficiently promote, monitor or enforce adherence to the [Code of Conduct]*.[2]

---

[2]      All citations are omitted and emphasis is added unless otherwise noted.

8.     The Company had an inappropriate tone at the top in which officers and managers engaged in, or condoned, fraudulent sales and accounting practices to falsely inflate quarterly financial results:

> *In the pursuit of quarterly revenue, certain sales, finance and operations personnel, including officers and managers, were aware of, condoned or were involved in actions that reflected an inappropriate tone at the top, that violated the Code of Conduct and accounting policies and procedures, and that were inconsistent with a commitment to integrity and ethical values.*

9.     The Company provided examples of willful and deliberate sales and accounting misconduct used to manipulate financial results and improperly and prematurely recognize revenue, including:

> *(i) shipping products in advance of customer requested delivery dates, (ii) shipping products to storage facilities at the end of a quarter for later delivery to customers, (iii) in certain cases entering into side agreements with customers, (iv) in certain cases, shipping products before manufacturing was completed, (v) altering source documents related to some sales transactions and (vi) failing to disclose or obscuring material facts about sales transactions.*

10.     The Company also admitted that Super Micro officers and managers were not forthright with – and indeed sought to conceal facts from – Super Micro's Audit Committee ("Audit Committee") and external auditors, Deloitte & Touche LLP ("Deloitte"):

> *Some employees, including officers and managers, also failed to raise issues with material accounting consequences to the Audit Committee and our external auditors, and with respect to one transaction, appear to have attempted to minimize material facts about a sales transaction to, or obscure those facts from, the Audit Committee and our external auditors.*

11.     The FY17 Form 10-K details significant remediation plans put in place – and still ongoing – necessary to address the extensive pattern of misconduct.  Defendant CEO Liang was identified as needing training on compliant sales practices, effective internal controls and revenue recognition compliance:

> – Revenue recognition training for our global sales force, various operations personnel, and certain senior executives, ***including our CEO***, which included detailed examples of acceptable and unacceptable sales practices.

> \*          \*          \*

> – ***Reviewing with our CEO*** enhanced processes for periodic evaluations by the CEO and the CFO of the effectiveness of our disclosure controls and procedures, and the periodic assessments by the CEO and the CFO of the

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATION OF THE
FEDERAL SECURITIES LAWS - 3:18-cv-00838-JST
4825-1376-7834.v1

- 3 -

effectiveness of our internal control over financial reporting, and other compliance matters.

\*       \*       \*

– Developing and implementing an ongoing compliance training program regarding significant accounting and financial reporting matters, as well as broad compliance matters, for accounting, financial reporting, sales and operations personnel, *as well as for our CEO*, other corporate executives and the Board.

12.     According to the FY17 Form 10-K, numerous high-ranking employees resigned and were replaced to address the accounting violations and misconduct, including the Chief Financial Officer (Defendant Hideshima), the Senior Vice President of International Sales (Defendant Liaw), the Corporate Controller, the Senior Vice President of Worldwide Sales, the Vice President, Strategic Accounts, the Vice President, Strategic Sales, the Vice President, Business Development and other sales personnel.  The Company also created new positions for a Chief Compliance Officer, Vice President of Internal Audit, Senior Director of Tax, Financial Audit Director and Information Technology Audit Director.  In a separate Form 8-K, the Company disclosed that Chiu-Chu Liu Lang ("Sara Liu") – wife of Defendant Liang – "transitioned" from her former positions as Chief Administrative Officer and Treasurer to a new position of Senior Vice President.  The Company also strengthened its Code of Business Conduct and Ethics ("Code of Conduct") with respect to "compliance and reporting."

13.     In connection with the restatement, Deloitte no longer provided a "clean" audit opinion but instead, as of June 30, 2017, "expressed an *adverse opinion* on the Company's internal control over financial reporting because of material weaknesses."  The Company has incurred more than $91 million in professional fees paid to accounting firms (Deloitte, KPMG) and law firms in connection with the Restatement.

14.     The Company's FY17 Form 10-K detailed numerous negative consequences of Defendants' conduct which "has placed, and will continue to place, downward pressure on our stock price" and has increased the degree of risk in investing in Super Micro.  The continued inability to file the outstanding financial statements with the SEC has also negatively impacted the Company's financing, including its ability to raise debt or issue equity, and has hurt the Company's

ability to attract and retain employees.  Despite the multiple SEC filings on May 17, 2019, Super Micro remains delinquent on its SEC filings and continues to be delisted from the NASDAQ.

## INTRODUCTION

15.     Super Micro was incorporated in California in September 1993, and reincorporated in Delaware in March 2007.  The Company is headquartered in San Jose, California.  During the Class Period, the Company traded on the NASDAQ Global Select Market ("NASDAQ") under the ticker symbol "SMCI."  The Company bills itself as a global leader in high-performance, high-efficiency server technology and innovation, and as a premier provider of end-to-end green computing solutions and integration/support services for Data Center, Cloud Computing, Enterprise IT, Big Data, High Performance Computing ("HPC") and internet of things ("IoT") Embedded Systems worldwide.

16.     In 2015, prior to the Class Period, the Company twice failed to timely file its required financial disclosures with the SEC.  First, at the end of August 2015, the Company required a 15-day extension to file its FY15 Form 10-K after discovering irregularities regarding certain marketing expenses; second, in November 2015, the Company disclosed issues with extended warranties where it prematurely recorded revenue, resulting in a delayed 1Q16 Form 10-Q and a prior period adjustment.[3]  Under heightened scrutiny, the Company assured investors that it had taken the necessary steps to remedy these issues, including through substantial investment in the implementation of a Systems, Applications and Products ("SAP") accounting system.

17.     On July 18, 2016, approximately two weeks prior to the Class Period, Super Micro pre-announced disappointing preliminary results for the completed 4Q16, including revenue of $520-$524 million, down from previous guidance of $580-$640 million, and earnings per share ("EPS") of $0.15-$0.17, down from previous guidance of $0.46-$0.58.  This pre-announcement put significant pressure on the Company to deliver at the higher end of their pre-announced ranges

---

[3]     Super Micro's fiscal year ends on June 30.  1Q refers to the first quarter, period ending September 30; 2Q refers to the second quarter, period ending December 31; 3Q refers to the third quarter, period ending March 31; and 4Q refers to the fourth quarter, period ending June 30, thus 1Q16 refers to Super Micro's first quarter 2016.

1   going forward.  As one analyst put it going into the August 4, 2016 earnings conference call:

2   "Thursday's call has the potential to be a pivotal event for the company."[4]

3         18.    On August 4, 2016, after the close of trading, on the eve of the Class Period, the

4   Company reported 4Q16 and FY16 financial results, including revenues of $524 million and EPS

5   of $0.20, both of which met or exceeded the pre-announced figures, and gave 1Q17 revenue

6   guidance of $470-$550 million and EPS guidance of $0.15-$0.30.  Liang described Super Micro

7   as "one of the fastest growing companies in the IT industry" and well-positioned going forward.

8   The Company's stock price rose to above $21 per share on these false and misleading statements

9   and omissions.

10         19.    On August 26, 2016, the Company filed its FY16 Form 10-K which materially

11   misrepresented the Company's commitment to effective disclosure controls and procedures and

12   falsely noted that the Company had remediated prior-year material weaknesses in internal controls.

13   The Form 10-K disclosed that management had evaluated the Company's internal controls over

14   financial reporting, had determined them to be effective as of June 30, 2016, and claimed that the

15   consolidated financial statements were presented consistent with generally accepted accounting

16   principles ("GAAP").  Moreover, the Company falsely stated it only "recognize[d] revenue from

17   sales of products when persuasive evidence of an arrangement exists, shipment has occurred and

18   title has transferred, the sales price is fixed or determinable, collection of the resulting receivable

19   is reasonably assured, and all significant obligations have been met."  The FY16 Form 10-K also

20   claimed that the Company had "adopted a 'Code of Business Conduct and Ethics'" applicable to

21   all employees and further referenced senior officers' responsibility for maintaining sufficient

22   internal controls over financial reporting.  The FY16 Form 10-K also attached Sarbanes-Oxley Act

23   of 2002 ("SOX") certifications, signed by Liang and Hideshima, attesting that the Company's

24   financial statements did not contain false or misleading statements, that each had designed the

25   Company's disclosure controls and internal controls over financial reporting and that such controls

26   were effective.

27

28       4    Roth Capital Partners August 2, 2016 Company Note.

20.     Defendants continued their false and misleading representations concerning the Company's financial results during each quarter in FY17 through the issuance of earnings releases and on investor conference calls.[5]  In addition, Defendants made similar misrepresentations as those contained in the FY16 Form 10-K in Forms 10-Q for 1Q17-3Q17, for example, expressly stating that no changes had occurred concerning its critical accounting policies, including its revenue recognition policy, since its previous disclosure in its FY16 Form 10-K.  Moreover, the Forms 10-Q contained similar misrepresentations regarding the Company's compliance with GAAP and the effectiveness of its disclosure controls and internal controls.  Each filing also included SOX certifications signed by Liang and Hideshima.   These false and misleading statements caused or maintained further inflation in Super Micro's stock price.

21.     On July 20, 2017, the Company pre-announced preliminary 4Q17 results and touted continued growth.  Two weeks later, the Company issued a press release and held an earnings conference call proclaiming "record revenue and strong momentum" in FY17 and that "fiscal 2018 will be one of the strongest years in Super Micro's history."  These false statements and omissions drove the stock price above $27 per share.

22.     Defendants' statements concerning the Company's financial results, operations and prospects – in particular, its reported revenue and earnings results, claims of effective internal controls, its control environment, compliance with GAAP and SOX certifications – were materially false and misleading because Defendants knew, or were deliberately reckless in not knowing, that: (a) for FY13-FY17, the Company materially misstated revenues by approximately $104.7 million, net income by $20.3 million and EPS by $0.41, in aggregate; (b) the Company had a culture of aggressively focusing on quarterly revenue without sufficient focus on compliance, suffered from an inappropriate tone at the top and failed to monitor or enforce the Code of Conduct; (c) the Company suffered from material weakness in internal controls related to revenue recognition that resulted in material errors in its reported financials; (d) the Company violated

---

[5]     The 1Q17 Form 8-K earnings release was issued on October 27, 2016, the 2Q17 Form 8-K earnings release was issued on January 26, 2017, the 3Q17 Form 8-K earnings release was issued on April 27, 2017, and the 4Q17 Form 8-K earnings release was issued on August 3, 2017.

1   GAAP, its revenue recognition policies and its Code of Conduct by, among other things, shipping

2   products in advance of customer requested delivery dates, shipping products to storage facilities

3   for later delivery, entering into side agreements with customers, shipping incomplete products, and

4   altering source documents related to transactions; (e) the Company prematurely and improperly

5   recognized revenue for extended warranties and on-site services at the time of sale and failed to

6   remediate this previously-disclosed material weakness; (f) officers and managers failed to raise or

7   concealed information with material accounting consequences from the Audit Committee and

8   Deloitte; (g) the Company failed to maintain sufficient management, accounting and financial

9   reporting employees with appropriate knowledge, experience and training; (h) the Company failed

10   to maintain sufficient documentation for revenue recognition purposes; (i) the accounting for

11   thousands of transactions from FY13 through FY17 required reassessment; and (j) as a result of

12   the foregoing, the Company was exposed to the risk of restatement, inability to attest to the

13   accuracy of its historical financial statements, inability to obtain auditor sign-off, an adverse

14   opinion from its auditor, significant investigative and remediation costs, inability to attract or retain

15   employees, de-listing from the NASDAQ, investigation by the SEC and other regulatory action or

16   civil liability.

17        23.    The truth began to emerge in a series of partial disclosures – some obscured by

18   further false and misleading statements.  On August 29, 2017, when the Company announced it

19   would be unable to timely file its FY17 Form 10-K, Defendants revealed only that they needed

20   additional time "to compile and analyze certain information and documentation" prior to auditor

21   review but would file within 15 days.  On September 15, 2017, after failing to meet the 15-day

22   extension, the Company stated that it was "unable at this time to provide a date as to when the

23   review and the audits will be completed," but that it "intends to file its 10-K promptly upon

24   completion of the audit committee's review and the completion of the audit."  The stock price

25   declined 15% during the ensuing two trading days, but still traded at artificially high prices.

26        24.    On October 26, 2017, Super Micro disclosed that it was still unable to file its FY17

27   Form 10-K and revealed that the internal investigation was spurned by a review of a transaction

28   improperly recorded as revenue in 2Q17, which was subsequently reversed and recorded as

revenue in 3Q17.[6]  The ongoing investigation was to "determine whether there were any similar transactions and if so, whether such transactions were properly accounted for."  The Company admitted that "[d]ue to the volume of data to be reviewed to complete the investigation" it could not "predict the possible outcome of the investigation."  During an earnings conference call that day, Defendants refused to answer questions about the investigation or when it might file its FY17 Form 10-K.  The stock price continued its descent as these partial disclosures began to shed light on the nature of the fraudulent accounting but it remained artificially inflated.

25.     During the ongoing investigation and review, Defendants falsely claimed that the investigation was nearing completion and the Company would become current on its SEC filings.  On December 6, 2017, Wells Fargo reported on a conference at which Hayes stated that he "believes that Super Micro is in the final stages of audit review before filing its 10-K (and subsequent updated 10-Q)."  This and similar false statements and omissions caused Super Micro's stock price to remain inflated as Defendants revealed some information while concealing the full scope, magnitude and impact of the fraud.

26.     Multiple senior executives departed shortly thereafter.  On January 30, 2018, the last day of the Class Period, Defendant Liaw, Defendant Hideshima and Phidias Chou ("Chou"), Sr. Vice President, Worldwide Sales, resigned effective immediately.  Liaw, who was also a co-founder and owner of 4.6% of the Company, also resigned from the Company's Board of Directors.  A new CFO was appointed.  Unsurprisingly, an analyst described the resignations as "disturbing."  The Company also announced that the Audit Committee completed its investigation but that further investigation still remained to be done and the Company could no longer verify the accuracy of prior financial statements.  The stock price fell again, but remained artificially inflated.

27.     The disclosures did not stop, however, subsequent filings, press releases and earnings conference calls further revealed the falsity of Defendants' prior statements as well as their knowledge of, or deliberate disregard for, the truth.  Despite repeated statements that the

---

[6]   A year-and-a-half later, on May 17, 2019, the Company revealed that the transaction in question involved approximately $8.8 million in revenue.

1    Company intended to become current on its SEC filings, on August 21, 2018 – a year after its

2    FY17 Form 10-K was required to be filed – the Company admitted that substantial work remained

3    as thousands of transactions from FY15 through FY17 still needed to be reviewed with no set

4    completion date and it would not meet the filing deadline necessary to remain listed on the

5    NASDAQ.   The Company detailed at least one type of accounting violation: prematurely

6    recognizing revenue on certain quarter-end transactions where free shipping was offered.  Further,

7    Company executives admitted that they still could not determine the impact on the Company's

8    historical financial statements, whether a restatement was required or when the Company might

9    file with the SEC.  On August 22, 2018, Super Micro was suspended from trading on the

10   NASDAQ; its stock price continued to decline.

11           28.     On November 15, 2018, Super Micro disclosed in its Form 8-K that its financial

12   statements from FY15 (*i.e.*, July 1, 2014 to June 30, 2015), FY16 (*i.e.*, July 1, 2015 to June 30,

13   2016) and the first three quarters of FY17 (as well as 4Q17 preliminary results) "***should no longer***

14   ***be relied upon because of errors***" and would be restated: "The errors primarily related to the

15   timing of recognition of revenue and classification of certain inventory used for engineering

16   purposes and certain products returned to the Company for repair as inventory.   Revenue

17   recognition timing issues included quarter-end cut-off determinations and allocation of revenue

18   determinations for customer contracts with service elements."  The Company also reported that it

19   planned "to correct other accounting errors discovered through management's review process."

20   Furthermore, "[*t*]*he Company will report material weaknesses in internal control over financial*

21   *reporting related to this matter and will report that its disclosure controls and procedures were*

22   *ineffective.*"    The Company estimated that it overstated, in aggregate from FY15-FY17,

23   approximately $60 million of revenue, $8.5 million of net income and $0.16 of EPS.

24           29.     In a conference call the same day, Company executives reported that the "number

25   and breadth of the adjustments, coupled with their aggregate magnitude was significant enough

26   for us to conclude that restating prior periods was necessary."  The Company also described efforts

27   to remediate its material weaknesses including hiring additional personnel in the revenue area,

28   implementing "strong cut-off controls including locking the shipping dock at the close of the

1  quarter," enhanced revenue testing at quarter end, a revamped sales sub-certification process at

2  quarter-end and the formation of a new internal audit team.  The Company still could not estimate

3  when it would be able to file its FY17 Form 10-K or any subsequent SEC filing.

4      30.     Despite these iterative disclosures, the details revealed in the Company's May 17,

5  2019 Restatement disclosure vastly expanded the scope and magnitude of Defendants'

6  misconduct, including admissions of flagrant sales and accounting violations, inappropriate focus

7  on quarterly revenues, deliberate revenue recognition manipulations and unethical conduct at the

8  highest levels of the Company.  ¶¶4-14 (Recent Developments).  While the Restatement covered

9  the period from FY13-FY17, as a result of Defendants' fraudulent conduct, the Company remains

10  unable to predict when it will become current with its required SEC filings, or seek relisting on the

11  NASDAQ.[7]  As a result of Defendants' fraud, investors suffered tens of millions of dollars in

12  economic loss.

13                        **JURISDICTION AND VENUE**

14      31.     The claims asserted arise under §§10(b) and 20(a) of the Exchange Act, 15 U.S.C.

15  §78j(b) and 78t(a), and Rule 10b-5, 17 C.F.R. §240.10b-5.  Jurisdiction is conferred by §27 of the

16  Exchange Act, 15 U.S.C. §78aa.  Venue is proper pursuant to §27 of the Exchange Act.  The

17  Company's headquarters are in San Jose, California, false statements were made in this District

18  and acts giving rise to the violations complained of occurred in this District.

19                           **THE PARTIES**

20      32.     Lead Plaintiff New York Hotel Pension Fund provides health, pension and other

21  benefits to over 90,000 Union members, dependents and retirees of the New York City hotel

22  industry.  The New York Hotel Pension Fund purchased Super Micro common stock during the

23  Class Period and was damaged thereby.

24      33.     Defendant Super Micro describes itself as a global leader in high-performance,

25  high-efficiency server technology and innovation, and as a premier provider of end-to-end green

26

27  [7]    To date, the Company's delinquent reports include 1Q18, 2Q18, 3Q18, 1Q19, 2Q19, 3Q19
28  Forms 10-Q and FY18 Form 10-K.

computing solutions and integration/support services for Data Center, Cloud Computing, Enterprise IT, Big Data, HPC and IoT Embedded Systems worldwide. The Company is headquartered in San Jose, California and traded on the NASDAQ, an efficient market, under the ticker symbol "SMCI" until August 22, 2018 when Super Micro was suspended from trading effective August 23, 2018, and formally delisted effective March 22, 2019. Super Micro shares continued to trade over-the-counter thereafter. Numerous analysts covered Super Micro including those from Stifel Nicolaus, D.A. Davidson & Co, Susquehanna Financial Group LLP, Pacific Crest, Roth Capital Partners, LLC and Maxim Group LLC.

34. Defendant Liang was, at all relevant times, the Company's President, CEO and Chairman of the Board (Principal Executive Officer). He founded Super Micro and has served as President, CEO and Chairman of the Board since its inception in September 1993. Liang has been developing server system architectures and technologies for the past two decades. Liang holds an M.S. in Electrical Engineering from the University of Texas at Arlington and a B.S. in Electrical Engineering from National Taiwan University of Science & Technology in Taiwan. Liang is known to obsess over every detail of Super Micro's business from approving custom orders to dictating environmentally themed green neckties that executives wear to customer meetings.[8] "'He is the person who approves and looks at everything the company is doing – every new product, marketing effort, sales effort, anything you want to do or promote,'" said a former employee who was manager of American sales.[9] Liang, as a director, officer and significant stockholder of Super Micro has considerable influence over the management of the Company's business. Super Micro's FY16 Form 10-K states that Liang is critical to the overall management of the Company and notes that he is personally involved in key relationships with suppliers, customers and strategic partners. Super Micro's FY16 Form 10-K also states that Liang is the chief operating decision maker. Liang, together with his wife Chiu-Chu (Sara) Liu Liang (who co-founded Super Micro and has served

---

[8]   Ashlee Vance, *Super Micro Computer: A One-Man, or at Least One-Family, Powerhouse*, N.Y. Times (Nov. 23, 2008), https://www.nytimes.com/2008/11/24/technology/business-computing/24micro.html.

[9]   *Id.*

1   as Senior Vice President of Operations, Chief Administration Officer, Treasurer and member of

2   the Company's Board of Directors since 1993), collectively own 18% of the outstanding Super

3   Micro stock as of December 31, 2016.

4         35.      Defendant Hideshima was the Senior Vice President and CFO of the Company until

5   his resignation on January 30, 2018.  Hideshima had served as CFO since May 2006.  Hideshima

6   holds an M.B.A. from San Francisco State University and a B.S. in Business Administration from

7   the University of California at Berkeley.  Throughout his tenure at Super Micro, Hideshima has

8   represented Super Micro, alongside Hayes, at dozens of non-deal roadshow and investor

9   conferences.  For example, between April and June 2015, Hideshima and Hayes represented Super

10  Micro for presentations or individual investor meetings on at least eight occasions, including at

11  the DA Davidson Technology Conference in New York and the Three Part Advisors Midwest

12  IDEAS Investor Conference in Dallas.  Hideshima also made presentations and spoke with

13  analysts at the August 31, 2016 Three Part Advisors Midwest IDEAS Investor Conference, as well

14  as at the June 8, 2017 Robert W. Baird Global Consumer, Technology & Services Conference.

15  Until he resigned from Super Micro, Hideshima was one of three Super Micro executives on all of

16  the quarterly earnings conference calls during the Class Period.

17        36.      Defendant Hayes was at all relevant times Senior Vice President-Investor Relations

18  at Super Micro and President of Super Micro Netherlands BV, a wholly owned subsidiary which

19  is the center for all sales, production, logistics and services for EMEA, contributing approximately

20  20% of total corporate revenue.  Hayes has served as President of Super Micro Netherlands BV

21  since 2008 when he joined Super Micro.  Hayes manages investor relations and other external

22  communications with the financial community.  Throughout his tenure at Super Micro, Hayes has

23  represented Super Micro, alongside Hideshima, at dozens of non-deal roadshow and investor

24  conferences.  For example, during November and December 2015, Hayes and Hideshima

25  represented Super Micro for presentations or individual investor meetings on at least five

26  occasions, including at the Needham Next-Gen Storage/Networking Conference in New York and

27  the Three Part Advisors Midwest IDEAS Investor Conference in Dallas.  Further, Hayes made a

28  presentation and spoke with analysts at the Wells Fargo Tech Summit 2017.  Hayes was one of

1    three Super Micro executives on all of six of the quarterly earnings conference calls during the

2    Class Period, alongside Liang and Hideshima (until Bauer replaced him as CFO).  Hayes, along

3    with Liang, was identified as the point of contact for investors on Super Micro press releases.

4         37.    Defendant Liaw (a/k/a Yih-Shyan (Wally) Liaw) was the Senior Vice President of

5    International Sales and Corporate Secretary until his resignation on January 30, 2018.  He was also

6    a co-founder of the Company and a member of the Board of Directors from inception in September

7    1993 until January 30, 2018.  Liaw owned 4.6% of the outstanding shares of the Company.  Liaw

8    holds an M.S. in Computer Engineering from University of Arizona, an M.S. in Electrical

9    Engineering from Tatung Institute of Technology in Taiwan and a B.S. degree from Taiwan

10   Provincial College of Marine and Oceanic Technology.

11        38.    The Defendants named in ¶¶34-37 are referred to herein as the "Individual

12   Defendants."

13        39.    The Individual Defendants controlled the contents of the Company's quarterly

14   reports, press releases and presentations to securities analysts, money and portfolio managers and

15   institutional investors, *i.e.*, the market.  They were provided with copies of the Company's reports

16   and press releases alleged herein to be misleading prior to or shortly after their issuance and had

17   the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of

18   their positions within the Company, and their access to material non-public information available

19   to them, the Individual Defendants knew that the adverse facts specified herein had not been

20   disclosed to and were being concealed from the public, and that the positive representations being

21   made were then materially false and misleading.  The Individual Defendants are liable for the false

22   and misleading statements and omissions pleaded herein.

23                                    **BACKGROUND**

24   **Before the Class Period Super Micro Twice Misses SEC Filing Deadlines and Implements
     New Accounting System to Improve Internal Controls**

25

26        40.    In 2015, prior to the Class Period, the Company twice failed to timely file its

27   required financial reports with the SEC.  First, at the end of August 2015, the Company required

28   a 15-day extension to file its FY15 Form 10-K because it discovered irregularities regarding certain

1    marketing expenses; second, in November 2015, the Company disclosed issues with extended

2    warranties which should have been accounted for as deferred revenue, resulting in a delayed 1Q16

3    Form 10-Q and a prior period adjustment that was corrected in the same period.  This prior period

4    adjustment resulted in the Company amending its previously filed FY15 Form 10-K.  Specifically,

5    on November 16, 2015, the Company filed a Form 10-K/A to restate that its disclosure controls

6    and procedures and its internal controls over financial reporting as of June 30, 2015, were

7    ineffective because of a material weakness related to its revenue recognition of contracts with

8    extended product warranties.  Notably, the Company assured investors that it had taken the

9    necessary steps to remedy these issues through a remediation plan for the material weakness and

10   substantial investment in the implementation of an SAP accounting system.

11        41.    On January 13, 2016, Hideshima spoke at the Needham Growth Conference about

12   Super Micro's adoption of the new SAP based accounting that went live in July 2015, and noted

13   that the Company had invested in infrastructure and accounting processes to avoid delayed SEC

14   filings:

15           [Unidentified Audience Member]: I don't want to embarrass you as a CFO,
      but we've had a couple of surprises on the accounting side and I would like to get
16    your perspective or what you learned about it, what you are doing actively so that
      we are not overexposed to surprises.

17
             [Hideshima]: We have had a couple of missteps in the last couple of
18    quarters.  Timing wise was unfortunate, because they seemed to happen back to
      back with each other.  Somewhat unrelated events, but both delayed our K filing
19    and our Q filing.

20           *We have added a new accounting system, SAP*.  We went live in the US in
      July.  We just went live in the Netherlands and Taiwan; they have gone well.  *But*
21    *we have invested in our infrastructure to improve our accounting and our books*
      *and what have you and our ability to manage the operations in the Company*.
22    This is an investment we have made for a number of different years.

23           *On the accounting side of it we have increased our resources in that area*
      *too and increased our processes*.  *So, again, we are hopeful that it doesn't happen*
24    *again*.

25           [Unidentified Audience Member]: But the other side would be people-
      related or the entities regarding that.  I'm just trying to get more color?
26
             [Hideshima]: Both.  They go in conjunction with each other because the
27    system will provide data to us.  *We will analyze the data, build processes around*
      *the new data that we have for it*.  *Again, it's a combination of both, more efficient*

28

*system backing up, generating reports; obviously more people reviewing and looking at the reports*.

42.     On July 18, 2016, Super Micro pre-announced disappointing preliminary results for the completed 4Q16, including revenue of $520-$524 million, down from previous guidance of $580-$640 million, and EPS of $0.15-$0.17, down from previous guidance of $0.46-$0.58.  This poor pre-announcement put significant pressure on the Company to begin delivering at the higher end of their pre-announced ranges.

43.     On August 2, 2016, Roth Capital Partners issued a report titled "SMCI: Thursday's Earnings Call Could be Pivotal," noting that the Company's upcoming earnings conference call and the Company's financial results would define the Company's growth story to Wall Street:

> *[W]e believe this Thursday's call has the potential to be a pivotal event for the company*.  Either it will be able to convince us and the rest of the Street that the June debacle was an anomaly and that its go-to-market strategy differentiates it from the competition, or we will be faced with the prospects of a slower growth company achieving substantially lower gross margins than we previously perceived.

**FALSE AND MISLEADING STATEMENTS ISSUED DURING THE CLASS PERIOD**

**Super Micro Announces 4Q16 and FY16 Financial Results and Files Form 10-K**

44.     <u>False and Misleading Statements</u>: On August 4, 2016, after the close of trading, Super Micro filed a Current Report on Form 8-K, signed by Liang, which included a press release titled "Super Micro Computer, Inc. Announces 4th Quarter 2016 Financial Results," and slides for the Company's earnings presentation, that touted the Company's performance:

- *Quarterly net sales of $524.3 million* . . . .

- *GAAP net income of $7.0 million* . . . .

- *GAAP gross margin was 14.1%* . . . .

                              *       *       *

> *GAAP net income for the fourth quarter of fiscal year 2016 was $7.0 million or $0.13 per diluted share*, a decrease of 73.9% from net income of $26.7 million, or $0.51 per diluted share in the same period a year ago.  Included in net income for the quarter is $4.4 million of stock-based compensation expense (pre-tax). Excluding this item and the related tax effect, *non-GAAP net income for the fourth quarter was $10.4 million, or $0.20 per diluted share*, compared to non-GAAP net income of $30.0 million, or $0.57 per diluted share, in the same quarter of the prior year.

1                              *      *      *

2          Fiscal Year 2016 Summary

3               *Net sales for the fiscal year ended June 30, 2016 were $2,215.6 million,
   *up 11.3% from $1,991.2 million for the fiscal year ended June 30, 2015*.  GAAP
4  *net income for fiscal year 2016 decreased to $72.0 million, or $1.39 per diluted
   share, a decrease of 29.3% from $101.9 million, or $2.03 per diluted share, for
5  fiscal year 2015*.  Included in net income for the fiscal year ended June 30, 2016 is
   $16.1 million of stock-based compensation expense (pre-tax). Excluding this item
6  and the related tax effect, *non-GAAP net income for the fiscal year 2016 was $83.8
   million or $1.59 per diluted share*, a decrease of 24.9% compared to $111.6 million
7  or $2.15 per diluted share for fiscal year 2015.

8          Business Outlook & Management Commentary

9                              *      *      *

10              "[W]e will take actions to leverage our capacity and improve operational
    efficiency to become more flexible and competitive in winning new business.  By
11  offering  the  best  value  for  innovation  and  emphasizing  strategic  customer
    relationships, *we are confident that we can achieve stronger growth and improve
12  financial performance*" [said Liang].

13         45.    <u>False and Misleading Statements</u>:  The same day, Super Micro held an earnings

14  conference call where the Company discussed 4Q16 and FY16 financial results:

15              [Liang]: Thank you, Howard.  *For the entire fiscal year, we saw 11%
    [revenue growth] for the year, which means Super Micro is still one of the fastest-
16  growing companies in the IT industry*.

17         46.    Liang also repeatedly highlighted the implementation of the Company's new SAP

18  accounting system to assure investors of the strength of the Company's internal controls:

19              [Liang]: We are undergoing a restructure of our operational infrastructure,
    including our global SAP implementation, new global tax restructure, and bonded
20  warehouse. These investments will streamline the business, improve efficiency, and
    increase  profitability  in  long-term  .  .  .  .    We  expect  to  complete  the  whole
21  restructuring in the December quarter this year.  And after that, we will be more
    efficient than ever before.
22
                               *      *      *
23
                And  our  global  operation  and  *automation  have  been  significantly
24  improving*. We know the urgency to improve.  And we are leveraging all of our
    strength and capacity to create a competitive vertical position for our customers.
25
                               *      *      *
26
                [Liang]: We are much better positioned with our new global SAP
27  implementation, new global operation and corporate tax restructure, and bonded
    warehouse.
28

1                                            *      *      *

2          Basically it's a big transition.  And not just SAP implementation global
   wide, but also a big impact from our restructure for production, operation, and also
3  global tax, a new system.

4                                            *      *      *

5          I guess start from December quarter, right?  Start from October, for
   example, as our SAP global reorg become much more stable, become more ready.
6  Our iteration rate will grow and our volume, for sure, will grow.  And that will
   improve our profit margin and overall profitability.
7
       47.    Following the August 4, 2016 press release and earnings conference call, the price
8
   of Super Micro's common stock increased from its close of $20.42 per share on August 4, 2016,
9
   to a close at $21.48 per share on August 5, 2016, on increased trading volume.
10
       48.    <u>False and Misleading Statements</u>: On August 26, 2016, after the close of trading,
11
   Super Micro filed the Company's FY16 Form 10-K, signed by Liang, Hideshima and Liaw,
12
   reiterating the 4Q16 and FY16 financial results, describing the Company's commitment to
13
   effective internal controls, falsely stating that prior material weaknesses in revenue recognition
14
   had been remediated and attaching signed SOX certifications:
15
                  ***Evaluation of Effectiveness of Disclosure Controls and Procedures***
16
          We are committed to maintaining disclosure controls and procedures
17 designed to ensure that information required to be disclosed in our periodic reports
   filed under the Exchange Act is recorded, processed, summarized and reported
18 within the time periods specified in the SEC's rules and forms, and that such
   information is accumulated and communicated to our management, including our
19 Chief Executive Officer and Chief Financial Officer, as appropriate, to allow for
   timely decisions regarding required disclosure.
20
          Under the supervision and with the participation of our management,
21 including our Chief Executive Officer and our Chief Financial Officer, we
   evaluated the effectiveness of our disclosure controls and procedures, as such term
22 is defined in Rule 13a-15(e) and 15d-15(e) promulgated under the Exchange Act.
   The evaluation considered the procedures designed to ensure that information
23 required to be disclosed by us in the reports filed or submitted by us under the
   Exchange Act is recorded, processed, summarized and reported within the time
24 periods specified in the Securities and Exchange Commission rules and forms and
   is accumulated and communicated to our management, including our Chief
25 Executive Officer and Chief Financial Officer, as appropriate to allow timely
   decisions regarding required disclosure.  ***Based on that evaluation, our Chief***
26 ***Executive Officer and our Chief Financial Officer concluded that our disclosure***
   ***controls and procedures were effective at a reasonable assurance level as of June***
27 ***30, 2016***.

28                                           *      *      *

1

Remediation of Prior Year Material Weakness

2

As disclosed in our fiscal year 2015 Form 10-K/A, in November 2015 our management determined that we had a material weakness in the design of our internal controls related to recording revenue. *Since that time, with the oversight of our management and audit committee, we have taken steps to remediate the material weakness to ensure that proper extended warranty and any other deliverables in our bill of materials are tracked and related revenue deferrals are recorded.* The following steps have been implemented and performed:

3

4

5

6

• Initiation of a review of extended warranty and any other deliverables in our bill of materials for all products;

7

• Increased oversight and monitoring by our management of extended warranty and other deliverables in our bill of materials for any new products; and

8

9

• Documenting and tracking extended warranty and other deliverables in our contract matrix to ensure proper revenue recognition.

10

Our management believes the foregoing efforts *have effectively remediated the material weakness as these procedures have been implemented for a sufficient period of time beginning in the first half of fiscal year 2016* and we have completed our testing of the design and operating effectiveness of these above procedures as of June 30, 2016.

11

12

13

*        *        *

14

*Management's Report on Internal Control over Financial Reporting*

15

Our management is responsible for establishing and maintaining adequate internal control over financial reporting (as defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act). Under the supervision and with the participation of our management, including our Chief Executive Officer and Chief Financial Officer, we conducted an evaluation of the effectiveness of our internal control over financial reporting based on the criteria set forth in *Internal Control – Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission (2013 framework). *Based on our evaluation, our management has concluded that our internal control over financial reporting was effective as of June 30, 2016 to provide reasonable assurance regarding the reliability of financial reporting and preparation of consolidated financial statements for external reporting purposes in accordance with United States generally accepted accounting principles*.

16

17

18

19

20

21

22

49.  <u>False and Misleading Statements</u>: In describing its Critical Accounting Policies, Super Micro's FY16 Form 10-K stated that the Company's consolidated financial statements complied with GAAP and described its compliance with revenue recognition criteria:

23

24

25

Our discussion and analysis of our financial condition and results of operations are based upon *our consolidated financial statements, which have been prepared in accordance with accounting principles generally accepted in the United States*. . . .

26

27

28

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS - 3:18-cv-00838-JST
4825-1376-7834.v1

- 19 -

1
2
3
4
5
6

   **Revenue recognition**. *We recognize revenue from sales of products when persuasive evidence of an arrangement exists, shipment has occurred and title has transferred, the sales price is fixed or determinable, collection of the resulting receivable is reasonably assured, and all significant obligations have been met. Generally this occurs at the time of shipment when risk of loss and title has passed to the customer if all other revenue recognition criteria have been met. Our standard arrangement with our customers includes a signed purchase order or contract, 30 to 60 days payment terms, Ex-works terms, except for a few customers who have free-on-board destination terms, for which revenue is recognized when the products arrive at the destination if all other revenue recognition criteria have been met.*

7
8
9
10
11
12

   **Multiple-element arrangements**. Our multiple-element product offerings including server systems with embedded software and support, which are considered separate units of accounting. We allocate revenue to each element in a multiple-element arrangement based upon their relative selling price. When applying the relative selling price method, we determine the selling price for each deliverable using vendor-specific objective evidence ("VSOE") of selling price, if it exists, or third-party evidence ("TPE") of selling price. If neither VSOE nor TPE of selling price exist for a deliverable, we use our best estimate of selling price for that deliverable. *Revenue allocated to each element is then recognized when all the revenue recognition criteria are met for each element.*

13
14

   **Services revenue**. Services revenue mainly consists of extended warranty and on-site services. Extended warranty and on-site services are offered as part of multiple-element arrangements. *Revenue related to extended warranty and on-site services is deferred and recognized ratably over the contractual period.*

15   50.   <u>False and Misleading Statements</u>:  Super Micro's FY16 Form 10-K also disclosed

16  that the Company had "adopted a 'Code of Business Conduct and Ethics' that is applicable to all

17  directors and employees and embodies our principles and practices relating to the ethical conduct

18  of our business and our long-standing commitment to honesty, fair dealing and full compliance

19  with all laws affecting our business."  Moreover, the FY16 Form 10-K directed readers to Super

20  Micro's website to access the Code of Conduct which read:

21
22
23
24
25
26
27

   *Senior Officers are also responsible for establishing and maintaining adequate internal control over financial reporting to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. The Senior Officers will take all necessary steps to ensure compliance with established accounting procedures, the Company's system of internal controls and generally accepted accounting principles. Senior Officers will ensure that the Company makes and keeps books, records, and accounts, which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the Company. Senior Officers will also ensure that the Company devises and maintains a system of internal accounting controls sufficient to provide reasonable assurances that*:

28
   • transactions are executed in accordance with management's general or specific authorization;

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATION OF THE
FEDERAL SECURITIES LAWS - 3:18-cv-00838-JST                                                      - 20 -
4825-1376-7834.v1

- ***transactions are recorded as necessary (a) to permit preparation of financial statements in conformity with generally accepted accounting principles or any other criteria applicable to such statements, and (b) to maintain accountability for assets***.

51.     <u>False and Misleading Statements</u>: The Company's FY16 Form 10-K also attached SOX certifications, pursuant to §§302 and 906, signed by Liang and Hideshima on August 26, 2016, affirming that the financial statements were in compliance with GAAP, that each had designed the Company's controls over financial reporting and that such controls were effective during the Class Period:

I, [Charles Liang/Howard Hideshima], certify that:

1.     I have reviewed this annual report on Form 10-K of Super Micro Computer, Inc.;

2.     Based on my knowledge, ***this report does not contain any untrue statement of a material fact or omit to state a material fact*** . . . ;

3.     Based on my knowledge, ***the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant*** as of, and for, the periods presented in this report;

4.     The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    a)     ***Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared***;

    b)     ***Designed such internal control over financial reporting***, or caused such internal control over financial reporting to be designed under our supervision, ***to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles***;

\*     \*     \*

    d)     ***Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is***

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATION OF THE
FEDERAL SECURITIES LAWS - 3:18-cv-00838-JST
4825-1376-7834.v1

- 21 -

*reasonably likely to materially affect, the registrant's internal control over financial reporting; and*

5.     The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

a)     *All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information* . . . .[10]

52.     <u>False and Misleading Statements</u>: Super Micro's 1Q17, 2Q17 and 3Q17 Forms 10-Q contained substantially similar SOX certifications, signed by Liang and Hideshima, on November 7, 2016, February 7, 2017 and May 10, 2017, respectively.  These certifications attested to the accuracy of the Company's financial statements and the effectiveness of its disclosure controls and its internal controls over financial reporting.

**Super Micro Announces 1Q17 Financial Results and Files Form 10-Q**

53.     <u>False and Misleading Statements</u>: On October 27, 2016, after the close of trading, Super Micro filed a Current Report on Form 8-K, signed by Liang, which included a press release titled "Super Micro Computer, Inc. Announces 1st Quarter 2017 Financial Results," and slides for the Company's earnings presentations:

- *Quarterly net sales of $529.0 million* . . . .

- *GAAP net income of $13.5 million* . . . .

- *GAAP gross margin was 15.1%* . . . .

                              *        *        *

*GAAP net income for the first quarter of fiscal year 2017 was $13.5 million or $0.26 per diluted share*, a decrease of 1.2% from net income of $13.7 million, or $0.27 per diluted share in the same period a year ago.  Included in net income for the quarter is $4.5 million of stock-based compensation expense (pretax). Excluding this item and the related tax effect, *non-GAAP net income for the first quarter was $16.7 million, or $0.32 per diluted share*, compared to non-GAAP net income of $16.5 million, or $0.32 per diluted share, in the same quarter of the prior year.

                              *        *        *

---

[10]     Exhibits 31.1 and 31.2 to the FY16 Form 10-K.

"*We are pleased that SuperMicro was able to report revenues and profits at the higher end of our expectations for the first quarter*. . . ." said Charles Liang, President and Chief Executive Officer.

54.     False and Misleading Statements:  The same day, Super Micro held an earnings conference call where the Company reiterated its false and misleading 1Q17 financial results. Defendants also further discussed the status of the implementation of the Company's SAP accounting system:

[Liang]: Last quarter we discussed the restructuring of our global operational infrastructure, including our new SAP implementation, global tax restructure and a bonded warehouse.  This quarter we saw much smoother operations, and reduced impact from the transition.  We expect to 100% complete the transition in this December quarter, and see sustained long-term improvement to our operational efficiency and profitability.

55.     After the October 27, 2016 financial results and earnings conference call, the price of Super Micro's common stock increased from its close of $22.10 per share on October 27, 2016, to a close at $24.40 per share on October 28, 2016, on increased trading volume.

56.     False and Misleading Statements: On November 7, 2016, after the close of trading, Super Micro filed the Company's 1Q17 Form 10-Q, signed by Liang and Hideshima, and made similar false and misleading statements concerning its financial results as contained in the October 27, 2016 press release, including among other matters, that the Company had earned $0.26 EPS, had net income of $13,532,000 and made net sales of $528,968,000.  As detailed above, the Company's 1Q17 Form 10-Q also attached SOX certifications, signed by Liang and Hideshima, attesting that the financial statements were in compliance with GAAP and that the Company's disclosure controls and its internal controls over financial reporting were designed such that the controls were effective.  Further, the 1Q17 Form 10-Q falsely stated: "The unaudited condensed consolidated financial statements included herein *reflect all adjustments, including normal recurring adjustments, which are, in the opinion of management, necessary for a fair presentation of the consolidated financial position, results of operations and cash flows for the periods presented*."

57.     <u>False and Misleading Statements</u>: Super Micro also disclosed in the 1Q17 Form 10-Q that no changes had occurred concerning its critical accounting policies, including its revenue recognition policy, since its previous disclosure in its FY16 Form 10-K:

> ***There have been no material changes in the matters for which we make critical accounting policies and estimates in the preparation of our Condensed Consolidated Financial Statements during the three months ended September 30, 2016***, as compared to those disclosed in our Annual Report on Form 10-K for the fiscal year ended June 30, 2016.

**Super Micro Announces 2Q17 Financial Results and Files Form 10-Q**

58.     <u>False and Misleading Statements</u>: On January 26, 2017, after the close of trading, Super Micro filed a Current Report on Form 8-K, signed by Liang, which included a press release titled "Super Micro Computer, Inc. Announces 2nd Quarter 2017 Financial Results," and slides for Super Micro's earnings presentation:

- ***Quarterly net sales of $652.0 million*** . . . .

- ***GAAP net income of $22.0 million*** . . . .

- ***GAAP gross margin was 14.3%*** . . . .

    *          *          *

> ***GAAP net income for the second quarter of fiscal year 2017 was $22.0 million or $0.43 per diluted share***, a decrease of 36.6% from net income of $34.7 million, or $0.67 per diluted share in the same period a year ago.  Included in net income for the quarter is $4.7 million of stock-based compensation expense (pre-tax). Excluding this item and the related tax effect, ***non-GAAP net income for the second quarter was $25.0 million, or $0.48 per diluted share***, compared to non-GAAP net income of $38.0 million, or $0.73 per diluted share, in the same quarter of the prior year.

    *          *          *

> "***We are pleased to report record second quarter revenues of $652.0 million that exceeded our guidance and outpaced a strong compare with last year***. . . ." said Charles Liang, Chairman and Chief Executive Officer.  "We expect to continue the growth of last quarter and be reflected in the year-over-year revenue growth in the March quarter based on an increasing number of sizable customer engagements demanding the performance and advantages of our leading product lines."

59.     <u>False and Misleading Statements</u>:  The same day, Super Micro held an earnings conference call where the Company reiterated its false and misleading 2Q17 financial results.

1   Defendants stated that the implementation of the Company's SAP accounting system was

2   complete and that its implementation improved their earnings guidance and bottom line:

3       [Brian Alger]: Is there a specific growth driver here . . .?

4       [Liang]: I guess the major reason is because we just finished our global
operations [there]. I mean, in last fourth quarter, we mentioned we spent a lot of

5   effort to beef up global operations, and that's including SAP implementation and
global warehouse, (inaudible) warehouse. So now, ***all of those have been ready,***

6   ***and global, on-site service [see some also] pretty ready now. That's how we are***
***able to focus on (technical difficulty) and how to grow***.

7

                    *      *      *

8

9       [Nehal Chokshi]: . . . My second topic is visibility. Your guidance ranges,
again, a little bit more narrow than the prior quarter, and two quarters ago it was

10   very wide. So, I take that as an implication of increasing visibility. Is that a correct
characterization, there? . . .

11       [Hideshima]: . . . if we go back historically, you know, we went through a
lot of investments last year with regard to SAP and our [bonded warehouse] and

12   our reorganization. ***Those investments have been made, and have been into the***
***system for now over a year, or a year-and-a-half. So, some of those things have***

13   ***helped us improve our overall efficiency***.

14       60.   <u>False and Misleading Statements</u>: On February 7, 2017, after the close of trading,

15   Super Micro filed the Company's 2Q17 Form 10-Q, signed by Liang and Hideshima, and made

16   similar false and misleading statements concerning its financial results as contained in the January

17   26, 2017 press release, including among other matters, that the Company had earned $0.43 EPS,

18   had net income of $21,996,000 and made net sales of $651,954,000.  The Company's 2Q17 Form

19   10-Q also attached SOX certifications, signed by Liang and Hideshima, attesting that the financial

20   statements were in compliance with GAAP and that the Company's disclosure controls and its

21   internal controls over financial reporting were designed such that the controls were effective.

22   Further, the 2Q17 Form 10-Q falsely stated: "The unaudited condensed consolidated financial

23   statements included herein ***reflect all adjustments, including normal recurring adjustments,***

24   ***which are, in the opinion of management, necessary for a fair presentation of the consolidated***

25   ***financial position, results of operations and cash flows for the periods presented***."

26       61.   <u>False and Misleading Statements</u>: Super Micro also disclosed in the 2Q17 Form 10-

27   Q that no changes had occurred concerning its critical accounting policies, including its revenue

28   recognition policy, since its previous disclosure in its FY16 Form 10-K:

1

2

3

***There have been no material changes in the matters for which we make critical accounting policies and estimates in the preparation of our Condensed Consolidated Financial Statements during the three and six months ended December 31, 2016***, as compared to those disclosed in our Annual Report on Form 10-K for the fiscal year ended June 30, 2016.

4

**Super Micro Announces 3Q17 Financial Results and Files Form 10-Q**

5    62.    <u>False and Misleading Statements</u>: On April 27, 2017, after the close of trading,

6    Super Micro filed a Current Report on Form 8-K, signed by Liang, which included a press release

7    titled "Super Micro Computer, Inc. Announces 3rd Quarter 2017 Financial Results," and slides for

8    the Company's earnings presentation:

9       • ***Quarterly net sales of $631.1 million*** . . . .

10      • ***GAAP net income of $16.7 million*** . . . .

11      • ***GAAP gross margin was 14.0%*** . . . .

12                          *          *          *

13

14

15

16

***GAAP net income for the third quarter of fiscal year 2017 and for the same period a year ago were both $16.7 million or $0.32 per diluted share***. Included in net income for the quarter is $4.8 million of stock-based compensation expense (pre-tax). Excluding this item and the related tax effect*, **non-GAAP net income for the third quarter was $20.3 million, or $0.38 per diluted share***, compared to non-GAAP net income of $19.0 million, or $0.36 per diluted share, in the same quarter of the prior year.

17   63.    <u>False and Misleading Statements</u>: On May 10, 2017, after the close of trading,

18   Super Micro filed the Company's 3Q17 Form 10-Q, signed by Liang and Hideshima, and made

19   similar false and misleading statements concerning its financial results as contained in the April

20   27, 2017 press release, including among other matters, that the Company had earned $0.32 EPS,

21   had net income of $16,666,000 and made net sales of $631,124,000.  The Company's 3Q17 Form

22   10-Q also attached SOX certifications, signed by Liang and Hideshima, attesting that the financial

23   statements were in compliance with GAAP and that the Company's disclosure controls and its

24   internal controls over financial reporting were designed such that the controls were effective.

25   Further, the 3Q17 Form 10-Q falsely stated: "The unaudited condensed consolidated financial

26   statements included herein ***reflect all adjustments, including normal recurring adjustments,***

27   ***which are, in the opinion of management, necessary for a fair presentation of the consolidated***

28   ***financial position, results of operations and cash flows for the periods presented***."

64.   <u>False and Misleading Statements</u>: Super Micro also disclosed in the 3Q17 Form 10-Q that no changes had occurred concerning its critical accounting policies, including its revenue recognition policy, since its previous disclosure in its FY16 Form 10-K:

> ***There have been no material changes in the matters for which we make critical accounting policies and estimates in the preparation of our Condensed Consolidated Financial Statements during the three and nine months ended March 31, 2017***, as compared to those disclosed in our Annual Report on Form 10-K for the fiscal year ended June 30, 2016.

**Super Micro Announces Preliminary 4Q17 Financial Results**

65.   <u>False and Misleading Statements</u>: On July 20, 2017, after the close of trading, Super Micro filed a Current Report on Form 8-K, signed by Liang, which incorporated a press release titled "Super Micro Computer, Inc. Schedules Conference Call and Webcast for Fourth Quarter and Fiscal 2017 Financial Results Company to Report Preliminary Financial Results":

> ***The Company now anticipates it will report revenue for its fourth quarter of fiscal 2017 in the range of $712 million to $717 million***.  This compares to the Company's previous guidance range of $655 million to $715 million.  Revenue exceeded expectations primarily due to stronger sales in Asia and at storage customers with strong shipments that accelerated late in the quarter.
>
> ***The Company also anticipates its non-GAAP earnings per diluted share will be in a range of $0.35 to $0.37***. . . .
>
> "***While Supermicro exceeded revenue expectations with record high revenues due to growth in our Asia business as well as new storage customers***, earnings were lower than forecast. . . .  We will provide more detail on the fourth quarter at the time of our earnings call," said Charles Liang, Chairman and Chief Executive Officer.

66.   <u>False and Misleading Statements</u>:  On August 3, 2017, Super Micro filed a Current Report on Form 8-K, signed by Liang, which included a press release titled "Super Micro Computer, Inc. Announces 4th Quarter 2017 Financial Results":

- ***Quarterly net sales of $717.9 million*** . . . .
- ***GAAP net income of $17.1 million*** . . . .
- ***GAAP gross margin was 13.5%*** . . . .

                    *          *          *

> ***GAAP net income for the fourth quarter of fiscal year 2017 was $17.1 million or $0.33 per diluted share,*** an increase of 145.7% from net income of $7.0 million, or $0.13 per diluted share in the same period a year ago.  Included in net income for the quarter is $5.1 million of stock-based compensation expense (pre-

tax). Excluding this item and the related tax effect, ***non-GAAP net income for the fourth quarter was $20.7 million, or $0.39 per diluted share***, compared to non-GAAP net income of $10.4 million, or $0.20 per diluted share, in the same quarter of the prior year.

*      *      *

***Net sales for the fiscal year ended June 30, 2017 were $2,529.9 million***, up 14.2% from $2,215.6 million for the fiscal year ended June 30, 2016. ***GAAP net income for fiscal year 2017 decreased to $69.3 million, or $1.34 per diluted share***, a decrease of 3.7% ***from $72.0 million, or $1.39 per diluted share, for fiscal year 2016***. Included in net income for the fiscal year ended June 30, 2017 is $19.2 million of stock-based compensation expense (pre-tax). Excluding this item and the related tax effect, ***non-GAAP net income for the fiscal year 2017 was $82.8 million or $1.57 per diluted share***, a decrease of 1.3% compared to ***$83.8 million or $1.59 per diluted share for fiscal year 2016***.

**Business Outlook & Management Commentary**

The Company expects net sales of $625 million to $685 million for the first quarter of fiscal year 2018 ending September 30, 2017. The Company expects non-GAAP earnings per diluted share of approximately $0.30 to $0.40 for the first quarter.

"***Supermicro has built a strong foundation for sustained high growth while improving profitability***. During the last couple of years we have made significant investments in global production capacity, engineering, quality, global services, and systems and datacenter management software. It is these investments that will power the new Supermicro 3.0" said Charles Liang, Chairman and Chief Executive Officer. "Supermicro 3.0 positions us as the only Tier 1 IT Infrastructure Provider capable of both first to market product innovation and global scale, quality, services and support to engage our rapidly growing enterprise customer base deeply in their business requirements. ***The record high revenue and strong 27.6% second half growth over last year*** is a direct result of these Supermicro 3.0 investments. With the major investments in place and the new Skylake product portfolio shipping, future investment and expenses will begin to flatten driving improved profitability moving forward."

67.    <u>False and Misleading Statements</u>: On August 3, 2017, after the close of trading, Super Micro held an earnings conference call where Liang touted the Company's revenues and strong momentum:

[Liang]: Thank you, Howard. ***We finished the fiscal year 2017 with record revenue and strong momentum***. Super Micro 3.0 provides the foundation and product to take advantage of this cycle of technology transition. We believe that fiscal 2018 will be one of the strongest years in Super Micro's history.

68.    <u>Reasons Why the Statements in ¶¶44-45, 48-54, 56-67 Were False and Misleading</u>: Defendants' statements concerning: (i) the Company's financial condition and performance, including reported revenue, net income and EPS; (ii) its operations, accounting, internal controls,

disclosure controls and SOX certifications; (iii) its compliance with GAAP; (iv) the remediation of prior material weaknesses; (v) its commitment to ethical conduct and standards; and (vi) its risks, outlook and prospects going forward were materially false and misleading because Defendants knew, or were deliberately reckless in not knowing, and failed to disclose the following:

(a) The Company materially misstated revenues, net income and EPS for five fiscal years, *i.e.*, FY13-FY17, including improperly recording in aggregate approximately $104.7 million of revenue (1.1%), $20.3 million of net income (6.8%) and $0.41 of EPS (6.8%);

(b) The Company prematurely and improperly recognized product revenue in violation of GAAP including instances where: (i) title and risk of loss had not transferred to the customer; (ii) pervasive evidence of an arrangement with a customer did not exist; (iii) the distributor's price was not fixed and determinable; or (iv) collectability was not assured;

(c) In violation of GAAP, the Company's revenue recognition policies and procedures and the Code of Conduct, Super Micro: (i) shipped products in advance of customer requested delivery dates; (ii) shipped products to storage facilities at the end of a quarter for later delivery to customers; (iii) entered into side agreements with customers; (iv) shipped products before manufacturing was completed; (v) altered source documents related to sales transactions; (vi) failed to disclose or obscured material facts about sales transactions; and (vii) improperly and prematurely recognized revenue on orders near quarter-end when offering free shipping.

(d) The Company lacked appropriate revenue recognition accounting controls resulting in material errors and constituted a material weakness including: (i) failing to identify and account for non-standard contract terms involving multiple elements and recognizing revenue before delivery occurred; (ii) with respect to sales transactions near quarter-end, failing to identify transactions where the terms of the sales arrangements were not properly documented; (iii) failing to properly resolve or account for transactions with inconsistent documentation; and (iv) lacking a consistent approach for allocating revenue between multiple elements in transaction.

(e) The Company suffered from material weaknesses in all five components of internal controls (*i.e.*, control environment, risk assessment, control activities, information and

communication and monitoring) including lack of effective internal controls over financial reporting exemplified by: (i) a culture of aggressively focusing on quarterly revenue without sufficient focus on compliance; (ii) a failure to establish and promote a control environment with an appropriate tone of compliance and control consciousness; (iii) a failure to sufficiently promote, monitor or enforce adherence to the Code of Conduct; (iv) a lack of appropriate revenue cut-off controls, including failing to lock the shipping dock at quarter close; (v) insufficient quarter-end revenue testing procedures and an inadequate sales sub-certification process at quarter-end; and (vi) officers and managers being aware of, condoning or acting in ways that violated Super Micro's accounting policies and procedures, violated the Code of Conduct, were inconsistent with integrity and ethical values and reflected an inappropriate "tone at the top";

(f)     The Company inflated revenue by mischaracterizing marketing arrangements with suppliers, distributors, partners and related parties, including recording free samples and cooperative marketing payments as expenses instead of reductions to revenue;

(g)     The Company prematurely and improperly recognized revenue for extended warranties or on-site services at the time of sale instead of deferring over the warranty or service period and failed to remediate this previously-disclosed material weakness;

(h)     The Company's accounting for inventory violated GAAP and the Company suffered from material weaknesses in internal controls related to its inventory, including failing to properly account for certain inventory used for engineering purposes, certain products returned to the Company for repair as inventory and applying improper cut-off procedures;

(i)     Super Micro officers and managers failed to raise issues with material accounting consequences to the Audit Committee and Deloitte and, with respect to at least one sales transaction, attempted to minimize material facts to, or obscure material facts from, the Audit Committee and Deloitte;

(j)     The Company's accounting violations were so pervasive, and its material weaknesses in internal controls so severe, that the accounting for thousands of transactions from FY13 through FY17 required reassessment to determine the appropriate revenue recognition treatment;

1  (k)   The Company lacked sufficient personnel in management, accounting,

2  financial reporting, sales, operations, engineering and information technology with appropriate

3  levels of knowledge, experience and training;

4  (l)   The Company suffered from material weakness in information technology

5  controls including authorizing users with broad access as administrators to all parts of the

6  accounting system without adequate monitoring or recording;

7  (m)   The Company failed to maintain sufficient documentation to support the

8  appropriate accounting treatment of certain transactions and establishing accountability for

9  internal controls; and

10  (n)   As a result of the foregoing, the Company was exposed to the risk of

11  restatement, inability to attest to the accuracy of its historical financial statements, inability to

12  obtain auditor sign-off, an adverse audit opinion from its auditor, significant investigative and

13  remediation costs, inability to attract or retain employees, de-listing from the NASDAQ,

14  investigation by the SEC and other regulatory action or civil liability.

15  **Super Micro Requests 15-Day Extension to File Form 10-K**

16  69.   <u>False and Misleading Statements</u>: On August 29, 2017, after the close of trading,

17  less than a month after announcing its 4Q17 results, Super Micro filed a Notification of Late Filing

18  on Form 12b-25, signed by Hideshima, revealing that the Company could not meet the August 29,

19  2017 deadline to file its FY17 Form 10-K, but falsely reassured analysts and investors that it "will

20  be filed on or before the fifteenth calendar day following the prescribed due date" (*i.e.*, September

21  13, 2017):

22  *The subject annual report . . . on Form 10-K . . . will be filed on or before*
*the fifteenth calendar day following the prescribed due date . . . .*

23

24  *       *       *

25  Super Micro Computer, Inc. (the "Company") is not in a position to file its
Form 10-K for fiscal year ended June 30, 2017 (the "Form 10-K"), in a timely
manner because the Registrant cannot complete the Form 10-K in a timely manner

26  without unreasonable effort or expense. Additional time is needed for the Company
to compile and analyze certain information and documentation and complete

27  preparation of its financial statements in order to permit the Company's
independent registered public accounting firm to complete its audit of the financial

28

statements to be incorporated in the Form 10-K and complete its audit of the Company's internal controls over financial reporting as of June 30, 2017.

70.     On this disclosure concerning the Company's inability to meet the deadline to file its FY17 Form 10-K, the price of Super Micro's common stock declined from its close of $27.20 per share on August 29, 2017, to a close at $25.85 per share on August 30, 2017, on increased trading volume, but remained inflated by, among other matters, the false assurance that the delay in filing would be temporary.

71.     On August 31, 2017, Maxim Group issued a report noting that the Company's repeated inability to timely file mandatory SEC disclosures was damaging "management's credibility" in the eyes of investors but – in light of the information made available at the time – it expected the delay to be "innocuous":

> **We expect better execution with respect to filing reports in a timely & accurate manner**. . . .  We note a similar situation took place in 2015, when SMCI required a 15-day extension to file its FY15 10-K in connection to a certain employee's unadvised activity relating to sales and marketing, but ultimately did not impact financial results.  Then in the following quarter (September 2015 quarter, F1Q16), management discovered some extended warranty revenue that should have been accounted for as deferred revenue, which delayed the 10-Q and led to a minor restatement of revenue (see our Nov-2015 note).  While we expect the current delayed filing to prove innocuous as well, ***we note that the recurring one-time nature of delayed filings are eroding management's credibility, based on our conversations with investors***.  We believe management will make changes to ensure that delayed filings do not recur, albeit the delays have been for unique reasons.

**Super Micro Fails to Meet Extended Deadline to File Form 10-K and Announces Audit Committee Review**

72.     <u>False and Misleading Statements</u>: On September 14, 2017, Super Micro issued a press release titled "Super Micro Computer, Inc. Announces Receipt of Non-Compliance Letter From Nasdaq."  The following day, September 15, 2017, after the close of trading, the Company filed a Current Report on Form 8-K disclosing the Company would not be able to meet the 15-day extension for filing the Form 10-K and that an Audit Committee review was underway, but nonetheless reassured analysts and investors that "***[t]he Company intends to file its 10-K promptly upon completion of the audit committee's review and the completion of the audit***":

> On September 14, 2017, Super Micro Computer, Inc. (the "Company") received a notification letter (the "Letter") from the Listing Qualifications Department of the NASDAQ Stock Market LLC ("NASDAQ") indicating that the

1
2
3
4
5
6
7

Company is not in compliance with NASDAQ Listing Rule 5250(c)(1), as a result of the Company's delay in filing its Annual Report on Form 10-K for fiscal year 2017 (the "Form 10-K"). **The Form 10-K was due on August 29, 2017. The Company filed a Form 12b-25 on August 29, 2017, the effect of which was to extend the due date for the Form 10-K to September 13, 2017. The Company was unable to file the Form 10-K by September 13, 2017, for the reasons reported in the Form 12b-25 and further described below**. The Letter has no immediate effect on the listing or trading of the Company's common stock on the NASDAQ Global Select Market. The Letter stated that, under NASDAQ rules, the Company has 60 calendar days to regain compliance or to submit a plan to do so, and that if a plan is submitted and accepted, NASDAQ could grant the Company an exception of up to 180 calendar days from the filing's due date to regain compliance. If NASDAQ does not accept the Company's plan, then the Company will have the opportunity to appeal that decision to a NASDAQ hearings panel.

8
9
10
11
12
13

As previously disclosed by the Company, additional time is needed for the Company to compile and analyze certain information and documentation and finalize its financial statements, **as well as complete a related audit committee review**, in order to permit the Company's independent registered public accounting firm to complete its audit of the financial statements to be incorporated in the Form 10-K and complete its audit of the Company's internal controls over financial reporting as of June 30, 2017. The Company is unable at this time to provide a date as to when the review and the audits will be completed. **The Company intends to file its 10-K promptly upon completion of the audit committee's review and the completion of the audit.**

14   73.   On these disclosures, the price of Super Micro's common stock declined from its

15  close of $25.25 per share on September 14, 2017, to a close at $23.35 per share on September 15,

16  2017, on extremely high trading volume, followed by a further decline on September 18, 2017, the

17  next trading day, to a close of $21.20 per share, again on extremely high trading volume. Still,

18  Super Micro's stock price remained inflated as Defendants continued to conceal the nature, scope

19  and magnitude of the issues related to their financial results and internal controls.

20  **Super Micro Reveals Premature Revenue Recognition; Fails to File 1Q18 Form 10-Q**

21   74.   On October 26, 2017, after the close of trading, Super Micro filed a Current Report

22  on Form 8-K, signed by Liang, incorporating a press release titled "Super Micro® Announces First

23  Quarter Fiscal 2018 Preliminary Financial Information," including revenue, income and earnings

24  figures for 1Q18. For the first time, the press release disclosed details of improper revenue

25  recognition specifically related to a sales transaction originally recorded as revenue during 2Q17

26  (*i.e.*, the period ending December 31, 2016), later reversed and recognized in 3Q17 (*i.e.*, the period

27
28

ending March 31, 2017).[11]  Due to this inappropriate transaction, the Company's Audit Committee

initiated an independent investigation to assess whether similar transactions existed and were

properly accounted for:

> In connection with the in-process audit of the Company's financial results for the year ended June 30, 2017, a sales transaction was subject to additional inquiry and review. ***The transaction in question was originally recorded as revenue during the quarter ended December 31, 2016.***  However, prior to review by the Company's independent auditors and prior to the Company's public announcement of its results for the quarter, ***the recognition of revenue was reversed and the revenue was subsequently recognized in the quarter ended March 31, 2017.  When the audit committee was made aware of this transaction, the Audit Committee of the Company's Board of Directors initiated an independent investigation to determine whether there were any similar transactions and if so, whether such transactions were properly accounted for.***  ***Due to the volume of data to be reviewed to complete the investigation, the Company was unable to file its Form 10-K on a timely basis.***

> The Company is unable at this time to provide a date as to when the investigation and the 2017 audits will be completed or predict the possible outcome of the investigation.

75.    <u>False and Misleading Statements</u>:  In the October 26, 2017 press release, Super

Micro also claimed that it would take the necessary steps "as soon as practicable" to achieve

compliance with NASDAQ listing requirements:

> Super Micro announced on September 14, 2017 that it received a notification letter from Nasdaq stating that the Company is not in compliance with Nasdaq listing rule 5250(c)(1), which requires timely filing of reports with the U.S. Securities and Exchange Commission. . . .

> The Nasdaq notice has no immediate effect on the listing or trading of the Company's common stock on the Nasdaq Global Select Market. Under the Nasdaq rules, the Company has 60 days from the date of the notice either to file the Form 10-K or to submit a plan to Nasdaq to regain compliance with Nasdaq's listing rules. The Company intends to submit a plan within the required time period and if the plan accepted, the Company could be granted up to 180 days from the Form 10-K's due date to regain compliance. If NASDAQ does not accept the Company's plan, then the Company will have the opportunity to appeal that decision to a NASDAQ hearings panel.

> ***Super Micro intends to take all necessary steps to achieve compliance with the NASDAQ continued listing requirements as soon as practicable.***

---

[11]  Super Micro's FY17 Form 10-K, filed on May 17, 2019, attached a Loan and Security Agreement, dated April 19, 2018, between Super Micro and Bank of America, which in turn included Schedule 9.1.16 (Litigation) detailing that the "transaction in question" represented approximately $8.8 million in revenue.

1        76.     On October 26, 2017, Super Micro held an earnings conference call where Liang

2   spoke alongside Hayes.  Notably absent was CFO Hideshima who had participated in all prior

3   earnings conference calls during the Class Period.  When asked about the CFO's status, Hayes

4   stated he was "working very hard on the issues":

5           [Alexander Kurtz]:  Last question for me.  Can you give us any update on
    your CFO, Howard, and his status with the company at this point?

6

7           [Hayes]:  Howard is working very hard on the issues related to the filing of
    the 10-K at this moment.

8   Three months later, Hideshima would "resign" from the Company effective immediately.

9        77.    <u>False and Misleading Statements</u>:   During the October 26, 2017 earnings

10   conference call, Super Micro reiterated that the Company needed additional time to compile and

11   analyze materials and finalize its financial statements, as was reported in prior press releases.

12   Super Micro refused to answer several questions concerning the Company's delinquent reports

13   and ongoing Audit Committee investigation and misleadingly downplayed the delay:

14           [Brian Matthew Alger]:  Just for a clarification point, reading through the
    release today and kind of going back to the delay that we're incurring here on the

15   10-K.  To be clear, what's being evaluated by the audit committee isn't whether or
    not the revenues were real, but rather not the documentation around which period

16   the revenues were recognized, is that the case?

17           [Hayes]:  Brian, as indicated, we're not going to answer any questions
    related to the filing of the 10-K.

18                                   *      *      *

19

20           [Nehal Sushil Chokshi]:  Okay.   And the reason why there's more
    uncertainty around what channel was as a % of revenue is that that's where the

21   uncertainty resides with the one revenue recognition.  Should be getting done.  Is
    that a correct interpretation?

22           [Hayes]:  Again, Nehal, we're not going to discuss anything related to the
    10-K filing.

23

24                                     *      *      *

25           [Brian Matthew Alger] Okay. And then other than the efforts going on
    surrounding the review here with the 10-K, has there been any structural changes

26   that would affect the operating expenses of the company outside of normal business
    operations?

27           [Hayes]: ***No. Everything is pretty much the same . . . everything is on track***.

28

78.     On these additional disclosures, the price of Super Micro's common stock declined from its close of $21.70 per share on October 26, 2017, to a close at $20.48 per share on October 27, 2017, on extremely high trading volume.  On October 30, 2017, the next trading date, Super Micro's stock fell to a close of $19.85 per share, but remained inflated as Defendants continued to downplay and conceal the details of their fraud.

79.     On October 27, 2017, Susquehanna Financial Group issued a report titled "Super Micro: Audit Review To Remain Overhang On Shares; Gross Margins Remain Constrained," noting the overhang on the Company's stock price due to questions concerning its revenue recognition processes and delinquent reports:

> *The audit investigation of SMCI's revenue recognition practices (and associated delay in 10-K filing) is expected to remain an overhang on shares*, while the fundamental backdrop remains mired by a lack of Gross Margin expansion.  Maintain Neutral rating.
>
> The delay in 10-K filing associated with a review of revenue recognition practices is likely to remain an overhang on shares until this is resolved and the company has adequately addressed its internal controls. . . .
>
> Audit committee investigation to remain an overhang, unclear when this will be resolved.  *SMCI indicated that the reason its 10-K had been delayed was due to an investigation into revenue recognition practices around revenue that was originally recognized in the Dec Q'16 and then reversed and recognized in Mar Q'17*.  This has resulted in a more thorough review of sales recognition practices.  SMCI did not provide any insight into when this matter would be resolved.

80.     On November 13, 2017, after the close of trading, Super Micro filed a Notification of Late Filing on Form 12b-25, signed by Hideshima, disclosing that it could not timely file its 1Q18 Form 10-Q:

> As previously announced, the Company has been unable to file its Annual Report on Form 10-K for the fiscal year ended June 30, 2017 (the "Form 10-K") pending the completion of an independent investigation by the Audit Committee of the Company's Board of Directors and any additional work required thereafter in order for the Company to finalize its financial statements and have the Company's independent registered public accounting firm complete its audit of the financial statements to be incorporated in the Form 10-K and complete its audit of the Company's internal controls over financial reporting as of June 30, 2017.  The Form 10-Q cannot be completed and filed until the Form 10-K is completed and filed. The Company does not expect the filing to be made within the time period required for a timely filing pursuant to Rule 12b-25(b) under the Securities Exchange Act of 1934.

81.     On November 20, 2017, after the close of trading, Super Micro filed a Current Report on Form 8-K, signed by Liang, incorporating a press release titled "Super Micro Computer Inc. Announces Receipt of Non-Compliance Letter from Nasdaq":

> On November 16, 2017, Super Micro Computer, Inc. (the "Company") received a notification letter (the "Letter") from the Listing Qualifications Department of the NASDAQ Stock Market LLC ("NASDAQ") **_indicating that the Company is not in compliance with NASDAQ Listing Rule 5250(c)(1)_**, as a result of the Company's delay in filing its Quarterly Report on Form 10-Q for the period ended September 30, 2017 and its continued delay in filing its Annual Report on Form 10-K for the period ending June 30, 2017 (the "Form 10-K"). The Company previously submitted a plan of compliance to Nasdaq on November 10, 2017 (the "Plan") with respect to its delay in filing the Form 10-K (the "Initial Delinquent Filing"). **_Upon review of the Company's Plan and in connection with this additional delinquency, the Letter requires that the Company submit an update to the Plan by November 30, 2017_** (the "Revised Plan"). The Letter has no immediate effect on the listing or trading of the Company's common stock on the NASDAQ Global Select Market. If the Revised Plan is submitted and accepted, the Company could be granted up to 180 days from the due date of the Initial Delinquent Filing, or March 12, 2018, to regain compliance. If NASDAQ does not accept the Company's plan, then the Company will have the opportunity to appeal that decision to a NASDAQ hearings panel.

82.     <u>False and Misleading Statements</u>: On December 6, 2017, Wells Fargo issued a report titled "SMCI: Takeaways from Wells Fargo Tech Summit 2017," noting that the Company faced an "[o]ngoing unknown risk / overhang related to continued Audit Committee revenue recognition investigation." The Wells Fargo Tech Summit 2017 was held at the St. Regis Deer Valley in Park City, Utah, between December 4-6, 2017. Hayes was scheduled to present for Super Micro on December 6, 2017. Following Hayes's presentation, Wells Fargo reported that: "**_Mr. Hayes believes that Supermicro is in the final stages of audit review before filing its 10-K (and subsequent updated 10-Q)_**."

83.     <u>Reasons Why the Statements in ¶¶69, 72, 75, 77, 82 Were False and Misleading</u>: In addition to the reasons detailed in ¶68, Defendants' statements concerning: (i) the completion of the Company's internal investigations; (ii) the timing of and its ability to comply with SEC filing requirements; (iii) the risks the Company faced; and (iv) its ability to comply with NASDAQ listing requirements were materially false and misleading because Defendants knew, or were deliberately reckless in not knowing, and failed to disclose the following:

(a)     As a result of an improper focus on quarterly revenue over compliance, including but not limited to, deliberate accounting manipulations, material weaknesses in internal controls, ineffective disclosure controls, insufficient personnel and a failure to communicate (or conceal) material information from the Audit Committee and Deloitte, the accounting for thousands of transactions from FY13 through FY17 required reassessment for determining appropriate revenue recognition treatment;

(b)     As of December 6, 2017, Super Micro was not in the "final stages" of its audit review for its FY17 Form 10-K or its 1Q18 Form 10-Q given the volume of transactions the Company, the Audit Committee, its accounting consultants or Deloitte were required to review for the period from FY13- FY18;

(c)     The Company lacked a defined process for reviewing transactions and lacked visibility into the work required to complete its investigation and SEC filings;

(d)     As a result of its material weakness in internal control over financial reporting and its insufficient personnel, the Company failed to maintain sufficient documentation to support the appropriate accounting treatment of certain transactions and, as a result, was forced to locate documentation from archived sources or from third parties;

(e)     The SEC had expanded its investigation that began in 2015 and for which the Company received a formal order of investigation on October 25, 2016, to include broader revenue recognition issues; and

(f)     Given the foregoing, as well as the reasons detailed in ¶68, the Company's statements concerning the Company's internal investigation, the status of its SEC filings and its ability to comply with NASDAQ listing requirements were false and misleading.

**Super Micro Announces Departure of Senior Executives and Cannot State if Its Historical Financial Statements Are Accurate; Audit Committee Investigation Results in Further Inquiry and Delay**

84.     On January 30, 2018, after the close of trading, Super Micro filed a Current Report on Form 8-K, signed by Liang, incorporating two press releases, one titled "Super Micro® Announces Second Quarter Fiscal 2018 Preliminary Financial Information; Management Changes," and another titled "Super Micro® Announces the Appointment of Kevin Bauer as Chief

Financial Officer," disclosing that three senior management level employees, including Defendants Hideshima and Liaw, had resigned and that the Company had appointed a new CFO:

> The Company announced the appointment of Kevin Bauer, as the Company's Senior Vice President and Chief Financial Officer ("CFO"), effective January 30, 2018. Mr. Bauer, 58, has served as the Company's Senior Vice President, Corporate Development and Strategy since January 2017.

> \*       \*       \*

> ***The Company also announced that Wally Liaw, Sr. Vice President of International Sales, Phidias Chou, Sr. Vice President, Worldwide Sales and Howard Hideshima, Senior Vice President and Chief Financial Officer, have resigned, effective January 30, 2018. Mr. Liaw has also resigned as a member of the Board of Directors of the Company (the "Board"), effective January 30, 2018.***

85.     In addition to providing preliminary financial results for 2Q18, the January 30, 2018 press release also revealed for the first time that the Audit Committee had finished its investigation but that further investigation was necessary and the Company could not represent that its historical financial statements were accurate. The Company reiterated that it had no completion date for its investigation or delinquent reports:

> The Audit Committee has completed the previously disclosed investigation. ***Additional time is required to analyze the impact, if any, of the results of the investigation on the Company's historical financial statements, as well as to conduct additional reviews*** before the Company will be able to finalize its Annual Report on Form 10-K for the fiscal year ended June 30, 2017 (the "Form 10-K"). ***The Company is unable at this time to provide a date as to when the Form 10-K will be filed or to determine whether the Company's historical financial statements will be adjusted or, if so, the amount of any such adjustment(s) and what periods any such adjustments may impact***. The Company intends to file its Quarterly Reports on Form 10-Q for the quarters ended September 30 and December 31, 2017 promptly after filing the Form 10-K.

86.     On January 30, 2018, Wells Fargo issued a report titled "SMCI: Significant Revenue Upside; Still Await Finalized Financial Filings," detailing expectations that the Company's shares would be weak due to, among other matters:

> (1) uncertainty related to the resignation of high-level sales executives, including co-founder, Wally Liaw, who owns 4.4% of shares outstanding. The company elected to not comment on the reasoning of these resignations / relation to the Audit Committee investigation. (2) While the Audit Committee has completed its investigation, Supermicro reported additional time is required to analyze the impact, *if any*, to historical results (Nasdaq filing deadline on March 13th).

With respect to the management changes and the Audit Committee investigation, the January 30, 2018 Wells Fargo report disclosed:

> Management Changes: (1) Supermicro reported that Wally Liaw, co-founder and SVP of International Sales, has resigned from the company and its board of directors. We would note that Mr. Liaw owns 4.4% of shares outstanding. (2) Phidias Chou, SVP of worldwide sales, has resigned from Supermicro; Don Clegg, VP of Worldwide Business Develop & Marketing will succeed Mr. Chou on an interim basis. (3) The company also announced that it had appointed Kevin Bauer as its new CFO.  Mr. Bauer joined Supermicro in January 2017 as SVP, Corporate Development and Strategy.  He holds previous CFO experience at Pericom Semiconductor and Exar Corporation. In connection with this prior CFO, Howard Hideshima, has resigned from the company.

> <u>Supermicro announced the Audit Committee completed its investigation; however, additional time is required to analyze the impact (if any) of its findings to historical financial statements</u> and to conduct additional reviews prior to filing its F2017 10-K and F1Q18 / F2Q18 10-Q filings.  The company is unable to provide an update on when these will be filed; however, we would note that Supermicro's Nasdaq extension expires on March 13th.

87.     On January 31, 2018, CFRA Research issued a report detailing concerns about Super Micro's failure to meet filing deadlines, management changes and the departure of Hideshima:

> ***We note SMCI has delayed filing of its 10-K given a pending independent audit review that began from the identification of a sales transaction that was realized during an incorrect quarter***.

> We await a resolution to the independent audit review amid a time of favorable business trends but ***view recent management changes, including the departure of the CFO, as disturbing***.

88.     On these further disclosures and developments, the price of Super Micro's common stock declined from its close of $24.65 per share on January 30, 2018, to a close at $22.83 per share on January 31, 2018, on increased trading volume.  The Company's stock price continued falling over the next several trading days, closing at $19.30 per share on February 5, 2018, representing a decline of over 21.7% from the January 30, 2018 closing price.

## POST-CLASS PERIOD EVENTS AND DISCLOSURES

89.     On February 9, 2018, after the close of trading, Super Micro filed a Notification of Late Filing on Form 12b-25, signed by Bauer, disclosing it could not file its 2Q18 Form 10-Q and repeated the Company's prior disclosures that it could not determine when the investigation would

1  be completed, its impact on the Company's historical financial statements or when it would

2  become current with its SEC filings:

3          Super Micro Computer, Inc. (the "Company") is not in a position to file its
        Quarterly Report on Form 10-Q for the period ended December 31, 2017 (the
4       "Form 10-Q"), in a timely manner because the Registrant cannot complete the Form
        10-Q in a timely manner without unreasonable effort or expense.  As previously
5       announced, the Company has been unable to file its Annual Report on Form 10-K
        for the fiscal year ended June 30, 2017 (the "Form 10-K") and Quarterly Report on
6       Form 10-Q for the quarter ended September 30, 2017 ("Q1 10-Q").  The Audit
        Committee of the Company's Board of Directors has completed the previously
7       disclosed investigation. Additional time is required to analyze the impact, if any, of
        the results of the investigation on the Company's historical financial statements, as
8       well as to conduct additional reviews before the Company will be able to finalize
        the Form 10-K.  ***The Company is unable at this time to provide a date as to when
9       the Form 10-K will be filed or to determine whether the Company's historical
        financial statements will be adjusted or, if so, the amount of any such
10      adjustment(s) and what periods any such adjustments may impact.***  The Form 10-
        Q cannot be completed and filed until the Form 10-K and Q1 10-Q are completed
11      and filed.  The Company does not expect the filing to be made within the time
        period required for a timely filing pursuant to Rule 12b-25(b) under the Securities
12      Exchange Act of 1934.  The Company intends to file its Quarterly Reports on Form
        10-Q for the quarters ended September 30 and December 31, 2017 promptly after
13      filing the Form 10-K.

14          90.     On February 20, 2018, after the close of trading, Super Micro filed a Current Report

15  on Form 8-K, signed by Liang, incorporating a press release titled "Super Micro Computer Inc.

16  Announces Receipt of Non-Compliance Letter from Nasdaq," disclosing that the Company was

17  not in compliance with NASDAQ listing rules due to failure to file its 2Q18 Form 10-Q and that

18  it had until February 28, 2018, to submit a revised plan to regain compliance.  The Company also

19  repeated that the Audit Committee had completed its investigation but that it needed additional

20  time to analyze any impact on the Company's historical financial statements and conduct

21  additional reviews prior to filing its FY17 Form 10-K:

22          On February 20, 2018, Super Micro Computer, Inc. (the "Company")
        announced that it received a notification letter (the "Letter") from the Listing
23      Qualifications Department of the Nasdaq Stock Market LLC ("Nasdaq") indicating
        that the Company is not in compliance with Nasdaq Listing Rule 5250(c)(1), as a
24      result of the Company's delay in filing its Quarterly Report on Form 10-Q for the
        period ended December 31, 2017 (the "Q2 10-Q") and its continued delay in filing
25      its Annual Report on Form 10-K for the period ending June 30, 2017 (the "Form
        10-K") and its Quarterly Report on Form 10-Q for the period ended September 30,
26      2017 ("Q1 10-Q").  As described in the letter, the Company has until February 28,
        2018 to submit to Nasdaq an update to its original plan to regain compliance with
27      the Nasdaq Listing Rules (the "Revised Plan").  As previously disclosed, Nasdaq
        has granted the Company an extension until March 13, 2018 to file the Form 10-K,
28      the Q1 10-Q and the Q2 10-Q.

1

2

3

4

        The Letter has no immediate effect on the listing or trading of the Company's common stock on the Nasdaq Global Select Market.  If the Revised Plan is submitted and accepted, the Company could be granted up to 180 days from the due date of the Initial Delinquent Filing, or March 13, 2018, to regain compliance.  If Nasdaq does not accept the Company's plan, then the Company will have the opportunity to appeal that decision to a Nasdaq hearings panel.

5

6

7

        91.     On these disclosures, the price of Super Micro's common stock declined from its close of $18.85 per share on February 20, 2018, to a close at $18.15 per share on February 21, 2018, on increased trading volume.

8

**Super Micro Subject to Delisting by NASDAQ**

9

10

11

12

        92.     On March 16, 2018, after the close of trading, Super Micro filed a Current Report on Form 8-K, signed by Bauer, incorporating a press release titled "Super Micro® Receives Nasdaq Staff Determination Letter; Has Requested Hearing Before Hearings Panel," disclosing that its stock was subject to delisting by NASDAQ:

13

14

15

16

17

18

19

        On March 14, 2018, Super Micro Computer, Inc. (the "Company") received a letter from the staff of the Listing Qualifications Department (the "Staff") of The Nasdaq Stock Market LLC ("Nasdaq") notifying the Company that since the Company had not filed its Annual Report on Form 10-K for the fiscal year ended June 30, 2017 and its Quarterly Reports on Form 10-Q for the quarterly periods ended September 30, 2017 and December 31, 2017 (collectively, the "Delinquent Filings") by March 13, 2018, the deadline by which the Company was to file its Delinquent Filings in order to regain compliance with Nasdaq Listing Rule 5250(c)(1), the Company's common stock is subject to delisting from Nasdaq.  The letter further noted that, unless the Company requested an appeal of the Staff's determination, trading of the Company's common stock on Nasdaq would be suspended at the opening of business on March 23, 2018, and a Form 25-NSE would be filed with the SEC removing the Company's securities from listing and registration on Nasdaq.

20

21

22

23

24

        On March 16, 2018, the Company submitted a letter to Nasdaq requesting a hearing before a Hearings Panel at which it intends to present its plan to regain and thereafter maintain compliance with all applicable listing requirements.  In connection with its request for a hearing, the Company has also requested a stay of the suspension of trading and delisting of its common stock, pending the hearing and decision of the Hearings Panel.  The Hearings Panel will notify the Company of its decision to allow the Company to continue to trade on Nasdaq pending the hearing and a decision by the Hearings Panel by April 5, 2018.  There can be no assurance that the Hearings Panel will grant the Company's request for continued listing or stay the delisting of its common stock.

25

26

27

        93.     On March 16, 2018, Wells Fargo issued a report titled "SMCI: Supermicro Requests Hearing With Nasdaq To Avoid Delisting (Negative)" describing Super Micro's March

28

16, 2018 announcements regarding its non-compliance with NASDAQ listing requirements as "clearly negative":

> News: Supermicro has announced that today (3/16) it submitted a letter to Nasdaq requesting a hearing before a Hearings Panel to present a plan in which it intends to regain compliance related to the inability to file its F2017 10-K and F1Q18 / F2Q18 10-Qs.  The request is for a hearing by March 21, 2018.  This follows the company missing its 3/13 deadline to reach compliance.  Supermicro has also requested a stay in the suspension of trading / delisting of its stock from Nasdaq.
>
> Supermicro noted that the hearing request automatically stays the delisting process for a period of 15 calendar days from the date of the deadline to request a hearing (or until April 5th).  The Hearings Panel has the authority to grant Supermicro additional time of up to 360 days from the original due date of the company's first late filing to regain compliance (late August timeframe) before further action to delist the company's common stock will occur.  **The Hearings Panel will notify the Company by April 5, 2018 of its decision to allow Supermicro to continue to trade on Nasdaq pending the hearing and a decision by the Hearings Panel**.
>
> Quick Thoughts: ***This news is clearly negative as the company has persistently struggled to regain compliance with Nasdaq – in this release Supermicro did not provide an update on the progress of completing its internal audit investigation***.  At the time of the company's December quarter results, Supermicro reported that it was continuing to analyze the findings of its investigation to determine the amount (if any) of a potential financial restatement.

(Emphasis in original and added).

94.     On these disclosures, the price of Super Micro's common stock declined from its close of $19.70 per share on March 16, 2018, to a close at $18.70 per share on March 19, 2018, on increased trading volume.

**Super Micro Fails to File 3Q18 Form 10-Q**

95.     On May 3, 2018, after the close of trading, Super Micro filed a Current Report on Form 8-K, signed by Liang, incorporating a press release titled "Super Micro® Announces Third Quarter Fiscal 2018 Preliminary Financial Information."  In addition to preliminary 3Q18 results, the press release also disclosed that the additional testing overseen by the Audit Committee was "nearing completion":

> ***The Company has completed the previously disclosed investigation conducted by the Audit Committee.  In furtherance of the preparation of the financial statements, the Audit Committee is overseeing additional testing that the Company believes is nearing completion***.  To date, the Company's cash flows have not been impacted by the findings of the investigation or the additional testing. Additional time is required to analyze any impact of the results of the investigation

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS - 3:18-cv-00838-JST
4825-1376-7834.v1

- 43 -

and additional testing on the Company's historical financial statements, as well as to complete additional reviews before the Company will be able to finalize its Annual Report on Form 10-K for the fiscal year ended June 30, 2017 (the "2017 10-K").

The Company presented an updated compliance plan to The Nasdaq Stock Market Hearings Panel on April 26, 2018 and the Company requested an additional exception period for continued listing of its common stock on The Nasdaq Global Select Market through August 24, 2018 in order for it to complete and file its 2017 10-K and subsequent delinquent SEC quarterly filings.  The Company is unable at this time to provide a date as to when the 2017 10-K will be filed or to predict whether the Company's historical financial statements will be adjusted or, if so, the amount of any such adjustment.  The Company intends to file its Quarterly Reports on Form 10-Q for the quarters ended September 30, December 31, 2017, and March 31, 2018 promptly after filing the 2017 10-K.

96.     On May 3, 2018, Super Micro held an earnings conference call where Liang and Bauer spoke alongside Hayes.  During the earnings conference call, Hayes reiterated that the Audit Committee had completed its investigation and additional testing was nearing completion; that the Company had until August 24, 2018 to complete and file its delinquent reports, and continued to downplay the significance of the internal control issues:

[Hayes]:  Good afternoon, and thank you, for attending Supermicro's business update conference call for the third quarter fiscal 2018, which ended March 31, 2018.  As announced in our press release earlier today, *the company has completed the previously disclosed investigation conducted by the audit committee. In furtherance of the preparation of the financial statements, the audit committee is overseeing additional testing that the company believes is nearing completion*.

*To date, the company's cash flows have not been impacted by the findings of the investigation or the additional testing*.  Additional time is required to analyze any impact of the results of the investigation and additional testing on the company's historical financial statements as well as to complete additional reviews before the company will be able to finalize its annual report on Form 10-K for the fiscal year ended June 30, 2017.  Otherwise known as the 2017 10-K.

The company presented an updated compliance plan to the NASDAQ stock market hearings panel on April 26, 2018.  And the company requested an additional exception period for continued listing of its common stock on the NASDAQ Global Select Market, through August 24, 2018, in order for it to complete and file its 2017 10-K and subsequent delinquent SEC quarterly filings.

The company is unable at this time to provide a date as to when the 2017 10-K will be filed or to predict whether the company's historical financial statements will be adjusted or, if so, the amount of any such adjustments.  The company intends to file its quarterly reports on Form 10-Q for the quarters ended September 30 and December 31, 2017, and March 31, 2018, promptly after filing the 2017's 10-K.

1    97.    Additionally, during the May 3, 2018 earnings conference call, Bauer stated that

2  the Company would not answer questions regarding the delinquent reports but that it was nearing

3  completion of its investigation and filings:

4        [Bauer]:  The SEC filings process.  As we stated in our press release and as
         Perry articulated during the introduction, we continue to expend great effort to
5        complete  our  financial  statements  and  work  with  our  independent  auditor  to
         complete  the  fiscal  year  2017  audit  process  and  ultimately  file  our  delinquent
6        reports with the SEC.  As previously indicated, we'll now have a Q&A session,
         where sell-side analysts will be permitted to ask questions.  *I'd like to remind you*
7        *that your questions should be directed to the business update that we just provided*
         *and  we'll  not  answer  any  further  questions  relating  to  the  audit  committee*
8        *investigation or the delayed filing of our 10-K*.  Operator, at this time, we're ready
         for questions.
9
                                    *       *       *
10
         As it relates to the additional testing, I'll remind you that we're not going to
11       be answering questions about that.  But it's just the continuation of the process to
         get your arms around all of the issues that occurred during that timeframe.  So as we
12       said, *we believe that we think we're nearing completion there and we're working*
         *in parallel with other teams to be able to our get our filings done as expeditiously*
13       *as possible and we'll leave it at that*.

14    98.    The price of Super Micro's common stock increased from its close of $18.05 per

15  share on May 3, 2018, to a close at $21.25 per share on May 4, 2018, on increased trading volume.

16  Super Micro's stock price continued to increase to nearly $24.00 per share over the ensuing two

17  trading days.

18    99.    On May 10, 2018, after the close of trading, Super Micro filed a Notification of

19  Late Filing on Form 12b-25, signed by Bauer, disclosing that it could not timely complete its 3Q18

20  Form 10-Q:

21       Super Micro Computer, Inc. (the "Company") is unable to file its Quarterly
         Report on Form 10-Q for the period ended March 31, 2018 (the "Form 10-Q") in a
22       timely manner without unreasonable effort or expense.  As previously announced,
         the Company has been unable to file its Annual Report on Form 10-K for the fiscal
23       year ended June 30, 2017 (the "Form 10-K"), Quarterly Report on Form 10-Q for
         the quarter ended September 30, 2017 ("Q1 10-Q") and Quarterly Report on Form
24       10-Q for the quarter ended December 31, 2017 ("Q2 10-Q"). . . .

25       The Company presented an updated compliance plan to The Nasdaq Stock
         Market Hearings Panel (the "Panel") on April 26, 2018 and the Company requested
26       an additional exception period for continued listing of its common stock on The
         Nasdaq Global Select Market ("Nasdaq") through August 24, 2018 in order for it
27       to complete and file its 2017 10-K and subsequent delinquent SEC quarterly filings.
         The Panel has since granted the Company's request to continue its listing on Nasdaq
28       through  August  24,  2018,  subject  to  the  condition  that  the  Company  becomes

current with its SEC filings by that date and informs the Panel the Company is current with such filings.

100.    On May 21, 2018, after the close of trading, Super Micro filed a Current Report on Form 8-K, signed by Bauer, disclosing that it had received a letter from NASDAQ detailing additional delinquencies with listing rules but that it remained "on track" to meet the August 24, 2018 deadline:

> On May 15, 2018, Super Micro Computer, Inc. (the "Company") received a letter (the "Letter") from the Listing Qualifications Department of The Nasdaq Stock Market ("Nasdaq") notifying the Company of its determination of an additional delinquency related to the Company's noncompliance with Nasdaq Listing Rule 5250(c)(1) (the "Rule") because the Company has not yet filed its Quarterly Report on Form 10-Q for the quarter ended March 31, 2018 (the "Q3 10-Q"). . . .   The Letter states that the Nasdaq Hearings Panel (the "Panel") will consider this matter in their decision regarding the Company's continued listing on The Nasdaq Global Market, and that the Company should present its views with respect to this additional deficiency to the Panel in writing no later than May 22, 2018.

> On May 18, 2018, the Company submitted a response to the Nasdaq Hearings Panel (the "Panel") stating that, consistent with the Company's presentation at the recent hearing before the Panel and as of the date of the reply, *the Company believes it remains on track to file the Delinquent Reports with the SEC and thereby evidence compliance with the Rule on or before the Panel deadline of August 24, 2018*.

> As the Company previously announced, the Panel has granted the Company's request to continue its listing on Nasdaq through August 24, 2018, subject to the condition that the Company becomes current with its SEC filings by that date and informs the Panel the Company is current with such filings. The Company is diligently working to become current with its SEC filings and intends to continue to take all steps necessary to regain compliance with the Rule.

101.    On July 13, 2018, after the close of trading, Super Micro filed a Current Report on Form 8-K, signed by Liang, disclosing that the Company had failed to hold a required annual meeting of shareholders:

> On July 9, 2018, Super Micro Computer, Inc. (the "Company") received a letter (the "Letter") from the Listing Qualifications Department of The Nasdaq Stock Market LLC ("Nasdaq") notifying the Company of its determination of an additional deficiency related to the Company's noncompliance with the annual meeting requirement set forth in Nasdaq Listing Rule 5260(a) (the "Rule") because the Company did not hold an annual meeting of shareholders within twelve months of the end of the Company's prior fiscal year end. The Letter states that the Nasdaq Hearings Panel (the "Panel") will consider this matter in their decision regarding the Company's continued listing on The Nasdaq Global Select Market, and that the Company should present its views with respect to the additional deficiency to the Panel in writing no later than July 16, 2018.

1   . . . The Company is diligently working to become current with its SEC
2   filings and intends to continue to take all steps necessary to regain compliance with
    the Nasdaq Listing Rules, including the Rule.

3   **Super Micro Fails to Meet Filing Deadline; NASDAQ Suspends Trading**

4   102.   On August 21, 2018, after the close of trading, Super Micro filed a Current Report

5   on Form 8-K, signed by Liang, disclosing that its SEC filings dating back to the Company's FY17

6   Form 10-K would remain delinquent, and as such, the Company would face delisting proceedings:

7           On August 20, 2018, Super Micro Computer, Inc. (the "Company")
8       submitted a supplemental letter to the Hearings Panel (the "Panel") of The Nasdaq
        Stock Market LLC ("Nasdaq") notifying the Panel that ***the Company will be unable***
9       ***to meet the Panel's August 24, 2018 deadline to regain compliance with Nasdaq***
        ***Listing Rule 5250(c)(1)*** because the Company will not be able to complete and file
10      its Annual Report on Form 10-K for its fiscal year ended June 30, 2017 (the "2017
        Form 10-K") and its Quarterly Reports on Form 10-Q for its fiscal quarters ended
11      September 30, 2017, December 31, 2017 and March 31, 2018 (collectively with the
        2017 Form 10-K, the "Delinquent Reports") with the Securities and Exchange
12      Commission ("SEC") by such date.

13          As previously disclosed, by decision dated May 9, 2018, the Panel granted
        the Company's request to continue its listing on Nasdaq's Global Select Market
14      through August 24, 2018, subject to the condition that the Company become current
        with its SEC filings by that date and informs the Panel the Company is current with
15      such filings.   ***While the Company has made significant progress toward***
        ***completing the necessary accounting review processes, it has determined that the***
16      ***Delinquent Reports will not be filed with the SEC by August 24, 2018***.

17          ***As a result of the updated timing, the Company expects that its common***
        ***stock will soon be suspended from trading on Nasdaq's Global Select Market and***
18      ***the Panel will begin delisting proceedings***.

19  103.   The August 20, 2018 Form 8-K incorporated a press release disclosing the

20  Company would not file its delinquent reports with the SEC given the magnitude of transactions

21  that needed to be reviewed for revenue recognition purposes and reiterated that it expected to be

22  delisted from the NASDAQ:

23          The Company is currently in the process of preparing its financial
        statements in light of the results of the Audit Committee investigation and other
24      ongoing testing. ***A significant number of transactions remain to be reviewed***.  To
        date, none of the hundreds of reviewed transactions has involved revenue that could
25      not ultimately be recognized, however, we have not concluded that a restatement
        to previously filed financial results is necessary.  The Company's cumulative cash
26      flows have not been impacted by the findings of the investigation or other testing,
        although the expenses associated with the investigation and testing have been
27      significant.

28          ***The delay primarily relates to the magnitude of work that the Company***
        ***still must perform in order to review the Company's accounting judgments,***

*estimates and records for transactions that occurred during fiscal years 2015 through 2017, as well as the Company's assessment and conclusions on the effectiveness of its internal control over financial reporting during such periods, so that it can complete the financial statements for the 2017 Form 10-K.* Although the Company has made substantial progress in these matters and committed extraordinary resources and personnel toward the effort, the amount of work is substantial and the additional testing required has taken longer than anticipated. The Company is committed to filing its Delinquent Reports as soon as practicable.

Charles Liang, Chairman and Chief Executive Officer commented, "Despite our substantial progress in these matters, we are very disappointed that we did not meet the filing deadline. *We are strongly committed to completing our SEC filings as soon as possible. In addition, we continue to strengthen our internal accounting, audit and compliance functions*. . . ."

*As a result of the updated timing, the Company expects that its common stock will soon be suspended from trading on Nasdaq's Global Select Market and the Panel will begin delisting proceedings*. If the Panel decides to delist the Company's common stock, the Company will evaluate all of its options, including filing an appeal to the Nasdaq Listing and Hearing Review Council.

Following a possible suspension of trading in the Company's common stock on Nasdaq, the Company expects that its shares will be quoted over-the-counter on the OTC Markets. The Company intends to continue to work diligently toward completing its Delinquent Reports, regaining compliance with its SEC reporting obligations, and regaining its listing on Nasdaq or another national stock exchange as soon as practicable.

104. Later that day, Super Micro held an earnings conference call where Liang and Bauer disclosed that the Company still had a substantial amount of transactions to review for revenue recognition purposes and reiterated that its stock would be suspended from trading on the NASDAQ:

[Bauer]: We have worked diligently and deployed significant resources towards completing the 2017 and 2018 financial statements, but are not able to file by the deadline of August 24, 2018. . . . We have made tremendous progress on this matter, having completed the analysis of specific revenue transactions identified through our audit committee's investigation.

To-date, our cash flows have not been impacted by our findings and no transaction reviewed by the company as part of this process has involved revenue that could not ultimately be recognized nor have we concluded that a restatement of financial results is necessary. *The question you must be asking is; why is this matter taking so long. The answer is that in order to be thorough, we are reviewing transactions near the end of each quarter for similar issues found in the earlier testing, but particularly as it relates to the matching of purchase order and shipping terms to the timing of revenue*.

As we are a high-volume business, this entails locating documentation that is onsite, archived, or [ph] at third-parties. *I'm reviewing thousands of revenue*

1    *transactions in detail using a structured approach*. **There are a number of issues**. However, let me share an example of an issue that has arisen in our reviews.

2

3    We have from time to time offered free shipping to customers even though terms of our agreements with those customers provided that the customer would arrange for its own shipping company to pick the products up at our factory shipping dock. ***This practice had the unintended accounting consequence of converting the transaction from an Ex Works transaction to an FOB transaction. If end-of-quarter shipments are adjusted in this way, it can cause the appropriate date for recognizing the revenue for those shipments to slip from one quarter into the next. This is one example of what we are looking for as we review thousands of transactions***.

4

5

6

7

8    The company believes the revenue recognized for review transactions is valid revenue. ***The main issue is the quarter in which revenue must be recognized. We have not yet determined whether the magnitude of any timing adjustment will be material to any of our previously filed financial statements***.

9

10   We continue to work diligently to complete the review, assess the impact, and complete our financial statements and assessment of internal controls over financial reporting. ***We have engaged KPMG to assist us with our review*** and we are also working closely with our independent auditor, Deloitte, to complete the job.  We appreciate the efforts of both KPMG and Deloitte.

11

12

13   ***We are not able today to project the date by which we will complete this review and file all our delinquent SEC reports, but we believe that date is not too far in the future***.

14

15   105.    On August 21, 2018, during the 4Q18 earnings conference call, analysts recognized

16   that the Company's stock price was declining in reaction to Super Micro's delayed SEC filings

17   and noted that the Company had disclosed significant work remained to be done in connection

18   with the delinquent reports:

19   [Nehal Sushil Chokshi]: ***But, Kevin, as you know, the stock is reacting to delayed filing*** and really great color on some of the examples that's going on.  You made a statement at the end that you believe that the ability to [ph] solve these problems is not too far away, but in the second press release of the day it does say that there is still significant work to do.  So can you help bridge the delta between the verbal comment and what's in the file – in what's the 8-K?

20

21

22

23   106.    In response, Bauer admitted that the Company still had a substantial amount of

24   work remaining, possessed "pretty good visibility" on completing the process, had analyzed the

25   largest transactions first and was just now moving toward assessing smaller transactions:

26   [Bauer]: Yeah. So I think it is true that ***we still have a substantial amount of work to do***.  I think what we said in terms of being able to see it in the future is that ***now that we are later in the process we actually have pretty good visibility on what it takes to remain to be able to complete the process***. So that's how I would string them together that it's one of better visibility, but there's still a fair amount to do.

27

28

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS - 3:18-cv-00838-JST                                                              - 49 -
4825-1376-7834.v1

[Nehal Sushil Chokshi]: Okay. *So the process that was defined on what needs to be done to review a transaction was established relatively late relative to when the investigation started about a year ago*. Is that fair to say?

[Bauer]: *Well, certainly, as the results of the investigation came in, we were able to see a little bit more in terms of the processes that we [ph] would needing . . . to do*. *So certainly it was evolving*.

[Nehal Sushil Chokshi]: Okay. And just to be clear, you said significant transactions left for review, but you've already reviewed hundreds of transactions. So are you only a fraction of the way through? Are you like 10% to 20% the way through or are you more like 80%, 90% the way through of what needs to be reviewed?

[Bauer]: Yeah. We really can't go into that level of detail. *What I can share with you is that we've taken the approach of largest transactions and are now going towards smaller transactions*.

107. On August 21, 2018, Wells Fargo issued a report titled "SMCI: Suspension of Coverage," disclosing that Wells Fargo was suspending research coverage in light of Super Micro's failure to meet SEC filing deadlines and the risk of NASDAQ delisting: "[O]ur current policy is that we will suspend research coverage when the Analyst is unable to maintain our existing coverage status due to various legal, regulatory and/or company policy circumstances."

108. On these disclosures, the price of Super Micro's common stock declined from its close of $18.35 per share on August 21, 2018, to a close at $15.65 per share on August 22, 2018 – a decline of over 14.7% – on increased trading volume.

109. On August 22, 2018, Susquehanna Financial Group issued a report titled "Super Micro: Suspending Coverage," disclosing that they were suspending coverage of their ratings and estimates due to Super Micro's failure to meet SEC filing deadlines and NASDAQ listing standards:

Why is it taking the company so long to complete the reviews: SMIC [sic] disclosed last night that its cash flows have not been impacted by the on-going investigation, and there is no need for restatement of financial results. However, *SMCI is still reviewing transactions near the end of each quarter for similar issues found in the earlier reviews, but particularly as it relates to the matching of purchase order and shipping terms to the timing of revenue. In our view, lack of proper internal controls has lengthened this review process. Yes, there is no restatement, but lack of proper internal controls has also made it difficult for the company to provide necessary documentation for the past transactions which is consequently [sic] making it difficult for the company to determine the timing of revenue recognition*.

110. On August 22, 2018, CFRA issued a report detailing concerns about Super Micro's failure to meet SEC filing deadlines and anticipated NASDAQ delisting:

> *We are growing wary after SMCI states it has been unable to complete the analysis of specific revenue transactions found through its audit committee's investigation*. *We expect SMCI to be delisted from the Nasdaq Exchange given its inability to properly file SEC required documents*.

*    *    *

> *We remain concerned about the timetable as well as necessary costs it will take for SMCI to complete its review, as the company still noted a substantial amount of transactions that need to be reviewed*.

*    *    *

> Our 12-month target price of $20 is based on a P/E of 7.7X our FY 19 operating EPS estimate, below comparable peers *to reflect limited visibility surrounding accounting issues*.

111. CFRA's report also contained a research note dated August 22, 2018, 8:33 a.m. ET, which reiterated that the limited visibility surrounding Super Micro's failure to meet SEC filing deadlines coupled with NASDAQ delisting and the substantial number of transactions that needed to be reviewed, impacted the value of the Company's shares:

> 08:33 am ET . . . CFRA KEEPS HOLD OPINION ON SHARES OF SUPER MICRO COMPUTER, INC. (SMCI 18.35***): *We cut our 12-month target to $20 from $24, on steep peer-discount P/E of 7.7X our FY 19 (Jun.) EPS estimate given limited visibility surrounding accounting issues*. . . . While SMCI is benefiting from secular trends within its end-markets, we are growing more cautious after SMCI states it has been unable to complete the analysis of specific revenue transactions identified through its audit committee's investigation. While SMCI cited its findings thus far will not impact its cash flows, we expect the company to be delisted from the Nasdaq Exchange given its inability to properly file SEC required documents. We remain concerned about the timetable as well as necessary costs it will take for SMCI to complete its review, as it still noted a substantial amount of transactions that need to be reviewed. /Angelo Zino, CFA

112. On August 23, 2018, Super Micro issued a press release titled "Super Micro® Announces Suspension of Trading of Common Stock on Nasdaq and its Intention to Appeal," disclosing the Company anticipated its stock suspension from trading on the NASDAQ:

> *Super Micro* Computer, Inc. (NASDAQ:SMCI) (the "Company"), a global leader in high performance, high-efficiency server, storage technology and green computing, *today announced that, as expected, the Company received a notification letter from* The *Nasdaq* Stock Market Hearings Panel (the "Panel") *on August 22, 2018, indicating that trading in the Company's common stock on Nasdaq's Global Select Market will be suspended effective at the open of business on August 23, 2018*.

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS - 3:18-cv-00838-JST
4825-1376-7834.v1

- 51 -

1                                    *      *      *

2          While the Company's common stock is suspended from trading on Nasdaq,
   the Company expects that its shares will be quoted on the OTC Markets under the
3  trading symbol SMCI.  For quotes or additional information on the OTC Markets,
   you may visit http://www.otcmarkets.com.
4
   113.    On August 23, 2018, after the close of trading, Super Micro filed a Current Report
5
   on Form 8-K, signed by Liang, disclosing the NASDAQ Hearing Panel had delisted the
6
   Company's common stock and suspend trading on the NASDAQ as of August 23, 2018.  The
7
   Company indicated that it intended to appeal:
8
          On August 22, 2018, Super Micro Computer, Inc. (the "Company")
9  received a letter from the Hearings Panel (the "Panel") of The Nasdaq Stock Market
   LLC ("Nasdaq") notifying the Company that *the Panel has determined to delist
10 *the Company's common stock and that trading on Nasdaq's Global Select Market*
   *will be suspended effective at the open of business on August 23, 2018*.
11
                                     *      *      *
12
          The Company intends to appeal the Panel's decision to the Nasdaq Listing
13 and Hearing Review Council.  During the appeal period, trading in the Company's
   common stock on Nasdaq will remain suspended and Nasdaq will not delist the
14 Company's common stock pending such appeal. . . .

15         While the Company's common stock is suspended from trading on Nasdaq,
   the Company expects that its shares will be quoted on the OTC Markets under the
16 trading symbol SMCI.

17   114.    On August 29, 2018, after the close of trading, Super Micro filed a Notification of

18 Late Filing on Form 12b-25, signed by Bauer:

19         Super Micro Computer, Inc. (the "Company") is unable to file its Annual
   Report on Form 10-K for fiscal year ended June 30, 2018 (the "2018 Form 10-K")
20 in a timely manner without unreasonable effort or expense.  As previously
   announced, the Company has been unable to file its Annual Report on Form 10-K
21 for the fiscal year ended June 30, 2017 (the "2017 Form 10-K"), Quarterly Report
   on Form 10-Q for the quarter ended September 30, 2017 ("Q1 10-Q"), Quarterly
22 Report on Form 10-Q for the quarter ended December 31, 2017 ("Q2 10-Q") and
   Quarterly Report on Form 10-Q for the quarter ended March 31, 2018 ("Q3 10-Q")
23 (the 2017 Form 10-K, Q1 10-Q, Q2 10-Q, Q3 10-Q and the 2018 Form 10-K being
   collectively referred to herein as the "Delinquent Reports").  The Audit Committee
24 of the Company's Board of Directors has completed the previously disclosed
   investigation. The Company is currently in the process of preparing its financial
25 statements in light of the results of the Audit Committee investigation and other
   ongoing testing.  *A significant number of transactions remain to be reviewed*.
26
          *The delay primarily relates to the magnitude of work that the Company*
27 *still must perform in order to review the Company's accounting judgments,*
   *estimates and records for transactions that occurred during fiscal years 2015*
28 *through 2017, as well as the Company's assessment and conclusions on the*

*effectiveness of its internal control over financial reporting during such periods, so that it can complete the financial statements for the 2017 Form 10-K and subsequently complete the other delinquent reports.* Although the Company has made substantial progress in these matters and committed extraordinary resources and personnel toward the effort, the amount of work is substantial and the additional testing required has taken longer than anticipated.

**Super Micro Announces Need to Restate and Material Weaknesses**

115.    On November 15, 2018, Super Micro filed a Current Report on Form 8-K (the Restatement Announcement) that disclosed the need to restate its financials for each of the quarterly and annual periods during FY15, FY16 and the first three quarters of FY17 (as well as 4Q17 preliminary results), estimated ranges for the restatement, and announced material weaknesses in internal controls and ineffective disclosure controls, as well as remediation efforts taken to date:

> **Item 4.02(a) Non-Reliance on Previously Issued Financial Statements or a Related Audit Report or Completed Interim Review**
>
> On November 14, 2018, the Board of Directors of the Company, based on the recommendation of the Audit Committee and in consultation with management, determined that (i) *the Company's consolidated financial statements and the related reports of its independent registered public accounting firm contained in its Annual Report on Form 10-K for the fiscal years ended June 30, 2016 and 2015, (ii) the Company's previously issued condensed consolidated financial statements contained in its Quarterly Reports on Form 10-Q for the interim quarterly periods for the previously mentioned fiscal years ended June 30, 2016 and 2015 and (iii) the Company's previously issued condensed consolidated financial statements contained in its Quarterly Reports on Form 10-Q for the quarterly periods ended March 31, 2017, December 31, 2016 and September 30, 2016 should no longer be relied upon because of errors. The errors primarily related to the timing of recognition of revenue and classification of certain inventory used for engineering purposes and certain products returned to the Company for repair as inventory. Revenue recognition timing issues included quarter-end cut-off determinations and allocation of revenue determinations for customer contracts with service elements.* To date, none of the revenue recognition errors identified relating to customer transactions involved revenues that could not ultimately be recognized. The Company also plans to correct other accounting errors discovered through management's review process. To date, the Company believes total cash flows from operating, investing, and financing have not been impacted, with the exception of certain balance sheet classification errors that have been determined to have an immaterial effect on cash and cash flows from operations.
>
> *                    *                    *
>
> *The Company intends to restate its financial statements for prior periods as required.* The Company's preliminary estimates for the changes in revenue, net income and GAAP earnings per share for the fiscal years ended June 30, 2015 and 2016 (as contained in the Company's Annual Reports on Form 10-K filed with the

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS - 3:18-cv-00838-JST
4825-1376-7834.v1

- 53 -

1   Securities and Exchange Commission (the "SEC") on September 10, 2015 and
2   August 26, 2016, respectively) and the fiscal year ended June 30, 2017 (as
    announced on a preliminary basis in an exhibit to the Company's Current Report
3   on Form 8-K furnished on August 3, 2017) resulting from the expected restatement
    is as set forth below (in millions, except per share amounts).

4                              *        *        *

5          The Company intends to file its restated consolidated financial statements
    as soon as practicable; however, the Company cannot predict with certainty when
6   the preparation of its prior period restated financial statements, as well as its Forms
    10-Q and Forms 10-K for subsequent periods, will be completed. As part of the
7   restatement process, the Company is continuing to assess the adjustments identified
    above and will assess any other potential items for correction as needed.

8
           In addition, the Company is evaluating the impact of the identified errors
9   on its internal control over financial reporting and disclosure controls and
    procedures. ***The Company will report material weaknesses in internal control***
10  ***over financial reporting related to this matter and will report that its disclosure***
    ***controls and procedures were ineffective.*** The Company has already commenced
11  efforts to remediate its material weaknesses. The Company will report those
    material weaknesses and its remediation efforts in its Annual Report on Form 10-
12  K for the year ended June 30, 2017.

13         116.    In the Restatement Announcement, Super Micro reported the preliminary estimated

14  restatement impact on its revenues, net income and diluted EPS for the fiscal years ended June 30,

15  2015, June 30, 2016 and June 30, 2017.  Using the mid-point estimate from the "Expected

16  Adjustment Range," Super Micro over a three year cumulative period overstated revenues by $60

17  million, net income by $8.5 million and EPS by $0.16.

18
| | Year Ended as Reported | | | | | | Year Ended as Announced | | |
|---|---|---|---|---|---|---|---|---|---|
| | June 30, 2015 | | | June 30, 2016 | | | June 30, 2017 | | |
| | As Reported | Expected Adjustment Range | Expected as Adjusted Range | As Reported | Expected Adjustment Range | Expected as Adjusted Range | As Announced | Expected Adjustment Range | Expected as Adjusted Range |
| Revenue | $1,991 | $(40) - $(20) | $1,951 - $1,971 | $2,216 | $3 - $23 | $2,219 - $2,239 | $2,530 | $(53) - $(33) | $2,477 - $2,497 |
| Net Income | $102 | $(8) - $(5) | $94 - $97 | $72 | $2 - $5 | $74 - $77 | $69 | $(7) - $(4) | $62 - $65 |
| Diluted Earnings per Share | $2.03 | $(0.15) - $(0.09) | $1.88 - $1.94 | $1.39 | $0.04 - $0.10 | $1.43 - $1.49 | $1.34 | $(0.14) - $(0.08) | $1.20 - $1.26 |

24         117.    The Restatement Announcement also announced the Company's intention to

25  restate the non-GAAP EPS amounts that it previously disclosed for prior periods in its quarterly

26  earnings releases.  Using the mid-point estimate, Super Micro over a three year cumulative period

27  overstated non-GAAP EPS by $0.13.  The Company's estimates of the changes to the non-GAAP

28  EPS amounts are set forth below:

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATION OF THE
FEDERAL SECURITIES LAWS - 3:18-cv-00838-JST                                          - 54 -
4825-1376-7834.v1

| | Year Ended as Reported | | | | | | Year Ended as Announced | | |
| | June 30, 2015 | | | June 30, 2016 | | | June 30, 2017 | | |
| | As Reported | Expected Adjustment Range | Expected as Adjusted Range | As Reported | Expected Adjustment Range | Expected as Adjusted Range | As Announced | Expected Adjustment Range | Expected as Adjusted Range |
|---|---|---|---|---|---|---|---|---|---|
| GAAP | $2.03 | $(0.15) - $(0.09) | $1.88 - $1.94 | $1.39 | $0.04 - $0.10 | $1.43 - $1.49 | $1.34 | $(0.14) - $(0.08) | $1.20 - $1.26 |
| Less: Stock-based Compensation net of Tax Effect | 0.12 | 0.01   0.01 | 0.13   0.13 | 0.20 | 0.01   0.01 | 0.21   0.21 | 0.23 | 0.01   0.01 | 0.24   0.24 |
| Non-GAAP | $2.15 | $(0.14) - $(0.08) | $2.01 - $2.07 | $1.59 | $0.05 - $0.11 | $1.64 - $1.70 | $1.57 | $(0.13) - $(0.07) | $1.44 - $1.50 |

118.    The Company also issued a press release the same day titled "Supermicro® Announces First Quarter Fiscal 2019 Preliminary Financial Information and Decision to Restate Prior Period Financial Statements," which discussed the need for restatement and continued testing:

### Decision to Restate Prior Period Financial Statements

Also today, the Company filed a Current Report on Form 8-K with the Securities and Exchange Commission noting that on November 14, 2018, the Board of Directors of the Company, based on the recommendation of the Audit Committee and in consultation with management, determined to restate prior period financial statements and advised that those financial statements should not be relied upon. The restatement primarily relates to the timing of recognition of revenue and classification of certain inventory. The Company believes total cash flows from operating, investing, and financing have not been affected with the exception of certain balance sheet classification errors that have been determined to have an immaterial effect on cash and cash flows from operations. Investors are encouraged to review that report. Included in the Form 8-K are the Company's preliminary estimates for the changes in revenue, net income, GAAP diluted earnings per share and non-GAAP diluted earnings per share for the fiscal years ended June 30, 2015 and 2016 (as reported) and fiscal year ended June 30, 2017 (as announced).

119.    On November 15, 2018, the Company held an earnings conference call in which it discussed the restatement and elaborated on steps taken to remediate certain material weaknesses:

[Bauer:]   Now, let's turn to the progress we are making on the fiscal 2017 Form 10-K. The company has substantially completed its testing and assessments. Today, we announced that we have determined to restate prior period financials and provided estimated adjusted amounts. We are in the final stages of preparation and conclusion, so that we may continue to work with our auditors to complete our 2017 Form 10-K. *The core basis of the restatements remains the timing of revenue recognition.* Based on our assessment to date, the company confirms that, although in our restated financials some revenue recognized in prior periods will be recognized in a subsequent period, all revenue from customer transactions in the period subject to the restatement is valid revenue. *During our review of prior periods, we also discovered additional errors relating to the classification of certain inventories.*

*The number and breadth of the adjustments, coupled with their aggregate magnitude was significant enough for us to conclude that restating prior periods was necessary.* To date, we believe total cash flows from operating, investing and financing have not been impacted with the exception of certain balance sheet classification errors that have been determined to have an immaterial effect on cash and cash flow from operations.

*Based on our findings, we expect to report material weaknesses of our financial reporting*. We have, depending on the matter, begun remediation measures to varying degrees. Along the way, *we have developed stronger revenue policies, trained employees, and developed new standards*.

There are a number of remediation efforts. Let me share a few examples. *We have hired senior revenue talent and grown our revenue team, implemented strong cut-off controls including locking the shipping dock at the close of the quarter and enhancing our revenue testing, and we have revamped the sales sub-certification process at quarter end*. In addition, we have formed a new internal audit team that is conducting testing on the second half of 2018 and absorbing the transfer of knowledge from the efforts of our advisors in the process.

**Super Micro Restates and Amends Financial Results for Five Year Period**

120.    On May 17, 2019, Super Micro filed its delayed FY17 Form 10-K (for the fiscal year ending June 30, 2017), as well as Forms 10-Q/A for 1Q17-3Q17 (the quarters ending September 30, December 31, 2016 and March 31, 2017, respectively).[12]  The FY17 Form 10-K restated Super Micro's: (i) FY16 balance sheet and related statements of operations, income and equity and cash flows for FY15 and FY16; (ii) selected financial data for FY15 and FY16; (iii) management's discussion and analysis of financial condition and results of operations for FY15 and FY16; and (iv) quarterly financial information for 4Q16.  The FY17 Form 10-K also reported "Adjustments" for FY13 and FY14.

121.    Super Micro's FY17 Form 10-K stated that the Company's internal controls over financial reporting and disclosure controls were ineffective due to material weaknesses:

*We have concluded that our internal control over financial reporting was not effective as of June 30, 2017 due to the existence of material weaknesses in such controls, and we have also concluded that our disclosure controls and procedures were not effective as of June 30, 2017 due to material weaknesses in our internal control over financial reporting* . . . .

---

[12]  Super Micro's 1Q17, 2Q17 and 3Q17 Forms 10-Q/A included, among other matters, restatements of: (1) the Company's condensed consolidated balance sheet and the related condensed consolidated statements of operations, comprehensive income and cash flows; and (2) its management's discussion and analysis of financial condition and results of operation.  *See* ¶¶142-142.

122.     The Company described the material weaknesses related to principles associated with the control environment.  In addition, Defendants admitted that Super Micro had engaged in specific fraudulent and deliberate conduct to prematurely recognize revenue, including but not limited to "altering source documents related to . . . sales transactions," and "failing to disclose or obscuring material facts about sales transactions."  Specifically, Defendants stated in relevant part:

- *We had a culture of aggressively focusing on quarterly revenue without sufficient focus on compliance. Senior management did not establish and promote a control environment with an appropriate tone of compliance and control consciousness throughout the entire Company.   The Company did not sufficiently promote, monitor or enforce adherence to the Code of Conduct.  In the pursuit of quarterly revenue, certain of our sales, finance and operations personnel, including officers and managers, were aware of, condoned or were involved in actions that reflected an inappropriate tone at the top, that violated our Code of Conduct and our accounting policies and procedures, and that were inconsistent with a commitment to integrity and ethical values.  These actions included (i) shipping products in advance of customer requested delivery dates, (ii) shipping products to storage facilities at the end of a quarter for later delivery to customers, (iii) in certain cases entering into side agreements with customers, (iv) in certain cases, shipping products before manufacturing was completed, (v) altering source documents related to some sales transactions and (vi) failing to disclose or obscuring material facts about sales transactions. As a result of those actions, we recognized revenue from numerous sales transactions in the incorrect period, although these valid sales transactions were recognized in one or more subsequent quarters in the aforementioned restatement. Some employees, including officers and managers, also failed to raise issues with material accounting consequences to the Audit Committee and our external auditors, and with respect to one transaction, appear to have attempted to minimize material facts about a sales transaction to, or obscure those facts from, the Audit Committee and our external auditors. Finally, we did not, on a consistent basis, (i) timely and thoroughly detect and address failures to comply with the Code of Conduct and (ii) train employees adequately to identify and report issues to management and the Audit Committee.*

- *The Company did not maintain a sufficient complement of management, accounting, financial reporting, sales, operations, engineering and information technology personnel* who had appropriate levels of knowledge, experience, and training in accounting and internal control matters commensurate with the nature, growth and complexity of our business. The lack of sufficient appropriately skilled and trained personnel contributed to our failure to (i) adequately identify potential risks, (ii) include in the scope of our internal controls framework certain systems relevant to financial reporting and the preparation of our consolidated financial statements, (iii) design and implement certain risk-mitigating internal controls and (iv) consistently operate certain of our internal controls. The lack of sufficient appropriately skilled and trained personnel also contributed to deficiencies in establishing and maintaining policies and procedures, establishing and enforcing standards for maintaining

documents for revenue recognition purposes and establishing accountability for internal controls across the entire Company.

123.    The Company's FY17 Form 10-K also identified material weaknesses in connection with revenue recognition accounting, stating in relevant part:

> ***The Company identified deficiencies in revenue recognition accounting controls that resulted in material errors constituting material weaknesses, either individually or in the aggregate, as the Company did not appropriately design, or effectively operate, internal controls over certain aspects of accurate recording, presentation, and disclosure of revenue and related costs.*** The following were contributing factors to the material weaknesses in revenue recognition accounting:

- The Company's internal controls did not consistently identify and properly account for key non-standard contract or arrangement terms for sales transactions that involved multiple elements (such as when the price of a system includes an extended warranty period and/or the Company's agreement to provide services to its customer). Specifically, the Company's internal controls failed to identify, accumulate and assess the accounting impact of situations in which they recognized revenue before all the elements necessary to establish "delivery" had occurred.

- With respect to sales transactions near quarter-end, the Company's internal controls failed to consistently identify transactions where the terms of the sales arrangements with its customers were not properly documented in a form that fully reflected the final understanding between the parties as to the specific nature and terms of the agreed-upon transaction.

- The Company's internal controls failed to consistently identify, resolve, document in its accounting system and allow for proper accounting where there were inconsistencies among the various documents underlying its sales transactions, and the Company did not always communicate the existence or resolution of those inconsistencies to its accounting organization to enable the proper recognition of revenue.

- The Company lacked a control to ensure a consistent approach for reviewing its pricing and establishing supportable estimates of best estimated selling prices in allocating revenue between multiple elements. Consequently, the Company did not always correctly calculate the portions of the total revenue recognized from sales transactions allocated among the various elements.

124.    Under Note 19, "Restatement of Previously Issued Consolidated Financial Statements," the FY17 Form 10-K stated the following:

> During the course of the Investigation, the further procedures by outside counsel and the management analysis (collectively, the "Investigation, Procedures and Analysis"), ***the Audit Committee and management determined certain employees had violated the Company's Code of Business Conduct and Ethics and discovered accounting and financial reporting errors and certain irregularities.*** On November 14, 2018, the Board, upon the recommendation, and with the concurrence of the Audit Committee and new members of management, concluded

1    that certain previously filed consolidated financial statements and related financial
     information should no longer be relied upon.

2

3        As a result, within these consolidated financial statements, the Company
     has included the restated consolidated financial statements as of and for the years
     ended June 30, 2016 and June 30, 2015, which is referred to as the "Restatement".

4    The Restatement corrects errors and certain irregularities which are discussed in
     detail within this footnote.

5

6        ***The errors and certain irregularities primarily related to the timing of
     recognition of (i) revenue, (ii) expenses related to certain inventory used for
     engineering and marketing purposes and (iii) expenses related to defective***

7    ***products under warranty not returned by customers. Additionally, errors were
     identified whereby the Company had derecognized inventory while control over***

8    ***such inventory was retained because the Company was obligated to buy it back.***

9        125.    The FY17 Form 10-K described the Company's improper revenue recognition on

10   product sales, stating in relevant part:

11       ***During the fiscal years ended June 30, 2016 and 2015, product revenue
     was recognized prematurely.*** As a result of the information gathered in the
     Investigation, Procedures and Analysis, ***it was determined that there was an***

12   ***aggressive focus on quarterly revenue without sufficient focus on compliance by
     an appropriate number of competent resources, and all relevant information was***

13   ***not communicated among the Company's internal functions as well as the
     management to both the Audit Committee and the independent auditors that***

14   ***resulted in the inappropriate recording of revenue with insufficient
     documentation or rigorous assessment of revenue transactions.*** The Company

15   found instances where (i) title and risk of loss had not transferred to the customer,
     (ii) persuasive evidence of an arrangement with the customer consistent with the

16   Company's customary business practices was not present, (iii) the distributor's
     price was not fixed or determinable, or (iv) collectibility was not reasonably

17   assured, all of which resulted in premature recognition of revenue.

18       126.    The FY17 Form 10-K described the Company's improper revenue recognition in

19   connection with service revenues, stating in relevant part:

20

21       During the fiscal years ended June 30, 2016 and 2015, ***services revenue was
     misstated as it was determined that as a result of the information gathered in the
     Investigation, Procedures and Analysis there were errors related to inaccurate***

22   ***allocation of contract consideration for multiple element arrangements*** resulting
     from (a) lack of proper identification or accounting for contractual service

23   obligations, (b) incorrect allocation of discounts to service related deliverables, and
     (c) lack of a robust process resulting in inaccurate determination of BESP [Best

24   Estimated Selling Price]. Additionally, there were misalignments of the revenue
     recognition period and the contractual requisite service period. Consequently,

25   certain contracts for extended warranties on products or on-site services in multiple
     element arrangements were incorrectly recorded as revenue at the time of sale of

26   the product instead of being deferred and amortized over the contractual warranty
     or service period. The Company had previously identified a portion of these errors

27   in the amount of $9.0 million related to extended warranty in a prior period and had
     adjusted the consolidated financial statements for the fiscal year ended June 30,

28   2016 for their cumulative effect with an out-of-period correction to revenues.

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATION OF THE
FEDERAL SECURITIES LAWS - 3:18-cv-00838-JST                                                    - 59 -

1      127.    The FY17 Form 10-K also revealed that the material weakness related to revenue

2    recognition previously disclosed in November 2015 and purportedly addressed, had not been

3    remediated as of the filing of the FY17 Form 10-K:

4              ***In addition, in November 2015, we reported a material weakness in our
            internal control over financial reporting related to the revenue recognition of
5            contracts with extended product warranties. This material weakness has not been
            fully remediated as of the filing date of this Annual Report on Form 10-K***, and
6            we cannot ensure that other errors or material weaknesses will not be identified in
            the future. If we fail to maintain an effective system of internal control over
7            financial reporting, the accuracy and timeliness of our financial reporting may be
            adversely affected.
8
9      128.    In connection with inventory, the Company's FY17 Form 10-K stated in relevant

10    part:

11              As of June 30, 2016 and 2015, inventories were overstated due to
            misapplication of accounting principles, whereby materials issued from inventory
12            to research and development projects and marketing with no alternative use were
            included as inventory and expensed upon completion of a project rather than being
13            expensed upon consumption.

14              Also as of June 30, 2016 and 2015, inventories were understated due to
            misapplication of accounting principles, whereby (i) inventory of materials
15            transferred to certain contract manufacturers was improperly derecognized upon
            transfer that the Company retained control over the materials because it was
16            obligated to buy them back; and (ii) in-transit inventory was not being recorded in
            the appropriate period due to improper cut-off procedures.

17      129.    The Company's FY17 Form 10-K detailed numerous negative consequences in

18    connection with material weaknesses in Super Micro's internal controls over financial reporting.

19    For example, Super Micro admitted in its FY17 Form 10-K that its "[f]ailure to timely file our

20    SEC reports and make our current financial information available, ***has placed, and will continue***

21    ***to place, downward pressure on our stock price*** . . . ."  Super Micro also stated that the delays

22    caused by its investigation – and the further delays it may create – resulted in "a greater degree of

23    risk" when investing in Super Micro stock.  Further, the "lack of current public information may

24    have an adverse impact on investor confidence, which could lead to a reduction in our stock price."

25    The Company also noted that its inability to file its SEC filings, "precludes us from raising debt

26    or equity financing in the public markets and limits our access to the private markets and also

27    limits our ability to use stock options and other equity-based awards to attract, retain and provide

28    incentives to our employees."

130.     Further, Super Micro admitted in its FY17 Form 10-K that it had incurred, and expected to continue incurring, significant expenses in connection with the investigation into and as a result of its internal control weaknesses:

> Specifically, in connection with the Audit Committee's Investigation, Procedures and Analysis, audit and compliance efforts and related litigation, *we have incurred professional fees totaling $40.6 million in fiscal year 2018 and $50.7 million through the third quarter of fiscal year 2019*.

131.     Super Micro also admitted in its FY17 Form 10-K that their SAP system would need further enhancements and developments in order to automate internal controls:

> We have incurred and expect to continue to incur additional expenses related to our ERP systems, as we continue to further enhance and develop them, including by automating certain internal controls.

132.     The FY17 Form 10-K detailed the status of Super Micro's remediation actions, stating in relevant part, that the Company had taken the following steps:

- Restructured our sales organization, which resulted in the resignations of the Senior Vice President of International Sales, the Senior Vice President of Worldwide Sales, the Vice President, Strategic Accounts, the Vice President, Strategic Sales, the Vice President, Business Development and certain other sales personnel.

- Appointed experienced professionals to key accounting and finance and compliance leadership positions, including the appointments of a new Chief Financial Officer and a new Corporate Controller in January 2018, and the creation of, and appointments to, two newly established roles of Chief Compliance Officer and Vice President of Internal Audit in May 2018 and August 2018, respectively.

- Reviewed and amended our Code of Conduct to align with the organizational changes described above and to strengthen certain provisions regarding compliance and reporting.

- Adopted an Internal Audit Charter setting forth the responsibilities of the internal audit function and establishing that the Vice President of Internal Audit reports directly to the Audit Committee and that the Audit Committee has authority to provide adequate funding for this function.

- Changed our organizational structure to narrow the scope of responsibilities of certain of our senior executives and to revise various reporting relationships, which included the appointment of a new Senior Vice President of Worldwide Sales, and a new Senior Vice President of Operations.

- Conducted training in the following areas:

  − Revenue recognition training for our global sales force, various operations personnel, and certain senior executives, including our CEO,

which included detailed examples of acceptable and unacceptable sales practices,

‒ Reviewing with our senior management team our amended Code of Conduct,

‒ Reviewing with our CEO enhanced processes for periodic evaluations by the CEO and the CFO of the effectiveness of our disclosure controls and procedures, and the periodic assessments by the CEO and the CFO of the effectiveness of our internal control over financial reporting, and other compliance matters, and

‒ Shipping and cut-off training for accounting and operations personnel that included new requirements for quarter-end procedures.

• Upgraded our accounting department to include the new roles of Senior Director of Tax, Financial Audit Director and Information Technology Audit Director, as well as replaced certain of our accounting personnel with more experienced individuals, including rebuilding and expanding our revenue recognition team.

• Enhanced the sales sub-certification document that supports our CEO's and CFO's financial statement certifications and expanded the sub-certification participation population to the global sales force.

133. The FY17 Form 10-K also disclosed some of the more significant remaining remediation activities including:

• Developing and implementing an ongoing compliance training program regarding significant accounting and financial reporting matters, as well as broad compliance matters, for accounting, financial reporting, sales and operations personnel, as well as for our CEO, our other corporate executives and the Board.

• Integrating the responsibility for internal controls across business functions to ensure accountability for internal controls beyond the accounting and finance team.

• Continuing to assess current staffing levels and competencies to ensure the optimal complement of personnel with appropriate qualifications and skill sets.

• Reevaluating and revising our Sarbanes-Oxley compliance program (our "SOX Program"), and making improvements to our SOX Program governance, risk assessment processes, testing methodologies and corrective action mechanisms.

• Redesigning and implementing necessary changes to the existing system of internal controls in the context of the revised and more comprehensive risk assessment.

• Assigning accountability for certain internal controls to our Compliance Department, such as our organizational-wide quarterly sales certification process.

- Reevaluating the boundary applications that interface with our primary accounting and reporting application and redesigning logical access and program change controls to enhance the reliability of information used to conduct other internal controls.

- Continuing to re-assess risks and controls related to the accurate recording, presentation, and disclosure of revenue and related costs.

134. Deloitte signed a May 16, 2019 Report of Independent Registered Public Accounting Firm ("May 16, 2019 Audit Report") in connection with its audit of Super Micro. In the May 16, 2019 Audit Report, Deloitte emphasized Super Micro's restatement and related party footnotes and also rendered an ***adverse opinion*** on the Company's internal controls due to material weaknesses:

As discussed in Note 19 to the consolidated financial statements, ***the accompanying 2016 and 2015 consolidated financial statements have been restated to correct misstatements.***

As discussed in Note 11 to the consolidated financial statements, ***the Company has significant purchases from and sales to two related parties***.

We have also audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), the Company's internal control over financial reporting as of June 30, 2017, based on the criteria established in *Internal Control-Integrated Framework (2013)* issued by the Committee of Sponsoring Organizations of the Treadway Commission and ***our report dated May 16, 2019 expressed an adverse opinion on the Company's internal control over financial reporting because of material weaknesses.***

135. Deloitte also included in its May 16, 2019 Audit Report that the Company had identified deficiencies with its control environment, risk assessment, control activities and revenue recognition accounting, among other matters. In light of Super Micro's material weaknesses, Deloitte stated, among other matters, that:

In our opinion, because of the effect of the material weaknesses identified above on the achievement of the objectives of the control criteria, the Company ***has not maintained effective internal control over financial reporting*** as of June 30, 2017, based on the criteria established in *Internal Control - Integrated Framework (2013)* issued by the Committee of Sponsoring Organizations of the Treadway Commission.

136. As to Super Micro's deficient control environment, Deloitte substantially reiterated the material weaknesses that the Company identified. *See* ¶122.

137. Deloitte also reiterated that Super Micro's revenue recognition accounting suffered from material errors constituting material weaknesses. *See* ¶123.

138.   Super Micro also admitted in its FY17 Form 10-K that its Restatement and internal control weaknesses negatively impacted the Company's business and financial condition as well as its reputation:

> ***Matters relating to or arising from the restatement and the results of the Investigation, Procedures and Analysis of our internal control over financial reporting, including adverse publicity and potential concerns from our customers, have had and could continue to have an adverse effect on our business and financial condition.***

139.   The Form 10-K stated that the Company was delisted from the NASDAQ due to its delays in filing periodic reports with the SEC which presented significant risks to the Company:

> The delisting of our common stock from Nasdaq may have a material adverse effect on us by, among other things, causing investors to dispose of our shares and limiting:
>
> •       The liquidity of our common stock;
>
> •       The market price of our common stock;
>
> •       The number of institutional and other investors that will consider investing in our common stock;
>
> •       The availability of information concerning the trading prices and volume of our common stock;
>
> •       The number of broker-dealers willing to execute trades in shares of our common stock; and
>
> •       Our ability to obtain equity or debt financing for the continuation of our operations.

## SUPER MICRO'S FINANCIAL STATEMENTS WERE MATERIALLY MISSTATED AND ITS INTERNAL CONTROLS HAD MATERIAL WEAKNESSES

### Defendants Have Restated Super Micro's Financial Statements

140.   During the Class Period, Super Micro's reported financial results were included in Forms 10-Q and 10-K and in related earnings releases filed with the SEC.  Super Micro's SEC filings represented that the financial information was a fair statement of the Company's financial results and that the results were prepared in accordance with GAAP.[13]  These representations were

---

[13]   GAAP are those principles recognized by the accounting profession as the conventions, rules, and procedures necessary to define accepted accounting practice at a particular time.   SEC Regulation S-X (17 C.F.R. §210.4-01(a)(1)) ("Regulation S-X") states that financial statements filed with the SEC that are not prepared in compliance with GAAP are presumed to be misleading and inaccurate, despite footnotes and other disclosure.   Regulation S-X requires that interim

1  false and misleading as the financial results were not a fair statement and were not prepared in

2  accordance with GAAP.

3       141.   On November 15, 2018, Defendants filed the Restatement Announcement

4  disclosing that Super Micro would restate its previously issued financial statements for FY15-

5  FY17 due to improper revenue recognition and inventory misstatements.  In the Restatement

6  Announcement, Defendants provided preliminary estimates for the changes in revenue, net income

7  and GAAP earnings per share.  *See* ¶¶116-117.

8       142.   On May 17, 2019, Defendants finalized and issued the Restatement, specifically

9  filing amended quarterly reports on Form 10-Q/A for the quarters ended September 30, 2016,

10  December 31, 2016 and March 31, 2017, which included restated financial results for the quarters

11  ended September 30, 2015, December 31, 2015, March 31, 2016, September 30, 2016, December

12  31, 2016 and March 31, 2017.  Defendants also filed the delayed FY17 Form 10-K which contained

13  financial results that differed from: (i) the Company's unaudited preliminary financial information

14  for the year ended June 30, 2017, previously included as an exhibit to the Company's August 3,

15  2017 Form 8-K; and (ii) the ranges previously included in the Restatement Announcement.  The

16  FY17 Form 10-K also included restated financial results for each of the fiscal years ended June

17  30, 2015, and June 30, 2016 as well as quarterly financial information for the three months ended

18  June 30, 2016.  In addition, the Company's FY17 Form 10-K also disclosed that the Company had

19  misstated its financial results for each of the fiscal years ended June 30, 2013 and June 30, 2014,

20  for the same inventory and revenue recognition issues requiring FY15 through FY17 to be restated.

21  ***In other words, for five consecutive years, Super Micro had prematurely recognized revenue***

22

23  financial statements must also comply with GAAP, with the exception that interim financial
24  statements need not include disclosures that would be duplicative of disclosures accompanying
   annual disclosures, pursuant to 17 C.F.R. §210.10-01(a).  On June 30, 2009, the Financial
25  Accounting Standards Board ("FASB") issued the Statement of Financial Accounting Standards
   No. 168, *The FASB Accounting Standards Codification and the Hierarchy of Generally Accepted*
26  *Accounting Principles – a replacement of FASB Statement No. 162*.  FASB Accounting Standards
   Codification ("ASC") became the source of authoritative U.S. accounting and reporting standards
27  for nongovernmental entities, in addition to guidance issued by the SEC, effective for financial
   statements issued for reporting periods that ended after September 15, 2009.  The ASC did not
28  change existing U.S. GAAP.

1  ***and misstated its financial results***.  At Attachments 1-4, Plaintiffs have shown Super Micro's

2  adjustments to its originally reported false financial results for the Company's income statement

3  from FY13 through FY15, FY16 (including interim periods), FY17 (including interim periods)

4  and the Company's balance sheet for FY16 and FY17 (including interim periods).

5       143.  As seen at Attachments 1-4, the Restatement adjusted nearly every financial

6  account on the income statement and the majority of financial accounts on the balance sheet.  In

7  total, from FY13 to FY17, Super Micro overstated revenues by $104.7 million (or 1.1%),

8  overstated net income by $20.3 million (or 6.8%) and overstated EPS by $0.41 (or 6.8%).  Super

9  Micro falsely reported its financial condition by materially misstating items on its balance sheet,

10  including, among other items, accounts receivable ("A/R"), inventory, prepaid expenses and other

11  current assets, accounts payable and accrued liabilities.[14]  Finally, contrary to Defendants'

12  representation in the Restatement Announcement that total cash flows were likely to not be

13  restated, the Company has restated its statements of cash flows.

14  **Super Micro's Restatement Is an Admission of Falsity**

15       144.  The fact that Super Micro has now restated its financial results, including revenues,

16  net income and EPS, is an admission that its prior financial statements were false, not prepared in

17  accordance with GAAP and that the misstated financial statements were material.  Under ASC

18  Topic 250, *Accounting Changes and Error Corrections*, the type of restatement and revisions

19  announced by Super Micro were to correct for material errors in previously issued financial

20  statements.  Further, a restatement of previously issued financial statements is only allowed when

21  a Company makes "[a]n error in recognition, measurement, presentation, or disclosure in financial

22  statements resulting from mathematical mistakes, mistakes in the application of generally accepted

23

---

[14]  In addition, Super Micro also disclosed its transactions and the nature of its relationship with related parties Ablecom Technology, Inc. ("Ablecom") and Compuware Technology, Inc. ("Compuware"), which required restatement as well.  *See* Attachments 1-4.  Ablecom is one of Super Micro's major contract manufacturers and its Chief Executive Officer, Steve Liang, is a brother of Defendant Liang.  As of June 30, 2017 Liang and his spouse Sara Liu, together owned approximately 10.5% of Ablecom's capital stock.  Compuware is both a distributor of Super Micro's products and a contract manufacturer to Super Micro.  The Chief Executive Officer of Compuware, Bill Liang, is also a brother to Defendant Liang.  Bill Liang is a member of the Board of Directors of Ablecom.

accounting principles (GAAP), or oversight or misuse of facts that ***existed at the time the financial statements were prepared***."  ASC 250-10-20.  Thus, GAAP provides that financial statements should only be restated in limited circumstances, *i.e.*, there is a change in reporting entity, there is a change in accounting principles used, or ***to correct an error in previously issued financial statements***.  Super Micro's restatement was not due to a change in reporting entity or a change in accounting principle, but rather to correct errors in previously issued financial statements approved by Defendants.  Thus, the restatement is an admission by Defendants that Super Micro's previously issued financial results and Defendants' public statements regarding those results were false and misleading.

**Defendants' GAAP Violations Required Restatement of Its Financial Statements**

145.    Defendants manipulated their financial results through a host of improper accounting practices that violated GAAP resulting in the Restatement.  These improper accounting practices primarily related to: (i) premature revenue recognition on product revenue and service revenue; (ii) expenses related to certain inventory used for engineering and marketing purposes; and (iii) expenses related to defective products under warranty not returned by customers.  Additionally, errors were identified whereby the Company had derecognized inventory while control over such inventory was retained because the Company was obligated to buy it back.  These improper accounting practices are described further below.

*Premature Revenue Recognition in Violation of GAAP*

146.    During the Class Period, Super Micro violated basic revenue recognition rules facilitated by senior management's ineffective tone at the top that aggressively focused on maximizing quarterly revenue without sufficient GAAP compliance.  Super Micro was required to follow the revenue recognition rules found in FASB Accounting Standards Codification Topic 605, *Revenue Recognition*, ("ASC 605"), but failed to do so.  Under ASC 605, revenue can only be appropriately recognized under GAAP when it is both: (a) "realized" ("or realizable") and (b) "earned."[15]  ASC 605-10-25-1.  Critically, ASC 605 lists four criteria that ***all*** must be met before

---

[15]    Pursuant to ASC 605, "revenue and gains are ***realized*** when products (goods and services), merchandise, or other assets are exchanged for cash or claims to cash," while "revenue and gains

revenue can be appropriately recognized under GAAP.  The four criteria necessary for revenue to be "realized" and "earned" are: (i) "Persuasive evidence of an arrangement exists"; (ii) "Delivery has occurred or services have been rendered"; and (iii) "The seller's price to the buyer is fixed or determinable"; and (iv) "Collectibility is reasonably assured." ASC 605-10-S99-1.

147.    Defendants have admitted that Super Micro prematurely recorded revenue in violation of GAAP by contravening **all** four criteria.  As stated in the Company's FY17 Form 10-K:

> As a result of the information gathered in the Investigation, Procedures and Analysis, it was determined that there was an aggressive focus on quarterly revenue without sufficient focus on compliance by an appropriate number of competent resources, and all relevant information was not communicated among the Company's internal functions as well as the management to both the Audit Committee and the independent auditors that resulted in the inappropriate recording of revenue with insufficient documentation or rigorous assessment of revenue transactions.  The Company found instances where (i) title and risk of loss had not transferred to the customer, (ii) persuasive evidence of an arrangement with the customer consistent with the Company's customary business practices was not present, (iii) the distributor's price was not fixed or determinable, or (iv) collectability was not reasonably assured, all of which resulted in premature recognition of revenue.

148.    Super Micro's premature revenue recognition was driven by material weaknesses in internal controls, including an ineffective control environment and ineffective tone at the top, where Super Micro: (i) shipped products before customers had requested them; (ii) shipped products to storage facilities at quarter-end for later delivery to customers[16]; (iii) entered side agreements with customers that disallowed revenue recognition; (iv) shipped products to customers before manufacturing was completed; (v) altered source documents to facilitate improper sales; and (vi) officers and managers failed to raise, disclose or obscured facts with

---

are **realizable** when related assets received or held are readily convertible to known amounts of cash or claims to cash."  ASC 605-10-25-1.  Similarly, revenue is "earned" when an "entity has substantially accomplished what it must do to be entitled to the benefits represented by the revenues."  *Id*.

[16]    Super Micro shipping products to a storage facility for later delivery to a customer is an example of a classic bill and hold scheme.  ASC 605 warns this type of transaction is likely to prohibit revenue recognition because the "delivery" criterion is not considered to have been met because the buyer has not taken title and assumed the risk and rewards of ownership of the products.  ASC 605-10-S99-1.

1    material accounting consequences from the Company's Audit Committee and Deloitte.  As a result

2    of these improper actions, Super Micro recognized revenue from numerous sales transactions in

3    the incorrect period for at least five years. [17]

4         149.    Defendants' false and misleading statements during the Class Period disclosing and

5    certifying to the accuracy of the Company's financial results is egregious given the blatant

6    misconduct utilized to improperly inflate sales.  For example, altering source documents on

7    transactions is a tell-tale sign that the Company knew the sales were improper.[18]  Further, officers

8    and managers' efforts to conceal information from the Company's Audit Committee or external

9    auditors evidences an expectation that no reasonable accountant would have approved recording

10   these sales.

11        150.    Super Micro also recognized services revenue prematurely in violation of GAAP

12   through inaccurate allocation of contract consideration for multiple element arrangements and

13   misalignments of the revenue recognition period and the contractual requisite service period.  As

14   a result, certain contracts were incorrectly and prematurely recorded as revenue at the time of sale

15   in violation of GAAP instead of being deferred and amortized over the contractual warranty or

16   service period.  Notably, in November 2015, Super Micro had previously identified revenue errors

17   related to this issue (*i.e.*, extended warranty service contracts) and recorded a prior period

18   adjustment of $9 million in 1Q16 and amended its 2015 Form 10-K to report a material weakness.

19   Yet, despite Defendants stating in the FY16 Form 10-K that revenues were recorded in compliance

20   with GAAP and the material weakness related to the extended warranty misstatements had been

21

22

---

23   [17]  Super Micro also admitted to inappropriate revenue recognition related to consideration paid
     to customers under the Company's cooperative marketing arrangements for which the Company
24   did not receive an identifiable benefit.  These transactions were incorrectly recorded as sales and
     marketing expense and have now been corrected and recorded as a reduction of revenue.  *See* ASC
25   605-50-45-2 ("cash consideration (including a sales incentive) given by a vendor to a customer is
     presumed to be a reduction of the selling prices of the vendor's products or services and, therefore,
26   shall be characterized as a reduction of revenue when recognized in the vendor's income
     statement").

27   [18]  Public Company Accounting Oversight Board ("PCAOB") Auditing Standard, AS 2401:
28   *Consideration of Fraud in a Financial Statement Audit* ("AS 2401"), ¶2401.09.

1    remediated, the Restatement has shown Defendants continued to misstate revenues on these

2    extended warranty service contracts.

3        *Inventory Misstatements*

4        151.    Super Micro's restatement included material misstatements of inventory as a result

5    of multiple accounting errors.  First, inventory was misstated due to the premature revenue

6    recognition violations that are discussed above.  Consequently, inventory was increased and A/R

7    was reduced in the periods the violations occurred.

8        152.    Second, Super Micro overstated inventories whereby materials issued from

9    inventory to research and development projects and marketing with no alternative use were

10   included as inventory and expensed upon completion of a project rather than being expensed upon

11   consumption.  To correct the errors related to this inventory overstatement, the Company recorded

12   the materials as a research and development expense, or a marketing expense, in the period that

13   inventory was consumed.

14       153.    Third, Super Micro understated inventories whereby: (i) inventory of materials

15   transferred to certain contract manufacturers was improperly derecognized upon transfer that the

16   Company retained control over the materials because it was obligated to buy them back; and (ii)

17   in-transit inventory was not being recorded in the appropriate period due to improper cut-off

18   procedures.   To correct the errors related to these inventory understatements, the Company

19   adjusted the carrying value of inventory in the periods in which the errors took place.

20       *Other Accounting Misstatements*

21       154.    Super Micro identified additional accounting misstatements that were corrected as

22   part of the Restatement in connection with its failure to correctly record A/R from suppliers as

23   prepaid expenses and other current assets, record payments for certain payroll tax related liabilities,

24   and accrue certain withholding tax liabilities.

25

26

27

28

**Defendants Had Material Weaknesses in Internal Controls and Ineffective Disclosure Controls During the Class Period**

155.    The Restatement disclosed that Super Micro had material weaknesses in its internal control over financial reporting ("ICFR") and that its disclosure controls and procedures were ineffective during the Class Period, which led to the Company's Restatement:

> Based on this evaluation of our disclosure controls and procedures, our CEO and CFO have concluded that our disclosure controls and procedures were not effective as of June 30, 2017 because of certain material weaknesses in our internal control over financial reporting.
>
> In connection with management's assessment of the Company's internal control over financial reporting described above, management has identified the deficiencies described below that constituted material weaknesses in our internal control over financial reporting as of June 30, 2017.[19] ***These deficiencies led to material errors in our previously issued financial statements, which in turn led to the restatement of those previously issued financial statements***…

156.    A material weakness, as defined in the PCAOB, Auditing Standard No. 5 ("AS 5") is a:

> [D]eficiency, or a combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of the company's annual or interim financial statements will not be prevented or detected on a timely basis.[20]

157.    Control deficiencies that are determined to be a material weakness must be disclosed in management's annual report on its assessment of the effectiveness of ICFR. Management may not disclose that it has assessed ICFR as effective if there is one or more control deficiencies determined to be a material weakness in ICFR.[21]

158.    AS 5.69 also provides indicators of material weaknesses in ICFR that includes the following:

---

[19]    Similar admissions of ineffective ICFR and disclosure controls were made for the quarterly periods ended September 30, 2016, December 31, 2016 and March 31, 2017 in the Company's amended quarterly reports on Forms 10-Q/A.  *See* 1Q17 Form 10-Q at 49-50, 2Q17 Form 10-Q at 53-54 and 3Q17 Form 10-Q at 54-55.

[20]    An Audit of Internal Control Over Financial Reporting That Is Integrated with An Audit of Financial Statements, AS 5.A7.

[21]    Management's Report on Internal Control Over Financial Reporting, Exchange Act Release No. 34-54976 at 41 (Dec. 20, 2006).

*Identification of fraud, whether or not material, on the part of senior management*;

*Restatement of previously issued financial statements to reflect the correction of a material misstatement*;

Identification by the auditor of a material misstatement of financial statements in the current period in circumstances that indicate that the misstatement would not have been detected by the company's internal control over financial reporting; and

Ineffective oversight of the company's external financial reporting and internal control over financial reporting by the company's audit committee.

159.    During the Class Period, Defendants made repeated assurances that Super Micro's internal controls functioned properly to prevent or detect material misstatements in its financial statements.  Specifically, the FY16 Form 10-K, and Forms 10-Q for 1Q17, 2Q17 and 3Q17 falsely stated that the Company's ICFR and its disclosure controls were effective when they were not and ultimately contributed to a material restatement of its financial statements.

160.    The Restatement also evidences that the SOX certifications signed by Defendants Liang and Hideshima during the Class Period were false and misleading because of the Company's failure to disclose the existence of material weaknesses in ICFR.  Specifically, the Defendants' certifications were false and misleading because they failed to disclose to the Company's auditors and Audit Committee the following:

"*[A]ll significant deficiencies and material weaknesses* in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information."

Super Micro's disclosures in the FY17 Form 10-K and Forms 10-Q/A for 1Q17, 2Q17 and 3Q17 regarding the existence of material weaknesses are an admission that Super Micro's ICFR and disclosure controls were ineffective during the Class Period.

161.    As opposed to Defendants' false and misleading statements that Super Micro's ICFR and disclosure controls were effective, the Company has now admitted to seven separate material weaknesses in ICFR as part of the Restatement.  Those material weaknesses are in the areas of revenue recognition accounting, all five interrelated components of internal control and information technology ("IT") general controls, which are described further below.

**Defendants' Material Weaknesses in Revenue Recognition Accounting**

162.    Super Micro identified a material weakness in its revenue recognition accounting. Specifically, internal control deficiencies in the revenue recognition area resulted in material revenue errors that contributed to the Restatement, including the premature revenue recognition described herein.   Consequently, Super Micro disclosed as part of the Restatement, a material weakness in ICFR over the accurate recording, presentation and disclosure of revenue and related costs.

163.    Super Micro disclosed specific revenue recognition internal control failures, which contributed to the material weakness in its revenue recognition accounting. *See* ¶¶122-123, 125-127.  Super Micro's lack of internal controls over the revenue recognition area allowed instances of sales to be improperly recorded with insufficient documentation and where: (i) title and risk of loss had not transferred to the customer; (ii) persuasive evidence of an arrangement with the customer was not present; (iii) the price was not fixed or determinable; or (iv) collectability was not reasonably assured.   Further, the premature revenue recognition described herein was facilitated by senior management's ineffective control environment and a lack of revenue controls over quarter-end sales including, failing to lock the shipping dock at the close of the quarter and a deficient sales sub-certification process that did not include sales sub-certification participation from Super Micro's global sales force.  The Restatement has demonstrated the failure to lock the shipping dock at quarter-end was part of a business culture established by senior management that aggressively focused on quarterly revenue without sufficient focus on compliance and was inconsistent with integrity and ethical values.

**Defendants' Material Weaknesses in the Five Internal Control Components Established by the COSO Framework**

164.    During the Class Period, Super Micro's management represented it used the criteria set forth by the Committee of Sponsoring Organization of the Treadway Commission in *Internal Control – Integrated Framework (2013)* (the "COSO Framework") in assessing the Company's ICFR.  The COSO Framework is the internal control framework used by public companies for

evaluating ICFR as required by SOX.  The COSO Framework consists of the following five interrelated components of internal control:

> 1.  **Control Environment**:  The control environment is the set of standards, processes, and structures that provide the basis for carrying out internal control across the organization.
>
> 2.  **Risk Assessment:**  Risk assessment involves the dynamic and iterative process for identifying and analyzing risks to achieving the entity's objectives, forming a basis for determining how risks should be managed.
>
> 3.  **Control Activities:**  Control activities are the actions established by policies and procedures to help ensure that management directives to mitigate risks to the achievement of objectives are carried out.
>
> 4.  **Information and Communication:**  Information is necessary for the entity to carry out internal control responsibilities in support of achievement of its objectives.  Communication occurs both internally and externally and provides the organization with the information needed to carry out day-to-day controls.
>
> 5.  **Monitoring:**  Ongoing evaluations, separate evaluations, or some combinations of the two are used to ascertain whether each of the five components of internal control, including controls to effect the principles within each component, is present and functioning.[22]

165.    The effectiveness of these five components is necessary and vital for a properly functioning system of internal controls.  For example, a material weakness in only one of the five components results in ineffective ICFR.  Super Micro reported material weaknesses in ***all five components*** as part of their Restatement, as described below.

*Control Environment*

166.    Defendants reported a material weakness in the Company's control environment. According to the COSO Framework, the control environment includes the integrity and ethical values of the organization and has a pervasive impact on the overall system of internal control.[23] A key component to an effective control environment is an appropriate tone at the top of the organization, established by the board of directors and senior management regarding the importance of internal control and expected standards of conduct.[24]  The COSO Framework states:

---

[22]   COSO Framework at 12-14.

[23]   *Id.* at 31.

[24]   *Id.*

> Tone at the top and throughout the organization is fundamental to the functioning of an internal control system.  Without a strong tone at the top to support a strong culture of internal control, awareness of risk can be undermined, responses to risks may be inappropriate, control activities may be ill defined or not followed, information and communication may falter, and feedback from monitoring activities may not be heard or acted upon.  Therefore tone can be either a driver or a barrier to internal control.[25]

The COSO Framework also states that "[m]ore than any other individual, the CEO sets the tone at the top that affects the control environment and all other components of internal control."[26]

167.    The control environment Super Micro's senior management promoted during the Class Period was one that contravened integrity and ethical values and fostered a culture of maximizing quarterly revenue without sufficient focus on GAAP compliance and appropriate internal controls.  This resulted in premature revenue recognition as described at ¶122, which violated GAAP, the Company's Code of Conduct and its accounting policies and procedures.  The ineffective control environment included **officers** and managers failing to raise, minimized or obscured facts with material accounting consequences from the Audit Committee and Deloitte. The Company also lacked sufficient appropriately skilled and trained personnel, which contributed to deficiencies in establishing and maintaining policies and procedures, establishing and enforcing standards for maintaining documents for revenue recognition purposes and establishing accountability for internal controls.  Critically, Super Micro disclosed in the Company's FY17 Form 10-K that "[d]ue to the interdependencies between the [five] COSO Framework components, the weaknesses in our control environment contributed to other material weaknesses within our system of internal control over financial reporting."

*Risk Assessment*

168.    Defendants FY17 Form 10-K reported a material weakness in risk assessment.  The deficiencies related to the principles associated with the risk assessment component of the COSO Framework, namely: (i) identifying, assessing and communicating appropriate control objectives; (ii) identifying and analyzing risks to achieve these objectives; (iii) contemplating fraud risks; and

---

[25]  *Id.* at 35.

[26]  *Id.* at 149.

1    (iv) identifying and assessing changes in the business that could impact our system of internal

2    controls.

3         *Control Activities*

4         169.    Control activities includes actual internal controls put in place, such as

5    authorizations and approvals, verifications, reconciliations and business performance reviews to

6    help achieve effective ICFR and ensure financial statements are prepared in accordance with

7    GAAP.[27]   Segregation of duties is a key input to the control activities component and typically

8    built into the selection and development of control activities.

9         170.    Defendants reported a material weakness in the control activities, specifically, the

10   Company did not adequately select and develop control activities to mitigate risks, failed to deploy

11   the necessary control activities, had control deficiencies with IT controls across multiple

12   applications relevant to financial reporting and lacked segregation of duties.  Defendants admitted

13   the Company did not design or operate certain control activities to sufficiently respond to potential

14   risks of material misstatement in the area of revenue recognition.  Defendants' Restatement admits

15   that Super Micro's control activities were so deficient that they contributed to ***material accounting***

16   ***errors*** and the potential for additional material accounting errors in substantially ***all the***

17   ***Company's financial statement account balances and disclosures***.

18        *Information and Communication*

19        171.    Defendants also reported a material weakness with the information and

20   communication component of internal control as part of the Restatement.  Specifically, Defendants

21   admitted to deficiencies in generating and using relevant quality information, internally

22   communicating information necessary to support the functioning of internal control and

23   communicating with external parties regarding matters affecting the functioning of internal

24   control.  Defendants also admitted as part of the material weakness that ***officers and managers*** of

25   the Company withheld information from both the Audit Committee and Deloitte.

26        *Monitoring of Controls*

27   _____

28   [27]  *Id.* at 87.

172.     Defendants reported a material weakness in monitoring of controls as part of the Restatement, specifically, Defendants admitted the Company lacked controls to determine whether components of internal control were present and functioning, to mitigate the risk of management overriding internal controls and to detect incorrect accounting practices.  Further, consistent with its failure to remediate the prior material weakness related to the revenue recognition of contracts with extended product warranties, Defendants admitted the Company did not always ensure that control deficiencies were remediated thoroughly and timely.

**Defendants' Material Weaknesses in Information Technology General Controls**

173.     Super Micro identified a material weakness related to its IT general controls.  IT general controls are controls that can be applied to IT systems and "include control activities over the technology infrastructure, security management and technology acquisition, development and maintenance."[28]

174.     As part of the disclosure of Super Micro's material weakness in the IT general controls, the Company identified the following contributing factors to the material weakness:

> [I]nternal procedures for granting and monitoring employee access, and managing changes to various applications and infrastructure layers relevant to our financial reporting are not consistent across those applications and infrastructure layers;

> [S]ome of our internally-developed applications relevant to financial reporting lack logging capabilities to monitor access changes or application changes;

> [A]uthorized certain users with broad access, both as a user and as an administrator, to all parts of our primary accounting system without adequate monitoring or recording of how they used that access.

175.     As a result of the above factors, Super Micro had material weaknesses related to access controls and change management, which made it possible that Super Micro's business process controls that depend on the affected IT systems could be adversely affected.

**Super Micro's Remediation Plans for Its Material Weaknesses in ICFR**

176.     The depth and breadth of Super Micro's Restatement and material weaknesses in ICFR are illustrated by the Company's remediation plan for its ineffective ICFR.  For example,

---

[28]    COSO Framework at 98.

Super Micro's remediation plan includes developing and implementing an ongoing compliance training program regarding significant accounting and financial reporting matters, as well as broad compliance matters, for accounting, financial reporting, sales and operations personnel, ***as well as for the Company's CEO***, other corporate executives and the Board.   Some of the areas where Super Micro has conducted training includes the following:

- Revenue recognition training for its global sales force, various operations personnel, and certain other senior executives, ***including Super Micro's CEO***, which includes detailed examples of acceptable and unacceptable sales practices;

- Reviewing with the senior management team Super Micro's amended Code of Conduct;

- ***Reviewing with Super Micro's CEO*** enhanced processes for periodic evaluations by the CEO and the CFO of the effectiveness of our disclosure controls and procedures, and the periodic assessments by the CEO and the CFO of the effectiveness of the Company's internal control over financial reporting, and other compliance matters, and

- Shipping and cut-off training for accounting and operations personnel that included new requirements for quarter-end procedures.

177.    The remediation plan demonstrates a major deficiency existed during the Class Period in regards to the sales sub-certification process.   The Company has admitted the SOX certification process Liang and Hideshima utilized during the Class Period was severely lacking. The Company admitted that it was enhancing the sales sub-certification document to support the CEO's and CFO's financial statement certifications.   Further, the remediation plan includes expanding the sales sub-certification to cover the global sales force and using a new organization-wide quarterly sales certification process.   The fact Super Micro's quarterly sales certification process had to be expanded to cover the global sales force means it did not previously require (or even cover) the global sales force completing sales sub-certifications to identify any unusual, non-standard revenue transactions at quarter-ends.   This further demonstrates Liang's and Hideshima's deficient approach in falsely certifying Super Micro's effective internal controls over revenue recognition during the Class Period.

178.    In addition, Super Micro's remediation plan provides significant evidence regarding the Company's inappropriate control environment during the Class Period, which

included an ineffective tone at the top.  For example, Super Micro's remediation plan included the following steps:

> • Restructured our sales organization, which resulted   in the resignations of the Senior Vice President of International Sales [Liaw], the Senior Vice President of Worldwide Sales [Chou], the Vice President, Strategic Accounts, the Vice President, Strategic Sales, the Vice President, Business Development and certain other sales personnel.
>
> Appointed experienced professionals to key accounting and finance and compliance leadership positions, including the appointments of a *new Chief Financial Officer* and a new Corporate Controller in January 2018, and *the creation of, and appointments to, two newly established roles of Chief Compliance Officer and Vice President of Internal Audit* in May 2018 and August 2018, respectively.
>
> • Reviewed and amended our Code of Conduct to align with the organizational changes described above and to strengthen certain provisions regarding compliance and reporting.
>
> *             *             *
>
> • Changed our organizational structure to narrow the scope of responsibilities of certain of our senior executives and to revise various reporting relationships, which included the appointment of a new Senior Vice President of Worldwide Sales, and a new Senior Vice President of Operations.

**Defendants' GAAP Violations and Restatement Were Material**

179.    Defendants' false and misleading Class Period statements and omissions regarding Super Micro's accounting were material.  The SEC Staff Accounting Bulletin: Codification of Staff Accounting Bulletins' Topic 1-M, *Materiality* ("SEC Topic 1-M"), sets forth the generally accepted methods for accountants to evaluate materiality as it relates to the financial statements of SEC registrants:

> The omission or misstatement of an item in a financial report is material if, in the light of surrounding circumstances, the magnitude of the item is such that it is probable that the judgment of a reasonable person relying upon the report would have been changed or influenced by the inclusion or correction of the item.

180.    SEC Topic 1-M also stresses that materiality requires qualitative, as well as quantitative, considerations: "[T]here are numerous circumstances in which misstatements below 5% could well be material. Qualitative factors may cause misstatements of quantitatively small amounts to be material."   SEC Topic 1-M also notes that assessing materiality solely on a

1    quantitative basis "has no basis in the accounting literature or the law."  It notes that the FASB

2    "has long emphasized that materiality cannot be reduced to a numerical formula."

3         181.    Defendants' misstatements, by their own admission, were material from both a

4    quantitative and qualitative perspective.  For example, the fact that Super Micro has restated its

5    financial statements reported every quarter during the Class Period demonstrates the Company's

6    admission that the misstatements were material, as only *materially* misstated financial statements

7    need to be corrected and reissued on a retroactive basis.[29]  In addition, Super Micro overstated net

8    income and EPS by 5.1% from FY15 through FY17 and 6.8% from FY13 through FY17, which

9    meets or exceeds the 5% rule of thumb quantitative materiality threshold referenced in SEC Topic

10   1-M.

11        182.    Each of Super Micro's accounting misstatements and omissions were qualitatively

12   material as well.  For example, SEC Topic 1-M notes that quantitatively small misstatements may

13   be material if management has intentionally violated GAAP.  Here, Super Micro's investigation

14   determined certain employees had violated the Company's Code of Conduct and discovered

15   accounting and financial reporting errors and certain *irregularities*.  The term irregularity in

16   accounting parlance typically refers to intentional misstatements of financial statements.  For

17   instance, the PCAOB auditing standard on fraud (AS 2401) notes the requirement of auditors to

18   communicate possible fraud to management and the Audit Committee, but that "the

19   communication may use terms other than fraud – for example, irregularity, intentional

20   misstatement, misappropriation or defalcations – if there is possible confusion with a legal

21   definition of fraud or other reason to prefer alternative terms."  AS 2401 n.37.

22        183.    In addition, Super Micro admitted the Restatement resulted from, in part, "officers"

23   who were aware of, condoned, or were involved in blatant premature revenue recognition that

24   included shipping unordered products to customers, shipping to storage facilities at quarter-end

25   for later delivery to customers, entering in to undisclosed side agreements with customers, shipping

26

---

27   [29]  *See, e.g.,* ASC Topic 250, *Accounting Changes and Error Corrections*, SEC Topic 1-M, and
     SEC Staff Accounting Bulletin Topic 1-N, *Considering the Effects of Prior Year Misstatements*
28   *when Quantifying Misstatements in Current Year Financial Statements*.

1    products to customers before manufacturing was complete, altering source documents on certain

2    sales transactions and failing to raise issues with material accounting consequences to Super

3    Micro's Audit Committee and Deloitte.  In addition, the Restatement disclosed that:

4           [i]n the pursuit of quarterly revenue, certain of our sales, finance and operations
            personnel, including *officers* and managers, were aware of, condoned or were
5           involved in actions that reflected an inappropriate tone at the top, that *violated our*
            *Code of Conduct* and our *accounting policies and procedures*, and that were
6           *inconsistent with a commitment to integrity and ethical values*.

7           184.    Further, whether or not the misstatement arises from an item capable of precise

8    measurement or whether it arises from an estimate is a qualitative materiality factor that must be

9    considered under SEC Topic 1-M.  There was no judgment required to know the methods by which

10   the Company inflated sales were improper and needed to be reversed under GAAP.  Consequently,

11   the premature revenue violations arose from misstatements "capable of precise measurement," as

12   easily determined by the sales price for each Super Micro product, and were not inherently,

13   complex accounting estimates requiring judgment.

14          185.    SEC Topic 1-M states: "the demonstrated volatility of the price of a registrant's

15   securities in response to certain types of disclosures may provide guidance as to whether investors

16   regard quantitatively small misstatements as material."  Super Micro's ineffective internal controls

17   and multiple material weaknesses led to an inability to timely file SEC filings, investigation into

18   its historical financials, resignations and a stock delisting.  The market's negative reaction to these

19   events supports qualitative materiality.

20          186.    Finally, SEC Topic 1-M states "[w]hether the misstatement concerns a segment or

21   other portion of the registrant's business that has been identified as playing a significant role in the

22   registrant's operations or profitability" is another qualitative factor to consider in assessing

23   materiality.   It's undisputed that the Restatement, primarily related to premature revenue

24   recognition and inventory misstatements, materially impacted Super Micro's business in its one

25   reporting segment, server solutions.  For example, the Restatement has shown that Super Micro

26   each quarter during the Class Period misstated virtually every financial account on its income

27   statement and misstated the majority of its accounts on its balance sheet.  *See* Attachments 2-4.

28

**Defendants' Violations of SEC Regulations Related to Super Micro's Inadequate Internal Controls**

187. Section 13(b)(2) of the Exchange Act states, in pertinent part, that every reporting company must:

> (A)   make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the issuer; [and]
>
> (B)   devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that-
>
> *        *        *
>
> (ii)   transactions are recorded as necessary . . . to permit preparation of financial statements in conformity with [GAAP].

15 U.S.C. §78m(b)(2)(A), (B).  These provisions require a reporting company to employ and supervise reliable personnel, to maintain reasonable assurances that transactions are executed as authorized, to record transactions on an issuer's books and, at reasonable intervals, to compare accounting records with physical assets.

188. Notably, Defendants recognized the importance for Super Micro's senior officers to maintain an effective internal control system as evidenced by the Company's "Code of Business Conduct and Ethics" accessible on its website.[30]  Super Micro's Code of Conduct required its senior officers to follow the SEC regulations of §13(b)(2), which they failed to do.  *Compare* ¶50 to ¶187.  In fact, Defendants have now admitted that the Company's senior management did not promote an appropriate tone of compliance, including *officers* and managers were aware of,

---

[30]   The Code of Conduct in effect during the Class Period stated that "Super Micro's Senior Officers," including its CEO and CFO, "are also responsible for establishing and maintaining adequate internal control over financial reporting to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles.  The Senior Officers will take all necessary steps to ensure compliance with established accounting procedures, the Company's system of internal controls and generally accepted accounting principles."  As part of its remediation measures, Super Micro adopted a new Code of Business Conduct and Ethics which no longer has the foregoing language but does state that: "The Company's CEO and CFO are responsible for designing, establishing, maintaining, reviewing and evaluating on a quarterly basis the effectiveness of the Company's disclosure controls and procedures (as such term is defined by applicable SEC rules)."   Super Micro, Code of Business Conduct and Ethics, https://ir.supermicro.com/static-files/6dedc126-3312-40a8-97c6-79d6b18b572d.

1    condoned or were involved in actions that reflected an inappropriate tone at the top, ***that violated***

2    ***the Code of Conduct*** and that were inconsistent with a commitment to integrity and ethical values.

3    These deficiencies constituted material weaknesses in ICFR that Defendants failed to disclose to

4    investors during the Class Period.

5         189.   As a result, Defendants violated §13(b)(2)(A),(B) of the Exchange Act and its own

6    Code of Conduct by failing to ensure that the Company maintained adequate internal controls in

7    order to ensure that Super Micro's financial statements were prepared in conformity with GAAP

8    and that its public filings were accurate.  Super Micro's lack of adequate internal controls

9    (including its undisclosed material weaknesses) rendered the Company's Class Period financial

10   reporting inherently unreliable and precluded the Company from preparing financial statements

11   that complied with GAAP.  Nonetheless, throughout the Class Period, Defendants Liang,

12   Hideshima and Liaw knowingly or recklessly caused the Company to issue quarterly or annual

13   financial statements that did not disclose the existence of significant and material deficiencies in

14   the Company's internal accounting controls and falsely asserted that Super Micro's financial

15   statements complied with GAAP.

16                   **ADDITIONAL SCIENTER ALLEGATIONS**

17         190.   Defendants acted with scienter in that they knew, or were deliberately reckless in

18   not knowing, that: (i) the public documents and statements issued or disseminated in Super Micro's

19   name, or their own name, were materially false and misleading; (ii) that such statements or

20   documents would be issued or disseminated to the investing public; and (iii) substantially

21   participated or acquiesced in the issuance of such statements or documents as primary violations

22   of the federal securities laws.

23         191.   By virtue of their participation, condoning receipt or deliberate disregard of

24   information reflecting the true facts regarding Super Micro, their control over, receipt or

25   modification of Super Micro's materially misleading statements, or their other actions and

26   associations with the Company, each Defendant was privy to confidential information concerning

27   Super Micro and knowingly or with deliberate recklessness participated in the fraudulent scheme,

28   acts, practices, course of business and conduct alleged herein.

1    192.   Super Micro's FY17 Form 10-K reveals pervasive and deliberate sales and

2    accounting violations, manipulations and distortions, as well as reckless disregard for the truth, at

3    every level of the Company.  The FY17 Form 10-K admits Super Micro had a corporate culture

4    "aggressively" focused on quarterly revenue at the expense of compliance, integrity and ethics,

5    and directly implicates senior management as both participating in and encouraging misconduct:

6          ***Senior management did not establish and promote a control environment
           with an appropriate tone of compliance and control consciousness throughout
7          the entire Company.***

8    193.   The FY17 Form 10-K describes unethical violations of Super Micro's Code of

9    Conduct and accounting policies by officers and managers – including by finance personnel –

10   undertaken for the purpose of prematurely recognizing revenue:

11         ***In the pursuit of quarterly revenue, certain of our sales, finance and
           operations personnel, including officers and managers, were aware of, condoned
12         or were involved in actions that reflected an inappropriate tone at the top, that
           violated our Code of Conduct and our accounting policies and procedures, and
13         that were inconsistent with a commitment to integrity and ethical values.***

14   194.   The extensive accounting violations detailed in the FY17 Form 10-K strengthen the

15   inference that Defendants' claims to accounting compliance and ethical conduct were knowingly

16   false and misleading.  The examples detailed in the FY17 Form 10-K show Super Micro officers

17   knew of or condoned improper revenue recognition practices, including: (i) shipping products in

18   advance of customer requested delivery dates; (ii) shipping products to storage facilities at the end

19   of a quarter for later delivery to customers; (iii) entering into side agreements with customers; (iv)

20   shipping products before manufacturing was completed; (v) altering source documents related to

21   some sales transactions; and (vi) failing to disclose or obscuring material facts about sales

22   transactions.  These are egregious accounting violations of clear defined rules that did not involve

23   significant accounting judgment or estimates, further supporting Defendants' knowledge or

24   deliberate recklessness.

25   195.   The FY17 Form 10-K also reveals that certain Super Micro officers and managers

26   deliberately concealed material accounting information from the Audit Committee and Deloitte:

27         ***Some employees, including officers and managers, also failed to raise
           issues with material accounting consequences to the Audit Committee and our
28         external auditors***, and with respect to one transaction, appear to have ***attempted to***

*minimize material facts about a sales transaction to, or obscure those facts from, the Audit Committee and our external auditors*.

196.    Scienter is further established by the presence of significant material weaknesses in Super Micro's ICFR which affected nearly every account.  Defendants have admitted that the Company's material weaknesses in the revenue recognition process directly contributed to the Company's false financial statements.  The pervasive, aggressive, unethical and inappropriate nature of the internal control failures indicate that Defendants knew of or willfully turned a blind eye to their ineffective control environment around revenue recognition and allowed the issuance of false financial statements.

197.    The extensive remediation efforts undertaken by Super Micro to address the accounting violations, material weaknesses, ineffective and absent internal controls, and inappropriate tone at the top further demonstrate scienter – in particular training programs on unacceptable sales practices and internal controls specifically for Defendant Liang:

> − *Revenue recognition training* for our global sales force, various operations personnel, and *certain senior executives, including our CEO, which included detailed examples of acceptable and unacceptable sales practices*,

> − *Reviewing with our senior management team our amended Code of Conduct*,

> − *Reviewing with our CEO enhanced processes for periodic evaluations by the CEO and the CFO of the effectiveness of our disclosure controls and procedures, and the periodic assessments by the CEO and the CFO of the effectiveness of our internal control over financial reporting*, and other compliance matters.

198.    The FY17 Form 10-K revealed that the remediation efforts were far from complete and that Defendant Liang, alongside other executives and Super Micro's Board, would need further compliance training on accounting and financial reporting to remedy the Company's material weaknesses.  Some of the more significant remaining remediation activities include:

> •    Developing and implementing an ongoing compliance training program regarding significant accounting and financial reporting matters, as well as broad compliance matters, for accounting, financial reporting, sales and operations personnel, *as well as for our CEO*, our other corporate executives and the Board.

199.    These remediation and reforms efforts came in addition to those revealed on November 15, 2018, which demonstrated a significant absence of effective internal controls over

1   revenue recognition, for example: locking the shipping dock at the close of quarters; hiring more

2   experienced personnel in the revenue area; revamping the sales sub-certification process at quarter-

3   end; enhancing revenue testing; and forming a new internal audit team.  These remediation reforms

4   also strengthen the inference of scienter.

5        200.   The departure of numerous high-ranking management as part of the Company's

6   remediation efforts further supports scienter.  The FY17 Form 10-K connected the resignations of

7   Senior Vice President of International Sales (Defendant Liaw), the Senior Vice President of

8   Worldwide Sales, the Vice President, Strategic Accounts, the Vice President, Strategic Sales, the

9   Vice President, Business Development and certain other sales personnel as efforts to remediate the

10  identified material weaknesses and accounting violations.  ¶178.  Super Micro's remediation also

11  included replacing Defendant Hideshima who "resigned" on January 30, 2018, the same date the

12  Company announced that it had already appointed a new CFO and the conclusion of the Audit

13  Committee's internal investigation.

14       201.   Defendants' false SOX certifications attached to Super Micro's Forms 10-Q and

15  Form 10-K also support scienter.  Defendants Liang and Hideshima certified that they had

16  personally reviewed Super Micro's financial statements, had designed, established, maintained

17  and evaluated Super Micro's disclosure controls and procedures, and had designed Super Micro's

18  ICFR.  Defendants Liang and Hideshima also certified that the financial statements "[do] not

19  contain any untrue statement of a material fact or omit to state a material fact necessary to make

20  the statements made, in light of the circumstances under which such statements were made, not

21  misleading" and "fairly present in all material respects the financial condition, results of operation

22  and cash flows of [Super Micro]."  Such reviews and evaluations, if performed as represented,

23  would have alerted them to the problems with Super Micro's financial results, disclosure controls

24  and ICFR.  For example, Liang and Hideshima certified Super Micro's revenue results despite the

25  fact that they must have known Super Micro's sales employees did not complete sub-certifications

26  to identify any unusual or non-standard quarter-end transactions.  Liang and Hideshima were also

27  on notice of past material weaknesses with the Company's revenue recognition and failures by the

28  Company to timely file its SEC filings and yet affirmatively assured investors that appropriate

1    remediation had occurred.  *See* ¶¶19, 48.  Further, Super Micro admitted in its FY17 Form 10-K

2    that it was "[r]eevaluating and revising our Sarbanes-Oxley compliance program (our 'SOX

3    Program'), and making improvements to our SOX Program governance, risk assessment

4    processes, testing methodologies and corrective action mechanisms."

5          202.    The substantial scope – covering thousands of transactions – and the length of time

6    it took Super Micro to complete its investigation and finalize its Restatement evidences the

7    enormity of the problems with the Company's accounting and internal controls that the Individual

8    Defendants knew or were deliberately reckless in not knowing about.  And, the Company remains

9    unable to get current on its SEC filings for all periods beyond the end of FY17 and is still late on

10   filing its 1Q18, 2Q18, 3Q18, FY18 alongside its 1Q19, 2Q19 and 3Q19 financial reports.

11   Accordingly, the Company is delisted from the NASDAQ.

12         203.    The inference of scienter is further strengthened by the existence of SEC

13   enforcement activities at Super Micro.  On August 31, 2015, Super Micro disclosed that it was

14   investigating a marketing expense matter.  However, Defendants concealed an investigation by the

15   SEC that began in late 2015 and the receipt of a formal order of investigation on October 25, 2016,

16   pursuant to which the SEC obtained documents and took testimony of a number of individuals.

17   The marketing expense matter investigation is still ongoing as of the filing of the FY17 Form

18   10-K.  This information is disclosed only in an exhibit to the FY17 Form 10-K.

19         204.    Super Micro's Form 10-K for FY17 states that "we have received subpoenas from

20   the SEC in connection with the matters underlying our inability to timely file our Form 10-K for

21   the fiscal year ending June 30, 2017."  As detailed in an exhibit to Super Micro's FY17 Form

22   10-K, the Company has admitted that the SEC expanded its October 25, 2016 formal investigation

23   to cover revenue recognition issues.[31]

24

25   [31]  According to the SEC's Enforcement Manual, "the Director of the Division may, in his or her
     discretion, issue a formal order [Formal Order of Investigation] when a formal investigation is
26   appropriate and necessary to determine whether a violation of the federal securities laws may have
     occurred or may be occurring."   SEC, Division of Enforcement, *Enforcement Manual* 17-18
27   (2017), https://www.sec.gov/divisions/enforce/enforcementmanual.pdf.  Super Micro's admission
     that the SEC had issued a Formal Order of Investigation on October 25, 2016, and expanded that
28   investigation to include revenue recognition issues further strengthens scienter.

As the Company has previously publicly announced, in connection with the in-process audit of the Company's financial results for the year ended June 30, 2017, a sales transaction was subject to additional inquiry and review (the "Revenue Recognition Matter"). The transaction in question, representing approximately $8.8 million in revenue, was originally recorded as revenue during the quarter ended December 31, 2016. . . . Acting under the authority of its investigation of the Marketing Expense Matter, the SEC has expanded its investigation to include the Revenue Recognition Matter. The Company has produced documents relating to the Revenue Recognition Matter and is continuing to cooperate with the SEC investigation.

205. Each of the Individual Defendants was a senior executive involved in Super Micro's daily operations with access to all material information regarding the Company's core operations. Each of the Individual Defendants is presumed to have knowledge of all material facts regarding Super Micro's core business. Given the importance of the Company's financial results including revenues and earnings, internal controls and maintaining compliance with NASDAQ listing requirements, the inference of scienter is strong. Moreover, the SOX certifications make clear Super Micro's CEO and CFO supervised and analyzed the Company's disclosure controls and internal controls over financial reporting.

206. The core operations inference establishes scienter as to Liang, Hideshima and Liaw. Liang is known to obsess over every detail of Super Micro's business and is the chief operating decision maker at the Company. According to a former Super Micro sales manager, Liang "'is the person who approves and looks at everything the company is doing – every new product, marketing effort, sales effort, anything you want to do or promote.'" The same article notes: "'As an individual, Charles [Liang] is very aggressive and motivated,' said Patrick P. Gelsinger, Intel's senior vice president in charge of server chips. 'Every once in a while, he appears on the verge of reckless, but if you're going up against the big guys, you have to be willing to take risks.'" Super Micro's FY16 Form 10-K reads: "Charles Liang, our President, Chief Executive Officer and Chairman of the Board, is critical to the overall management of our company . . . . His experience in running our business and his personal involvement in key relationships with suppliers, customers and strategic partners are extremely valuable to our company." Liang, as CEO, and Hideshima, as former CFO, had responsibility over internal control and financial reporting. Given the magnitude and extent of material weaknesses admitted to in the FY17 Form 10-K, it would be

1   absurd to suggest that Liang and Hideshima did not know about the weaknesses when they assured

2   investors that Super Micro had effective internal controls, complied with GAAP, the Company's

3   accounting policies and procedures, and the Code of Conduct.  Similarly, it would be absurd to

4   suggest that Liaw, Senior Vice President of Internal Sales until his purported resignation, did not

5   know that sales personnel including officers and managers were engaged in the sales misconduct

6   described herein, including altering source documents related to sales transactions or obscuring

7   facts about sales transactions in an effort to increase quarterly revenue.

8                              **LOSS CAUSATION AND ECONOMIC LOSS**

9         207.    During the Class Period, as detailed herein, Defendants made false and misleading

10   statements and omissions regarding Super Micro's financial results and operations, the sufficiency

11   of its internal controls and consistency with GAAP of its revenue recognition practices, as well as

12   the status of its investigation and ability to become current on its delinquent reports.  This

13   artificially inflated Super Micro's stock price and operated as a fraud or deceit on all persons who

14   purchased Super Micro's common stock during the Class Period (the "Class").  When Defendants'

15   prior misrepresentations, omissions and fraudulent conduct became apparent to the market, Super

16   Micro's stock price fell precipitously, as the prior artificial inflation came out of the stock price

17   over time.  As a result of their purchases of Super Micro common stock during the Class Period,

18   Plaintiff and other members of the Class suffered economic loss, *i.e.*, damages, under the federal

19   securities laws.  The timing and magnitude of the declines in Super Micro's stock price negates

20   any inference that the loss suffered by Plaintiff and other Class members was caused by changed

21   market conditions, macroeconomic or industry factors or Company-specific facts unrelated to

22   Defendants' fraudulent conduct.

23         208.    Defendants' false or misleading statements and omissions had their intended effect,

24   causing Super Micro's common stock to trade at artificially inflated prices throughout the Class

25   Period, reaching as high as $28.80 per share on December 19, 2016.  The economic loss, *i.e.*,

26   damages, suffered by Plaintiff and other members of the Class was a direct and proximate result

27   of Defendants' misrepresentations artificially inflating Super Micro's common stock price and the

28   subsequent significant declines in the value of Super Micro common stock as the true state of the

1   Company's operations was revealed to the market in a series of partial disclosures correcting the

2   misrepresentations or revealing the economic impact thereof.

3        209.   Defendants' false and misleading statements and omissions were revealed to the

4   market through a series of partial disclosures – some mitigated by further false or misleading

5   statements or omissions that caused the price to remain artificially inflated – which caused Super

6   Micro's stock price to decline as a result, including but are not limited to: (i) the August 29, 2017

7   disclosure that the Company was unable to timely file its FY17 Form 10-K; (ii) the September 14-

8   15, 2017 disclosures that the Company was unable to meet the 15-day extension for filing its FY17

9   Form 10-K; (iii) the October 26, 2017 disclosure of an internal investigation stemming from a

10  review of a single transaction; (iv) the January 30, 2018 announcement that Defendants Hideshima

11  and Liaw had resigned and that further investigations into the Company's historical financials were

12  being conducted; (v) the February 20, 2018 disclosure that the Company could not file its 2Q18

13  Form 10-Q and received a non-compliance letter from NASDAQ; (vi) the March 16, 2018

14  disclosure that the Company was subject to delisting by NASDAQ; and (vii) the August 21, 2018

15  disclosure that the Company faced delisting proceedings.  Even after delisting, further revelations

16  concerning Defendants' Class Period misconduct continued to emerge, for example, via the

17  Restatement Announcement and the Restatement.

18                              **NO SAFE HARBOR**

19        210.   Super Micro's verbal "safe harbor" warnings accompanying its oral forward-

20  looking statements ("FLS") issued during the Class Period were ineffective to shield those

21  statements from liability.

22        211.   Defendants are also liable for any false or misleading FLS plead because, at the

23  time each FLS was made, the speaker knew the FLS was false or misleading and the FLS was

24  authorized or approved by an executive officer of Super Micro who knew that the FLS was false.

25  None of the historic or present tense statements made by Defendants were assumptions underlying

26  or relating to any plan, projection or statement of future economic performance, as they were not

27  stated to be such assumptions underlying or relating to any projection or statement of future

28  economic performance when made, nor were any of the projections or forecasts made by

1   Defendants expressly related to or stated to be dependent on those historic or present tense

2   statements when made.

3           212.    Super Micro's purported cautionary language is inadequate to insulate Defendants'

4   false statements under the statutory safe harbor because each of the disclosures is vague and

5   boilerplate language.  And, in multiple instances, the purported risks were referenced as potential

6   or contingent outcomes when in fact, the purported risks warned of had already come to fruition

7   and were negatively impacting the Company.  For example, warning that "[b]ecause of the inherent

8   limitations in all control systems, no evaluation of controls can provide absolute assurance that all

9   control issues and instances of management override or improper acts, if any, have been detected"

10  and that "[t]hese inherent limitations include the realities that judgments in decision making can

11  be faulty, and that breakdowns can occur because of simple errors or mistakes" applies to virtually

12  any company.  The language is so vague as to be meaningless.  Similarly meaningless are the

13  universally applicable and contingent statements that:

14          •      "If we are unable to favorably assess the effectiveness of our internal control over
15                 financial reporting, or if our independent auditors are unable to provide an
                   unqualified attestation report on our internal control over financial reporting, our
16                 stock price could be adversely affected."

17          •      "If we identify such issues or if we are unable to produce accurate and timely
                   financial statements, our stock price may be adversely affected and we may be
18                 unable to maintain compliance with Nasdaq listing requirements."

19          •      "If we fail to maintain effective internal controls in future periods, our operating
20                 results, financial position and stock price could be adversely affected."

21                     **APPLICABILITY OF PRESUMPTION OF RELIANCE:**
                              **FRAUD ON THE MARKET**

22          213.    Plaintiff will rely upon the presumption of reliance established by the fraud-on-the-

23  market doctrine in that, among other things:

24          (a)     Defendants made public misrepresentations or failed to disclose material

25  facts during the Class Period;

26          (b)     The omissions and misrepresentations were material;

27          (c)     The Company's stock traded in an efficient market;

28

1          (d)      The misrepresentations alleged would tend to induce a reasonable investor

2 to misjudge the value of the Company's stock; and

3          (e)      Plaintiff and other members of the Class purchased Super Micro common

4 stock between the time Defendants misrepresented or failed to disclose material facts and the time

5 the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

6        214.    At all relevant times, the market for Super Micro's common stock was efficient for

7 the following reasons, among others:

8          (a)      As a regulated issuer, Super Micro filed periodic public reports with the

9 SEC with the exception of its delinquent reports (*i.e.*, its annual reports on Forms 10-K for FY17

10 and FY18 ended June 30, 2017 and 2018, respectively, and its quarterly reports on Forms 10-Q

11 for 1Q18 ended September 30, 2017, 2Q18 ended December 31, 2017, 3Q18 ended March 31,

12 2018, 1Q19 ended September 30, 2018, 2Q19 ended December 31, 2018, 3Q19 ended March 31,

13 2019);

14         (b)      Super Micro's stock traded on the NASDAQ until August 22, 2018, and

15 thereafter its shares were quoted on the over-the-counter ("OTC") Markets under the trading

16 symbol SMCI; and

17         (c)      Super Micro regularly communicated with public investors via established

18 market communication mechanisms, including through regular dissemination of press releases on

19 the major news wire services and through other wide-ranging public disclosures, such as

20 communications with the financial press, securities analysts and other similar reporting services.

21 **CLASS ACTION ALLEGATIONS**

22        215.    Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules

23 of Civil Procedure on behalf of all members of the Class.  Excluded from the Class are Defendants

24 and their families, and directors and officers of Super Micro and their families and affiliates.

25        216.    The members of the Class are so numerous that joinder of all members is

26 impracticable.  The disposition of their claims in a class action will provide substantial benefits to

27 the parties and the Court.  Super Micro has 48.69 million shares of common stock outstanding.

28

217.    There is a well-defined community of interest in the questions of law and fact involved in this case.  Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

        (a)    Whether the Exchange Act was violated by Defendants;

        (b)    Whether Defendants omitted or misrepresented material facts;

        (c)    Whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

        (d)    Whether Defendants knew, or were deliberately reckless in not knowing, that their statements were false and misleading;

        (e)    Whether the price of Super Micro's common stock was artificially inflated; and

        (f)    The extent of damage sustained by Class members and the appropriate measure of damages.

218.    Plaintiff's claims are typical of those of the Class because Plaintiff and the Class sustained damages from Defendants' wrongful conduct.

219.    Plaintiff will adequately protect the interests of the Class and has retained counsel who are experienced in class action securities litigation.  Plaintiff has no interests which conflict with those of the Class.

220.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

### COUNT I

**For Violation of §10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants**

221.    Plaintiff incorporates ¶¶1-220 by reference.

222.    During the Class Period, Defendants disseminated or approved the false statements specified above, which they knew, or were deliberately reckless in not knowing, were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATION OF THE
FEDERAL SECURITIES LAWS - 3:18-cv-00838-JST
4825-1376-7834.v1

- 93 -

1    make the statements made, in light of the circumstances under which they were made, not

2    misleading.

3         223.    Defendants violated §10(b) of the Exchange Act and Rule 10b-5 promulgated

4    thereunder in that they:

5              (a)    Employed devices, schemes, and artifices to defraud;

6              (b)    Made untrue statements of material facts or omitted to state material facts

7    necessary in order to make the statements made, in light of the circumstances under which they

8    were made, not misleading; or

9              (c)    Engaged in acts, practices, and a course of business that operated as a fraud

10   or deceit upon Plaintiff and others similarly situated in connection with their purchases of Super

11   Micro common stock during the Class Period.

12        224.    Plaintiff and the Class have suffered damages in that, in reliance on the integrity of

13   the market, they paid artificially inflated prices for Super Micro's common stock.  Plaintiff and

14   the Class would not have purchased Super Micro common stock at the prices they paid, or at all,

15   if they had been aware that the market prices had been artificially and falsely inflated by

16   Defendants' misleading statements.

17        225.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the

18   other members of the Class suffered damages in connection with their purchases of Super Micro

19   common stock during the Class Period.

20                              **COUNT II**

21                   **For Violation of §20(a) of the Exchange Act**
                           **Against All Defendants**
22

     226.    Plaintiff incorporates ¶¶1-225 by reference.
23

24        227.    The Individual Defendants acted as controlling persons of Super Micro within the

25   meaning of §20(a) of the Exchange Act.  By virtue of their positions and their power to control

26   public statements about Super Micro, the Individual Defendants had the power and ability to

27   control the actions of Super Micro and its employees.  Super Micro controlled the Individual

28

1   Defendants and its other officers and employees.  By reason of such conduct, Defendants are liable
2   pursuant to §20(a) of the Exchange Act.

3                                    **PRAYER FOR RELIEF**

4          WHEREFORE, Plaintiff prays for relief and judgment, as follows:

5          A.    Determining that this action is a proper class action and certifying Plaintiff as Class
6   representatives under Rule 23 of the Federal Rules of Civil Procedure and Plaintiff's counsel as
7   Lead Counsel;

8          B.    Awarding compensatory damages in favor of Plaintiff and the other Class members
9   against all Defendants, jointly and severally, for all damages sustained as a result of Defendants'
10  wrongdoing, in an amount to be proven at trial, including interest thereon;

11         C.    Awarding Plaintiff and the Class their reasonable costs and expenses incurred in
12  this action, including counsel fees and expert fees; and

13         D.    Such equitable, injunctive or other relief as may be deemed appropriate by the
14  Court.

15                                    **JURY DEMAND**

16         Plaintiff demands a trial by jury.

17  DATED:  June 21, 2019                    ROBBINS GELLER RUDMAN
                                               & DOWD LLP
18                                           SHAWN A. WILLIAMS
                                             DANIEL J. PFEFFERBAUM
19                                           ARMEN ZOHRABIAN
                                             PATTON L. JOHNSON
20

21                                                  s/ Daniel J. Pfefferbaum
22                                           DANIEL J. PFEFFERBAUM

23                                           Post Montgomery Center
                                             One Montgomery Street, Suite 1800
24                                           San Francisco, CA  94104
                                             Telephone:  415/288-4545
25                                           415/288-4534 (fax)

26                                           Lead Counsel for Plaintiffs

27

28

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATION OF THE
FEDERAL SECURITIES LAWS - 3:18-cv-00838-JST                                         - 95 -
4825-1376-7834.v1

<u>CERTIFICATE OF SERVICE</u>

I hereby certify under penalty of perjury that on June 21, 2019, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses on the attached Electronic Mail Notice List, and I hereby certify that I caused the mailing of the foregoing via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

s/ Daniel J. Pfefferbaum
DANIEL J. PFEFFERBAUM

ROBBINS GELLER RUDMAN
& DOWD LLP
Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA  94104
Telephone:  415/288-4545
415/288-4534 (fax)
E-mail:  dpfefferbaum@rgrdlaw.com

## Mailing Information for a Case 3:18-cv-00838-JST Hessefort v. Super Micro Computer, Inc. et al

### Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Daniel Scott Carlton**
  scottcarlton@paulhastings.com,melmanahan@paulhastings.com,lisavermeulen@paulhastings.com,lindayoung@paulhastings.com,nicolasmorgan@paulhastings.com

- **Richard Martin Heimann**
  rheimann@lchb.com

- **Stephen D. Hibbard**
  sdhibbard@jonesday.com,jctang@jonesday.com,cdelacroix@jonesday.com,jvallette@jonesday.com,marniephillips@jonesday.com

- **J Alexander Hood , II**
  ahood@pomlaw.com,abarbosa@pomlaw.com

- **Lester Rene Hooker**
  lhooker@saxenawhite.com,e-file@saxenawhite.com,cwallace@saxenawhite.com

- **Patton L. Johnson**
  pjohnson@rgrdlaw.com

- **Jeremy A Lieberman**
  jalieberman@pomlaw.com,disaacson@pomlaw.com,abarbosa@pomlaw.com,lpvega@pomlaw.com

- **Katherine Collinge Lubin**
  klubin@lchb.com,rtexier@lchb.com

- **Tricia Lynn McCormick**
  triciam@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Nicolas Morgan**
  nicolasmorgan@dlapiper.com,jette.brasher@dlapiper.com

- **Dennis Francis Murphy**
  dennismurphy@jonesday.com

- **Jennifer Pafiti**
  jpafiti@pomlaw.com,disaacson@pomlaw.com,cgarcia@pomlaw.com,abarbosa@pomlaw.com

- **Daniel Jacob Pfefferbaum**
  DPfefferbaum@rgrdlaw.com,smorris@rgrdlaw.com,khuang@rgrdlaw.com,mburch@rgrdlaw.com,abell@rgrdlaw.com,e_file_sd@rgrdlaw.com,6064570420@filings.do

- **Laurence Matthew Rosen**
  lrosen@rosenlegal.com,larry.rosen@earthlink.net

- **Shawn A. Williams**
  shawnw@rgrdlaw.com,kmccarty@rgrdlaw.com,e_file_sd@rgrdlaw.com,1101510420@filings.docketbird.com

- **Armen Zohrabian**
  AZohrabian@rgrdlaw.com,8791790420@filings.docketbird.com

### Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)