United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LOGAN HESSEFORT,<br>Plaintiff,<br>v.<br>SUPER MICRO COMPUTER, INC., et al.,<br>Defendants. | Case No. 18-cv-00838-JST<br><br>**MOTIONS TO DISMISS**<br>Re: ECF Nos. 75, 76 |

Before the Court is a motion to dismiss Plaintiffs' second amended consolidated class action complaint filed by Defendant Howard Hideshima, ECF No. 75, and a motion to dismiss or strike filed by Defendants Super Micro Computer, Inc. ("Super Micro"), Charles Liang, Perry G. Hayes, and Wally Liaw, ECF No. 76. The Court will grant the motions with leave to amend.

## I. BACKGROUND

Plaintiffs have filed a federal securities class action complaint on behalf of all purchasers of Super Micro's common stock between August 5, 2016 and January 30, 2018 ("Class Period"). Second Amended Consolidated Class Action Complaint ("SAC") ¶ 2, ECF No. 71. They allege that Super Micro made false and misleading statements and failed to disclose adverse information regarding the company. *Id.* ¶ 3.

### A. Factual Background

For the purposes of this order, the following allegations in the SAC are taken to be true. *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001).

Super Micro provides "high-efficiency server technology and innovation" and other "computing solutions." *Id.* ¶ 15. This lawsuit stems from an internal audit initiated by Super Micro in September 2017 that led to financial restatements for fiscal years ("FY") 2013 through

2017. *Id.* ¶¶ 72-120; ECF Nos. 71-1, 71-2, 71-3, 71-4. Between FY13 and FY17, Super Micro overstated its revenue by $104.7 million (1.1 percent), net income by $20.3 million (6.8 percent), and earnings per share by $0.41 (6.8 percent). SAC ¶ 143.

In 2015, before the start of the class period, Super Micro twice failed to meet Securities and Exchange Commission ("SEC") filing deadlines due to accounting regularities and was required to issue a prior period adjustment. *Id.* ¶ 16. The company assured investors that it had taken steps to remedy these problems, including implementing a new accounting system. *Id.* In October 2017, however, Super Micro disclosed that a sales transaction had been improperly recorded as revenue one quarter too early. *Id.* ¶¶ 24,74. Super Micro's Audit Committee began an investigation, which in turn caused delays in meeting the company's SEC filing requirements. *Id.* ¶¶ 69-103. Moreover, once the Audit Committee completed its investigation, the company announced that it would need additional time to analyze the impact of the investigation on the company's historical financial statements, and that its 2018 SEC filings would be delayed. *Id.* ¶ 85. On March 16, 2018, Super Micro disclosed that its stock was subject to delisting by NASDAQ. *Id.* ¶ 85. On August 21, 2018, Super Micro disclosed that its SEC filings dating back to the company's FY17 Form 10-K would remain delinquent, and as such, the Company expected to be delisted, *Id.* ¶¶ 102-03, which it was on August 23, 2018, *id.* at ¶ 112. Defendant Hideshima, who had been chief financial officer ("CFO"), as well as Defendant Liaw, who was senior vice president of international sales, both resigned during the Class Period. *Id.* ¶ 84.

In May 2019, Super Micro filed its delayed FY17 Form 10-K, which included financial adjustments for fiscal years 2013 through 2017. *Id.* ¶ 120. In its Form 10-K, Super Micro identified and described "material weaknesses" in its internal controls over financial reporting. *Id.* ¶¶ 121-123. Super Micro described a "culture of aggressively focusing on quarterly revenue without sufficient focus on compliance" and stated that "[s]enior management did not establish and promote a control environment with an appropriate tone of compliance and control consciousness throughout the entire Company." *Id.* ¶ 122. Further, the Form 10-K stated that certain sales, finance, and operations personnel, "including officers and managers, were aware of, condoned or were involved in actions that reflected an inappropriate tone at the top," including

shipping products in advance of requested delivery dates and other improper practices. *Id.* Super Micro detailed a remediation plan that included restructuring the sales organization and establishing training programs, among other efforts. *Id.* ¶ 132.

Plaintiffs allege that Super Micro made materially false statements related to this sequence of events in its SEC filings as well as in press releases and conference calls. *Id.* ¶¶ 44-88. The alleged false statements involved commentary on: (1) Super Micro's financial performance; (2) the effectiveness of Super Micro's internal operations and controls; (3) Super Micro's compliance with generally accepted accounting principles ("GAAP"); and (4) the investigation and its consequences, including delinquent filings and NASDAQ compliance. *Id.* ¶¶ 44-45, 48-54, 56-68-6972, 75, 77, 82, 83.

**B. Procedural Background**

On February 8, 2018, Plaintiffs Logan Hessefort and United Union of Roofers, Waterproofers & Allied Workers Local Union No. 8 WBPA Fund filed two separate class action complaints against Super Micro, Hideshima, and Liang. ECF No. 1; Case No. 4:18-cv-850-JST, ECF No. 1.[1] The complaints alleged the same violations of federal securities laws. *See* ECF No. 46 at 4. The Court consolidated the two cases, appointed NYHTC as Lead Plaintiff, and approved NYHTC's choice of lead counsel. *Id.* at 7.

Plaintiffs filed a consolidated class action complaint on September 24, 2018, adding Hayes, who was senior vice president for investor relations during the class period, SAC ¶ 36, as a defendant. ECF No. 51. In November 2018, Super Micro filed a new Form 8-K indicating an intent to issue additional financial restatements. ECF No. 70 at 2. The parties stipulated to allow Plaintiffs to file an amended complaint incorporating these developments. ECF No. 60. Plaintiffs filed a first amended consolidated class action complaint ("FAC") on January 22, 2019. ECF No. 61. Defendants moved to dismiss the FAC, ECF Nos. 62, 63, and Plaintiffs filed an opposition, ECF No. 68. On May 17, 2019, however, Super Micro issued additional financial restatements. ECF No. 70 at 3. The parties again stipulated to allow Plaintiffs to amend their complaint, *id.*,

[1] Unless otherwise noted, all ECF citations in this order are to Case No. 4:18-cv-838-JST.

mooting the motions to dismiss. On June 21, 2019, Plaintiffs filed the SAC, adding Liaw as a defendant and incorporating the recent developments. ECF No. 71.

The SAC asserts two causes of action: (1) violation of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and SEC Rule 10b-5, 17 C.F.R. §240.10b-5; and (2) violation of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a). SAC ¶¶ 221-27. Defendants Super Micro, Liang, Liaw, and Hayes and Defendant Hideshima filed separate motions to dismiss on July 26, 2019. ECF Nos. 75, 76. Plaintiffs filed a consolidated opposition, ECF No. 79, and Defendants filed separate replies, ECF Nos. 81, 84. The Court took the motions under submission without a hearing.

## II. JURISDICTION

This Court has jurisdiction pursuant to 28 U.S.C. § 1331 because this action arises under the federal securities laws.

## III. LEGAL STANDARD

### A. The Dual Pleading Requirements

Section 10(b) of the Securities Exchange Act of 1934 prohibits any act or omission resulting in fraud or deceit in connection with the purchase or sale of any security. To establish a violation of Section 10(b), a plaintiff must plead: (1) a material misrepresentation or omission made by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation. *See Stoneridge Inv. Partners, LLC v. Sci.-Atlanta*, 552 U.S. 148, 157 (2008).

On a motion to dismiss, the Court accepts the material facts alleged in the complaint, together with reasonable inferences to be drawn from those facts, as true. *Navarro*, 250 F.3d at 732. However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions" or "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements . . . ." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Moreover, while a plaintiff generally need only plead "enough facts to state a claim to relief that is plausible on its face" to survive a motion to dismiss, *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007), "[s]ecurities fraud class actions must meet the higher, exacting pleading standards of Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act

(PSLRA)," *Or. Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*, 774 F.3d 598, 604 (9th Cir. 2014).

Under the PSLRA and Rule 9(b), a complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind" with respect to each alleged false statement or omission, and "a party must state with particularity the circumstances constituting fraud or mistake." 15 U.S.C. § 78u-4(b)(2)(A); Fed. R. Civ. P. 9(b); *see also Or. Pub. Emps. Ret. Fund*, 774 F.3d at 605. "In order to show a strong inference of deliberate recklessness, plaintiffs must state facts that come closer to demonstrating intent, as opposed to mere motive and opportunity." *In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970, 974 (9th Cir. 1999), *superseded by statute and abrogated on other grounds by S. Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 784 (9th Cir. 2008). If the complaint does not satisfy the PSLRA's pleading requirements, the Court must grant a motion to dismiss the complaint. 15 U.S.C. § 78u-4(b)(3)(A).

**B. Falsity and Materiality**

The PSLRA provides that "the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1)(B). For statements to be actionable under the PSLRA, they must be both false or misleading and material. A statement or omission is misleading under the PSLRA and Section 10(b) of the Exchange Act "if it would give a reasonable investor the impression of a state of affairs that differs in a material way from the one that actually exists." *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 985 (9th Cir. 2008) (internal quotation marks and citation omitted).

A false or misleading statement or omission is material if there is a "substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976). To plead materiality, a complaint's allegations must "suffice to raise a reasonable expectation that discovery will reveal evidence satisfying the materiality requirement, and to allow the court to draw the reasonable inference that the defendant

is liable." *In re Atossa Genetics Inc Sec. Litig.*, 868 F.3d 784, 794 (9th Cir. 2017) (citation omitted). "Although determining materiality in securities fraud cases should ordinarily be left to the trier of fact, conclusory allegations of law and unwarranted inferences are insufficient to defeat a motion to dismiss for failure to state a claim." *In re Cutera Sec. Litig.*, 610 F.3d 1103, 1108 (9th Cir. 2010) (internal quotation marks and citations omitted).

**C. Scienter**

The required state of mind under the PSLRA is a "mental state embracing intent to deceive, manipulate, or defraud." *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 193-94 n.12 (1976). In order to adequately establish scienter, the complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(A).

The "strong inference" required by the PSLRA "must be more than merely 'reasonable' or 'permissible' – it must be cogent and compelling, thus strong in light of other explanations." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007). "A court must compare the malicious and innocent inferences cognizable from the facts pled in the complaint, and only allow the complaint to survive a motion to dismiss if the malicious inference is at least as compelling as any opposing innocent inference." *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 991 (9th Cir. 2009). In evaluating whether a complaint satisfies the "strong inference" requirement, courts must undertake a two-step inquiry by first considering "whether any of the allegations, standing alone, are sufficient to create a strong inference of scienter," and "if no individual allegation is sufficient, . . . conduct[ing] a 'holistic' review of the same allegations to determine whether the insufficient allegations combine to create a strong inference of intentional conduct or deliberate recklessness." *Curry v. Yelp Inc.*, 875 F.3d 1219, 1226 (9th Cir. 2017) (citation omitted).

In the Ninth Circuit, scienter is a "mental state that not only covers intent to deceive, manipulate, or defraud, but also deliberate recklessness." *City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605, 619 (9th Cir. 2017) (quoting *Schueneman v. Arena Pharm., Inc.*, 840 F.3d 698, 705 (9th Cir. 2016)). "Deliberate recklessness



United States District Court
Northern District of California

is an *extreme* departure from the standards of ordinary care[,] which presents a danger of misleading buyers or sellers that is either known to the defendant or is so *obvious* that the actor must have been aware of it." *Webb v. Solarcity Corp.*, 884 F.3d 844, 851 (9th Cir. 2018) (alteration and emphasis in original) (quoting *City of Dearborn Heights*, 856 F.3d at 619). Stated differently, deliberate recklessness requires that an actor "had reasonable grounds to believe material facts existed that were misstated or omitted, but nonetheless failed to obtain and disclose such facts although [the actor] could have done so without extraordinary effort." *Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1063 (9th Cir. 2014) (citation omitted). "Facts showing mere recklessness or a motive to commit fraud and opportunity to do so provide some reasonable inference of intent, but are not sufficient to establish a strong inference of deliberate recklessness." *In re Verifone Holdings, Inc. Sec. Litig.*, 704 F.3d 694, 701 (9th Cir. 2012).

**D. Loss Causation**

Loss causation, "i.e., a causal connection between the material misrepresentation and the loss" experienced by the plaintiff, is a necessary element of pleading a securities fraud claim under Section 10(b) of the Exchange Act. *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 342 (2005). The plaintiff "must demonstrate that an economic loss was caused by the defendant's misrepresentations, rather than some other intervening event." *Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200, 1209 (9th Cir. 2016). In other words, plaintiffs alleging that they suffered a loss because they resold shares at a lower price must show that the price reflects "the earlier misrepresentation" rather than "changed economic circumstances, changed investor expectations, new industry-specific or firm-specific facts, conditions, or other events, which taken separately or together account for some or all of that lower price." *Dura Pharm.*, 544 U.S. at 343. The Ninth Circuit has held that, as with other elements of a securities fraud claim, plaintiffs must plead loss causation with the particularity required by Federal Rule of Civil Procedure 9(b). *See Or. Pub. Emps. Ret. Fund*, 774 F.3d at 605.

"The burden of pleading loss causation is typically satisfied by allegations that the defendant revealed the truth through 'corrective disclosures' which 'caused the company's stock

price to drop and investors to lose money.'" *Lloyd*, 811 F.3d at 1209 (quoting *Halliburton Co. v. Erica P. John Fund, Inc.*, 134 S. Ct. 2398, 2406 (2014)); *see also Nuveen Mun. High Income Opportunity Fund v. City of Alameda*, 730 F.3d 1111, 1119 (9th Cir. 2013) ("Typically, 'to satisfy the loss causation requirement, the plaintiff must show that the revelation of that misrepresentation or omission was a substantial factor in causing a decline in the security's price, thus creating an actual economic loss for the plaintiff.'") (quoting *McCabe v. Ernst & Young, LLP*, 494 F.3d 418, 425-26 (3d. Cir. 2007)). However, "[d]isclosure of the fraud is not a sine qua non of loss causation, which may be shown even where the alleged fraud is not necessarily revealed prior to the economic loss." *Nuveen*, 730 F.3d at 1120. "The fundamental inquiry before the Court remains whether there is 'a causal connection between the material misrepresentation and the loss.'" *Thomas v. Magnachip Semiconductor Corp.*, 167 F. Supp. 3d 1029, 1046 (N.D. Cal. 2016) (quoting *Dura Pharm.*, 544 U.S. at 342).

## IV. DISCUSSION

Defendants focus their motions on scienter. Super Micro also moves to strike certain statements from the SAC pursuant to Federal Rule of Civil Procedure 12(f). ECF No. 76 at 27-32. Because the Court will hold that Plaintiffs have not sufficiently alleged scienter, it does not reach Super Micro's Rule 12(f) argument.

### A. Scienter

Defendants argue that the SAC's allegations are insufficient to establish scienter either individually or collectively, and that "the most plausible inference to be drawn is that company management discovered, investigated, and have remedied errors in the way certain transactions were accounted for." ECF No. 76 at 19.[2] The Court will consider the allegations separately before considering them holistically. *See Curry*, 875 F.3d at 1226. If scienter is met as to any of the individual Defendants, it is met as to Super Micro because Super Micro does not argue that the individual Defendants were acting outside the scope of their apparent authority. *In re ChinaCast Educ. Corp. Sec. Litig.*, 809 F.3d 471, 476 (9th Cir. 2015) ("The scienter of the senior controlling

[2] Because Hideshima's motion to dismiss closely mirrors the other Defendants', the Court will reference it only where it provides facts or analysis not present in the other motion.

officers of a corporation may be attributed to the corporation itself to establish liability as a primary violator of § 10(b) and Rule 10b-5 when those senior officials were acting within the scope of their apparent authority.”).

**1. Statements in FY17 Form 10-K**

Plaintiffs argue that Super Micro’s FY17 Form 10-K, in which the company restated financials for FY13 through FY17, amounts to an “admission of scienter.” ECF No. 79 at 28. The 10-K states, in relevant part:

> We had a culture of aggressively focusing on quarterly revenue without sufficient focus on compliance. Senior management did not establish and promote a control environment with an appropriate tone of compliance and control consciousness throughout the entire Company. The Company did not sufficiently promote, monitor or enforce adherence to the Code of Conduct. In the pursuit of quarterly revenue, certain of our sales, finance and operations personnel, including officers and managers, were aware of, condoned or were involved in actions that reflected an inappropriate tone at the top, that violated our Code of Conduct and our accounting policies and procedures, and that were inconsistent with a commitment to integrity and ethical values. . . . Some employees, including officers and managers, also failed to raise issues with material accounting consequences to the Audit Committee and our external auditors, and with respect to one transaction, appear to have attempted to minimize material facts about a sales transaction to, or obscure those facts from, the Audit Committee and our external auditors.

ECF No. 75-2 at 5.[3]

Defendants argue that these statements do not create an inference of scienter because they do not mention any of the individual Defendants by name. ECF No. 76 at 21-22. Hideshima additionally argues that the alleged improprieties involved customer sales, not accounting or finance, and that the SAC lacks specific allegations that he was aware of any irregularity in the

[3] At Hideshima’s request, *see* ECF Nos. 75-2, 83, the Court will consider excerpts of the FY17 Form 10-K as incorporated into the SAC. *See Johnson v. Fed. Home Loan Mortg. Corp.*, 793 F.3d 1005, 1007 (9th Cir. 2015) (a court “may consider extrinsic evidence not attached to the complaint if the document’s authenticity is not contested and the plaintiff’s complaint necessarily relies on it”). The purpose of the judicially created incorporation-by-reference doctrine is to “prevent plaintiffs from selecting only portions of documents that support their claims, while omitting portions of those very documents that weaken − or doom − their claims.” *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1002 (9th Cir. 2018). The SAC “necessarily relies on” the FY17 Form 10-K as the source of multiple statements that Plaintiffs allege demonstrate scienter, and Plaintiffs do not contest the authenticity of the excerpts submitted by Hideshima. The Court therefore considers these excerpts in evaluating Defendants’ motions to dismiss.



United States District Court
Northern District of California

United States District Court
Northern District of California

sales transactions. ECF No. 84 at 15.

On their own, the Form 10-K's statements about "[s]enior management" and "officers and managers" are not enough to infer scienter to individual Defendants. *Cf. Zucco*, 552 F.3d at 1000 ("In general, the mere publication of a restatement is not enough to create a strong inference of scienter."). Plaintiffs cite *In re Sipex Corp. Sec. Litig.*, No. C 05-00392 WHA, 2005 WL 3096178, at *1 (N.D. Cal. Nov. 17, 2005) for the proposition that "[m]any decades of experience teach that sham transactions like the one alleged are not done for the fun of it – they are done to cook the books." ECF No. 79 at 28. In that case, however, the plaintiff had alleged "in painful detail" how the CEO had "personally orchestrated" the sham sale at issue. *In re Sipex*, 2005 WL 3096178, at *1. And in *In re Verifone*, also cited by Plaintiffs, ECF No. 79 at 29, allegations that a senior manager "had a history of putting accounting staff under pressure" supported an inference of scienter in combination with allegations that the manager had "direct[ed] baseless adjustments to the company's financial statements" and "fail[ed] to inquire further once projections were met at the same time [he] encouraged employees to engage in 'aggressive' accounting to ensure VeriFone hit other financial targets." 704 F.3d at 705, 710.

Generalized statements about management may, however, support an inference of scienter when combined with "enough other suggestions of knowledge or recklessness on the part of defendants." *Thomas*, 167 F. Supp. 3d at 1043; *see also Luna v. Marvell Tech. Grp.*, No. C 15-05447 WHA, 2017 WL 2171273, at *3-5 (N.D. Cal. May 17, 2017) (allegations of "an inappropriate tone at the top" created a strong inference of scienter when combined with termination of certain executives and various remedial actions). The Court thus considers these statements in its holistic analysis.

**2. GAAP Violations**

Defendants do not dispute that Super Micro violated GAAP standards for revenue recognition; indeed, Super Micro acknowledged as much in its FY17 Form 10-K. Plaintiffs argue, however, that the scope of these violations shows that "Super Micro, Liang, Hideshima and Liaw 'knew or must have been aware of the improper revenue recognition.'" ECF No. 79 at 35 (quoting *DSAM Glob. Value Fund v. Altris Software, Inc.*, 288 F.3d 385, 391 (9th Cir. 2002); *see also* SAC

¶ 194. Defendants respond that the violations were not significant enough to support an inference of scienter. ECF No. 76 at 22.

"[W]hile scienter cannot be established by publishing inaccurate accounting figures, even when in violation of GAAP, significant violations of GAAP standards can provide evidence of scienter so long as they are pled with particularity." *In re Daou Sys., Inc.*, 411 F.3d 1006, 1022 (9th Cir. 2005) (internal citation omitted). "When there are substantial allegations that the violations [involved 'significant inflation of revenue'], a strong inference arises that senior management intentionally misstated earnings." *In re McKesson HBOC, Inc. Sec. Litig.*, 126 F. Supp. 2d 1248, 1273 (N.D. Cal. 2000). In *McKesson*, "revenue inflation exceeded 25% in some quarters," which the court found to be "powerful circumstantial evidence of scienter." *Id. See also Thomas*, 167 F. Supp. 3d at 1042 (holding that net income inflation of nearly 500 percent was so significant as to "suggest a typical corporate executive should have noticed" the underlying violations); *Luna*, 2017 WL 2171273, at *4 (erroneous transactions constituting as much as 46 percent of earnings per share in at least one affected quarter supported inference of scienter); *but see Luna v. Marvell Tech. Grp.*, No. 15-cv-05447-RMW, 2016 WL 5930655, at *12 (N.D. Cal. Oct. 12, 2016) ("The premature recognition of 7-8% of revenue cannot plausibly be described as 'core' to Marvell's operations."); *In re Taleo Corp. Sec. Litig.*, No. C 09-00151 JSW, 2010 WL 597987, at *11 (N.D. Cal. Feb. 17, 2010) (revenue overstatement of 4 percent not so significant as to support a strong inference of scienter); *In re Sonus Networks, Inc. Sec. Litig.*, No. Civ. A. 04-10294-DPW, 2006 WL 1308165, at *19 (D. Mass. May 10, 2006) (total revenue overstatement of 12 percent "not sufficient, without more particularized information, to ground a strong inference that senior executives knew or were reckless that revenue recognition was being timed inappropriately.").

Plaintiffs here allege an overstatement of revenue by 1.1 percent, net income by 6.8 percent, and earnings per share by 6.8 percent for FY13 through FY17. SAC ¶ 143. While Plaintiffs argue in their opposition that these figures demonstrate materiality, they cite no case in which an overstatement of similar size supported a finding of scienter. ECF No. 79 at 40-41. The Court thus holds that the overstatements are not significant enough to create an inference of



United States District Court
Northern District of California

scienter on their own, though it will consider them in its holistic analysis.

**3. Resignations and Remedial Measures**

Plaintiffs argue that the resignations of Hideshima and Liaw, along with those of "multiple high-ranking executives across multiple departments," also support a strong inference of scienter. ECF No. 79 at 30-33. Plaintiffs allege that Hideshima resigned on the same day the audit committee completed its internal investigation and Super Micro announced that it had appointed a new CFO. SAC ¶ 200. Plaintiffs additionally point to various remediation efforts Super Micro announced alongside the restatement, including restructuring its sales organization, appointing new accounting, finance, and compliance leadership, amending its code of conduct, overhauling its internal audit structure, and implementing "[r]evenue recognition training for our global sales force, various operations personnel, and certain senior executives, including our CEO . . ."[4] SAC ¶ 132. Super Micro's description of these efforts alluded to both Hideshima's and Liaw's resignations. *Id.* Plaintiffs also allege "suspicious circumstances" surrounding both resignations, ECF No. 79 at 31, noting that Liaw owned 4.6 percent of the company and served on its board, a position he also resigned from, SAC ¶ 26, and that Hideshima had not been replaced after two prior accounting issues that had resulted in delayed SEC filings and a prior period adjustment, *id.* ¶¶ 40-41; ECF No. 79 at 31.

"[A]n employee's resignation supports an inference of scienter only when 'the resignation at issue was uncharacteristic when compared to the defendant's typical hiring and termination

[4] Defendants object to Plaintiffs' reliance on allegations of Super Micro's remediation efforts under Federal Rule of Evidence 407. ECF No. 76 at 23; ECF No. 81 at 12. They cite two securities class actions in which courts have chosen not to rely on remedial allegations at the motion to dismiss stage. *See Higginbotham v. Baster Int'l, Inc.*, 495 F.3d 753, 760 (7th Cir. 2007) ("Drawing any inference from this would be incompatible with Fed. R. Evid. 407, which provides that subsequent remedial measures may not be used as evidence of liability."); *In re Longtop Fin. Techs. Ltd. Sec. Litig.*, 939 F. Supp. 2d 360, 388 n.13 (S.D.N.Y. 2013) ("I further note that drawing an adverse inference from DTTC's attempts to strengthen Longtop's financial controls would be inconsistent with the policy animating Federal Rule of Evidence 407, which prohibits using subsequent remedial measures as evidence of liability."). The Ninth Circuit, however, does not appear to have considered whether Rule 407 applies at the pleading stage in securities class actions, and courts in this district routinely consider allegations of remedial activity in this context. *See, e.g.*, *Luna*, 2017 WL 2171273, at *3; *Mulligan v. Impax Labs., Inc.*, 36 F. Supp. 3d 942, 950-51, 961 (N.D. Cal. 2014); *In re Sipex*, 2005 WL 3096178, at *1. The Court therefore considers these allegations in its scienter analysis.

patterns or was accompanied by suspicious circumstances.'" *City of Dearborn Heights*, 856 F.3d at 622 (quoting *Zucco*, 552 F.3d at 1002). "Where a resignation occurs slightly before or after the defendant corporation issues a restatement, a plaintiff must plead facts refuting the reasonable assumption that the resignation occurred as a result of [the] restatement's issuance itself in order for a resignation to be strongly indicative of scienter." *Zucco*, 552 F.3d at 1002. The plaintiff in *Luna* met this bar by alleging that the defendant company had (1) terminated its CEO a month after its audit committee launched an investigation, (2) "did not terminate any lower-level employees (or any senior employees, for that matter)," (3) identified the hiring of a new CEO as a "remedial measure," and (4) implemented remedial training only for executives. 2017 WL 2171273, at *5. By contrast, in *In re U.S. Aggregates, Inc. Securities Litigation*, an allegation that the defendant's CFO had been terminated after auditors raised concerns was insufficient to support scienter when accompanied only by a press release noting that "certain members of management resigned, were put on administrative leave, or were terminated" as a result of improprieties leading to a financial restatement. 235 F. Supp. 2d 1063, 1074 (N.D. Cal. 2002). That court reasoned that the plaintiff could "point to no particularized allegation refuting the reasonable assumption that [the CFO defendant] was fired simply because the errors that [led] to the restatement occurred on his watch or because he failed adequately to supervise his department." *Id.*

Unlike in *Luna*, Hideshima and Liaw were not terminated, multiple other employees also resigned, and the remedial training targeted line-level sales employees as well as senior executives. Plaintiffs do not spell out how Liaw's ownership stake and board participation render his resignation "suspicious," nor do they connect the dots regarding their allegation that Hideshima did not resign after prior accounting issues. Plaintiffs' description of Hideshima's resignation as "uncharacteristic," supported solely by the fact that he had worked for Super Micro for twelve years, ECF No. 79 at 31, is conclusory. Plaintiffs' only relevant allegation that the resignations signify anything more than that "the errors that [led] to the statement occurred on [Hideshima's and Liaw's] watch," *In re U.S. Aggregates*, 235 F. Supp. 2d at 1074, is that the restatement referred to Liaw's resignation and Hideshima's replacement in its section on remedial measures, SAC ¶ 132. As in *In re U.S. Aggregates*, this allegation is not particularized enough to

United States District Court
Northern District of California

refute the alternative inference.

Plaintiffs' authority is not to the contrary. *In re UTStarcom, Inc. Securities Litigation* found scienter as to an individual defendant whose resignation the company had announced contemporaneously with a financial restatement as well as with a revelation that the SEC was considering filing a Section 10(b) action against that individual defendant. 617 F. Supp. 2d 964, 976 (N.D. Cal. 2009). Plaintiffs in that case had also alleged that the individual defendants had actual knowledge of accounting irregularities and had engaged in suspicious stock sales, the "timing and magnitude" of which the court found supported an inference of scienter. *Id.* And in *In re Volkswagen "Clean Diesel" Marketing, Sales Practices, & Products Liability Litigation*, Plaintiffs had alleged that Volkswagen had replaced "virtually all of its prior management" and "pledged to prosecute those involved in the scheme to cheat emissions tests," and that various former executives had "expressly admitted wrongdoing." MDL No. 2672 CRB (JSC), 3:15-md-02672-CRB, 2017 WL 66281, at *14 (N.D. Cal. Jan. 4, 2017). Plaintiffs' allegations here do not approach this level of particularity.

The Court will nevertheless consider these allegations in its holistic scienter analysis.

**4. Other Allegations**

In addition to the allegations above, Plaintiffs argue that the lack of internal controls, SAC ¶¶ 165-75, "the existence of SEC enforcement activities at Super Micro," *id.* ¶ 203, and the fact that Liang and Hideshima signed allegedly false Sarbanes-Oxley ("SOX") certifications, *id.* ¶ 201, support an inference of scienter. ECF No. 79 at 35-36.

None of these allegations are sufficient on their own to plead scienter. *See In re Hansen Nat. Corp. Sec. Litig.*, 527 F. Supp. 2d 1142, 1158 (C.D. Cal. 2007) (deficient internal controls); *Thomas*, 167 F. Supp. 3d at 1043 (SOX certifications and SEC investigations). Because all of them may contribute "one more piece of the scienter puzzle," however, *Thomas*, 167 F. Supp. 3d at 1043 (quoting *In re UTStarcom*, 617 F. Supp. 2d at 976), the Court will consider them in its holistic analysis.

**5. Core Operations Doctrine**

Plaintiffs argue both that the individual Defendants had "actual access" to the misconduct

at issue and that the breadth of this misconduct was such that it would be "absurd" to suggest that they did not know about it. ECF No. 79 at 37-38.

Under the core operations doctrine, "[a]llegations regarding management's role may help satisfy the PSLRA scienter requirement . . . where they are particular and suggest that defendants had actual access to the disputed information," or, "in rare circumstances" and "without accompanying particularized allegations, where the nature of the relevant fact is of such prominence that it would be 'absurd' to suggest that management was without knowledge of the matter." *Reese v. Malone*, 747 F.3d 557, 575-76 (9th Cir. 2014), *overruled on other grounds by City of Dearborn Heights*, 856 F.3d at 616 (internal quotation marks and citations omitted). To show "actual access," a plaintiff "must produce either specific admissions by one or more corporate executives of detailed involvement in the minutia of a company's operations . . . or witness accounts demonstrating that executives had actual involvement in creating false reports." *Police Ret. Sys.*, 759 F.3d at 1062.

The Ninth Circuit has found actual access where plaintiffs have pleaded "specific admissions from top executives that they are involved in every detail of the company and that they monitored portions of the company's database," and where a complaint included a CEO's "specific and detailed statement about defendants' actual knowledge." *S. Ferry LP*, 542 F.3d at 785 (citing *In re Daou*, 411 F.3d at 1022 and *Nursing Home Pension Fund, Local 144 v. Oracle Corp.*, 380 F.3d 1226, 1231 (9th Cir. 2004)). By contrast, allegations by witnesses that executives "were involved with [the company's] day-to-day operations" and that they must have been familiar with growth numbers contained in software-generated reports "because the substance of the reports was discussed in meetings" were insufficient to plead a core operations inference. *Police Ret. Sys.*, 759 F.3d at 1062-63 ("Missing are allegations linking specific reports and their contents to the executives, not to mention the link between the witnesses and the executives.").

Plaintiffs argue that Liang, Hideshima, and Liaw had "actual access" to the revenue recognition violations because "they each signed SEC filings reflecting the relevant revenue recognition standards that were violated." ECF No. 79 at 37. They add that Liang and Hideshima "also held themselves out as 'responsible' for GAAP-compliant financial statements and effective

United States District Court
Northern District of California

internal controls." *Id.* Plaintiffs allege that Liang was "known to obsess over every detail of Super Micro's business from approving custom orders to dictating environmentally themed green neckties that executives wear to customer meetings," and quote a former employee who said that "[h]e is the person who approves and looks at everything the company is doing – every new product, marketing effort, sales effort, anything you want to do or promote." SAC ¶ 34. Plaintiffs also allege that Super Micro's FY16 Form 10-K called Liang "the chief operating decision maker" and described him as "critical to the overall management of the Company" and "personally involved in key relationships with suppliers, customers and strategic partners." *Id.* As for Hideshima, Plaintiffs argue that his former position as CFO demonstrates that he was "responsible for the Company's financials." ECF No. 79 at 37.

None of these allegations are particular enough to plead "actual access" to the revenue recognition violations at issue. The SAC contains no "specific admissions" by any of the individual Defendants of their involvement in revenue recognition procedures. *See S. Ferry LP*, 542 F.3d at 785. Plaintiffs have alleged only Defendants' general involvement in Super Micro's "day-to-day operations," *Police Ret. Sys.*, 759 F.3d at 1062, and their approval of its SEC filings. Even if the SAC had provided such admissions, however, missing would be allegations linking Defendants not just to revenue recognition *policies* but to particular suspect transactions. *See id.* at 1063; *Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1068 (9th Cir. 2008) ("As this court has noted on more than one occasion, corporate management's general awareness of the day-to-day workings of the company's business does not establish scienter – at least absent some additional allegation of specific information conveyed to management and related to the fraud."). These allegations are insufficient to create a core operations inference.

Neither is the alleged fraud here "of such prominence that it would be 'absurd' to suggest that management was without knowledge of the matter." *Reese*, 747 F.3d at 576. Plaintiffs cite *Berson*, 527 F.3d at 988 n.5, 989, ECF No. 79 at 38, in which the Ninth Circuit held that "it would be absurd to suggest that top management was unaware" of a stop-work order on "the company's largest contract with one of its most important customers." Defendants are alleged to have made financial overstatements ranging from 1.1 to 6.8 percent, depending on the metric. SAC ¶ 143.

The Court has already held that these amounts are not significant enough to create an inference of scienter on their own. For the same reasons, it holds that the financial inflation due to the alleged improper revenue recognition was not so significant that "it would be absurd to suggest" that the individual Defendants were not aware of it. *See Berson*, 527 F.3d at 989.[5]

**6. Holistic Analysis**

Because Plaintiffs have not alleged scienter based on any individual allegation, the Court will conduct a holistic review "to determine whether the insufficient allegations combine to create a strong inference of intentional conduct or deliberate recklessness." *Curry*, 875 F.3d at 1226 (citation omitted).

Plaintiffs have alleged that Super Micro admitted that it had maintained "a culture of aggressively focusing on quarterly revenue without sufficient focus on compliance" and that its "[s]enior management did not establish and promote a control environment with an appropriate tone of compliance and control consciousness throughout the entire Company." SAC ¶ 122. Plaintiffs have also alleged that Super Micro violated GAAP standards, resulting in a financial overstatement of 1.1 to 6.8 percent, depending on the metric, *id.* ¶ 143; that it lacked sufficient internal controls, *id.* ¶ 165-75; and that the SEC had previously investigated it for accounting irregularities, *id.* ¶ 203.

While Defendant Liang did not resign, Plaintiffs have alleged that Super Micro's FY17 Form 10-K identified him "as needing training on compliant sales practices, effective internal controls and revenue recognition compliance," *id.* ¶ 11; that he signed SOX certifications that later turned out to be false, *id.* ¶¶ 19, 201; and that he had a detail-oriented management style, *id.* ¶ 34. Plaintiffs have alleged that Defendant Hideshima also signed false SOX certifications, *id.* ¶¶ 19, 201; that he resigned on the same day Super Micro announced its internal investigation, *id.* ¶ 200; and that the FY17 Form 10-K referenced his resignation in its description of Super Micro's remedial efforts, *id.* ¶¶ 132, 178, 200. Plaintiffs have alleged that the FY17 Form 10-K also

---

[5] Likewise distinguishable is *In re LendingClub Sec. Litig.*, 254 F. Supp. 3d 1107, 1121-22 (N.D. Cal. 2017), where the court held that it would be absurd for a CFO not to have known about failures in internal controls where the CEO had previously taken advantage of those failures to inflate the company's numbers and been forced to resign as a result.



United States District Court
Northern District of California

referenced Defendant Liaw's resignation as a remedial effort. *Id.* ¶¶ 132, 178, 200. The SAC makes no additional allegations as to Defendant Hayes's scienter.

In many ways, these allegations resemble those made by the plaintiffs in *Luna* and *Thomas*, which created strong inferences of scienter. *See Luna*, 2017 WL 2171273, at *3-5 (inferring scienter from corporate defendant's admission of "inappropriate tone at the top"; termination of defendant CEO concurrently with launch of investigation; identification of new CEO as remedial measure; defendant CEO's micromanagement; and remedial training for executives); *Thomas*, 167 F. Supp. 3d at 1045 (inferring scienter from corporate defendant's general admission of fault on part of management; termination of two senior officers concurrently with announcement of violations; individual defendants' signing of SOX certifications and motive to lie; and fact that many individual defendants had "served on a committee whose responsibility was to police for such violations"). Critically, however, the violations in both of those cases were of much greater magnitude. In *Luna*, the suspect transactions constituted as much as 46 percent of earnings per share in at least one affected quarter, and the defendant company would have missed its quarterly targets without them, "support[ing] an inference that certain revenue was prematurely recognized due to pressure from senior management to meet revenue targets." 2017 WL 2171273, at *4. In *Thomas*, the net income inflation of nearly 500 percent "dramatically affected Magnachip's financial results, and in ways that strongly suggest a typical corporate executive should have noticed them." 167 F. Supp. 3d at 1042.

The alleged violations here resulted in inflations of at most 6.8 percent. For the reasons already discussed, they did not constitute a significant enough percentage of Super Micro's bottom line to overcome the "opposing innocent inference" that Super Micro's sales personnel acted without the knowledge or deliberate recklessness of Defendants Liang, Hideshima, Liaw, and Hayes. *See Zucco*, 552 F.3d at 991. Accordingly, the Court holds that Plaintiffs have not pleaded scienter as to any Defendants with the particularity required by the PSLRA.

Because scienter is a necessary element of a Section 10(b) claim, Plaintiffs have failed to state such a claim and the Court need not reach Defendants' argument regarding whether the statements at issue are actionable. *See* ECF No. 76 at 27-32. The Court dismisses Plaintiffs'

Section 10(b) and Rule 10b-5 claim with leave to amend.

**B. Section 20(a) Control Person Liability**

Section 20(a) of the Exchange Act, which forms the basis of Plaintiffs' second cause of action, extends liability to persons who directly or indirectly control a violation of the securities laws. 15 U.S.C. § 78t(a). Under Section 20(a), "a defendant employee of a corporation who has violated the securities laws will be jointly and severally liable to the plaintiff, as long as the plaintiff demonstrates a 'primary violation of federal securities law' and that the 'defendant exercised actual power or control over the primary violator.'" *City of Dearborn Heights*, 856 F.3d at 623 (quoting *Zucco*, 552 F.3d at 990).

A claim under Section 20(a) can survive only if the underlying predicate Exchange Act violation also survives. *See City of Dearborn Heights*, 856 F.3d at 623. Because the Court dismisses Plaintiffs' Section 10(b) claim, Plaintiffs' second cause of action must also be dismissed.

**CONCLUSION**

For the foregoing reasons, the Court GRANTS both motions to dismiss, with leave to amend. Any amended complaint must be filed within 30 days of the date of this order.

**IT IS SO ORDERED.**

Dated: March 23, 2020

JON S. TIGAR
United States District Judge