1    ROBBINS GELLER RUDMAN
        & DOWD LLP
2    SHAWN A. WILLIAMS (213113)
     DANIEL J. PFEFFERBAUM (248631)
3    ARMEN ZOHRABIAN (230492)
     PATTON L. JOHNSON (320631)
4    Post Montgomery Center
     One Montgomery Street, Suite 1800
5    San Francisco, CA  94104
     Telephone:  415/288-4545
6    415/288-4534 (fax)
     shawnw@rgrdlaw.com
7    dpfefferbaum@rgrdlaw.com
     azohrabian@rgrdlaw.com
8    pjohnson@rgrdlaw.com

9    Lead Counsel for Plaintiffs

10   [Additional counsel appear on signature page.]

11                     UNITED STATES DISTRICT COURT

12                   NORTHERN DISTRICT OF CALIFORNIA

13                            OAKLAND DIVISION

14   LOGAN HESSEFORT, Individually and on      )   Lead Case No. 4:18-cv-00838-JST
     Behalf of All Others Similarly Situated,  )
15                                             )   CLASS ACTION
                          Plaintiff,           )
16                                             )   THIRD AMENDED CONSOLIDATED
           vs.                                 )   CLASS ACTION COMPLAINT FOR
17                                             )   VIOLATION OF THE FEDERAL
     SUPER MICRO COMPUTER, INC., et al.,       )   SECURITIES LAWS
18                                             )
                          Defendants.          )
19   _____)

20                                                 DEMAND FOR JURY TRIAL

21

22

23

24

25

26

27

28

1

**TABLE OF CONTENTS**

2

**Page**

3 SUMMARY OF ACTION.................................................................................................1

4 SUMMARY OF AMENDMENTS................................................................................2

5 OVERVIEW .....................................................................................................................3

6 INTRODUCTION ...........................................................................................................4

7 JURISDICTION AND VENUE ...................................................................................12

8 THE PARTIES................................................................................................................13

9 BACKGROUND.............................................................................................................16

10 Prior to the Class Period, Super Micro Falsely Claims to Meet or Beat FY13 to FY15
        Annual EPS Expectations, Twice Misses SEC Filing Deadlines and Implements
11      New Accounting System to Purportedly Improve Internal Controls................................16

12 FALSE AND MISLEADING STATEMENTS ISSUED DURING THE CLASS
        PERIOD ...................................................................................................................18
13
   Super Micro Announces 4Q16 and FY16 Financial Results and Files Form 10-K......................18
14
   Super Micro Announces 1Q17 Financial Results and Files Form 10-Q ......................................27
15
   Super Micro Announces 2Q17 Financial Results and Files Form 10-Q ......................................30
16
   Super Micro Announces 3Q17 Financial Results and Files Form 10-Q ......................................32
17
   Super Micro Announces Preliminary 4Q17 Financial Results ....................................................34
18
   Super Micro Requests 15-Day Extension to File Form 10-K.......................................................37
19
   Super Micro Fails to Meet Extended Deadline to File Form 10-K and Announces Audit
20      Committee Review.........................................................................................................38

21 Super Micro Reveals Premature Revenue Recognition; Fails to File 1Q18 Form 10-Q.............39

22 Super Micro Announces Departure of Senior Executives and Cannot State if Its Historical
        Financial Statements Are Accurate; Audit Committee Investigation Results in
23      Further Inquiry and Delay...........................................................................................44

24 POST-CLASS PERIOD EVENTS AND DISCLOSURES........................................46

25 Super Micro Subject to Delisting by NASDAQ ........................................................48

26 Super Micro Fails to File 3Q18 Form 10-Q................................................................49

27 Super Micro Fails to Meet Filing Deadline; NASDAQ Suspends Trading.................................52

28

1

2                                                                                                    **Page**

3

4    Super Micro Announces Need to Restate FY15-FY17 and Material Weaknesses,
            Continues to Minimize Misconduct.....................................................................58

Super Micro Restates and Amends Financial Results for FY13-FY17, Implicates
        Defendants In Wide-Ranging Fraudulent Sales and Accounting Misconduct .................61

Super Micro Files 2019 SEC Form 10-K With Additional Disclosures.......................................69

SUPER MICRO'S FINANCIAL STATEMENTS WERE MATERIALLY MISSTATED
        AND ITS INTERNAL CONTROLS HAD MATERIAL WEAKNESSES ....................71

Defendants Have Restated Super Micro's Financial Statements....................................................71

Super Micro's Restatement Is an Admission of Falsity.................................................................73

Defendants' GAAP Violations Required Restatement of Its Financial Statements .....................74

Defendants Had Material Weaknesses in Internal Controls and Ineffective Disclosure
        Controls During the Class Period ...................................................................................77

Defendants' Material Weaknesses in Revenue Recognition Accounting......................................79

Defendants' Material Weaknesses in the Five Internal Control Components Established
        by the COSO Framework.................................................................................................80

Defendants' Material Weaknesses in Information Technology General Controls ........................83

Super Micro's Remediation Plans for Its Material Weaknesses in ICFR.....................................84

Defendants' GAAP Violations and Restatement Were Material....................................................85

Defendants' Violations of SEC Regulations Related to Super Micro's Inadequate Internal
        Controls............................................................................................................................89

ADDITIONAL SCIENTER ALLEGATIONS.................................................................................90

The Restatement Directly Implicates Defendants Super Micro, Liang, Hideshima and
        Liaw in Misconduct .........................................................................................................91

The Restatement Admits to Deliberate and Unethical Misconduct Intended to Inflate
        Quarterly Revenue – Not Innocent or Negligent Behavior – Establishing Scienter..........91

The Impact of Defendants' Misconduct and Accounting Violations on Super Micro's
        Financial Results, Guidance and Consensus Supports a Strong Inference of
        Scienter ............................................................................................................................93

The Admitted Efforts to Conceal Misconduct from the Audit Committee and External
        Auditors Establishes Scienter as to Liang and Hideshima...............................................95

1

2                                                                                          **Page**

3

4      Defendant Liang's Improper Margin Loan Provides Motive and Supports a Strong
                Inference of Scienter ......................................................................................96

5      The Departures of Individual Defendants Hideshima and Liaw Supports a Strong
                Inference of Scienter ......................................................................................97

6
       The Breadth and Magnitude of the Remediation Plan Supports a Strong Inference of
7               Scienter ..........................................................................................................98

8      False SOX Certifications Support a Strong Inference of Scienter................................99

9      Defendants Super Micro, Liang and Hideshima's False Claim that the Prior FY15
                Material Weakness was Remediated Supports a Strong Inference of Scienter ................99
10
       Enforcement Actions Support a Strong Inference of Scienter....................................100
11
       The Restatement Establishes Corporate Scienter as to Super Micro ..........................102
12
       Core Operations Supports a Strong Inference of Scienter ........................................103
13
       LOSS CAUSATION AND ECONOMIC LOSS................................................104
14
       NO SAFE HARBOR ......................................................................................106
15
       APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET........107
16
       CLASS ACTION ALLEGATIONS ..................................................................108
17
       COUNT I ......................................................................................109
18
       COUNT II ....................................................................................110
19
       PRAYER FOR RELIEF ................................................................................110
20
       JURY DEMAND ............................................................................................111
21

22

23

24

25

26

27

28

1.     Lead Plaintiff New York Hotel Trades Council & Hotel Association of New York City, Inc. Pension Fund ("Plaintiff" or "New York Hotel Pension Fund"), individually and on behalf of all others similarly situated, by Plaintiff's undersigned attorneys, alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and upon information and belief as to all other matters based on the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of Super Micro Computer, Inc.'s ("Super Micro" or the "Company") press releases, United States Securities and Exchange Commission ("SEC") filings, analyst reports, media reports and other publicly disclosed information about the Defendants.[1] Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## SUMMARY OF ACTION

2.     This is a securities fraud class action alleging violations of the anti-fraud provisions of the federal securities laws on behalf of all purchasers of the common stock of Super Micro between August 5, 2016 and January 30, 2018, inclusive (the "Class Period").  The claims asserted herein are brought against Super Micro; Charles Liang ("Liang"), the Company's President, Chief Executive Officer ("CEO") and Chairman of the Board (Principal Executive Officer); Howard Hideshima ("Hideshima"), former Senior Vice President and Chief Financial Officer ("CFO") Perry G. Hayes ("Hayes"), Senior Vice President-Investor Relations; and Wally Liaw ("Liaw"), former Sr. Vice President of International Sales and former member of the Board of Directors.

3.     During the Class Period, Defendants violated §§10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder, 17 C.F.R. §240.10b-5, by making false and misleading statements and omissions concerning the Company's accounting, internal controls, operations, financial performance and prospects, and by engaging in a fraudulent scheme, acts, practices and course of business that deceived investors.

---

[1]     As defined below.

1

**SUMMARY OF AMENDMENTS**

2      4.      On March 23, 2020, the Court dismissed the Second Amended Consolidated Class

3  Action Complaint for Violation of the Federal Securities Laws (ECF No. 79) for failure to

4  sufficiently allege scienter as to the Individual Defendants.[2]  ECF. No. 95.  The Third Amended

5  Consolidated Class Action Complaint for Violation of the Federal Securities Laws ("TAC") contains

6  new allegations, and clarifies prior allegations, to address the identified shortcomings including, but

7  not limited to, the following:

8      (a)      First, alleging that the misconduct described in the Restatement[3] demonstrates

9  an intent to deceive through deliberate actions not capable of innocent or negligent explanation –

10  such as altering source documents, shipping products to warehouses at quarter-end for later delivery

11  to book revenues and concealing material information from the Audit Committee ("Audit

12  Committee") and external auditors – and thus pleads scienter;

13      (b)      Second, alleging that the Restatement, through its admissions of misconduct

14  and the remediation plan, as well as based upon their duties and responsibilities, implicates the

15  Individual Defendants Liang, Hideshima and Liaw in intentional misconduct;

16      (c)      Third, explicitly alleging corporate scienter based on Super Micro's admission

17  that its officers and managers, acting within the scope of their authority and in pursuit of quarterly

18  revenues, knew of, participated in and attempted to obscure, rampant violations of accounting rules,

19  the Company's accounting policies and the Company's Code of Business Conduct and Ethics

20  ("Code of Conduct").

21      (d)      Fourth, alleging that Defendants' sales and accounting misconduct set forth in

22  the Restatement significantly inflated quarterly results, including GAAP EPS by as much as 32%;

23  quarterly revenue by as much $40 million or 6%; and accounts receivable by as much as 65%.

24

25  [2]   The Individual Defendants are Liang, Hideshima, Liaw and Hayes, collectively.  All terms
otherwise defined herein have the same meaning as defined in the Second Amended Consolidated
26  Class Action Complaint for Violation of the Federal Securities Laws (ECF No. 79).

27  [3]   Super Micro's FY17 Form 10-K, and the three amended Forms 10-Q , restating its financial
results from FY15-FY17 and "adjusting" its financial results from FY13-FY14, are collectively
28  referred to as  the "Restatement."

1         (e)     Fifth, alleging that, as a result of these overstatements of key financial metrics,

2  Defendants' falsely claimed the Company was meeting or exceeding guidance and Wall Street

3  consensus expectations.  For example, Defendants claimed to significantly beat their pre-announced

4  EPS guidance for 4Q16 and to make gross margin guidance, in truth, EPS only met guidance and

5  gross margin missed.  In 3Q17, Defendants claimed to precisely hit EPS consensus estimates and

6  beat revenue guidance by $1 million; in truth they missed EPS consensus by two cents and the top

7  end of revenue guidance by $15 million.  Again, in 4Q17, Defendants falsely claimed to beat

8  revenue and EPS; in truth the Company overstated revenue by a staggering $40 million and missed

9  EPS consensus.  Similarly, for FY17, Defendants falsely claimed EPS of $1.57 and revenues of

10  $2.53 billion, both exceeding consensus expectations.  In truth, they missed FY17 consensus EPS,

11  by $0.04, and missed consensus revenue expectations.

12         (f)     Sixth, alleging motive based on Defendant Liang's use of Super Micro stock

13  to obtain two personal margin loans totaling more than $12 million that were subject to repayment in

14  the event the Company's stock price declined.

15         (g)     Seventh, alleging that the immediate departures of Individual Defendants

16  Liaw and Hideshima were labeled as "terminations" in Super Micro's SEC filings – indicating that

17  they were fired for cause – and alleging additional factors that made their departures both suspicious

18  and uncharacteristic.

19                                          **OVERVIEW**

20         5.     Operating out of San Jose, California, Super Micro bills itself as a leader in high-

21  performance server technology and as a provider of computing solutions, integration and support

22  services for data center, cloud computing, enterprise IT, and big data.  Defendants' portrayed Super

23  Micro as a rapidly growing Company and issued financial results for FY13 through FY17

24  purportedly backing their claims.[4]  Then, in August 2017, the Company announced that it would be

25  unable to file its FY17 SEC Form 10-K.  For the next twenty months, the Company was unable to

---

26  [4]    Super Micro's fiscal year ends on June 30.  1Q refers to the first quarter, period ending

27  September 30; 2Q refers to the second quarter, period ending December 31; 3Q refers to the third
quarter, period ending March 31; and 4Q refers to the fourth quarter, period ending June 30, thus

28  1Q16 refers to Super Micro's first quarter 2016.

make its required filings with the SEC and was delisted from the NASDAQ.  Three of five members of Super Micro's Senior Management lost their jobs, including two of the Individual Defendants. Finally, on May 17, 2019, the Company issued a Restatement for a five-year period (FY13-FY17) admitting that Super Micro and its officers and managers were aware of, engaged in, and concealed sales and accounting misconduct motivated by an aggressive focus on increasing quarterly financial results.  This improper revenue recognition scheme inflated quarterly EPS by as much as 32% and revenues by as much as $40 million, or 6%.  Just as significant, Defendants falsely reported that the Company beat or met investor expectations in three of five quarters during the Class Period when the restated results would have met or missed.  The intentional actions described in the Restatement are not subject to innocent or negligent interpretation, including altering source documents, recognizing revenue on products shipped to Super Micro's own warehouses, and concealing material facts from the audit committee and the Company's outside auditors.  It took nearly two years for Defendants' fraud to fully unravel and the Company incurred $109 million in investigatory costs.  While the disclosures in the Restatement came too late for some investors who purchased in FY13-FY16, it strongly supports this securities fraud action on behalf of Class Period investors who lost tens of millions of dollars as a result of Defendants' admitted actions.

## INTRODUCTION

6.     Prior to the Class Period, Defendants' improper revenue recognition scheme inflated the Company's financial results for at least three years and Defendants falsely claimed the Company met or beat its financial guidance and Street expectations.  In FY13, the Company claimed to beat consensus EPS (GAAP) of $0.45 by falsely reporting $0.48.  In truth, the Restatement showed the Company only earned $0.43 – a two cent miss.  In FY14, the Company reported beating EPS (non-GAAP) by a penny, $1.34 to $1.33.  In truth, the Company earned just $1.21 – a $0.12 miss.  In FY15, Super Micro claimed to meet consensus for EPS (non-GAAP) at $2.15.  In truth, the Restatement shows the Company earned EPS (non-GAAP) of $1.97 – a miss of consensus by $0.18.

7.     Also before the Class Period, the Company twice failed to timely file its required financial disclosures with the SEC.  First, at the end of August 2015, the Company required a 15-day extension to file its FY15 Form 10-K after discovering irregularities regarding certain marketing

expenses. Then, in November 2015, the Company disclosed issues with extended warranties where it prematurely recorded revenue, resulting in a delayed 1Q16 Form 10-Q and a prior period adjustment. Under heightened scrutiny, the Company assured investors that it had taken the necessary steps to remedy these issues, including through substantial investment in the implementation of an SAP SE ("SAP") accounting system.

8.      On July 18, 2016, approximately two weeks prior to the Class Period, Super Micro pre-announced disappointing preliminary results for the completed 4Q16 quarter, including revenue of $520-$524 million, down from previous guidance of $580-$640 million, and non-GAAP earnings per share ("EPS") of $0.15-$0.17, down from previous guidance of $0.46-$0.58. Super Micro also stated on July 18, 2016, that it anticipated non-GAAP gross margin of 14%. This pre-announcement put significant pressure on the Company to meet or exceed its pre-announced ranges going forward. As one analyst put it going into the August 4, 2016 earnings conference call: "Thursday's call has the potential to be a pivotal event for the company."[5]

9.      On August 4, 2016, after the close of trading, on the eve of the Class Period, the Company reported 4Q16 and FY16 financial results, including EPS (non-GAAP) of $0.20, which significantly exceeded the pre-announced figures, and gross margins of 14% - meeting its pre-announcement. During the Company's conference call on August 4, 2016, Liang described Super Micro as "one of the fastest growing companies in the IT industry" and well-positioned going forward. Liang stated that the Company would –"try to be very aggressive to grow our revenue." The Company's stock price rose to above $21 per share on these false and misleading statements and omissions.

10.      On August 26, 2016, the Company filed its FY16 Form 10-K which materially misrepresented the Company's commitment to effective disclosure controls and procedures and falsely stated that the Company had remediated prior-year material weaknesses in internal controls. The Form 10-K disclosed that management had evaluated the Company's internal controls over financial reporting, had determined them to be effective as of June 30, 2016, and claimed that the

[5]   *Roth Capital Partners*, Company Note (Aug. 2, 2016).

THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS - 4:18-cv-00838-JST                   - 5 -
4838-8753-1962.v1-4/22/20

1   consolidated financial statements were presented consistent with generally accepted accounting

2   principles ("GAAP").  Moreover, the Company falsely stated it only "recognize[d] revenue from

3   sales of products when persuasive evidence of an arrangement exists, shipment has occurred and title

4   has transferred, the sales price is fixed or determinable, collection of the resulting receivable is

5   reasonably assured, and all significant obligations have been met."  The FY16 Form 10-K also

6   claimed that the Company had "adopted a 'Code of Business Conduct and Ethics'" applicable to all

7   employees and further referenced senior officers' responsibility for maintaining sufficient internal

8   controls over financial reporting.  The FY16 Form 10-K also attached Sarbanes-Oxley Act of 2002

9   ("SOX") certifications, signed by Liang and Hideshima, attesting that the Company's financial

10  statements did not contain false or misleading statements, that each had designed the Company's

11  disclosure controls and internal controls over financial reporting and that such controls were

12  effective.  Defendants made similar misrepresentations in Forms 10-Q for 1Q17-3Q17, for example,

13  expressly stating that no changes had occurred concerning its critical accounting policies, including

14  its revenue recognition policy, since its previous disclosure in the FY16 Form 10-K.  Moreover, the

15  Forms 10-Q contained similar misrepresentations regarding the Company's compliance with GAAP

16  and the effectiveness of its disclosure controls and internal controls.  Each filing also included SOX

17  certifications signed by Liang and Hideshima.

18      11.     Defendants continued their false and misleading statements and omissions concerning

19  the Company's financial results during each quarter in FY17 through the issuance of earnings

20  releases, and on investor conference calls.[6]

21      12.     In 3Q17, Defendants inflated their quarterly financial results to falsely report EPS

22  (non-GAAP) of $0.38, purportedly equaling consensus estimates.  Defendants also reported $631

23  million in revenue – purportedly beating the top end of guidance by just $1 million.  These false and

24  misleading statements and omissions caused or maintained further inflation in Super Micro's stock

25  price.

26

27  [6]     The 1Q17 Form 8-K earnings release was issued on October 27, 2016, the 2Q17 Form 8-K
    earnings release was issued on January 26, 2017, the 3Q17 Form 8-K earnings release was issued on
28  April 27, 2017, and the 4Q17 Form 8-K earnings release was issued on August 3, 2017.

THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATION OF THE
FEDERAL SECURITIES LAWS - 4:18-cv-00838-JST                                         - 6 -
4838-8753-1962.v1-4/22/20

13.     On August 3, 2017, the Company issued a press release reporting financial results that purportedly beat consensus estimates for both 4Q17 and FY17.  For 4Q17, the Company reported revenues of $718 million and EPS (non-GAAP) of $0.39, both ahead of consensus estimates.  For full-year FY17, the Company reported revenues of $2.53 billion and EPS (non-GAAP) of $1.57, both also exceeding consensus expectations.  Defendants held an earnings conference call proclaiming the Company had achieved "record revenue and strong momentum" in FY17 and that "fiscal 2018 will be one of the strongest years in Super Micro's history."  These false statements and omissions drove the stock price above $27 per share.

14.     Defendants' statements concerning the Company's financial results, operations and prospects – in particular, its reported revenue and earnings results, claims of effective internal controls, compliance with GAAP and SOX certifications – were materially false and misleading because Defendants knew, or were deliberately reckless in not knowing, among other things, that:

(a)     as a result of Defendants' improper revenue recognition, the Company materially misstated quarterly and annual financial results, including EPS, revenues, and gross margin, as well as balance sheet amounts;

(b)     the Company falsely claimed to meet or exceed the Company's guidance and Street expectations:  (i) For 4Q16, Defendants overstated EPS (GAAP) by 30%, falsely claimed a beat of EPS (non-GAAP) by $0.03, when in fact it had only met its pre-announcement, and falsely claimed to meet gross margin when it had in fact missed its pre-announcement.  (ii) For 3Q17 Defendants falsely claimed to meet EPS (non-GAAP) consensus of $0.38 when they had earned only $0.36 and missed.  Defendants also falsely reported $631 million in revenue, purportedly beating the top end of guidance by $1 million; in truth, the Company overstated revenue by $16 million and missed the top end of guidance.  (iii) For 4Q17, the Company reported revenues of $718 million and EPS (non-GAAP) of $0.39, both ahead of consensus estimates of $709 million and $0.36, respectively.  In fact, the Company's EPS was $0.31 – an $0.05 miss of consensus EPS expectations – and its revenue was $678 million or $31 million below consensus revenue expectations.  (iv) For full-year FY17, the Company falsely reported revenues of $2.53 billion and EPS (non-GAAP) of $1.57, both exceeding consensus expectations.  In fact, Super Micro's restated financial results for

1   FY17 show the Company's EPS was $1.52 – a $0.04 miss of consensus EPS expectations – and its

2   revenue of $2.49 billion also missed consensus;

3          (c)    the Company suffered from an inappropriate tone at the top, had a culture of

4   aggressively focusing on quarterly revenue without sufficient focus on compliance, and failed to

5   monitor or enforce the Code of Conduct;

6          (d)    the Company suffered from material weakness in internal controls related to

7   revenue recognition and did not have sufficient management, accounting and financial reporting

8   employees with appropriate knowledge, experience and training, resulting in material errors in its

9   reported financials;

10          (e)    the Company violated GAAP and its own accounting policies by, among other

11   things, shipping products in advance of customer requested delivery dates, shipping products to

12   storage facilities for later delivery, entering into side agreements, shipping incomplete products, and

13   altering source documents related to transactions;

14          (f)    officers and managers failed to raise issues with material accounting

15   consequences from the Audit Committee and Deloitte & Touche LLP ("Deloitte"), the Company's

16   external auditor, and attempted to conceal information concerning at least one sales transaction from

17   the Audit Committee and Deloitte;

18          (g)    the Company prematurely and improperly recognized revenue for extended

19   warranties and on-site services at the time of sale and failed to remediate this previously-disclosed

20   material weakness; and

21          (h)    the accounting for at least thousands of transactions from FY13 through FY17

22   required reassessment and the number and breadth of the adjustments, coupled with their aggregate

23   magnitude, required Super Micro to restate financial results.

24          15.    The truth began to emerge in a series of partial disclosures – some obscured by

25   further false and misleading statements and omissions.  On August 29, 2017, the Company

26   announced it would be unable to timely file its FY17 Form 10-K, but would file within 15 days.  On

27   September 15, 2017, the Company stated that it was "unable at this time to provide a date as to when

28   the review and the audits will be completed."  On October 26, 2017, Super Micro revealed that the

1    internal investigation was spurned by a transaction improperly recorded as revenue in 2Q17, which

2    was subsequently reversed and recorded as revenue in 3Q17, and it was investigating "similar

3    transactions."[7]  The stock price declined on these partial disclosures but remained artificially inflated

4    by false claims that the investigation was nearing completion and the Company would become

5    current on its SEC filings.

6            16.    On January 30, 2018, the last day of the Class Period, the Company announced that

7    the Audit Committee completed its investigation but that further investigation still remained to be

8    done and the Company could no longer verify the accuracy of prior financial statements.  The

9    Company unexpectedly announced the immediate departure of Company co-founder and member of

10   the Board of Directors, Defendant Liaw, its CFO, Defendant Hideshima, as well as Phidias Chou

11   ("Chou"), Sr. Vice President, Worldwide Sales.  These employees comprised three of the

12   Company's five members of senior management and collectively had 45 years of experience at

13   Super Micro, yet the Company refused to comment on the departures.  A new CFO was appointed

14   immediately.  Unsurprisingly, an analyst described the departures as "disturbing."  Contrary to

15   claims that these officers willingly "resigned" their senior positions, the Restatement labelled the

16   resignations as "terminations," while stating that the appointment of their replacements were part of

17   the Company's plan to remediate its misconduct.  The stock price fell again, but remained artificially

18   inflated.

19           17.    Facing delisting from the NASDAQ for failure to make required financial filings, on

20   August 21, 2018, the Company admitted that substantial work remained to review thousands of

21   transactions from FY15 through FY17 and it would not meet the filing deadline.  Yet, the Company

22   continued to downplay its misconduct, providing an example of premature revenue recognition on

23   certain quarter-end transactions where free shipping was offered – a far cry from the intentional

24   misconduct later disclosed in the Restatement.  On August 22, 2018, Super Micro was suspended

25   from trading on the NASDAQ; its stock price continued to decline.

26

27   _____
     [7]   A year-and-a-half later, on May 17, 2019, the Company revealed that the transaction in question
28   involved approximately $8.8 million in revenue.

     THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATION OF THE
     FEDERAL SECURITIES LAWS - 4:18-cv-00838-JST                                              - 9 -
     4838-8753-1962.v1-4/22/20

18.     On November 15, 2018, Super Micro made another partial disclosure:  Its financial statements dating back to FY15 (*i.e.*, July 1, 2014) "should no longer be relied upon" and would be restated due to "the timing of recognition of revenue."  The Company also had "material weaknesses in internal control over financial reporting" and ineffective "disclosure controls and procedures."  In a conference call the same day, Company executives stated that the "number and breadth of the adjustments, coupled with their aggregate magnitude, was significant enough for us to conclude that restating prior periods was necessary."  However, Defendants continued to downplay their misconduct, suggesting that an appropriate remedy included locking the "shipping dock at the close of the quarter."

19.     On May 17, 2019, after more than 20 months of delay, Super Micro filed its FY17 Form 10-K, and three amended Forms 10-Q, restating its financial results from FY15-FY17 and "adjusting" its financial results from FY13-FY14, *i.e.*, the Restatement.  The Restatement contains numerous admissions of willful and intentional disregard for accounting rules and improper revenue recognition and a pervasive lack of ethical conduct.  Through its identification of "officers and managers" and "senior management" as responsible actors, the Restatement implicates Super Micro in knowing and deliberately reckless misconduct sufficient to allege corporate scienter.  The Restatement also implicates Individual Defendants' Liang, Hideshima and Liaw in intentional misconduct sufficient to allege scienter as to them as Individual Defendants.  According to the Restatement, the misconduct was motivated by an "aggressive focus on quarterly revenue" at the expense of compliance:

> *[Super Micro] had a culture of aggressively focusing on quarterly revenue without sufficient focus on compliance. . . .  The Company did not sufficiently promote, monitor or enforce adherence to the [Code of Conduct].*[8]

20.     The Company had an inappropriate tone at the top in which officers and managers engaged in, or condoned, fraudulent sales and accounting practices to falsely inflate quarterly financial results:

> *In the pursuit of quarterly revenue, certain sales, finance and operations personnel, including officers and managers, were aware of, condoned or were*

---

[8]     All citations are omitted and emphasis is added unless otherwise noted.

1
2
*involved in actions that reflected an inappropriate tone at the top, that violated the Code of Conduct and accounting policies and procedures, and that were inconsistent with a commitment to integrity and ethical values.*

3   21.   The Company provided multiple examples of willful and deliberate sales and

4 accounting misconduct which "officers and managers" were "aware of, condoned or were involved

5 in" that were used to manipulate financial results and improperly and prematurely recognize revenue

6 that defied innocent or negligent explanation, including:

7
8
9
10
*(i) shipping products in advance of customer requested delivery dates, (ii) shipping products to storage facilities at the end of a quarter for later delivery to customers, (iii) in certain cases entering into side agreements with customers, (iv) in certain cases, shipping products before manufacturing was completed, (v) altering source documents related to some sales transactions and (vi) failing to disclose or obscuring material facts about sales transactions.*

11   22.   The Company also admitted that Super Micro officers and managers sought to

12 deceive Super Micro's Audit Committee and Deloitte to conceal misconduct:

13
14
15
*Some employees, including officers and managers, also failed to raise issues with material accounting consequences to the Audit Committee and our external auditors, and with respect to one transaction, appear to have attempted to minimize material facts about a sales transaction to, or obscure those facts from, the Audit Committee and our external auditors.*

16   23.   The FY17 Form 10-K details significant remediation plans put in place – and still

17 ongoing – necessary to address the extensive pattern of misconduct.  Defendant CEO Liang was

18 singled out as needing training on compliant sales practices, effective internal controls and revenue

19 recognition compliance:

20
21
– Revenue recognition training for our global sales force, various operations personnel, and certain senior executives, ***including our CEO***, which included detailed examples of acceptable and unacceptable sales practices.

22   *   *   *

23
24
25
– ***Reviewing with our CEO*** enhanced processes for periodic evaluations by the CEO and the CFO of the effectiveness of our disclosure controls and procedures, and the periodic assessments by the CEO and the CFO of the effectiveness of our internal control over financial reporting, and other compliance matters.

*   *   *

26
27
28
– Developing and implementing an ongoing compliance training program regarding significant accounting and financial reporting matters, as well as broad compliance matters, for accounting, financial reporting, sales and operations personnel, ***as well as for our CEO***, other corporate executives and the Board.

24.     According to the FY17 Form 10-K, numerous high-ranking employees were replaced to address the accounting violations and misconduct, including the Chief Financial Officer (Defendant Hideshima), the Senior Vice President of International Sales (Defendant Liaw), the Corporate Controller, the Senior Vice President of Worldwide Sales, the Vice President, Strategic Accounts, the Vice President, Strategic Sales, the Vice President, Business Development and other sales personnel.  The Company also created new positions for a Chief Compliance Officer, Vice President of Internal Audit, Senior Director of Tax, Financial Audit Director and Information Technology Audit Director.  The Company disclosed that Chiu-Chu Liu Liang ("Sara Liang") – wife of Defendant Liang – was demoted from her officer position from Chief Administrative Officer and Treasurer to Senior Vice President.  The Company also strengthened its Code of Conduct with respect to "compliance and reporting."

25.     In connection with the restatement, Deloitte no longer provided a "clean" audit opinion but instead, as of June 30, 2017, "expressed an ***adverse opinion*** on the Company's internal control over financial reporting because of material weaknesses."  The Company has incurred $109 million in professional fees paid to accounting firms (Deloitte, KPMG) and law firms in connection with the Restatement.

26.     The Company's FY17 Form 10-K detailed numerous negative consequences of Defendants' conduct which placed "downward pressure on our stock price" and increased the degree of risk in investing in Super Micro.  The inability to file financial statements with the SEC negatively impacted the Company's financing, including its ability to raise debt or issue equity, and hurt the Company's ability to attract and retain employees.

27.     As a result of Defendants' fraud, Super Micro's stock price traded at prices as high as $31.75 during the Class Period.  As their misconduct was disclosed through partial revelations – many accompanied by further untruths – the stock price declined to $15.65 on August 22, 2018, and investors suffered tens of millions of dollars in economic loss as a result.

## JURISDICTION AND VENUE

28.     The claims asserted arise under §§10(b) and 20(a) of the Exchange Act, 15 U.S.C. §78j(b) and 78t(a), and Rule 10b-5, 17 C.F.R. §240.10b-5.  Jurisdiction is conferred by §27 of the

1   Exchange Act, 15 U.S.C. §78aa.  Venue is proper pursuant to §27 of the Exchange Act.  The

2   Company's headquarters are in San Jose, California, false statements were made in this District and

3   acts giving rise to the violations complained of occurred in this District.

4                                    **THE PARTIES**

5          29.     Lead Plaintiff New York Hotel Pension Fund provides health, pension and other

6   benefits to over 90,000 Union members, dependents and retirees of the New York City hotel

7   industry.  The New York Hotel Pension Fund purchased Super Micro common stock during the

8   Class Period and was damaged thereby.

9          30.     Defendant Super Micro describes itself as a global leader in high-performance, high-

10  efficiency server technology and innovation, and as a premier provider of end-to-end green

11  computing solutions and integration/support services for Data Center, Cloud Computing, Enterprise

12  IT, Big Data, HPC and IoT Embedded Systems worldwide.  Super Micro was incorporated in

13  California in September 1993, and reincorporated in Delaware in March 2007.  The Company is

14  headquartered in San Jose, California and traded on the NASDAQ, an efficient market, under the

15  ticker symbol "SMCI" until August 22, 2018 when Super Micro was suspended from trading

16  effective August 23, 2018, and formally delisted effective March 22, 2019.  Super Micro shares

17  continued to trade over-the-counter thereafter.  Super Micro was relisted as of January 14, 2020.

18  Numerous analysts covered Super Micro including those from Stifel Nicolaus, D.A. Davidson & Co,

19  Susquehanna Financial Group LLP, Pacific Crest, Roth Capital Partners, LLC and Maxim Group

20  LLC.

21         31.     Defendant Liang was, at all relevant times, the Company's President, CEO and

22  Chairman of the Board (Principal Executive Officer).  He founded Super Micro and has served as

23  President, CEO and Chairman of the Board since its inception in September 1993.  Liang has been

24  developing server system architectures and technologies for the past two decades.  Liang holds an

25  M.S. in Electrical Engineering from the University of Texas at Arlington and a B.S. in Electrical

26  Engineering from National Taiwan University of Science & Technology in Taiwan.  Liang is known

27  to obsess over every detail of Super Micro's business from approving custom orders to dictating

28

environmentally themed green neckties that executives wear to customer meetings.[9]  "'He is the person who approves and looks at everything the company is doing – every new product, marketing effort, sales effort, anything you want to do or promote,'" said a former employee who was manager of American sales.[10]  Liang, as a director, officer and significant stockholder of Super Micro has considerable influence over the management of the Company's business.  Super Micro's FY16 Form 10-K states that Liang is critical to the overall management of the Company and notes that he is personally involved in key relationships with suppliers, customers and strategic partners.  Super Micro's FY16 Form 10-K also states that Liang is the chief operating decision maker.  Liang, together with his wife Sara Liang (who co-founded Super Micro and has served as Senior Vice President of Operations, Chief Administration Officer, Treasurer and member of the Company's Board of Directors since 1993), collectively own 18% of the outstanding Super Micro stock as of December 31, 2016.

32.     Defendant Hideshima was the Senior Vice President and CFO of the Company until his employment was immediately terminated on January 30, 2018 without prior announcement.  Hideshima had served as CFO since May 2006.  Hideshima holds an M.B.A. from San Francisco State University and a B.S. in Business Administration from the University of California at Berkeley.  Throughout his tenure at Super Micro, Hideshima has represented Super Micro, alongside Hayes, at dozens of non-deal roadshow and investor conferences.  For example, between April and June 2015, Hideshima and Hayes represented Super Micro for presentations or individual investor meetings on at least eight occasions, including at the DA Davidson Technology Conference in New York and the Three Part Advisors Midwest IDEAS Investor Conference in Dallas.  Hideshima also made presentations and spoke with analysts at the August 31, 2016 Three Part Advisors Midwest IDEAS Investor Conference, as well as at the June 8, 2017 Robert W. Baird Global Consumer, Technology & Services Conference.  Until his termination from Super Micro, Hideshima was one of

---

[9]     Ashlee Vance, *Super Micro Computer: A One-Man, or at Least One-Family, Powerhouse*, N.Y. Times (Nov. 23, 2008), https://www.nytimes.com/2008/11/24/technology/business-computing/24micro.html.

[10]    *Id.*

1    three Super Micro executives on all but the October 26, 2017 1Q18 quarterly earnings conference

2    calls during the Class Period.

3          33.    Defendant Hayes was at all relevant times Senior Vice President-Investor Relations at

4    Super Micro and President of Super Micro Netherlands BV, a wholly owned subsidiary which is the

5    center for all sales, production, logistics and services for EMEA, contributing approximately 20% of

6    total corporate revenue.  Hayes has served as President of Super Micro Netherlands BV since 2008

7    when he joined Super Micro.  Hayes manages investor relations and other external communications

8    with the financial community.  Throughout his tenure at Super Micro, Hayes has represented Super

9    Micro, alongside Hideshima, at dozens of non-deal roadshow and investor conferences.  For

10   example, during November and December 2015, Hayes and Hideshima represented Super Micro for

11   presentations or individual investor meetings on at least five occasions, including at the Needham

12   Next-Gen Storage/Networking Conference in New York and the Three Part Advisors Midwest

13   IDEAS Investor Conference in Dallas.  Further, Hayes made a presentation and spoke with analysts

14   at the Wells Fargo Tech Summit 2017.  Hayes was one of three Super Micro executives on all of six

15   of the quarterly earnings conference calls during the Class Period, alongside Liang and Hideshima

16   (until Bauer replaced him as CFO).  Hayes, along with Liang, was identified as the point of contact

17   for investors on Super Micro press releases.

18         34.    Defendant Liaw (a/k/a Yih-Shyan (Wally) Liaw) was a co-founder of the Company.

19   He served as Senior Vice President of International Sales, Corporate Secretary and a member of the

20   Board of Directors from inception in September 1993 until his immediate termination on January 30,

21   2018.  Liaw also owned 4.6% of the outstanding shares of the Company.  Liaw holds an M.S. in

22   Computer Engineering from University of Arizona, an M.S. in Electrical Engineering from Tatung

23   Institute of Technology in Taiwan and a B.S. degree from Taiwan Provincial College of Marine and

24   Oceanic Technology.  During the Class Period, Liaw signed Super Micro's FY16 Form 10-K on

25   August 26, 2016, and Super Micro's Proxy Statement Pursuant to Section 14A on January 18, 2017.

26         35.    The Defendants named in ¶¶31-34 are referred to herein as the "Individual

27   Defendants."

28

THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATION OF THE
FEDERAL SECURITIES LAWS - 4:18-cv-00838-JST                                          - 15 -
4838-8753-1962.v1-4/22/20

36.     The Individual Defendants controlled the contents of the Company's quarterly reports, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market.  They were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions within the Company and/or on the Board of Directors, their direct and/indirect ownership of Super Micro stock and their access to material non-public information available to them, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading.  The Individual Defendants are liable for the false and misleading statements and omissions pleaded herein.

## BACKGROUND

**Prior to the Class Period, Super Micro Falsely Claims to Meet or Beat FY13 to FY15 Annual EPS Expectations, Twice Misses SEC Filing Deadlines and Implements New Accounting System to Purportedly Improve Internal Controls**

37.     In the three fiscal years leading up to the Class Period, Super Micro falsely claimed to meet or beat full-year consensus estimates on key metrics including EPS and revenue – false statements would not be revealed until after the Class Period.

38.     In August, 2013, Super Micro reported annual FY13 EPS (GAAP) of $0.48, purportedly beating consensus of $0.45.  In truth, Super Micro's Restatement admits that for FY13, the Company should have reported $0.43, missing consensus estimates.

39.     In August, 2014, the Company reported annual FY14 EPS (non-GAAP) of $1.34, purportedly beating consensus by a penny.  In truth, Super Micro's Restatement admits that for full year FY14, the Company should have reported $1.21 – a miss of $0.12.

40.     In August, 2015, Super Micro reported annual FY15 EPS (non-GAAP) of $2.15, precisely meeting consensus expectations.  In truth, the Restatement demonstrated that Super Micro earned EPS (non-GAAP) of $1.97 during FY15 – a $0.18 miss of consensus.  Similarly, the Company claimed to earn $1.99 billion in revenues, purportedly exceeding consensus of $1.97

THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS - 4:18-cv-00838-JST
4838-8753-1962.v1-4/22/20

- 16 -

1    billion.  The Restatement admits that the Company actually missed the Street's expectation, earning

2    $1.95 billion.

3            41.     During FY15-FY16, at the same time Defendants were reporting false financial

4    results, the Company also twice failed to timely file its required financial reports with the SEC.

5    First, at the end of August 2015, the Company required a 15-day extension to file its FY15 Form 10-

6    K because it discovered irregularities regarding certain marketing expenses; second, in November

7    2015, the Company disclosed issues with extended warranties which should have been accounted for

8    as deferred revenue, resulting in a delayed 1Q16 Form 10-Q and a prior period adjustment that was

9    corrected in the same period.  This prior period adjustment resulted in the Company amending its

10   previously filed FY15 Form 10-K.  Specifically, on November 16, 2015, the Company filed a Form

11   10-K/A to restate that its disclosure controls and procedures and its internal controls over financial

12   reporting as of June 30, 2015, were ineffective because of a material weakness related to its revenue

13   recognition of contracts with extended product warranties.  Notably, the Company assured investors

14   that it had taken the necessary steps to remedy these issues through a remediation plan for the

15   material weakness and substantial investment in the implementation of an SAP accounting system.

16           42.     On January 13, 2016, Hideshima spoke at the Needham Growth Conference about

17   Super Micro's adoption of the new SAP based accounting that went live in July 2015, and noted that

18   the Company had invested in infrastructure and accounting processes to avoid delayed SEC filings:

19          [Unidentified Audience Member]: I don't want to embarrass you as a CFO, but
            we've had a couple of surprises on the accounting side and I would like to get your
20          perspective or what you learned about it, what you are doing actively so that we are
            not overexposed to surprises.
21
            [Hideshima]: We have had a couple of missteps in the last couple of quarters.
22          Timing wise was unfortunate, because they seemed to happen back to back with each
            other.  Somewhat unrelated events, but both delayed our K filing and our Q filing.
23
            *We have added a new accounting system, SAP*.  We went live in the US in July.  We
24          just went live in the Netherlands and Taiwan; they have gone well.  *But we have
            invested in our infrastructure to improve our accounting and our books and what
25          have you and our ability to manage the operations in the Company*.  This is an
            investment we have made for a number of different years.
26
            *On the accounting side of it we have increased our resources in that area too and
27          increased our processes*.  *So, again, we are hopeful that it doesn't happen again*.

28

[Unidentified Audience Member]: But the other side would be people-related or the entities regarding that. I'm just trying to get more color?

[Hideshima]: Both. They go in conjunction with each other because the system will provide data to us. *We will analyze the data, build processes around the new data that we have for it. Again, it's a combination of both, more efficient system backing up, generating reports; obviously more people reviewing and looking at the reports*.

43.     On July 18, 2016, Super Micro pre-announced disappointing preliminary results for the completed 4Q16, including revenue of $520-$524 million, down from previous guidance of $580-$640 million; EPS of $0.15-$0.17, down from previous guidance of $0.46-$0.58; and gross margin of 14%, down from 15.7%. This poor pre-announcement put significant pressure on the Company to meet or exceed the pre-announced ranges.

44.     On August 2, 2016, Roth Capital Partners issued a report titled "SMCI: Thursday's Earnings Call Could be Pivotal," noting that the Company's upcoming earnings conference call and the Company's financial results would define the Company's growth story to Wall Street:

> *[W]e believe this Thursday's call has the potential to be a pivotal event for the company*. Either it will be able to convince us and the rest of the Street that the June debacle was an anomaly and that its go-to-market strategy differentiates it from the competition, or we will be faced with the prospects of a slower growth company achieving substantially lower gross margins than we previously perceived.

**FALSE AND MISLEADING STATEMENTS ISSUED DURING THE CLASS PERIOD**

**Super Micro Announces 4Q16 and FY16 Financial Results and Files Form 10-K**

45.     <u>False and Misleading Statements</u>: On August 4, 2016, after the close of trading, Super Micro filed a Current Report on Form 8-K, signed by Liang, which included a press release titled "Super Micro Computer, Inc. Announces 4th Quarter 2016 Financial Results," and slides for the Company's earnings presentation, that touted the Company's significant beat of its disappointing pre-announcement, particularly EPS (non-GAAP), which was reported at $0.20, well above the pre-announcement of $0.15-$0.17, and that it met the gross margin pre-announcement of 14%:

- *Quarterly net sales of $524.3 million* . . . .

- *GAAP net income of $7.0 million* . . . .

- *GAAP gross margin was 14.1%* . . . .

*       *       *

*GAAP net income for the fourth quarter of fiscal year 2016 was $7.0 million or $0.13 per diluted share*, a decrease of 73.9% from net income of $26.7 million, or $0.51 per diluted share in the same period a year ago.  Included in net income for the quarter is $4.4 million of stock-based compensation expense (pre-tax). Excluding this item and the related tax effect, *non-GAAP net income for the fourth quarter was $10.4 million, or $0.20 per diluted share*, compared to non-GAAP net income of $30.0 million, or $0.57 per diluted share, in the same quarter of the prior year.

\*          \*          \*

Fiscal Year 2016 Summary

*Net sales for the fiscal year ended June 30, 2016 were $2,215.6 million, up 11.3% from $1,991.2 million for the fiscal year ended June 30, 2015.  GAAP net income for fiscal year 2016 decreased to $72.0 million, or $1.39 per diluted share, a decrease of 29.3% from $101.9 million, or $2.03 per diluted share, for fiscal year 2015*.  Included in net income for the fiscal year ended June 30, 2016 is $16.1 million of stock-based compensation expense (pre-tax). Excluding this item and the related tax effect, *non-GAAP net income for the fiscal year 2016 was $83.8 million or $1.59 per diluted share*, a decrease of 24.9% compared to $111.6 million or $2.15 per diluted share for fiscal year 2015.

Business Outlook & Management Commentary

\*          \*          \*

"[W]e will take actions to leverage our capacity and improve operational efficiency to become more flexible and competitive in winning new business.  By offering the best value for innovation and emphasizing strategic customer relationships, *we are confident that we can achieve stronger growth and improve financial performance*" [said Liang].

46.     False and Misleading Statements: The Company's press release also reported on its consolidated balance sheet as of June 30, 2016, among other financial accounts, accounts receivable (net) of $288.9 million, inventories of $449.0 million, accrued liabilities of $55.6 million and retained earnings of $446.0 million.

47.     <u>False and Misleading Statements</u>:   The same day, Super Micro held an earnings conference call where the Company discussed 4Q16 and FY16 financial results:

[Liang]: Thank you, Howard.  *For the entire fiscal year, we saw 11% [revenue growth] for the year, which means Super Micro is still one of the fastest-growing companies in the IT industry*.

48.     Liang also repeatedly highlighted the implementation of the Company's new SAP accounting system to assure investors of the strength of the Company's internal controls:

[Liang]: We are undergoing a restructure of our operational infrastructure, including our global SAP implementation, new global tax restructure, and bonded warehouse. These investments will streamline the business, improve efficiency, and increase

profitability in long-term . . . .  We expect to complete the whole restructuring in the December quarter this year.  And after that, we will be more efficient than ever before.

\*        \*        \*

And our global operation and ***automation have been significantly improving***.  We know the urgency to improve.  And we are leveraging all of our strength and capacity to create a competitive vertical position for our customers.

\*        \*        \*

[Liang]: We are much better positioned with our new global SAP implementation, new global operation and corporate tax restructure, and bonded warehouse.

\*        \*        \*

Basically it's a big transition.  And not just SAP implementation global wide, but also a big impact from our restructure for production, operation, and also global tax, a new system.

\*        \*        \*

I guess start from December quarter, right?  Start from October, for example, as our SAP global reorg become much more stable, become more ready.  Our iteration rate will grow and our volume, for sure, will grow.  And that will improve our profit margin and overall profitability.

49.     Following the August 4, 2016 press release and earnings conference call, the price of Super Micro's common stock increased from its close of $20.42 per share on August 4, 2016, to a close at $21.48 per share on August 5, 2016, on increased trading volume.

50.     <u>False and Misleading Statements</u>: On August 26, 2016, after the close of trading, Super Micro filed the Company's FY16 Form 10-K, signed by Liang, Hideshima and Liaw, falsely reiterating the 4Q16 and FY16 financial results,[11] describing the Company's commitment to effective internal controls, stating that prior material weaknesses in revenue recognition had been remediated and attaching signed SOX certifications:

***Evaluation of Effectiveness of Disclosure Controls and Procedures***

We are committed to maintaining disclosure controls and procedures designed to ensure that information required to be disclosed in our periodic reports filed under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms, and that such information is accumulated and communicated to our management, including our

---

[11]   The FY16 Form 10-K also falsely reiterated Super Micro's FY13-FY15 financial results including revenues, net income, EPS and certain balance sheet data.  *See* FY16 Form 10-K at 25.

Chief Executive Officer and Chief Financial Officer, as appropriate, to allow for timely decisions regarding required disclosure.

Under the supervision and with the participation of our management, including our Chief Executive Officer and our Chief Financial Officer, we evaluated the effectiveness of our disclosure controls and procedures, as such term is defined in Rule 13a-15(e) and 15d-15(e) promulgated under the Exchange Act. The evaluation considered the procedures designed to ensure that information required to be disclosed by us in the reports filed or submitted by us under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the Securities and Exchange Commission rules and forms and is accumulated and communicated to our management, including our Chief Executive Officer and Chief Financial Officer, as appropriate to allow for timely decisions regarding required disclosure. ***Based on that evaluation, our Chief Executive Officer and our Chief Financial Officer concluded that our disclosure controls and procedures were effective at a reasonable assurance level as of June 30, 2016***.

\*          \*          \*

Remediation of Prior Year Material Weakness

As disclosed in our fiscal year 2015 Form 10-K/A, in November 2015 our management determined that we had a material weakness in the design of our internal controls related to recording revenue. ***Since that time, with the oversight of our management and audit committee, we have taken steps to remediate the material weakness to ensure that proper extended warranty and any other deliverables in our bill of materials are tracked and related revenue deferrals are recorded.*** The following steps have been implemented and performed:

• Initiation of a review of extended warranty and any other deliverables in our bill of materials for all products;

• Increased oversight and monitoring by our management of extended warranty and other deliverables in our bill of materials for any new products; and

• Documenting and tracking extended warranty and other deliverables in our contract matrix to ensure proper revenue recognition.

Our management believes the foregoing efforts ***have effectively remediated the material weakness as these procedures have been implemented for a sufficient period of time beginning in the first half of fiscal year 2016*** and we have completed our testing of the design and operating effectiveness of these above procedures as of June 30, 2016.

\*          \*          \*

***Management's Report on Internal Control over Financial Reporting***

Our management is responsible for establishing and maintaining adequate internal control over financial reporting (as defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act). Under the supervision and with the participation of our management, including our Chief Executive Officer and Chief Financial Officer, we conducted an evaluation of the effectiveness of our internal control over financial reporting based on the criteria set forth in *Internal Control – Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission

(2013 framework). ***Based on our evaluation, our management has concluded that our internal control over financial reporting was effective as of June 30, 2016 to provide reasonable assurance regarding the reliability of financial reporting and preparation of consolidated financial statements for external reporting purposes in accordance with United States generally accepted accounting principles***.

51.    <u>False and Misleading Statements</u>: In describing its Critical Accounting Policies, Super Micro's FY16 Form 10-K stated that the Company's consolidated financial statements complied with GAAP and described its compliance with revenue recognition criteria:

Our discussion and analysis of our financial condition and results of operations are based upon ***our consolidated financial statements, which have been prepared in accordance with accounting principles generally accepted in the United States***. . . .

***Revenue recognition***.  ***We recognize revenue from sales of products when persuasive evidence of an arrangement exists, shipment has occurred and title has transferred, the sales price is fixed or determinable, collection of the resulting receivable is reasonably assured, and all significant obligations have been met. Generally this occurs at the time of shipment when risk of loss and title has passed to the customer if all other revenue recognition criteria have been met.  Our standard arrangement with our customers includes a signed purchase order or contract, 30 to 60 days payment terms, Ex-works terms, except for a few customers who have free-on-board destination terms, for which revenue is recognized when the products arrive at the destination if all other revenue recognition criteria have been met***.

***Multiple-element arrangements***. Our multiple-element product offerings including server systems with embedded software and support, which are considered separate units of accounting.  We allocate revenue to each element in a multiple-element arrangement based upon their relative selling price.  When applying the relative selling price method, we determine the selling price for each deliverable using vendor-specific objective evidence ("VSOE") of selling price, if it exists, or third-party evidence ("TPE") of selling price. If neither VSOE nor TPE of selling price exist for a deliverable, we use our best estimate of selling price for that deliverable. ***Revenue allocated to each element is then recognized when all the revenue recognition criteria are met for each element***.

***Services revenue***. Services revenue mainly consists of extended warranty and on-site services. Extended warranty and on-site services are offered as part of multiple-element arrangements. ***Revenue related to extended warranty and on-site services is deferred and recognized ratably over the contractual period***.

52.    <u>False and Misleading Statements</u>:  Super Micro's FY16 Form 10-K also disclosed that the Company had "adopted a 'Code of Business Conduct and Ethics' that is applicable to all directors and employees and embodies our principles and practices relating to the ethical conduct of our business and our long-standing commitment to honesty, fair dealing and full compliance with all laws affecting our business."  Moreover, the FY16 Form 10-K directed readers to Super Micro's website to access the Code of Conduct which read:

1    *Senior Officers are also responsible for establishing and maintaining adequate internal control over financial reporting to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. The Senior Officers will take all necessary steps to ensure compliance with established accounting procedures, the Company's system of internal controls and generally accepted accounting principles. Senior Officers will ensure that the Company makes and keeps books, records, and accounts, which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the Company. Senior Officers will also ensure that the Company devises and maintains a system of internal accounting controls sufficient to provide reasonable assurances that*:

- transactions are executed in accordance with management's general or specific authorization;

- *transactions are recorded as necessary (a) to permit preparation of financial statements in conformity with generally accepted accounting principles or any other criteria applicable to such statements, and (b) to maintain accountability for assets*.

53.    <u>False and Misleading Statements</u>: The Company's FY16 Form 10-K also attached SOX certifications, pursuant to §§302 and 906, signed by Liang and Hideshima on August 26, 2016. Super Micro's 1Q17, 2Q17 and 3Q17 Forms 10-Q contained substantially similar SOX certifications, also signed by Liang and Hideshima, on November 7, 2016, February 7, 2017 and May 10, 2017, respectively. These certifications falsely affirmed that the financial statements were in compliance with GAAP, that each had designed the Company's controls over financial reporting and that such controls were effective during the Class Period:

I, [Charles Liang/Howard Hideshima], certify that:

1.    I have reviewed this annual report on Form 10-K of Super Micro Computer, Inc.;

2.    Based on my knowledge, *this report does not contain any untrue statement of a material fact or omit to state a material fact* . . . ;

3.    Based on my knowledge, *the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant* as of, and for, the periods presented in this report;

4.    The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

a)    *Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to*

*ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared*;

b)      *Designed such internal control over financial reporting*, or caused such internal control over financial reporting to be designed under our supervision, *to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles*;

*              *              *

d)      *Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and*

5.      The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

a)      *All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information* . . . .[12]

54.      <u>Reasons Why the Statements in ¶¶45-48, 50-53 Were False and Misleading</u>: Defendants' statements concerning: (i) the Company's financial condition and performance, including reported revenue, net income, EPS, gross margin and balance sheet amounts; (ii) its operations, accounting, internal controls, disclosure controls and SOX certifications; (iii) its compliance with GAAP; (iv) the remediation of prior material weaknesses; (v) its commitment to ethical conduct and standards; and (vi) its risks, outlook and prospects going forward were materially false and misleading because Defendants knew, or were deliberately reckless in not knowing, and failed to disclose the following:

(a)      The Company's 4Q16 and FY16 financial results were materially misstated and, contrary to Defendants' statements, the Company failed to meet or exceed its pre-announced guidance.  4Q16 GAAP EPS was falsely inflated by 30% (from $0.10 to $0.13); non-GAAP EPS, was falsely inflated by 18% (from $0.17 to $0.20) and did not exceed pre-announced guidance, as

---

[12]      Exhibits 31.1 and 31.2 to the FY16 Form 10-K.

claimed; the Company inflated its gross margin from 13.1% to 14% and falsely claimed to meet guidance when it missed. On its balance sheet, the Company inflated its accounts receivable by 65% (from $175 million to $289 million), understated inventory by 13.1%, understated accrued liabilities by 33.5%, and overstated retained earnings by 6.4%;

(b)    The Company's historical financial results for FY13, FY14 and FY15 were materially misstated and the Company improperly inflated its results to falsely claim to meet or beat consensus estimates for EPS and revenue. ¶¶125, 130, 154-157, 196-197, 221;

(c)    The Company prematurely and improperly recognized product revenue in violation of GAAP including instances where: (i) title and risk of loss had not transferred to the customer; (ii) pervasive evidence of an arrangement with a customer did not exist; (iii) the distributor's price was not fixed and determinable; or (iv) collectability was not assured. ¶¶135, 161, 167;

(d)    In violation of GAAP, the Company's revenue recognition policies and procedures and the Code of Conduct, Super Micro: (i) shipped products in advance of customer requested delivery dates; (ii) shipped products to storage facilities at the end of a quarter for later delivery to customers; (iii) entered into side agreements with customers; (iv) shipped products before manufacturing was completed; (v) altered source documents related to sales transactions; (vi) failed to disclose or obscured material facts about sales transactions; and (vii) improperly and prematurely recognized revenue on orders near quarter-end when offering free shipping. ¶¶132, 134, 159-161, 163-164, 198-199, 204-205;

(e)    The Company lacked appropriate revenue recognition accounting controls resulting in material errors and constituted a material weakness including: (i) failing to identify and account for non-standard contract terms involving multiple elements and recognizing revenue before delivery occurred; (ii) with respect to sales transactions near quarter-end, failing to identify transactions where the terms of the sales arrangements were not properly documented; (iii) failing to properly resolve or account for transactions with inconsistent documentation; and (iv) lacking a consistent approach for allocating revenue between multiple elements in transaction. ¶¶119, 125, 131-133, 136, 141, 143-144, 152, 162, 164-177;

(f)      The Company suffered from material weaknesses in all five components of internal controls (*i.e.*, control environment, risk assessment, control activities, information and communication and monitoring) including lack of effective internal controls over financial reporting exemplified by: (i) a culture of aggressively focusing on quarterly revenue without sufficient focus on compliance; (ii) a failure to establish and promote a control environment with an appropriate tone of compliance and control consciousness; (iii) a failure to sufficiently promote, monitor or enforce adherence to the Code of Conduct; (iv) a lack of appropriate revenue cut-off controls, including failing to lock the shipping dock at quarter close; (v) insufficient quarter-end revenue testing procedures and an inadequate sales sub-certification process at quarter-end; and (vi) officers and managers being aware of, condoning or acting in ways that violated Super Micro's accounting policies and procedures, violated the Code of Conduct, were inconsistent with integrity and ethical values and reflected an inappropriate "tone at the top."  ¶¶129, 132, 134, 160-161, 177, 180-181, 186, 191, 199, 204, 209, 213, 215, 233, 242, 245, 265;

(g)      The Company inflated revenue by mischaracterizing marketing arrangements with suppliers, distributors, partners and related parties, including recording free samples and cooperative marketing payments as expenses instead of reductions to revenue. ¶¶134, 138, 159, 162 n.20, 166;

(h)      Contrary to their statements that its prior material weakness had been addressed with appropriate internal controls – and tested by management and determined to be functioning – the Company continued to prematurely and improperly recognized revenue for extended warranties or on-site services at the time of sale instead of deferring over the warranty or service period and failed to remediate this previously-disclosed material weakness. ¶¶137, 186, 234-237;

(i)      The Company's accounting for inventory violated GAAP and the Company suffered from material weaknesses in internal controls related to its inventory, including failing to properly account for certain inventory used for engineering purposes, certain products returned to the Company for repair as inventory and applying improper cut-off procedures. ¶¶125, 128, 134, 138, 155, 159, 165-167;

1      (j)     Super Micro officers and managers failed to raise issues with material

2 accounting consequences to the Audit Committee and Deloitte and, with respect to at least one sales

3 transaction, attempted to minimize material facts to, or obscure material facts from, the Audit

4 Committee and Deloitte.  ¶¶132, 135, 162-163, 181, 185, 199, 222, 243;

5      (k)     The Company's accounting violations were so pervasive, and its material

6 weaknesses in internal controls so severe, that the accounting for thousands of transactions from

7 FY13 through FY17 required reassessment to determine the appropriate revenue recognition

8 treatment and the number and breadth of the necessary adjustments, coupled with their aggregate

9 magnitude, required Super Micro to restate financial results for that period.  ¶¶114, 129-130, 153-

10 158, 195;

11     (l)     The Company lacked sufficient personnel in management, accounting,

12 financial reporting, sales, operations, engineering and information technology with appropriate levels

13 of knowledge, experience and training.  ¶¶113, 124, 132, 142, 181, 190, 192;

14     (m)    The Company suffered from material weakness in information technology

15 controls including authorizing users with broad access as administrators to all parts of the accounting

16 system without adequate monitoring or recording.  ¶¶187-189;

17     (n)     The Company failed to maintain sufficient documentation to support the

18 appropriate accounting treatment of certain transactions and establishing accountability for internal

19 controls.  ¶¶79, 82, 114, 119, 135, 161, 177; and

20     (o)     As a result of the foregoing, the Company was exposed to the risk of

21 Restatement, inability to attest to the accuracy of its historical financial statements, inability to

22 obtain auditor sign-off, an adverse audit opinion from its auditor, significant investigative and

23 remediation costs, inability to attract or retain employees, de-listing from the NASDAQ,

24 investigation by the SEC and other regulatory action or civil liability.  ¶¶102, 139-140, 144-149.

25 **Super Micro Announces 1Q17 Financial Results and Files Form 10-Q**

26     55.   <u>False and Misleading Statements</u>: On October 27, 2016, after the close of trading,

27 Super Micro filed a Current Report on Form 8-K, signed by Liang, which included a press release

28

titled "Super Micro Computer, Inc. Announces 1st Quarter 2017 Financial Results," and slides for

the Company's earnings presentations:

- ***Quarterly net sales of $529.0 million*** . . . .

- ***GAAP net income of $13.5 million*** . . . .

- ***GAAP gross margin was 15.1%*** . . . .

\*       \*       \*

***GAAP net income for the first quarter of fiscal year 2017 was $13.5 million or
$0.26 per diluted share***, a decrease of 1.2% from net income of $13.7 million, or
$0.27 per diluted share in the same period a year ago.  Included in net income for the
quarter is $4.5 million of stock-based compensation expense (pre-tax). Excluding this
item and the related tax effect, ***non-GAAP net income for the first quarter was
$16.7 million, or $0.32 per diluted share***, compared to non-GAAP net income of
$16.5 million, or $0.32 per diluted share, in the same quarter of the prior year.

\*       \*       \*

"***We are pleased that SuperMicro was able to report revenues and profits at the
higher end of our expectations for the first quarter***. . . ." said Charles Liang,
President and Chief Executive Officer.

56.     <u>False and Misleading Statements</u>:  The Company's press release also reported on its

consolidated balance sheet as of September 30, 2016, among other financial accounts, accounts

receivable (net) of $328.3 million, inventories of $500.0 million, accrued liabilities of $60.8 million

and retained earnings of $459.5 million.

57.     <u>False and Misleading Statements</u>:  The same day, Super Micro held an earnings

conference call where the Company reiterated its false and misleading 1Q17 financial results.

Defendants also further discussed the status of the implementation of the Company's SAP

accounting system:

[Liang]: Last quarter we discussed the restructuring of our global operational
infrastructure, including our new SAP implementation, global tax restructure and a
bonded warehouse.  This quarter we saw much smoother operations, and reduced
impact from the transition.  We expect to 100% complete the transition in this
December quarter, and see sustained long-term improvement to our operational
efficiency and profitability.

58.     After the October 27, 2016 financial results and earnings conference call, the price of

Super Micro's common stock increased from its close of $22.10 per share on October 27, 2016, to a

close at $24.40 per share on October 28, 2016, on increased trading volume.

THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATION OF THE
FEDERAL SECURITIES LAWS - 4:18-cv-00838-JST
4838-8753-1962.v1-4/22/20

- 28 -

59.     <u>False and Misleading Statements</u>: On November 7, 2016, after the close of trading, Super Micro filed the Company's 1Q17 Form 10-Q, signed by Liang and Hideshima, and made similar false and misleading statements concerning its financial results as contained in the October 27, 2016 press release, including among other matters, that the Company had earned $0.26 EPS, had net income of $13,532,000 and made net sales of $528,968,000. As detailed above, the Company's 1Q17 Form 10-Q also attached SOX certifications, signed by Liang and Hideshima, attesting that the financial statements were in compliance with GAAP and that the Company's disclosure controls and its internal controls over financial reporting were designed such that the controls were effective. Further, the 1Q17 Form 10-Q falsely stated: "The unaudited condensed consolidated financial statements included herein *reflect all adjustments, including normal recurring adjustments, which are, in the opinion of management, necessary for a fair presentation of the consolidated financial position, results of operations and cash flows for the periods presented*."

60.     <u>False and Misleading Statements</u>: Super Micro also disclosed in the 1Q17 Form 10-Q that no changes had occurred concerning its critical accounting policies, including its revenue recognition policy, since its previous disclosure in its FY16 Form 10-K:

> *There have been no material changes in the matters for which we make critical accounting policies and estimates in the preparation of our Condensed Consolidated Financial Statements during the three months ended September 30, 2016*, as compared to those disclosed in our Annual Report on Form 10-K for the fiscal year ended June 30, 2016.

61.     <u>Reasons Why the Statements in ¶¶55-57, 59-60 Were False and Misleading</u>: Defendants' statements concerning: (i) the Company's financial condition and performance, including reported revenue, net income, EPS, gross margin and balance sheet amounts; (ii) its operations, accounting, internal controls, disclosure controls and SOX certifications; (iii) its compliance with GAAP; (iv) the remediation of prior material weaknesses; (v) its commitment to ethical conduct and standards; and (vi) its risks, outlook and prospects going forward were materially false and misleading because Defendants knew, or were deliberately reckless in not knowing, and failed to disclose the information set forth above in ¶54, as well as the following:

(a)     The Company's 1Q17 financial results, including revenue, EPS and gross margin were misstated; the Company's balance sheet overstated accounts receivable by 51.9%

understated inventories by 13.8%, understated accrued liabilities by 34.6%, and overstated retained earnings by 5.8%.

**Super Micro Announces 2Q17 Financial Results and Files Form 10-Q**

62.    <u>False and Misleading Statements</u>: On January 26, 2017, after the close of trading, Super Micro filed a Current Report on Form 8-K, signed by Liang, which included a press release titled "Super Micro Computer, Inc. Announces 2nd Quarter 2017 Financial Results," and slides for Super Micro's earnings presentation:

- *Quarterly net sales of $652.0 million* . . . .

- *GAAP net income of $22.0 million* . . . .

- *GAAP gross margin was 14.3%* . . . .

\*       \*       \*

*GAAP net income for the second quarter of fiscal year 2017 was $22.0 million or $0.43 per diluted share*, a decrease of 36.6% from net income of $34.7 million, or $0.67 per diluted share in the same period a year ago.  Included in net income for the quarter is $4.7 million of stock-based compensation expense (pre-tax). Excluding this item and the related tax effect, *non-GAAP net income for the second quarter was $25.0 million, or $0.48 per diluted share*, compared to non-GAAP net income of $38.0 million, or $0.73 per diluted share, in the same quarter of the prior year.

\*       \*       \*

"*We are pleased to report record second quarter revenues of $652.0 million that exceeded our guidance and outpaced a strong compare with last year*. . . ." said Charles Liang, Chairman and Chief Executive Officer.  "We expect to continue the growth of last quarter and be reflected in the year-over-year revenue growth in the March quarter based on an increasing number of sizable customer engagements demanding the performance and advantages of our leading product lines."

63.    <u>False and Misleading Statements</u>:  The Company's press release also reported on its consolidated balance sheet as of December 31, 2016, among other financial accounts, accounts receivable (net) of $366.9 million, inventories of $599.3 million, accrued liabilities of $74.3 million and retained earnings of $481.5 million.

64.    <u>False and Misleading Statements</u>:  The same day, Super Micro held an earnings conference call where the Company reiterated its false and misleading 2Q17 financial results. Defendants stated that the implementation of the Company's SAP accounting system was complete and that its implementation improved their earnings guidance and bottom line:

[Brian Alger]: Is there a specific growth driver here . . .?

[Liang]: I guess the major reason is because we just finished our global operations [there]. I mean, in last fourth quarter, we mentioned we spent a lot of effort to beef up global operations, and that's including SAP implementation and global warehouse, (inaudible) warehouse. So now, ***all of those have been ready, and global, on-site service [see some also] pretty ready now. That's how we are able to focus on (technical difficulty) and how to grow***.

*     *     *

[Nehal Chokshi]: . . . My second topic is visibility. Your guidance ranges, again, a little bit more narrow than the prior quarter, and two quarters ago it was very wide. So, I take that as an implication of increasing visibility. Is that a correct characterization, there? . . .

[Hideshima]: . . . if we go back historically, you know, we went through a lot of investments last year with regard to SAP and our [bonded warehouse] and our reorganization. ***Those investments have been made, and have been into the system for now over a year, or a year-and-a-half. So, some of those things have helped us improve our overall efficiency***.

65.    <u>False and Misleading Statements</u>: On February 7, 2017, after the close of trading, Super Micro filed the Company's 2Q17 Form 10-Q, signed by Liang and Hideshima, and made similar false and misleading statements concerning its financial results as contained in the January 26, 2017 press release, including among other matters, that the Company had earned $0.43 EPS, had net income of $21,996,000 and made net sales of $651,954,000.  The Company's 2Q17 Form 10-Q also attached SOX certifications, signed by Liang and Hideshima, attesting that the financial statements were in compliance with GAAP and that the Company's disclosure controls and its internal controls over financial reporting were designed such that the controls were effective. Further, the 2Q17 Form 10-Q falsely stated: "The unaudited condensed consolidated financial statements included herein ***reflect all adjustments, including normal recurring adjustments, which are, in the opinion of management, necessary for a fair presentation of the consolidated financial position, results of operations and cash flows for the periods presented***."

66.    <u>False and Misleading Statements</u>: Super Micro also disclosed in the 2Q17 Form 10-Q that no changes had occurred concerning its critical accounting policies, including its revenue recognition policy, since its previous disclosure in its FY16 Form 10-K:

> ***There have been no material changes in the matters for which we make critical accounting policies and estimates in the preparation of our Condensed Consolidated Financial Statements during the three and six months ended***

***December 31, 2016***, as compared to those disclosed in our Annual Report on Form 10-K for the fiscal year ended June 30, 2016.

67.    <u>Reasons Why the Statements in ¶¶62-66 Were False and Misleading</u>: Defendants' statements concerning: (i) the Company's financial condition and performance, including reported revenue, net income, EPS, gross margin and balance sheet amounts; (ii) its operations, accounting, internal controls, disclosure controls and SOX certifications; (iii) its compliance with GAAP; (iv) the remediation of prior material weaknesses; (v) its commitment to ethical conduct and standards; and (vi) its risks, outlook and prospects going forward were materially false and misleading because Defendants knew, or were deliberately reckless in not knowing, and failed to disclose the information set forth above in ¶54, as well as the following:

(a)    The Company's 2Q17 financial results, including revenue, EPS and gross margin were misstated, the Company's balance sheet overstated accounts receivable by 47.0%, understated inventories by 10.2% understated accrued liabilities by 30.9% and overstated retained earnings by 5.3%.

**Super Micro Announces 3Q17 Financial Results and Files Form 10-Q**

68.    <u>False and Misleading Statements</u>: On April 27, 2017, after the close of trading, Super Micro filed a Current Report on Form 8-K, signed by Liang, which included a press release titled "Super Micro Computer, Inc. Announces 3rd Quarter 2017 Financial Results," and slides for the Company's earnings presentation.  The Company claimed to exceed its high-end revenue guidance of $630 million, reporting $631.1 and reported EPS (non-GAAP) of $0.38, in line with street consensus of $0.38:

- ***Quarterly net sales of $631.1 million*** . . . .

- ***GAAP net income of $16.7 million*** . . . .

- ***GAAP gross margin was 14.0%*** . . . .

\*         \*         \*

***GAAP net income for the third quarter of fiscal year 2017 and for the same period a year ago were both $16.7 million or $0.32 per diluted share***.  Included in net income for the quarter is $4.8 million of stock-based compensation expense (pre-tax).  Excluding this item and the related tax effect***, non-GAAP net income for the third quarter was $20.3 million, or $0.38 per diluted share***, compared to non-GAAP

net income of $19.0 million, or $0.36 per diluted share, in the same quarter of the prior year.

69.     <u>False and Misleading Statements</u>:  The Company's press release also reported on its consolidated balance sheet as of March 31, 2017, among other financial accounts, accounts receivable (net) of $391.3 million, inventories of $642.3 million, accrued liabilities of $70.9 million and retained earnings of $498.2 million.

70.     <u>False and Misleading Statements</u>: On May 10, 2017, after the close of trading, Super Micro filed the Company's 3Q17 Form 10-Q, signed by Liang and Hideshima, and made similar false and misleading statements concerning its financial results as contained in the April 27, 2017 press release, including among other matters, that the Company had earned $0.32 EPS, had net income of $16,666,000 and made net sales of $631,124,000.  In addition, Defendant Liang referenced the Company's purported "'***resurgent revenue growth***'" and stated: "'***We are pleased to report third quarter revenues that exceeded our guidance*** in a quarter complicated by shortages in memory and SSD.'"

71.     The Company's 3Q17 Form 10-Q also attached SOX certifications, signed by Liang and Hideshima, attesting that the financial statements were in compliance with GAAP and that the Company's disclosure controls and its internal controls over financial reporting were designed such that the controls were effective.  Further, the 3Q17 Form 10-Q falsely stated: "The unaudited condensed consolidated financial statements included herein ***reflect all adjustments, including normal recurring adjustments, which are, in the opinion of management, necessary for a fair presentation of the consolidated financial position, results of operations and cash flows for the periods presented***."

72.     <u>False and Misleading Statements</u>: Super Micro also disclosed in the 3Q17 Form 10-Q that no changes had occurred concerning its critical accounting policies, including its revenue recognition policy, since its previous disclosure in its FY16 Form 10-K:

> ***There have been no material changes in the matters for which we make critical accounting policies and estimates in the preparation of our Condensed Consolidated Financial Statements during the three and nine months ended March 31, 2017***, as compared to those disclosed in our Annual Report on Form 10-K for the fiscal year ended June 30, 2016.

73. <u>Reasons Why the Statements in ¶¶68-70, 72 Were False and Misleading</u>: Defendants' statements concerning: (i) the Company's financial condition and performance, including reported revenue, net income, EPS, gross margin and balance sheet; (ii) its operations, accounting, internal controls, disclosure controls and SOX certifications; (iii) its compliance with GAAP; (iv) the remediation of prior material weaknesses; (v) its commitment to ethical conduct and standards; and (vi) its risks, outlook and prospects going forward were materially false and misleading because Defendants knew, or were deliberately reckless in not knowing, and failed to disclose the information set forth above in ¶54, as well as the following:

(a) The Company's financial results were materially misstated and the Company failed to meet or exceeded its guidance as claimed, including revenue, which was inflated by $16 million (from $615 to $631 million) and falsely claimed as a beat the top end of the Company's revenue guidance range by $1 million. The Company also inflated EPS (non-GAAP) from $0.36 to $0.38 and falsely reported as meeting consensus guidance of $0.38 when in fact the Company had missed consensus. On the balance sheet, the Company falsely inflated its accounts receivable by 44.5%, understated its inventories by 10.6%, understated its accrued liabilities by 30.8%, and overstated its retained earnings by 5.4%.

**Super Micro Announces Preliminary 4Q17 Financial Results**

74. <u>False and Misleading Statements</u>: On July 20, 2017, after the close of trading, Super Micro filed a Current Report on Form 8-K, signed by Liang, which incorporated a press release titled "Super Micro Computer, Inc. Schedules Conference Call and Webcast for Fourth Quarter and Fiscal 2017 Financial Results Company to Report Preliminary Financial Results":

> ***The Company now anticipates it will report revenue for its fourth quarter of fiscal 2017 in the range of $712 million to $717 million***. This compares to the Company's previous guidance range of $655 million to $715 million. Revenue exceeded expectations primarily due to stronger sales in Asia and at storage customers with strong shipments that accelerated late in the quarter.
>
> ***The Company also anticipates its non-GAAP earnings per diluted share will be in a range of $0.35 to $0.37***. . . .
>
> "***While Supermicro exceeded revenue expectations with record high revenues due to growth in our Asia business as well as new storage customers***, earnings were lower than forecast. . . . We will provide more detail on the fourth quarter at the time of our earnings call," said Charles Liang, Chairman and Chief Executive Officer.

75.     <u>False and Misleading Statements</u>:  On August 3, 2017, Super Micro filed a Current Report on Form 8-K, signed by Liang, which included a press release titled "Super Micro Computer, Inc. Announces 4th Quarter 2017 Financial Results".  Among other things, the press release state that the Company's revenues of $718 million exceeded both its guidance of $655 million-$715 million, as well as consensus estimates of $709 million, and that EPS of $0.39 topped the Company's pre-announcement and consensus of $0.36.

- ***Quarterly net sales of $717.9 million*** . . . .

- ***GAAP net income of $17.1 million*** . . . .

- ***GAAP gross margin was 13.5%*** . . . .

\*          \*          \*

***GAAP net income for the fourth quarter of fiscal year 2017 was $17.1 million or $0.33 per diluted share,*** an increase of 145.7% from net income of $7.0 million, or $0.13 per diluted share in the same period a year ago.  Included in net income for the quarter is $5.1 million of stock-based compensation expense (pre-tax). Excluding this item and the related tax effect, ***non-GAAP net income for the fourth quarter was $20.7 million, or $0.39 per diluted share***, compared to non-GAAP net income of $10.4 million, or $0.20 per diluted share, in the same quarter of the prior year.

\*          \*          \*

***Net sales for the fiscal year ended June 30, 2017 were $2,529.9 million***, up 14.2% from $2,215.6 million for the fiscal year ended June 30, 2016.  ***GAAP net income for fiscal year 2017 decreased to $69.3 million, or $1.34 per diluted share***, a decrease of 3.7% ***from $72.0 million, or $1.39 per diluted share, for fiscal year 2016***. Included in net income for the fiscal year ended June 30, 2017 is $19.2 million of stock-based compensation expense (pre-tax). Excluding this item and the related tax effect, ***non-GAAP net income for the fiscal year 2017 was $82.8 million or $1.57 per diluted share***, a decrease of 1.3% compared to ***$83.8 million or $1.59 per diluted share for fiscal year 2016***.

**Business Outlook & Management Commentary**

The Company expects net sales of $625 million to $685 million for the first quarter of fiscal year 2018 ending September 30, 2017.  The Company expects non-GAAP earnings per diluted share of approximately $0.30 to $0.40 for the first quarter.

"***Supermicro has built a strong foundation for sustained high growth while improving profitability***.  During the last couple of years we have made significant investments in global production capacity, engineering, quality, global services, and systems and datacenter management software.  It is these investments that will power the new Supermicro 3.0" said Charles Liang, Chairman and Chief Executive Officer.  "Supermicro 3.0 positions us as the only Tier 1 IT Infrastructure Provider capable of both first to market product innovation and global scale, quality, services and support to engage our rapidly growing enterprise customer base deeply in their business requirements. ***The record high revenue and strong 27.6% second half***

***growth over last year*** is a direct result of these Supermicro 3.0 investments.  With the major investments in place and the new Skylake product portfolio shipping, future investment and expenses will begin to flatten driving improved profitability moving forward."

76.    <u>False and Misleading Statements</u>:  The Company's press release also reported on its consolidated balance sheet as of June 30, 2017, among other financial accounts, accounts receivable (net) of $483.4 million, inventories of $636.0 million, accrued liabilities of $80.4 million and retained earnings of $515.3 million.

77.    <u>False and Misleading Statements</u>: On August 3, 2017, after the close of trading, Super Micro held an earnings conference call where Liang touted the Company's revenues and strong momentum:

[Liang]: Thank you, Howard. ***We finished the fiscal year 2017 with record revenue and strong momentum***.  Super Micro 3.0 provides the foundation and product to take advantage of this cycle of technology transition.  We believe that fiscal 2018 will be one of the strongest years in Super Micro's history.

78.    <u>Reasons Why the Statements in ¶¶74-77 Were False and Misleading</u>: Defendants' statements concerning: (i) the Company's financial condition and performance, including reported revenue, net income, EPS, gross margin and balance sheet; (ii) its operations, accounting, internal controls, disclosure controls and SOX certifications; (iii) its compliance with GAAP; (iv) the remediation of prior material weaknesses; (v) its commitment to ethical conduct and standards; and (vi) its risks, outlook and prospects going forward were materially false and misleading because Defendants knew, or were deliberately reckless in not knowing, and failed to disclose the information set forth above in ¶54, as well as the following:

(a)    The Company's financial results were materially misstated and the Company failed to meet or exceeded its guidance as claimed, including revenue, which was inflated by $40 million or 6% (from $678 to $718 million) and falsely claimed as a beat of the Company's high-end revenue guidance as well as consensus when in fact it missed both; GAAP EPS was inflated by 32% (from $0.25 to $0.33); non GAAP EPS was inflated 26% (from $0.31 to $0.39) and falsely reported as beating its pre-announcement and consensus guidance of $0.36 when in fact the Company had missed both.

(b)      Super Micro falsely reported annual FY17 non-GAAP EPS of $1.57, beating consensus of $1.56 by a penny.  In fact, Super Micro earned FY17 non-GAAP EPS of $1.52, which would have missed FY17 consensus by $0.04.  On the balance sheet, the Company falsely inflated its accounts receivable by 49.2%, understated inventories by 13.7%, understated accrued liabilities 28.8%, overstated retained earnings by 6.0%.

**Super Micro Requests 15-Day Extension to File Form 10-K**

79.     <u>False and Misleading Statements</u>: On August 29, 2017, after the close of trading, less than a month after announcing its 4Q17 results, Super Micro filed a Notification of Late Filing on Form 12b-25, signed by Hideshima, revealing that the Company could not meet the August 29, 2017 deadline to file its FY17 Form 10-K, but falsely reassured analysts and investors that it "will be filed on or before the fifteenth calendar day following the prescribed due date" (*i.e.*, September 13, 2017):

> ***The subject annual report . . . on Form 10-K . . . will be filed on or before the fifteenth calendar day following the prescribed due date*** . . . .
>
> \*      \*      \*
>
> Super Micro Computer, Inc. (the "Company") is not in a position to file its Form 10-K for fiscal year ended June 30, 2017 (the "Form 10-K"), in a timely manner because the Registrant cannot complete the Form 10-K in a timely manner without unreasonable effort or expense.  Additional time is needed for the Company to compile and analyze certain information and documentation and complete preparation of its financial statements in order to permit the Company's independent registered public accounting firm to complete its audit of the financial statements to be incorporated in the Form 10-K and complete its audit of the Company's internal controls over financial reporting as of June 30, 2017.

80.     On this disclosure concerning the Company's inability to meet the deadline to file its FY17 Form 10-K, the price of Super Micro's common stock declined from its close of $27.20 per share on August 29, 2017, to a close at $25.85 per share on August 30, 2017, on increased trading volume, but remained inflated by, among other matters, the false assurance that the delay in filing would be temporary.

81.     On August 31, 2017, Maxim Group issued a report noting that the Company's repeated inability to timely file mandatory SEC disclosures was damaging "management's credibility" in the eyes of investors but – in light of the information made available at the time – it expected the delay to be "innocuous":

THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATION OF THE
FEDERAL SECURITIES LAWS - 4:18-cv-00838-JST                                                          - 37 -
4838-8753-1962.v1-4/22/20

**We expect better execution with respect to filing reports in a timely & accurate manner**. . . .   We note a similar situation took place in 2015, when SMCI required a 15-day extension to file its FY15 10-K in connection to a certain employee's unadvised activity relating to sales and marketing, but ultimately did not impact financial results.  Then in the following quarter (September 2015 quarter, F1Q16), management discovered some extended warranty revenue that should have been accounted for as deferred revenue, which delayed the 10-Q and led to a minor restatement of revenue (see our Nov-2015 note).  While we expect the current delayed filing to prove innocuous as well, *we note that the recurring one-time nature of delayed filings are eroding management's credibility, based on our conversations with investors*.  We believe management will make changes to ensure that delayed filings do not recur, albeit the delays have been for unique reasons.

**Super Micro Fails to Meet Extended Deadline to File Form 10-K and Announces Audit Committee Review**

82.    <u>False and Misleading Statements</u>: On September 14, 2017, Super Micro issued a press release titled "Super Micro Computer, Inc. Announces Receipt of Non-Compliance Letter From Nasdaq."  The following day, September 15, 2017, after the close of trading, the Company filed a Current Report on Form 8-K disclosing the Company would not be able to meet the 15-day extension for filing the Form 10-K and that an Audit Committee review was underway, but nonetheless reassured analysts and investors that "*[t]he Company intends to file its 10-K promptly upon completion of the audit committee's review and the completion of the audit*":

On September 14, 2017, Super Micro Computer, Inc. (the "Company") received a notification letter (the "Letter") from the Listing Qualifications Department of the NASDAQ Stock Market LLC ("NASDAQ") indicating that the Company is not in compliance with NASDAQ Listing Rule 5250(c)(1), as a result of the Company's delay in filing its Annual Report on Form 10-K for fiscal year 2017 (the "Form 10-K").  ***The Form 10-K was due on August 29, 2017.  The Company filed a Form 12b-25 on August 29, 2017, the effect of which was to extend the due date for the Form 10-K to September 13, 2017. The Company was unable to file the Form 10-K by September 13, 2017, for the reasons reported in the Form 12b-25 and further described below***.  The Letter has no immediate effect on the listing or trading of the Company's common stock on the NASDAQ Global Select Market.  The Letter stated that, under NASDAQ rules, the Company has 60 calendar days to regain compliance or to submit a plan to do so, and that if a plan is submitted and accepted, NASDAQ could grant the Company an exception of up to 180 calendar days from the filing's due date to regain compliance.  If NASDAQ does not accept the Company's plan, then the Company will have the opportunity to appeal that decision to a NASDAQ hearings panel.

As previously disclosed by the Company, additional time is needed for the Company to compile and analyze certain information and documentation and finalize its financial statements, ***as well as complete a related audit committee review***, in order to permit the Company's independent registered public accounting firm to complete its audit of the financial statements to be incorporated in the Form 10-K and complete its audit of the Company's internal controls over financial reporting as of June 30, 2017.  The Company is unable at this time to provide a date as to when the

1  review and the audits will be completed.  ***The Company intends to file its 10-K***
2  ***promptly upon completion of the audit committee's review and the completion of***
   ***the audit.***

3      83.      On these disclosures, the price of Super Micro's common stock declined from its

4  close of $25.25 per share on September 14, 2017, to a close at $23.35 per share on September 15,

5  2017, on extremely high trading volume, followed by a further decline on September 18, 2017, the

6  next trading day, to a close of $21.20 per share, again on extremely high trading volume.  Still, Super

7  Micro's stock price remained inflated as Defendants continued to conceal the nature, scope and

8  magnitude of the issues related to their financial results and internal controls.

9  **Super Micro Reveals Premature Revenue Recognition; Fails to File 1Q18 Form 10-Q**

10     84.      On October 26, 2017, after the close of trading, Super Micro filed a Current Report

11 on Form 8-K, signed by Liang, incorporating a press release titled "Super Micro® Announces First

12 Quarter Fiscal 2018 Preliminary Financial Information," including revenue, income and earnings

13 figures for 1Q18.  For the first time, the press release disclosed details of improper revenue

14 recognition specifically related to a sales transaction originally recorded as revenue during 2Q17

15 (*i.e.*, the period ending December 31, 2016), later reversed and recognized in 3Q17 (*i.e.*, the period

16 ending March 31, 2017).[13]  Due to this inappropriate transaction, the Company's Audit Committee

17 initiated an independent investigation to assess whether similar transactions existed and were

18 properly accounted for:

19      In connection with the in-process audit of the Company's financial results for the
        year ended June 30, 2017, a sales transaction was subject to additional inquiry and
20      review. ***The transaction in question was originally recorded as revenue during the***
        ***quarter ended December 31, 2016***.  However, prior to review by the Company's
21      independent auditors and prior to the Company's public announcement of its results
        for the quarter, ***the recognition of revenue was reversed and the revenue was***
22      ***subsequently recognized in the quarter ended March 31, 2017***.  ***When the audit***
        ***committee was made aware of this transaction, the Audit Committee of the***
23      ***Company's Board of Directors initiated an independent investigation to determine***
        ***whether there were any similar transactions and if so, whether such transactions***
24      ***were properly accounted for***. ***Due to the volume of data to be reviewed to complete***
        ***the investigation, the Company was unable to file its Form 10-K on a timely basis***.
25

26 ───────────────
   [13]  Super Micro's FY17 Form 10-K, filed on May 17, 2019, attached a Loan and Security
27 Agreement, dated April 19, 2018, between Super Micro and Bank of America, which in turn
   included Schedule 9.1.16 (Litigation) detailing that the "transaction in question" represented
28 approximately $8.8 million in revenue.

1    The Company is unable at this time to provide a date as to when the investigation and
2    the 2017 audits will be completed or predict the possible outcome of the
     investigation.

3    85.   <u>False and Misleading Statements</u>:  In the October 26, 2017 press release, Super Micro

4    also claimed that it would take the necessary steps "as soon as practicable" to achieve compliance

5    with NASDAQ listing requirements:

6        Super Micro announced on September 14, 2017 that it received a notification letter
         from Nasdaq stating that the Company is not in compliance with Nasdaq listing rule
7        5250(c)(1), which requires timely filing of reports with the U.S. Securities and
         Exchange Commission. . . .

8        The Nasdaq notice has no immediate effect on the listing or trading of the
9        Company's common stock on the Nasdaq Global Select Market. Under the Nasdaq
         rules, the Company has 60 days from the date of the notice either to file the Form 10-
10       K or to submit a plan to Nasdaq to regain compliance with Nasdaq's listing rules.
         The Company intends to submit a plan within the required time period and if the plan
11       accepted, the Company could be granted up to 180 days from the Form 10-K's due
         date to regain compliance. If NASDAQ does not accept the Company's plan, then
12       the Company will have the opportunity to appeal that decision to a NASDAQ
         hearings panel.

13
         ***Super Micro intends to take all necessary steps to achieve compliance with the***
14       ***NASDAQ continued listing requirements as soon as practicable***.

15   86.   On October 26, 2017, Super Micro held an earnings conference call where Liang

16   spoke alongside Hayes.  Notably absent was CFO Hideshima who had participated in all prior

17   earnings conference calls during the Class Period.  When asked about the CFO's status, Hayes stated

18   he was "working very hard on the issues":

19       [Alexander Kurtz]:  Last question for me.  Can you give us any update on your CFO,
         Howard, and his status with the company at this point?
20
21       [Hayes]:  Howard is working very hard on the issues related to the filing of the 10-K
         at this moment.

22   Three months later, Hideshima would "resign" from the Company effective immediately.

23   87.   <u>False and Misleading Statements</u>:  During the October 26, 2017 earnings conference

24   call, Super Micro reiterated that the Company needed additional time to compile and analyze

25   materials and finalize its financial statements, as was reported in prior press releases.  Super Micro

26   refused to answer several questions concerning the Company's delinquent reports and ongoing Audit

27   Committee investigation and misleadingly downplayed the delay:

28

THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATION OF THE
FEDERAL SECURITIES LAWS - 4:18-cv-00838-JST                                              - 40 -
4838-8753-1962.v1-4/22/20

[Brian Matthew Alger]:  Just for a clarification point, reading through the release today and kind of going back to the delay that we're incurring here on the 10-K.  To be clear, what's being evaluated by the audit committee isn't whether or not the revenues were real, but rather not the documentation around which period the revenues were recognized, is that the case?

[Hayes]:  Brian, as indicated, we're not going to answer any questions related to the filing of the 10-K.

\* \* \*

[Nehal Sushil Chokshi]:  Okay.  And the reason why there's more uncertainty around what channel was as a % of revenue is that that's where the uncertainty resides with the one revenue recognition.  Should be getting done.  Is that a correct interpretation?

[Hayes]:  Again, Nehal, we're not going to discuss anything related to the 10-K filing.

\* \* \*

[Brian Matthew Alger] Okay. And then other than the efforts going on surrounding the review here with the 10-K, has there been any structural changes that would affect the operating expenses of the company outside of normal business operations?

[Hayes]: ***No. Everything is pretty much the same . . . everything is on track***.

88.     On these additional disclosures, the price of Super Micro's common stock declined from its close of $21.70 per share on October 26, 2017, to a close at $20.48 per share on October 27, 2017, on extremely high trading volume.  On October 30, 2017, the next trading date, Super Micro's stock fell to a close of $19.85 per share, but remained inflated as Defendants continued to downplay and conceal the details of their fraud.

89.     On October 27, 2017, Susquehanna Financial Group issued a report titled "Super Micro: Audit Review To Remain Overhang On Shares; Gross Margins Remain Constrained," noting the overhang on the Company's stock price due to questions concerning its revenue recognition processes and delinquent reports:

> ***The audit investigation of SMCI's revenue recognition practices (and associated delay in 10-K filing) is expected to remain an overhang on shares***, while the fundamental backdrop remains mired by a lack of Gross Margin expansion. Maintain Neutral rating.

> The delay in 10-K filing associated with a review of revenue recognition practices is likely to remain an overhang on shares until this is resolved and the company has adequately addressed its internal controls. . . .

> <u>Audit committee investigation to remain an overhang, unclear when this will be resolved</u>. ***SMCI indicated that the reason its 10-K had been delayed was due to an***

***investigation into revenue recognition practices around revenue that was originally recognized in the Dec Q'16 and then reversed and recognized in Mar Q'17***.  This has resulted in a more thorough review of sales recognition practices.  SMCI did not provide any insight into when this matter would be resolved.

90.     On November 13, 2017, after the close of trading, Super Micro filed a Notification of Late Filing on Form 12b-25, signed by Hideshima, disclosing that it could not timely file its 1Q18 Form 10-Q:

> As previously announced, the Company has been unable to file its Annual Report on Form 10-K for the fiscal year ended June 30, 2017 (the "Form 10-K") pending the completion of an independent investigation by the Audit Committee of the Company's Board of Directors and any additional work required thereafter in order for the Company to finalize its financial statements and have the Company's independent registered public accounting firm complete its audit of the financial statements to be incorporated in the Form 10-K and complete its audit of the Company's internal controls over financial reporting as of June 30, 2017.  The Form 10-Q cannot be completed and filed until the Form 10-K is completed and filed.  The Company does not expect the filing to be made within the time period required for a timely filing pursuant to Rule 12b-25(b) under the Securities Exchange Act of 1934.

91.     On November 20, 2017, after the close of trading, Super Micro filed a Current Report on Form 8-K, signed by Liang, incorporating a press release titled "Super Micro Computer Inc. Announces Receipt of Non-Compliance Letter from Nasdaq":

> On November 16, 2017, Super Micro Computer, Inc. (the "Company") received a notification letter (the "Letter") from the Listing Qualifications Department of the NASDAQ Stock Market LLC ("NASDAQ") ***indicating that the Company is not in compliance with NASDAQ Listing Rule 5250(c)(1)***, as a result of the Company's delay in filing its Quarterly Report on Form 10-Q for the period ended September 30, 2017 and its continued delay in filing its Annual Report on Form 10-K for the period ending June 30, 2017 (the "Form 10-K").  The Company previously submitted a plan of compliance to Nasdaq on November 10, 2017 (the "Plan") with respect to its delay in filing the Form 10-K (the "Initial Delinquent Filing").  ***Upon review of the Company's Plan and in connection with this additional delinquency, the Letter requires that the Company submit an update to the Plan by November 30, 2017*** (the "Revised Plan").  The Letter has no immediate effect on the listing or trading of the Company's common stock on the NASDAQ Global Select Market. If the Revised Plan is submitted and accepted, the Company could be granted up to 180 days from the due date of the Initial Delinquent Filing, or March 12, 2018, to regain compliance.  If NASDAQ does not accept the Company's plan, then the Company will have the opportunity to appeal that decision to a NASDAQ hearings panel.

92.     <u>False and Misleading Statements</u>: On December 6, 2017, Wells Fargo issued a report titled "SMCI: Takeaways from Wells Fargo Tech Summit 2017," noting that the Company faced an "[o]ngoing unknown risk / overhang related to continued Audit Committee revenue recognition investigation."  The Wells Fargo Tech Summit 2017 was held at the St. Regis Deer Valley in Park

1   City, Utah, between December 4-6, 2017.  Hayes was scheduled to present for Super Micro on

2   December 6, 2017.  Following Hayes's presentation, Wells Fargo reported that: "***Mr. Hayes believes***

3   ***that Supermicro is in the final stages of audit review before filing its 10-K (and subsequent***

4   ***updated 10-Q).***"

5        93.   <u>Reasons Why the Statements in ¶¶79, 82, 85, 87, 92 Were False and Misleading</u>:  In

6   addition to the reasons detailed in ¶54, Defendants' statements concerning: (i) the completion of the

7   Company's internal investigations; (ii) the timing of and its ability to comply with SEC filing

8   requirements; (iii) the risks the Company faced; and (iv) its ability to comply with NASDAQ listing

9   requirements were materially false and misleading because Defendants knew, or were deliberately

10  reckless in not knowing, and failed to disclose the following:

11        (a)   As a result of an improper focus on quarterly revenue over compliance,

12  including but not limited to, deliberate accounting manipulations, material weaknesses in internal

13  controls, ineffective disclosure controls, insufficient personnel and concealment of material

14  information from the Audit Committee and Deloitte, the accounting for thousands of transactions

15  from FY13 through FY17 required reassessment for determining appropriate revenue recognition

16  treatment and the number and breadth of the necessary adjustments, coupled with their aggregate

17  magnitude, required Super Micro to restate financial results for that period;

18        (b)   As of December 6, 2017, Super Micro was not in the "final stages" of its audit

19  review for its FY17 Form 10-K or its 1Q18 Form 10-Q given the volume of transactions the

20  Company, the Audit Committee, its accounting consultants or Deloitte were required to review for

21  the period from FY13- FY18;

22        (c)   The Company lacked a defined process for reviewing transactions and lacked

23  visibility into the work required to complete its investigation and SEC filings;

24        (d)   As a result of its material weakness in internal control over financial reporting

25  and its insufficient personnel, the Company failed to maintain sufficient documentation to support

26  the appropriate accounting treatment of certain transactions and, as a result, was forced to locate

27  documentation from archived sources or from third parties;

28

1      (e)     The SEC had expanded its investigation that began in 2015 and for which the

2  Company received a formal order of investigation on October 25, 2016, to include broader revenue

3  recognition issues; and

4      (f)     Given the foregoing, as well as the reasons detailed in ¶54, the Company's

5  statements concerning the Company's internal investigation, the status of its SEC filings and its

6  ability to comply with NASDAQ listing requirements were false and misleading.

7  **Super Micro Announces Departure of Senior Executives and Cannot State if Its Historical Financial Statements Are Accurate; Audit Committee Investigation Results in Further**

8  **Inquiry and Delay**

9      94.     On January 30, 2018, after the close of trading, Super Micro filed a Current Report on

10  Form 8-K, signed by Liang, incorporating two press releases, one titled "Super Micro® Announces

11  Second Quarter Fiscal 2018 Preliminary Financial Information; Management Changes," and another

12  titled "Super Micro® Announces the Appointment of Kevin Bauer as Chief Financial Officer,"

13  disclosing that three senior management level employees, including Defendants Hideshima and

14  Liaw, had departed effective immediately and that the Company had appointed a new CFO:

15      The Company announced the appointment of Kevin Bauer, as the Company's Senior Vice President and Chief Financial Officer ("CFO"), effective January 30, 2018. Mr.

16      Bauer, 58, has served as the Company's Senior Vice President, Corporate Development and Strategy since January 2017.

17

18                        *       *       *

19      ***The Company also announced that Wally Liaw, Sr. Vice President of International Sales, Phidias Chou, Sr. Vice President, Worldwide Sales and Howard Hideshima,***

20      ***Senior Vice President and Chief Financial Officer, have resigned, effective January 30, 2018. Mr. Liaw has also resigned as a member of the Board of***

21      ***Directors of the Company (the "Board"), effective January 30, 2018.***

22  In addition to providing preliminary financial results for 2Q18, the January 30, 2018 press release

23  also revealed for the first time that the Audit Committee had finished its investigation but that further

24  investigation was necessary and the Company could not represent that its historical financial

25  statements were accurate.  The Company reiterated that it had no completion date for its

26  investigation or delinquent reports:

27      The Audit Committee has completed the previously disclosed investigation. ***Additional time is required to analyze the impact, if any, of the results of the***

28      ***investigation on the Company's historical financial statements, as well as to conduct additional reviews*** before the Company will be able to finalize its Annual

Report on Form 10-K for the fiscal year ended June 30, 2017 (the "Form 10-K"). **The Company is unable at this time to provide a date as to when the Form 10-K will be filed or to determine whether the Company's historical financial statements will be adjusted or, if so, the amount of any such adjustment(s) and what periods any such adjustments may impact.** The Company intends to file its Quarterly Reports on Form 10-Q for the quarters ended September 30 and December 31, 2017 promptly after filing the Form 10-K.

95.    On January 30, 2018, the Company held an earnings conference call which was attended by Liang, Hayes and Bauer, in which the Company discussed its 2Q18 earnings – which were not filed with the SEC – and to introduce new members of management.  Defendants Liang and Hayes refused to discuss the departures of Defendants Hideshima or Liaw, because of their connection to the Audit Committee investigation:

[Analyst:]  The management resignations that you outlined in the press release, how do we – especially related to the sales leadership, how do we think about those relative to the audit that was just completed?  Are those related, are those separate?  And then, how do we think about your ability to forecast revenue kind of going forward?

[Hayes:]   [A]s you know, we said that we wouldn't comment on the Audit Committee investigation and the delayed financing K.  And definitely, we're not at liberty to discuss anything related to the Audit Committee, so I'm going to have to decline your question on that.

96.    On January 30, 2018, Wells Fargo issued a report titled "SMCI: Significant Revenue Upside; Still Await Finalized Financial Filings," detailing expectations that the Company's shares would be weak due to, among other matters:

(1) uncertainty related to the resignation of high-level sales executives, including co-founder, Wally Liaw, who owns 4.4% of shares outstanding.  **The company elected to not comment on the reasoning of these resignations / relation to the Audit Committee investigation**. (2) While the Audit Committee has completed its investigation, Supermicro reported additional time is required to analyze the impact, *if any*, to historical results (Nasdaq filing deadline on March 13th).

With respect to the management changes and the Audit Committee investigation, the January 30, 2018 Wells Fargo report disclosed:

Management Changes: (1) Supermicro reported that Wally Liaw, co-founder and SVP of International Sales, has resigned from the company and its board of directors.  We would note that Mr. Liaw owns 4.4% of shares outstanding. (2) Phidias Chou, SVP of worldwide sales, has resigned from Supermicro; Don Clegg, VP of Worldwide Business Develop & Marketing will succeed Mr. Chou on an interim basis. (3) The company also announced that it has appointed Kevin Bauer as its new CFO.   Mr. Bauer joined Supermicro in January 2017 as SVP, Corporate Development and Strategy.   He holds previous CFO experience at Pericom

Semiconductor and Exar Corporation.  In connection with this prior CFO, Howard Hideshima, has resigned from the company.

Supermicro announced the Audit Committee completed its investigation; however, additional time is required to analyze the impact (if any) of its findings to historical financial statements and to conduct additional reviews prior to filing its F2017 10-K and F1Q18 / F2Q18 10-Q filings.  The company is unable to provide an update on when these will be filed; however, we would note that Supermicro's Nasdaq extension expires on March 13th.

97.     On January 31, 2018, CFRA Research issued a report detailing concerns about Super Micro's failure to meet filing deadlines, management changes and the departure of Hideshima, which it viewed "as disturbing":

> *We note SMCI has delayed filing of its 10-K given a pending independent audit review that began from the identification of a sales transaction that was realized during an incorrect quarter*.

> We await a resolution to the independent audit review amid a time of favorable business trends but *view recent management changes, including the departure of the CFO, as disturbing*.

98.     On these further disclosures and developments, the price of Super Micro's common stock declined from its close of $24.65 per share on January 30, 2018, to a close at $22.83 per share on January 31, 2018, on increased trading volume.  The Company's stock price continued falling over the next several trading days, closing at $19.30 per share on February 5, 2018, representing a decline of over 21.7% from the January 30, 2018 closing price.

## POST-CLASS PERIOD EVENTS AND DISCLOSURES

99.     On February 9, 2018, after the close of trading, Super Micro filed a Notification of Late Filing on Form 12b-25, signed by Bauer, disclosing it could not file its 2Q18 Form 10-Q and repeated the Company's prior disclosures that it could not determine when the investigation would be completed, its impact on the Company's historical financial statements or when it would become current with its SEC filings:

> Super Micro Computer, Inc. (the "Company") is not in a position to file its Quarterly Report on Form 10-Q for the period ended December 31, 2017 (the "Form 10-Q"), in a timely manner because the Registrant cannot complete the Form 10-Q in a timely manner without unreasonable effort or expense.  As previously announced, the Company has been unable to file its Annual Report on Form 10-K for the fiscal year ended June 30, 2017 (the "Form 10-K") and Quarterly Report on Form 10-Q for the quarter ended September 30, 2017 ("Q1 10-Q").  The Audit Committee of the Company's Board of Directors has completed the previously disclosed investigation. Additional time is required to analyze the impact, if any, of the results of the

1   investigation on the Company's historical financial statements, as well as to conduct
2   additional reviews before the Company will be able to finalize the Form 10-K. ***The
    Company is unable at this time to provide a date as to when the Form 10-K will be
3   filed or to determine whether the Company's historical financial statements will be
    adjusted or, if so, the amount of any such adjustment(s) and what periods any such
4   adjustments may impact***. The Form 10-Q cannot be completed and filed until the
    Form 10-K and Q1 10-Q are completed and filed. The Company does not expect the
5   filing to be made within the time period required for a timely filing pursuant to Rule
    12b-25(b) under the Securities Exchange Act of 1934. The Company intends to file
6   its Quarterly Reports on Form 10-Q for the quarters ended September 30 and
    December 31, 2017 promptly after filing the Form 10-K.

7          100.    On February 20, 2018, after the close of trading, Super Micro filed a Current Report

8   on Form 8-K, signed by Liang, incorporating a press release titled "Super Micro Computer Inc.

9   Announces Receipt of Non-Compliance Letter from Nasdaq," disclosing that the Company was not

10  in compliance with NASDAQ listing rules due to failure to file its 2Q18 Form 10-Q and that it had

11  until February 28, 2018, to submit a revised plan to regain compliance. The Company also repeated

12  that the Audit Committee had completed its investigation but that it needed additional time to

13  analyze any impact on the Company's historical financial statements and conduct additional reviews

14  prior to filing its FY17 Form 10-K:

15         On February 20, 2018, Super Micro Computer, Inc. (the "Company") announced that
           it received a notification letter (the "Letter") from the Listing Qualifications
16         Department of the Nasdaq Stock Market LLC ("Nasdaq") indicating that the
           Company is not in compliance with Nasdaq Listing Rule 5250(c)(1), as a result of
17         the Company's delay in filing its Quarterly Report on Form 10-Q for the period
           ended December 31, 2017 (the "Q2 10-Q") and its continued delay in filing its
18         Annual Report on Form 10-K for the period ending June 30, 2017 (the "Form 10-K")
           and its Quarterly Report on Form 10-Q for the period ended September 30, 2017
19         ("Q1 10-Q"). As described in the letter, the Company has until February 28, 2018 to
           submit to Nasdaq an update to its original plan to regain compliance with the Nasdaq
20         Listing Rules (the "Revised Plan"). As previously disclosed, Nasdaq has granted the
           Company an extension until March 13, 2018 to file the Form 10-K, the Q1 10-Q and
21         the Q2 10-Q.

22         The Letter has no immediate effect on the listing or trading of the Company's
           common stock on the Nasdaq Global Select Market. If the Revised Plan is submitted
23         and accepted, the Company could be granted up to 180 days from the due date of the
           Initial Delinquent Filing, or March 13, 2018, to regain compliance. If Nasdaq does
24         not accept the Company's plan, then the Company will have the opportunity to
           appeal that decision to a Nasdaq hearings panel.
25
26         101.    On these disclosures, the price of Super Micro's common stock declined from its

    close of $18.85 per share on February 20, 2018, to a close at $18.15 per share on February 21, 2018,
27
    on increased trading volume.
28

1  **Super Micro Subject to Delisting by NASDAQ**

2        102.    On March 16, 2018, after the close of trading, Super Micro filed a Current Report on

3  Form 8-K, signed by Bauer, incorporating a press release titled "Super Micro® Receives Nasdaq

4  Staff Determination Letter; Has Requested Hearing Before Hearings Panel," disclosing that its stock

5  was subject to delisting by NASDAQ:

6        On March 14, 2018, Super Micro Computer, Inc. (the "Company") received a letter
from the staff of the Listing Qualifications Department (the "Staff") of The Nasdaq
7        Stock Market LLC ("Nasdaq") notifying the Company that since the Company had
not filed its Annual Report on Form 10-K for the fiscal year ended June 30, 2017 and
8        its Quarterly Reports on Form 10-Q for the quarterly periods ended September 30,
2017 and December 31, 2017 (collectively, the "Delinquent Filings") by March 13,
9        2018, the deadline by which the Company was to file its Delinquent Filings in order
to regain compliance with Nasdaq Listing Rule 5250(c)(1), the Company's common
10       stock is subject to delisting from Nasdaq. The letter further noted that, unless the
Company requested an appeal of the Staff's determination, trading of the Company's
11       common stock on Nasdaq would be suspended at the opening of business on March
23, 2018, and a Form 25-NSE would be filed with the SEC removing the Company's
12       securities from listing and registration on Nasdaq.

13       On March 16, 2018, the Company submitted a letter to Nasdaq requesting a hearing
before a Hearings Panel at which it intends to present its plan to regain and thereafter
14       maintain compliance with all applicable listing requirements. In connection with its
request for a hearing, the Company has also requested a stay of the suspension of
15       trading and delisting of its common stock, pending the hearing and decision of the
Hearings Panel. The Hearings Panel will notify the Company of its decision to allow
16       the Company to continue to trade on Nasdaq pending the hearing and a decision by
the Hearings Panel by April 5, 2018. There can be no assurance that the Hearings
17       Panel will grant the Company's request for continued listing or stay the delisting of
its common stock.

18
19       103.    On March 16, 2018, Wells Fargo issued a report titled "SMCI: Supermicro Requests

Hearing With Nasdaq To Avoid Delisting (Negative)" describing Super Micro's March 16, 2018
20
announcements regarding its non-compliance with NASDAQ listing requirements as "clearly
21
negative":
22
23       News: Supermicro has announced that today (3/16) it submitted a letter to Nasdaq
requesting a hearing before a Hearings Panel to present a plan in which it intends to
24       regain compliance related to the inability to file its F2017 10-K and F1Q18 / F2Q18
10-Qs. The request is for a hearing by March 21, 2018. This follows the company
25       missing its 3/13 deadline to reach compliance. Supermicro has also requested a stay
in the suspension of trading / delisting of its stock from Nasdaq.

26       Supermicro noted that the hearing request automatically stays the delisting process
for a period of 15 calendar days from the date of the deadline to request a hearing (or
27       until April 5th). The Hearings Panel has the authority to grant Supermicro additional
time of up to 360 days from the original due date of the company's first late filing to
28       regain compliance (late August timeframe) before further action to delist the

THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATION OF THE
FEDERAL SECURITIES LAWS - 4:18-cv-00838-JST                     - 48 -

company's common stock will occur. **The Hearings Panel will notify the Company by April 5, 2018 of its decision to allow Supermicro to continue to trade on Nasdaq pending the hearing and a decision by the Hearings Panel**.

Quick Thoughts: ***This news is clearly negative as the company has persistently struggled to regain compliance with Nasdaq – in this release Supermicro did not provide an update on the progress of completing its internal audit investigation***. At the time of the company's December quarter results, Supermicro reported that it was continuing to analyze the findings of its investigation to determine the amount (if any) of a potential financial restatement.

(Emphasis in original and added).

104.    On these disclosures, the price of Super Micro's common stock declined from its close of $19.70 per share on March 16, 2018, to a close at $18.70 per share on March 19, 2018, on increased trading volume.

**Super Micro Fails to File 3Q18 Form 10-Q**

105.    On May 3, 2018, after the close of trading, Super Micro filed a Current Report on Form 8-K, signed by Liang, incorporating a press release titled "Super Micro® Announces Third Quarter Fiscal 2018 Preliminary Financial Information." In addition to preliminary 3Q18 results, the press release also disclosed that the additional testing overseen by the Audit Committee was "nearing completion":

> ***The Company has completed the previously disclosed investigation conducted by the Audit Committee. In furtherance of the preparation of the financial statements, the Audit Committee is overseeing additional testing that the Company believes is nearing completion***. To date, the Company's cash flows have not been impacted by the findings of the investigation or the additional testing. Additional time is required to analyze any impact of the results of the investigation and additional testing on the Company's historical financial statements, as well as to complete additional reviews before the Company will be able to finalize its Annual Report on Form 10-K for the fiscal year ended June 30, 2017 (the "2017 10-K").
>
> The Company presented an updated compliance plan to The Nasdaq Stock Market Hearings Panel on April 26, 2018 and the Company requested an additional exception period for continued listing of its common stock on The Nasdaq Global Select Market through August 24, 2018 in order for it to complete and file its 2017 10-K and subsequent delinquent SEC quarterly filings. The Company is unable at this time to provide a date as to when the 2017 10-K will be filed or to predict whether the Company's historical financial statements will be adjusted or, if so, the amount of any such adjustment. The Company intends to file its Quarterly Reports on Form 10-Q for the quarters ended September 30, December 31, 2017, and March 31, 2018 promptly after filing the 2017 10-K.

106.    On May 3, 2018, Super Micro held an earnings conference call where Liang and Bauer spoke alongside Hayes. During the earnings conference call, Hayes reiterated that the Audit

1   Committee had completed its investigation and additional testing was nearing completion; that the

2   Company had until August 24, 2018 to complete and file its delinquent reports, and continued to

3   downplay the significance of the internal control issues:

4   [Hayes]: Good afternoon, and thank you, for attending Supermicro's business update
    conference call for the third quarter fiscal 2018, which ended March 31, 2018.  As
5   announced in our press release earlier today, *the company has completed the
    previously disclosed investigation conducted by the audit committee. In*
6   *furtherance of the preparation of the financial statements, the audit committee is*
    *overseeing additional testing that the company believes is nearing completion*.

7
    *To date, the company's cash flows have not been impacted by the findings of the*
8   *investigation or the additional testing*.  Additional time is required to analyze any
    impact of the results of the investigation and additional testing on the company's
9   historical financial statements as well as to complete additional reviews before the
    company will be able to finalize its annual report on Form 10-K for the fiscal year
10  ended June 30, 2017.  Otherwise known as the 2017 10-K.

11  The company presented an updated compliance plan to the NASDAQ stock market
    hearings panel on April 26, 2018.  And the company requested an additional
12  exception period for continued listing of its common stock on the NASDAQ Global
    Select Market, through August 24, 2018, in order for it to complete and file its 2017
13  10-K and subsequent delinquent SEC quarterly filings.

14  The company is unable at this time to provide a date as to when the 2017 10-K will
    be filed or to predict whether the company's historical financial statements will be
15  adjusted or, if so, the amount of any such adjustments.  The company intends to file
    its quarterly reports on Form 10-Q for the quarters ended September 30 and
16  December 31, 2017, and March 31, 2018, promptly after filing the 2017's 10-K.

17      107.    Additionally, during the May 3, 2018 earnings conference call, Bauer stated that the

18  Company would not answer questions regarding the delinquent reports but that it was nearing

19  completion of its investigation and filings:

20  [Bauer]:  The SEC filings process.  As we stated in our press release and as Perry
    articulated during the introduction, we continue to expend great effort to complete
21  our financial statements and work with our independent auditor to complete the fiscal
    year 2017 audit process and ultimately file our delinquent reports with the SEC.  As
22  previously indicated, we'll now have a Q&A session, where sell-side analysts will be
    permitted to ask questions.  *I'd like to remind you that your questions should be*
23  *directed to the business update that we just provided and we'll not answer any*
    *further questions relating to the audit committee investigation or the delayed filing*
24  *of our 10-K*.  Operator, at this time, we're ready for questions.

25                          *       *       *

26  As it relates to the additional testing, I'll remind you that we're not going to be
    answering questions about that.  But it's just the continuation of the process to get
27  our arms around all of the issues that occurred during that timeframe.  So as we said,
    *we believe that we think we're nearing completion there and we're working in*

28

*parallel with other teams to be able to our get our filings done as expeditiously as possible and we'll leave it at that*.

108.     The price of Super Micro's common stock increased from its close of $18.05 per share on May 3, 2018, to a close at $21.25 per share on May 4, 2018, on increased trading volume. Super Micro's stock price continued to increase to nearly $24.00 per share over the ensuing two trading days.

109.     On May 10, 2018, after the close of trading, Super Micro filed a Notification of Late Filing on Form 12b-25, signed by Bauer, disclosing that it could not timely complete its 3Q18 Form 10-Q:

> Super Micro Computer, Inc. (the "Company") is unable to file its Quarterly Report on Form 10-Q for the period ended March 31, 2018 (the "Form 10-Q") in a timely manner without unreasonable effort or expense.  As previously announced, the Company has been unable to file its Annual Report on Form 10-K for the fiscal year ended June 30, 2017 (the "Form 10-K"), Quarterly Report on Form 10-Q for the quarter ended September 30, 2017 ("Q1 10-Q") and Quarterly Report on Form 10-Q for the quarter ended December 31, 2017 ("Q2 10-Q"). . . .

> The Company presented an updated compliance plan to The Nasdaq Stock Market Hearings Panel (the "Panel") on April 26, 2018 and the Company requested an additional exception period for continued listing of its common stock on The Nasdaq Global Select Market ("Nasdaq") through August 24, 2018 in order for it to complete and file its 2017 10-K and subsequent delinquent SEC quarterly filings.  The Panel has since granted the Company's request to continue its listing on Nasdaq through August 24, 2018, subject to the condition that the Company becomes current with its SEC filings by that date and informs the Panel the Company is current with such filings.

110.     On May 21, 2018, after the close of trading, Super Micro filed a Current Report on Form 8-K, signed by Bauer, disclosing that it had received a letter from NASDAQ detailing additional delinquencies with listing rules but that it remained "on track" to meet the August 24, 2018 deadline:

> On May 15, 2018, Super Micro Computer, Inc. (the "Company") received a letter (the "Letter") from the Listing Qualifications Department of The Nasdaq Stock Market ("Nasdaq") notifying the Company of its determination of an additional delinquency related to the Company's noncompliance with Nasdaq Listing Rule 5250(c)(1) (the "Rule") because the Company has not yet filed its Quarterly Report on Form 10-Q for the quarter ended March 31, 2018 (the "Q3 10-Q"). . . . The Letter states that the Nasdaq Hearings Panel (the "Panel") will consider this matter in their decision regarding the Company's continued listing on The Nasdaq Global Market, and that the Company should present its views with respect to this additional deficiency to the Panel in writing no later than May 22, 2018.

On May 18, 2018, the Company submitted a response to the Nasdaq Hearings Panel (the "Panel") stating that, consistent with the Company's presentation at the recent hearing before the Panel and as of the date of the reply, ***the Company believes it remains on track to file the Delinquent Reports with the SEC and thereby evidence compliance with the Rule on or before the Panel deadline of August 24, 2018***.

As the Company previously announced, the Panel has granted the Company's request to continue its listing on Nasdaq through August 24, 2018, subject to the condition that the Company becomes current with its SEC filings by that date and informs the Panel the Company is current with such filings. The Company is diligently working to become current with its SEC filings and intends to continue to take all steps necessary to regain compliance with the Rule.

111.    On July 13, 2018, after the close of trading, Super Micro filed a Current Report on Form 8-K, signed by Liang, disclosing that the Company had failed to hold a required annual meeting of shareholders:

On July 9, 2018, Super Micro Computer, Inc. (the "Company") received a letter (the "Letter") from the Listing Qualifications Department of The Nasdaq Stock Market LLC ("Nasdaq") notifying the Company of its determination of an additional deficiency related to the Company's noncompliance with the annual meeting requirement set forth in Nasdaq Listing Rule 5260(a) (the "Rule") because the Company did not hold an annual meeting of shareholders within twelve months of the end of the Company's prior fiscal year end. The Letter states that the Nasdaq Hearings Panel (the "Panel") will consider this matter in their decision regarding the Company's continued listing on The Nasdaq Global Select Market, and that the Company should present its views with respect to the additional deficiency to the Panel in writing no later than July 16, 2018.

. . . The Company is diligently working to become current with its SEC filings and intends to continue to take all steps necessary to regain compliance with the Nasdaq Listing Rules, including the Rule.

**Super Micro Fails to Meet Filing Deadline; NASDAQ Suspends Trading**

112.    On August 21, 2018, after the close of trading, Super Micro filed a Current Report on Form 8-K, signed by Liang, disclosing that its SEC filings dating back to the Company's FY17 Form 10-K would remain delinquent, and as such, the Company would face delisting proceedings:

On August 20, 2018, Super Micro Computer, Inc. (the "Company") submitted a supplemental letter to the Hearings Panel (the "Panel") of The Nasdaq Stock Market LLC ("Nasdaq") notifying the Panel that ***the Company will be unable to meet the Panel's August 24, 2018 deadline to regain compliance with Nasdaq Listing Rule 5250(c)(1)*** because the Company will not be able to complete and file its Annual Report on Form 10-K for its fiscal year ended June 30, 2017 (the "2017 Form 10-K") and its Quarterly Reports on Form 10-Q for its fiscal quarters ended September 30, 2017, December 31, 2017 and March 31, 2018 (collectively with the 2017 Form 10-K, the "Delinquent Reports") with the Securities and Exchange Commission ("SEC") by such date.

1    As previously disclosed, by decision dated May 9, 2018, the Panel granted the
     Company's request to continue its listing on Nasdaq's Global Select Market through
2    August 24, 2018, subject to the condition that the Company become current with its
     SEC filings by that date and informs the Panel the Company is current with such
3    filings. *While the Company has made significant progress toward completing the
     necessary accounting review processes, it has determined that the Delinquent
4    Reports will not be filed with the SEC by August 24, 2018*.

5    *As a result of the updated timing, the Company expects that its common stock will
     soon be suspended from trading on Nasdaq's Global Select Market and the Panel
6    will begin delisting proceedings*.

7        113.    The August 20, 2018 Form 8-K incorporated a press release disclosing the Company

8    would not file its delinquent reports with the SEC given the magnitude of transactions that needed to

9    be reviewed for revenue recognition purposes and reiterated that it expected to be delisted from the

10   NASDAQ:

11   The Company is currently in the process of preparing its financial statements in light
     of the results of the Audit Committee investigation and other ongoing testing. *A*
12   *significant number of transactions remain to be reviewed*.  To date, none of the
     hundreds of reviewed transactions has involved revenue that could not ultimately be
13   recognized, however, we have not concluded that a restatement to previously filed
     financial results is necessary.  The Company's cumulative cash flows have not been
14   impacted by the findings of the investigation or other testing, although the expenses
     associated with the investigation and testing have been significant.

15
     *The delay primarily relates to the magnitude of work that the Company still must*
16   *perform in order to review the Company's accounting judgments, estimates and*
     *records for transactions that occurred during fiscal years 2015 through 2017, as*
17   *well as the Company's assessment and conclusions on the effectiveness of its*
     *internal control over financial reporting during such periods, so that it can*
18   *complete the financial statements for the 2017 Form 10-K*.  Although the Company
     has made substantial progress in these matters and committed extraordinary
19   resources and personnel toward the effort, the amount of work is substantial and the
     additional testing required has taken longer than anticipated.  The Company is
20   committed to filing its Delinquent Reports as soon as practicable.

21   Charles Liang, Chairman and Chief Executive Officer commented, "Despite our
     substantial progress in these matters, we are very disappointed that we did not meet
22   the filing deadline.  *We are strongly committed to completing our SEC filings as*
     *soon as possible. In addition, we continue to strengthen our internal accounting,*
23   *audit and compliance functions*. . . ."

24   *As a result of the updated timing, the Company expects that its common stock will*
     *soon be suspended from trading on Nasdaq's Global Select Market and the Panel*
25   *will begin delisting proceedings*.  If the Panel decides to delist the Company's
     common stock, the Company will evaluate all of its options, including filing an
26   appeal to the Nasdaq Listing and Hearing Review Council.

27   Following a possible suspension of trading in the Company's common stock on
     Nasdaq, the Company expects that its shares will be quoted over-the-counter on the
28   OTC Markets.   The Company intends to continue to work diligently toward

1   completing its Delinquent Reports, regaining compliance with its SEC reporting
2   obligations, and regaining its listing on Nasdaq or another national stock exchange as
    soon as practicable.

3   114.   Later that day, Super Micro held an earnings conference call where Liang and Bauer

4   disclosed that the Company still had a substantial amount of transactions to review for revenue

5   recognition purposes and reiterated that its stock would be suspended from trading on the NASDAQ:

6   [Bauer]:  We have worked diligently and deployed significant resources towards
    completing the 2017 and 2018 financial statements, but are not able to file by the
7   deadline of August 24, 2018. . . .  We have made tremendous progress on this matter,
    having completed the analysis of specific revenue transactions identified through our
8   audit committee's investigation.

9   To-date, our cash flows have not been impacted by our findings and no transaction
    reviewed by the company as part of this process has involved revenue that could not
10  ultimately be recognized nor have we concluded that a restatement of financial
    results is necessary.  *The question you must be asking is; why is this matter taking*
11  *so long*.  *The answer is that in order to be thorough, we are reviewing transactions*
    *near the end of each quarter for similar issues found in the earlier testing, but*
12  *particularly as it relates to the matching of purchase order and shipping terms to*
    *the timing of revenue*.
13
    As we are a high-volume business, this entails locating documentation that is onsite,
14  archived, or [ph] at third-parties.  *I'm reviewing thousands of revenue transactions*
    *in detail using a structured approach*.  *There are a number of issues*.  However, let
15  me share an example of an issue that has arisen in our reviews.

16  We have from time to time offered free shipping to customers even though terms of
    our agreements with those customers provided that the customer would arrange for
17  its own shipping company to pick the products up at our factory shipping dock.  *This*
    *practice had the unintended accounting consequence of converting the transaction*
18  *from an Ex Works transaction to an FOB transaction.  If end-of-quarter*
    *shipments are adjusted in this way, it can cause the appropriate date for*
19  *recognizing the revenue for those shipments to slip from one quarter into the next*.
    *This is one example of what we are looking for as we review thousands of*
20  *transactions*.

21  The company believes the revenue recognized for review transactions is valid
    revenue.  *The main issue is the quarter in which revenue must be recognized.  We*
22  *have not yet determined whether the magnitude of any timing adjustment will be*
    *material to any of our previously filed financial statements*.
23
    We continue to work diligently to complete the review, assess the impact, and
24  complete our financial statements and assessment of internal controls over financial
    reporting.  *We have engaged KPMG to assist us with our review* and we are also
25  working closely with our independent auditor, Deloitte, to complete the job.  We
    appreciate the efforts of both KPMG and Deloitte.
26
    *We are not able today to project the date by which we will complete this review and*
27  *file all our delinquent SEC reports, but we believe that date is not too far in the*
    *future*.
28

115.    On August 21, 2018, during the 4Q18 earnings conference call, analysts recognized that the Company's stock price was declining in reaction to Super Micro's delayed SEC filings and noted that the Company had disclosed significant work remained to be done in connection with the delinquent reports:

> [Nehal Sushil Chokshi]: ***But, Kevin, as you know, the stock is reacting to delayed filing*** and really great color on some of the examples that's going on.  You made a statement at the end that you believe that the ability to [ph] solve these problems is not too far away, but in the second press release of the day it does say that there is still significant work to do.  So can you help bridge the delta between the verbal comment and what's in the file – in what's the 8-K?

116.    In response, Bauer admitted that the Company still had a substantial amount of work remaining, possessed "pretty good visibility" on completing the process, had analyzed the largest transactions first and was just now moving toward assessing smaller transactions:

> [Bauer]: Yeah. So I think it is true that ***we still have a substantial amount of work to do***.  I think what we said in terms of being able to see it in the future is that ***now that we are later in the process we actually have pretty good visibility on what it takes to remain to be able to complete the process***.  So that's how I would string them together that it's one of better visibility, but there's still a fair amount to do.

> [Nehal Sushil Chokshi]:  Okay.  ***So the process that was defined on what needs to be done to review a transaction was established relatively late relative to when the investigation started about a year ago***.  Is that fair to say?

> [Bauer]: ***Well, certainly, as the results of the investigation came in, we were able to see a little bit more in terms of the processes that we [ph] would needing . . . to do.  So certainly it was evolving***.

> [Nehal Sushil Chokshi]: Okay.  And just to be clear, you said significant transactions left for review, but you've already reviewed hundreds of transactions.  So are you only a fraction of the way through?  Are you like 10% to 20% the way through or are you more like 80%, 90% the way through of what needs to be reviewed?

> [Bauer]: Yeah.  We really can't go into that level of detail.  ***What I can share with you is that we've taken the approach of largest transactions and are now going towards smaller transactions***.

117.    On August 21, 2018, Wells Fargo issued a report titled "SMCI: Suspension of Coverage," disclosing that Wells Fargo was suspending research coverage in light of Super Micro's failure to meet SEC filing deadlines and the risk of NASDAQ delisting: "[O]ur current policy is that we will suspend research coverage when the Analyst is unable to maintain our existing coverage status due to various legal, regulatory and/or company policy circumstances."

118.     On these disclosures, the price of Super Micro's common stock declined from its close of $18.35 per share on August 21, 2018, to a close at $15.65 per share on August 22, 2018 – a decline of over 14.7% – on increased trading volume.

119.     On August 22, 2018, Susquehanna Financial Group issued a report titled "Super Micro: Suspending Coverage," disclosing that they were suspending coverage of their ratings and estimates due to Super Micro's failure to meet SEC filing deadlines and NASDAQ listing standards:

> <u>Why is it taking the company so long to complete the reviews</u>: SMIC [sic] disclosed last night that its cash flows have not been impacted by the on-going investigation, and there is no need for restatement of financial results.  However, ***SMCI is still reviewing transactions near the end of each quarter for similar issues found in the earlier reviews, but particularly as it relates to the matching of purchase order and shipping terms to the timing of revenue.  In our view, lack of proper internal controls has lengthened this review process.  Yes, there is no restatement, but lack of proper internal controls has also made it difficult for the company to provide necessary documentation for the past transactions which is consequently [sic] making it difficult for the company to determine the timing of revenue recognition***.

120.     On August 22, 2018, CFRA issued a report detailing concerns about Super Micro's failure to meet SEC filing deadlines and anticipated NASDAQ delisting:

> ***We are growing wary after SMCI states it has been unable to complete the analysis of specific revenue transactions found through its audit committee's investigation.  We expect SMCI to be delisted from the Nasdaq Exchange given its inability to properly file SEC required documents***.
>
> *        *        *
>
> ***We remain concerned about the timetable as well as necessary costs it will take for SMCI to complete its review, as the company still noted a substantial amount of transactions that need to be reviewed***.
>
> *        *        *
>
> Our 12-month target price of $20 is based on a P/E of 7.7X our FY 19 operating EPS estimate, below comparable peers ***to reflect limited visibility surrounding accounting issues***.

121.     CFRA's report also contained a research note dated August 22, 2018, 8:33 a.m. ET, which reiterated that the limited visibility surrounding Super Micro's failure to meet SEC filing deadlines coupled with NASDAQ delisting and the substantial number of transactions that needed to be reviewed, impacted the value of the Company's shares:

> 08:33 am ET . . . CFRA KEEPS HOLD OPINION ON SHARES OF SUPER MICRO COMPUTER, INC. (SMCI 18.35***): ***We cut our 12-month target to $20 from $24, on steep peer-discount P/E of 7.7X our FY 19 (Jun.) EPS estimate given***

*limited visibility surrounding accounting issues*. . . .  While SMCI is benefiting from secular trends within its end-markets, we are growing more cautious after SMCI states it has been unable to complete the analysis of specific revenue transactions identified through its audit committee's investigation.  While SMCI cited its findings thus far will not impact its cash flows, we expect the company to be delisted from the Nasdaq Exchange given its inability to properly file SEC required documents.  We remain concerned about the timetable as well as necessary costs it will take for SMCI to complete its review, as it still noted a substantial amount of transactions that need to be reviewed.  /Angelo Zino, CFA

122.    On August 23, 2018, Super Micro issued a press release titled "Super Micro® Announces Suspension of Trading of Common Stock on Nasdaq and its Intention to Appeal," disclosing the Company anticipated its stock suspension from trading on the NASDAQ:

*Super Micro* Computer, Inc. (NASDAQ:SMCI) (the "Company"), a global leader in high performance, high-efficiency server, storage technology and green computing, *today announced that, as expected, the Company received a notification letter from* The *Nasdaq* Stock Market Hearings Panel (the "Panel") *on August 22, 2018, indicating that trading in the Company's common stock on Nasdaq's Global Select Market will be suspended effective at the open of business on August 23, 2018.*

\*      \*      \*

While the Company's common stock is suspended from trading on Nasdaq, the Company expects that its shares will be quoted on the OTC Markets under the trading symbol SMCI.  For quotes or additional information on the OTC Markets, you may visit http://www.otcmarkets.com.

123.    On August 23, 2018, after the close of trading, Super Micro filed a Current Report on Form 8-K, signed by Liang, disclosing the NASDAQ Hearing Panel had delisted the Company's common stock and suspend trading on the NASDAQ as of August 23, 2018.  The Company indicated that it intended to appeal:

On August 22, 2018, Super Micro Computer, Inc. (the "Company") received a letter from the Hearings Panel (the "Panel") of The Nasdaq Stock Market LLC ("Nasdaq") notifying the Company that *the Panel has determined to delist the Company's common stock and that trading on Nasdaq's Global Select Market will be suspended effective at the open of business on August 23, 2018.*

\*      \*      \*

The Company intends to appeal the Panel's decision to the Nasdaq Listing and Hearing Review Council.  During the appeal period, trading in the Company's common stock on Nasdaq will remain suspended and Nasdaq will not delist the Company's common stock pending such appeal. . . .

While the Company's common stock is suspended from trading on Nasdaq, the Company expects that its shares will be quoted on the OTC Markets under the trading symbol SMCI.

124.   On August 29, 2018, after the close of trading, Super Micro filed a Notification of Late Filing on Form 12b-25, signed by Bauer:

> Super Micro Computer, Inc. (the "Company") is unable to file its Annual Report on Form 10-K for fiscal year ended June 30, 2018 (the "2018 Form 10-K") in a timely manner without unreasonable effort or expense.  As previously announced, the Company has been unable to file its Annual Report on Form 10-K for the fiscal year ended June 30, 2017 (the "2017 Form 10-K"), Quarterly Report on Form 10-Q for the quarter ended September 30, 2017 ("Q1 10-Q"), Quarterly Report on Form 10-Q for the quarter ended December 31, 2017 ("Q2 10-Q") and Quarterly Report on Form 10-Q for the quarter ended March 31, 2018 ("Q3 10-Q") (the 2017 Form 10-K, Q1 10-Q, Q2 10-Q, Q3 10-Q and the 2018 Form 10-K being collectively referred to herein as the "Delinquent Reports").  The Audit Committee of the Company's Board of Directors has completed the previously disclosed investigation. The Company is currently in the process of preparing its financial statements in light of the results of the Audit Committee investigation and other ongoing testing. ***A significant number of transactions remain to be reviewed***.
>
> ***The delay primarily relates to the magnitude of work that the Company still must perform in order to review the Company's accounting judgments, estimates and records for transactions that occurred during fiscal years 2015 through 2017, as well as the Company's assessment and conclusions on the effectiveness of its internal control over financial reporting during such periods, so that it can complete the financial statements for the 2017 Form 10-K and subsequently complete the other delinquent reports***.  Although the Company has made substantial progress in these matters and committed extraordinary resources and personnel toward the effort, the amount of work is substantial and the additional testing required has taken longer than anticipated.

**Super Micro Announces Need to Restate FY15-FY17 and Material Weaknesses, Continues to Minimize Misconduct**

125.   On November 15, 2018, Super Micro filed a Current Report on Form 8-K (the Restatement Announcement) that disclosed the need to restate its financials for each of the quarterly and annual periods during FY15, FY16 and the first three quarters of FY17 (as well 4Q17 preliminary results, but not the need to "adjust" FY13 and FY14 results,) estimated ranges for the restatement, and announced material weaknesses in internal controls and ineffective disclosure controls, as well as remediation efforts taken to date:

> **Item 4.02(a) Non-Reliance on Previously Issued Financial Statements or a Related Audit Report or Completed Interim Review**
>
> On November 14, 2018, the Board of Directors of the Company, based on the recommendation of the Audit Committee and in consultation with management, determined that (i) ***the Company's consolidated financial statements and the related reports of its independent registered public accounting firm contained in its Annual Report on Form 10-K for the fiscal years ended June 30, 2016 and 2015, (ii) the Company's previously issued condensed consolidated financial statements contained in its Quarterly Reports on Form 10-Q for the interim quarterly periods***

*for the previously mentioned fiscal years ended June 30, 2016 and 2015 and (iii) the Company's previously issued condensed consolidated financial statements contained in its Quarterly Reports on Form 10-Q for the quarterly periods ended March 31, 2017, December 31, 2016 and September 30, 2016 should no longer be relied upon because of errors. The errors primarily related to the timing of recognition of revenue and classification of certain inventory used for engineering purposes and certain products returned to the Company for repair as inventory. Revenue recognition timing issues included quarter-end cut-off determinations and allocation of revenue determinations for customer contracts with service elements.*

\*       \*       \*

*The Company intends to restate its financial statements for prior periods as required.* The Company's preliminary estimates for the changes in revenue, net income and GAAP earnings per share for the fiscal years ended June 30, 2015 and 2016 (as contained in the Company's Annual Reports on Form 10-K filed with the Securities and Exchange Commission (the "SEC") on September 10, 2015 and August 26, 2016, respectively) and the fiscal year ended June 30, 2017 (as announced on a preliminary basis in an exhibit to the Company's Current Report on Form 8-K furnished on August 3, 2017) resulting from the expected restatement is as set forth below (in millions, except per share amounts).

\*       \*       \*

In addition, the Company is evaluating the impact of the identified errors on its internal control over financial reporting and disclosure controls and procedures. *The Company will report material weaknesses in internal control over financial reporting related to this matter and will report that its disclosure controls and procedures were ineffective*.

126.    In the Restatement Announcement, Super Micro reported the preliminary estimated restatement impact on its revenues, net income and diluted EPS for the fiscal years ended June 30, 2015, June 30, 2016 and June 30, 2017.   Using the mid-point estimate from the "Expected Adjustment Range," Super Micro over a three year cumulative period overstated revenues by $60 million, net income by $8.5 million and EPS by $0.16, however the Company would later concede that two additional years of historical statements were also inaccurate.

| | Year Ended as Reported | | | | | | Year Ended as Announced | | |
|---|---|---|---|---|---|---|---|---|---|
| | June 30, 2015 | | | June 30, 2016 | | | June 30, 2017 | | |
| | As Reported | Expected Adjustment Range | Expected as Adjusted Range | As Reported | Expected Adjustment Range | Expected as Adjusted Range | As Announced | Expected Adjustment Range | Expected as Adjusted Range |
| Revenue | $1,991 | $(40) - $(20) | $1,951 - $1,971 | $2,216 | $3 - $23 | $2,219 - $2,239 | $2,530 | $(53) - $(33) | $2,477 - $2,497 |
| Net Income | $102 | $(8) - $(5) | $94 - $97 | $72 | $2 - $5 | $74 - $77 | $69 | $(7) - $(4) | $62 - $65 |
| Diluted Earnings per Share | $2.03 | $(0.15) - $(0.09) | $1.88 - $1.94 | $1.39 | $0.04 - $0.10 | $1.43 - $1.49 | $1.34 | $(0.14) - $(0.08) | $1.20 - $1.26 |

127.     The Restatement Announcement also announced the Company's intention to restate the non-GAAP EPS amounts that it previously disclosed for prior periods in its quarterly earnings releases.  Using the mid-point estimate, Super Micro over a three year cumulative period overstated non-GAAP EPS by $0.13, however the Company would later concede that two additional years of historical statements were also inaccurate.  The Company's estimates of the changes to the non-GAAP EPS amounts are set forth below:

| | Year Ended as Reported | | | | | | Year Ended as Announced | | |
| | June 30, 2015 | | | June 30, 2016 | | | June 30, 2017 | | |
| | As Reported | Expected Adjustment Range | Expected as Adjusted Range | As Reported | Expected Adjustment Range | Expected as Adjusted Range | As Announced | Expected Adjustment Range | Expected as Adjusted Range |
|---|---|---|---|---|---|---|---|---|---|
| GAAP | $2.03 | $(0.15) - $(0.09) | $1.88 - $1.94 | $1.39 | $0.04 - $0.10 | $1.43 - $1.49 | $1.34 | $(0.14) - $(0.08) | $1.20 - $1.26 |
| Less: Stock-based Compensation net of Tax Effect | 0.12 | 0.01   0.01 | 0.13   0.13 | 0.20 | 0.01   0.01 | 0.21   0.21 | 0.23 | 0.01   0.01 | 0.24   0.24 |
| Non-GAAP | $2.15 | $(0.14) - $(0.08) | $2.01 - $2.07 | $1.59 | $0.05 - $0.11 | $1.64 - $1.70 | $1.57 | $(0.13) - $(0.07) | $1.44 - $1.50 |

128.     The Company also issued a press release the same day titled "Supermicro® Announces First Quarter Fiscal 2019 Preliminary Financial Information and Decision to Restate Prior Period Financial Statements," which discussed the need for restatement and continued testing:

Also today, the Company filed a Current Report on Form 8-K with the Securities and Exchange Commission noting that on November 14, 2018, the Board of Directors of the Company, based on the recommendation of the Audit Committee and in consultation with management, determined to restate prior period financial statements and advised that those financial statements should not be relied upon.  The restatement primarily relates to the timing of recognition of revenue and classification of certain inventory.  The Company believes total cash flows from operating, investing, and financing have not been affected with the exception of certain balance sheet classification errors that have been determined to have an immaterial effect on cash and cash flows from operations.  Investors are encouraged to review that report.  Included in the Form 8-K are the Company's preliminary estimates for the changes in revenue, net income, GAAP diluted earnings per share and non-GAAP diluted earnings per share for the fiscal years ended June 30, 2015 and 2016 (as reported) and fiscal year ended June 30, 2017 (as announced).

129.     On November 15, 2018, the Company held an earnings conference call in which it discussed the restatement and elaborated on steps taken to remediate certain material weaknesses:

[Bauer:]  Now, let's turn to the progress we are making on the fiscal 2017 Form 10-K.  The company has substantially completed its testing and assessments.  Today, we announced that we have determined to restate prior period financials and provided estimated adjusted amounts.  We are in the final stages of preparation and conclusion, so that we may continue to work with our auditors to complete our 2017 Form 10-K.  ***The core basis of the restatements remains the timing of revenue***

*recognition.* Based on our assessment to date, the company confirms that, although in our restated financials some revenue recognized in prior periods will be recognized in a subsequent period, all revenue from customer transactions in the period subject to the restatement is valid revenue. . . . *During our review of prior periods, we also discovered additional errors relating to the classification of certain inventories*.

*The number and breadth of the adjustments, coupled with their aggregate magnitude was significant enough for us to conclude that restating prior periods was necessary.* To date, we believe total cash flows from operating, investing and financing have not been impacted with the exception of certain balance sheet classification errors that have been determined to have an immaterial effect on cash and cash flow from operations.. . .

*Based on our findings, we expect to report material weaknesses of our financial reporting*. We have, depending on the matter, begun remediation measures to varying degrees. Along the way, *we have developed stronger revenue policies, trained employees, and developed new standards*.

There are a number of remediation efforts. Let me share a few examples. *We have hired senior revenue talent and grown our revenue team, implemented strong cut-off controls including locking the shipping dock at the close of the quarter and enhancing our revenue testing, and we have revamped the sales sub-certification process at quarter end*. In addition, we have formed a new internal audit team that is conducting testing on the second half of 2018 and absorbing the transfer of knowledge from the efforts of our advisors in the process.

**Super Micro Restates and Amends Financial Results for FY13-FY17, Implicates Defendants In Wide-Ranging Fraudulent Sales and Accounting Misconduct**

130.    On May 17, 2019, Super Micro filed its delayed FY17 Form 10-K (for the fiscal year ending June 30, 2017), as well as Forms 10-Q/A for 1Q17-3Q17 (the quarters ending September 30, December 31, 2016 and March 31, 2017, respectively).[14]  The FY17 Form 10-K restated Super Micro's: (i) FY16 balance sheet and related statements of operations, income and equity and cash flows for FY15 and FY16; (ii) selected financial data for FY15 and FY16; (iii) management's discussion and analysis of financial condition and results of operations for FY15 and FY16; and (iv) quarterly financial information for 4Q16.  The FY17 Form 10-K also reported "Adjustments" for FY13 and FY14.

---

[14]  Super Micro's 1Q17, 2Q17 and 3Q17 Forms 10-Q/A included, among other matters, restatements of: (1) the Company's condensed consolidated balance sheet and the related condensed consolidated statements of operations, comprehensive income and cash flows; and (2) its management's discussion and analysis of financial condition and results of operation. *See* ¶¶153-157.

1        131.    Super Micro's FY17 Form 10-K stated that the Company's internal controls over

2 financial reporting and disclosure controls were ineffective due to material weaknesses:

3        ***We have concluded that our internal control over financial reporting was not***
***effective as of June 30, 2017 due to the existence of material weaknesses in such***
4        ***controls, and we have also concluded that our disclosure controls and procedures***
***were not effective as of June 30, 2017 due to material weaknesses in our internal***
5        ***control over financial reporting*** . . . .

6        132.    The Company described the material weaknesses related to principles associated with

7 the control environment.  In addition, Defendants admitted that Super Micro, including officers and

8 managers, had awareness, engaged or condoned in specific fraudulent and deliberate conduct to

9 prematurely recognize revenue, including but not limited to "altering source documents related to . . .

10 sales transactions," and "failing to disclose or obscuring material facts about sales transactions."

11 Specifically, Defendants stated in relevant part:

12      •    ***We had a culture of aggressively focusing on quarterly revenue without***
***sufficient focus on compliance. Senior management did not establish and***
13        ***promote a control environment with an appropriate tone of compliance and***
***control consciousness throughout the entire Company.  The Company did***
14        ***not sufficiently promote, monitor or enforce adherence to the Code of***
***Conduct.  In the pursuit of quarterly revenue, certain of our sales, finance***
15        ***and operations personnel, including officers and managers, were aware of,***
***condoned or were involved in actions that reflected an inappropriate tone***
16        ***at the top, that violated our Code of Conduct and our accounting policies***
***and procedures, and that were inconsistent with a commitment to integrity***
17        ***and ethical values.  These actions included (i) shipping products in advance***
***of customer requested delivery dates, (ii) shipping products to storage***
18        ***facilities at the end of a quarter for later delivery to customers, (iii) in***
***certain cases entering into side agreements with customers, (iv) in certain***
19        ***cases, shipping products before manufacturing was completed, (v) altering***
***source documents related to some sales transactions and (vi) failing to***
20        ***disclose or obscuring material facts about sales transactions. As a result of***
***those actions, we recognized revenue from numerous sales transactions in***
21        ***the incorrect period, although these valid sales transactions were***
***recognized in one or more subsequent quarters in the aforementioned***
22        ***restatement. Some employees, including officers and managers, also failed***
***to raise issues with material accounting consequences to the Audit***
23        ***Committee and our external auditors, and with respect to one transaction,***
***appear to have attempted to minimize material facts about a sales***
24        ***transaction to, or obscure those facts from, the Audit Committee and our***
***external auditors. Finally, we did not, on a consistent basis, (i) timely and***
25        ***thoroughly detect and address failures to comply with the Code of Conduct***
***and (ii) train employees adequately to identify and report issues to***
26        ***management and the Audit Committee.***

27      •    ***The Company did not maintain a sufficient complement of management,***
***accounting, financial reporting, sales, operations, engineering and***
28        ***information technology personnel*** who had appropriate levels of knowledge,

experience, and training in accounting and internal control matters commensurate with the nature, growth and complexity of our business. The lack of sufficient appropriately skilled and trained personnel contributed to our failure to (i) adequately identify potential risks, (ii) include in the scope of our internal controls framework certain systems relevant to financial reporting and the preparation of our consolidated financial statements, (iii) design and implement certain risk-mitigating internal controls and (iv) consistently operate certain of our internal controls. The lack of sufficient appropriately skilled and trained personnel also contributed to deficiencies in establishing and maintaining policies and procedures, establishing and enforcing standards for maintaining documents for revenue recognition purposes and establishing accountability for internal controls across the entire Company.

133.    The Company's FY17 Form 10-K also identified material weaknesses in connection with revenue recognition accounting, stating in relevant part:

*The Company identified deficiencies in revenue recognition accounting controls that resulted in material errors constituting material weaknesses, either individually or in the aggregate, as the Company did not appropriately design, or effectively operate, internal controls over certain aspects of accurate recording, presentation, and disclosure of revenue and related costs.* The following were contributing factors to the material weaknesses in revenue recognition accounting:

- The Company's internal controls did not consistently identify and properly account for key non-standard contract or arrangement terms for sales transactions that involved multiple elements (such as when the price of a system includes an extended warranty period and/or the Company's agreement to provide services to its customer). Specifically, the Company's internal controls failed to identify, accumulate and assess the accounting impact of situations in which they recognized revenue before all the elements necessary to establish "delivery" had occurred.

- With respect to sales transactions near quarter-end, the Company's internal controls failed to consistently identify transactions where the terms of the sales arrangements with its customers were not properly documented in a form that fully reflected the final understanding between the parties as to the specific nature and terms of the agreed-upon transaction.

- The Company's internal controls failed to consistently identify, resolve, document in its accounting system and allow for proper accounting where there were inconsistencies among the various documents underlying its sales transactions, and the Company did not always communicate the existence or resolution of those inconsistencies to its accounting organization to enable the proper recognition of revenue.

- The Company lacked a control to ensure a consistent approach for reviewing its pricing and establishing supportable estimates of best estimated selling prices in allocating revenue between multiple elements. Consequently, the Company did not always correctly calculate the portions of the total revenue recognized from sales transactions allocated among the various elements.

134.   Under Note 19, "Restatement of Previously Issued Consolidated Financial Statements," the FY17 Form 10-K stated the following:

During the course of the Investigation, the further procedures by outside counsel and the management analysis (collectively, the "Investigation, Procedures and Analysis"), *the Audit Committee and management determined certain employees had violated the Company's Code of Business Conduct and Ethics and discovered accounting and financial reporting errors and certain irregularities.* On November 14, 2018, the Board, upon the recommendation, and with the concurrence of the Audit Committee and new members of management, concluded that certain previously filed consolidated financial statements and related financial information should no longer be relied upon.

As a result, within these consolidated financial statements, the Company has included the restated consolidated financial statements as of and for the years ended June 30, 2016 and June 30, 2015, which is referred to as the "Restatement". The Restatement corrects errors and certain irregularities which are discussed in detail within this footnote.

*The errors and certain irregularities primarily related to the timing of recognition of (i) revenue, (ii) expenses related to certain inventory used for engineering and marketing purposes and (iii) expenses related to defective products under warranty not returned by customers.  Additionally, errors were identified whereby the Company had derecognized inventory while control over such inventory was retained because the Company was obligated to buy it back.*

135.   The FY17 Form 10-K described the Company's improper revenue recognition on product sales, stating in relevant part:

*During the fiscal years ended June 30, 2016 and 2015, product revenue was recognized prematurely.* As a result of the information gathered in the Investigation, Procedures and Analysis, *it was determined that there was an aggressive focus on quarterly revenue without sufficient focus on compliance by an appropriate number of competent resources, and all relevant information was not communicated among the Company's internal functions as well as the management to both the Audit Committee and the independent auditors that resulted in the inappropriate recording of revenue with insufficient documentation or rigorous assessment of revenue transactions.* The Company found instances where (i) title and risk of loss had not transferred to the customer, (ii) persuasive evidence of an arrangement with the customer consistent with the Company's customary business practices was not present, (iii) the distributor's price was not fixed or determinable, or (iv) collectibility was not reasonably assured, all of which resulted in premature recognition of revenue.

136.   The FY17 Form 10-K described the Company's improper revenue recognition in connection with service revenues, stating in relevant part:

During the fiscal years ended June 30, 2016 and 2015, *services revenue was misstated as it was determined that as a result of the information gathered in the Investigation, Procedures and Analysis there were errors related to inaccurate allocation of contract consideration for multiple element arrangements* resulting from (a) lack of proper identification or accounting for contractual service

obligations, (b) incorrect allocation of discounts to service related deliverables, and (c) lack of a robust process resulting in inaccurate determination of BESP [Best Estimated Selling Price].  Additionally, there were misalignments of the revenue recognition period and the contractual requisite service period.  Consequently, certain contracts for extended warranties on products or on-site services in multiple element arrangements were incorrectly recorded as revenue at the time of sale of the product instead of being deferred and amortized over the contractual warranty or service period.  The Company had previously identified a portion of these errors in the amount of $9.0 million related to extended warranty in a prior period and had adjusted the consolidated financial statements for the fiscal year ended June 30, 2016 for their cumulative effect with an out-of-period correction to revenues.

137.    The FY17 Form 10-K also revealed that the material weakness related to revenue recognition previously disclosed in November 2015 and purportedly addressed, had not been remediated as of the filing of the FY17 Form 10-K:

*In addition, in November 2015, we reported a material weakness in our internal control over financial reporting related to the revenue recognition of contracts with extended product warranties.  This material weakness has not been fully remediated as of the filing date of this Annual Report on Form 10-K,* and we cannot ensure that other errors or material weaknesses will not be identified in the future.  If we fail to maintain an effective system of internal control over financial reporting, the accuracy and timeliness of our financial reporting may be adversely affected.

138.    In connection with inventory, the Company's FY17 Form 10-K stated in relevant part:

As of June 30, 2016 and 2015, inventories were overstated due to misapplication of accounting principles, whereby materials issued from inventory to research and development projects and marketing with no alternative use were included as inventory and expensed upon completion of a project rather than being expensed upon consumption.

Also as of June 30, 2016 and 2015, inventories were understated due to misapplication of accounting principles, whereby (i) inventory of materials transferred to certain contract manufacturers was improperly derecognized upon transfer that the Company retained control over the materials because it was obligated to buy them back; and (ii) in-transit inventory was not being recorded in the appropriate period due to improper cut-off procedures.

139.    The Company's FY17 Form 10-K detailed numerous negative consequences in connection with material weaknesses in Super Micro's internal controls over financial reporting.  For example, Super Micro admitted in its FY17 Form 10-K that its "[f]ailure to timely file our SEC reports and make our current financial information available, *has placed, and will continue to place, downward pressure on our stock price* . . . ."  Super Micro also stated that the delays caused by its investigation – and the further delays it may create – resulted in "a greater degree of risk" when

investing in Super Micro stock.  Further, the "lack of current public information may have an adverse impact on investor confidence, which could lead to a reduction in our stock price."  The Company also noted that its inability to file its SEC filings, "precludes us from raising debt or equity financing in the public markets and limits our access to the private markets and also limits our ability to use stock options and other equity-based awards to attract, retain and provide incentives to our employees."

140.    Further, Super Micro admitted in its FY17 Form 10-K that it had incurred, and expected to continue incurring, significant expenses in connection with the investigation into and as a result of its internal control weaknesses:

> Specifically, in connection with the Audit Committee's Investigation, Procedures and Analysis, audit and compliance efforts and related litigation, ***we have incurred professional fees totaling $40.6 million in fiscal year 2018 and $50.7 million through the third quarter of fiscal year 2019***.

141.    Super Micro also admitted in its FY17 Form 10-K that their SAP system would need further enhancements and developments in order to automate internal controls:

> We have incurred and expect to continue to incur additional expenses related to our ERP systems, as we continue to further enhance and develop them, including by automating certain internal controls.

142.    The FY17 Form 10-K detailed the status of Super Micro's remediation actions, stating in relevant part, that the Company had taken the following steps:

- Restructured our sales organization, which resulted in the resignations of the Senior Vice President of International Sales, the Senior Vice President of Worldwide Sales, the Vice President, Strategic Accounts, the Vice President, Strategic Sales, the Vice President, Business Development and certain other sales personnel.

- Appointed experienced professionals to key accounting and finance and compliance leadership positions, including the appointments of a new Chief Financial Officer and a new Corporate Controller in January 2018, and the creation of, and appointments to, two newly established roles of Chief Compliance Officer and Vice President of Internal Audit in May 2018 and August 2018, respectively.

- Reviewed and amended our Code of Conduct to align with the organizational changes described above and to strengthen certain provisions regarding compliance and reporting.

- Adopted an Internal Audit Charter setting forth the responsibilities of the internal audit function and establishing that the Vice President of Internal

Audit reports directly to the Audit Committee and that the Audit Committee has authority to provide adequate funding for this function.

- Changed our organizational structure to narrow the scope of responsibilities of certain of our senior executives and to revise various reporting relationships, which included the appointment of a new Senior Vice President of Worldwide Sales, and a new Senior Vice President of Operations.

- Conducted training in the following areas:

  - Revenue recognition training for our global sales force, various operations personnel, and certain senior executives, including our CEO, which included detailed examples of acceptable and unacceptable sales practices,

  - Reviewing with our senior management team our amended Code of Conduct,

  - Reviewing with our CEO enhanced processes for periodic evaluations by the CEO and the CFO of the effectiveness of our disclosure controls and procedures, and the periodic assessments by the CEO and the CFO of the effectiveness of our internal control over financial reporting, and other compliance matters, and

  - Shipping and cut-off training for accounting and operations personnel that included new requirements for quarter-end procedures.

- Upgraded our accounting department to include the new roles of Senior Director of Tax, Financial Audit Director and Information Technology Audit Director, as well as replaced certain of our accounting personnel with more experienced individuals, including rebuilding and expanding our revenue recognition team.

- Enhanced the sales sub-certification document that supports our CEO's and CFO's financial statement certifications and expanded the sub-certification participation population to the global sales force.

143. The FY17 Form 10-K also disclosed some of the more significant remaining remediation activities including:

- Developing and implementing an ongoing compliance training program regarding significant accounting and financial reporting matters, as well as broad compliance matters, for accounting, financial reporting, sales and operations personnel, as well as for our CEO, our other corporate executives and the Board.

- Integrating the responsibility for internal controls across business functions to ensure accountability for internal controls beyond the accounting and finance team.

- Continuing to assess current staffing levels and competencies to ensure the optimal complement of personnel with appropriate qualifications and skill sets.

- Reevaluating and revising our Sarbanes-Oxley compliance program (our "SOX Program"), and making improvements to our SOX Program governance, risk assessment processes, testing methodologies and corrective action mechanisms.

- Redesigning and implementing necessary changes to the existing system of internal controls in the context of the revised and more comprehensive risk assessment.

- Assigning accountability for certain internal controls to our Compliance Department, such as our organizational-wide quarterly sales certification process.

- Reevaluating the boundary applications that interface with our primary accounting and reporting application and redesigning logical access and program change controls to enhance the reliability of information used to conduct other internal controls.

- Continuing to re-assess risks and controls related to the accurate recording, presentation, and disclosure of revenue and related costs.

144.   Deloitte signed a May 16, 2019 Report of Independent Registered Public Accounting Firm ("May 16, 2019 Audit Report") in connection with its audit of Super Micro.  In the May 16, 2019 Audit Report, Deloitte emphasized Super Micro's restatement and related party footnotes and also rendered an ***adverse opinion*** on the Company's internal controls due to material weaknesses:

As discussed in Note 19 to the consolidated financial statements, ***the accompanying 2016 and 2015 consolidated financial statements have been restated to correct misstatements.***

As discussed in Note 11 to the consolidated financial statements, ***the Company has significant purchases from and sales to two related parties***.

We have also audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), the Company's internal control over financial reporting as of June 30, 2017, based on the criteria established in *Internal Control-Integrated Framework (2013)* issued by the Committee of Sponsoring Organizations of the Treadway Commission and ***our report dated May 16, 2019 expressed an adverse opinion on the Company's internal control over financial reporting because of material weaknesses.***

145.   Deloitte also included in its May 16, 2019 Audit Report that the Company had identified deficiencies with its control environment, risk assessment, control activities and revenue recognition accounting, among other matters.  In light of Super Micro's material weaknesses, Deloitte stated, among other matters, that:

In our opinion, because of the effect of the material weaknesses identified above on the achievement of the objectives of the control criteria, the Company ***has not maintained effective internal control over financial reporting*** as of June 30, 2017,

based on the criteria established in *Internal Control - Integrated Framework (2013)* issued by the Committee of Sponsoring Organizations of the Treadway Commission.

146.    As to Super Micro's deficient control environment, Deloitte substantially reiterated the material weaknesses that the Company identified. *See* ¶¶144-145.

147.    Deloitte also reiterated that Super Micro's revenue recognition accounting suffered from material errors constituting material weaknesses. *See* ¶¶144-145.

148.    Super Micro also admitted in its FY17 Form 10-K that its Restatement and internal control weaknesses negatively impacted the Company's business and financial condition as well as its reputation:

> ***Matters relating to or arising from the restatement and the results of the Investigation, Procedures and Analysis of our internal control over financial reporting, including adverse publicity and potential concerns from our customers, have had and could continue to have an adverse effect on our business and financial condition.***

149.    The Form 10-K stated that the Company was delisted from the NASDAQ due to its delays in filing periodic reports with the SEC which presented significant risks to the Company:

> The delisting of our common stock from Nasdaq may have a material adverse effect on us by, among other things, causing investors to dispose of our shares and limiting:
>
> •       The liquidity of our common stock;
>
> •       The market price of our common stock;
>
> •       The number of institutional and other investors that will consider investing in our common stock;
>
> •       The availability of information concerning the trading prices and volume of our common stock;
>
> •       The number of broker-dealers willing to execute trades in shares of our common stock; and
>
> •       Our ability to obtain equity or debt financing for the continuation of our operations.

**Super Micro Files 2019 SEC Form 10-K With Additional Disclosures**

150.    On December 19, 2019, Super Micro filed its delayed 2019 SEC Form 10-K which disclosed that Defendant Liang had two personal margin loans exceeding $12 million collateralized

1  by his Super Micro stock that had been called as a result of the Company's stock price decline.[15]

2  Liang received a loan from the wife of his brother, Steve Liang, to repay the financial institutions:

3          In October 2018, our CEO, Charles Liang, personally borrowed
   approximately $12.9 million from Chang Chien-Tsun, the spouse of Steve Liang.
4  The loan is unsecured, bore interest at 0.80% per month for the first six months and
   the loan has no maturity date.  After the first six months, the loan bears interest at
5  0.85% per month.  The loan was made at Charles Liang's request, to provide funds to
   repay personal margin loans to two financial institutions, which loans had been
6  secured by shares of our common stock held by Charles Liang.  The lenders called
   the loans in October 2018, following the suspension of our common stock from
7  trading on Nasdaq in August 2018 and the decline in the market price of our common
   stock in October 2018. As of November 30, 2019, the amount due on the unsecured
8  loan (including principal and accrued interest) was approximately $14.5 million.

9          151.    The 2019 SEC Form 10-K provided no explanation as to why this information was

10 not disclosed in connection with the Restatement, as the improper margin loans had been outstanding

11 since at least January 2017 and called in October 2018 by the time of its filing on May 17, 2019.

12 Super Micro's Insider Trading Policy states that "directors [and] officers . . . are **prohibited** from

13 holding Company securities in a margin account or pledging Company securities as collateral for a

14 loan." (emphasis in original).

15         152.    The 2019 SEC Form 10-K also increased the total investigation costs related to the

16 Restatement and work towards filing the delayed Form 10-K's to $109 million.  Additionally, the

17 2019 SEC Form 10-K disclosed the Company's internal controls as of June 30, 2019 were still

18 ineffective, and that actions remained ongoing to remediate the material weaknesses.  Some of these

19 remediation items were not in the FY17 Form 10-K, included the following:

20         •       Adopted a charter for our compliance program to promote an organizational culture
                   that encourages the highest standards of ethical business conduct and compliance
21                 with the law, exercises appropriate due diligence to prevent and detect unlawful
                   conduct, and protects the Company's reputation; and
22

23         •       Implementing a governance committee for our Sarbanes-Oxley compliance program
                   and assigning individual accountability for internal controls.
24

25

26

27 _____
   [15]  The Company's Def 14A Proxy dated January 18, 2017, stated that Liang had pledged certain
28 shares for a "personal credit line" but provided no further details as to the terms of the loan.

**SUPER MICRO'S FINANCIAL STATEMENTS WERE MATERIALLY MISSTATED AND ITS INTERNAL CONTROLS HAD MATERIAL WEAKNESSES**

**Defendants Have Restated Super Micro's Financial Statements**

153.    During the Class Period, Super Micro's reported financial results were included in Forms 10-Q and 10-K and in related earnings releases filed with the SEC.  Super Micro's SEC filings represented that the financial information was a fair statement of the Company's financial results and that the results were prepared in accordance with GAAP.[16]  These representations were false and misleading as the financial results were not a fair statement and were not prepared in accordance with GAAP.

154.    On November 15, 2018, Defendants filed the Restatement Announcement disclosing that Super Micro would restate its previously issued financial statements for FY15-FY17 due to improper revenue recognition and inventory misstatements.  In the Restatement Announcement, Defendants provided preliminary estimates for the changes in revenue, net income and GAAP earnings per share.  *See* ¶¶126-127.

155.    On May 17, 2019, Defendants finalized and issued the Restatement, specifically filing amended quarterly reports on Form 10-Q/A for the quarters ended September 30, 2016, December 31, 2016 and March 31, 2017, which included restated financial results for the quarters ended September 30, 2015, December 31, 2015, March 31, 2016, September 30, 2016, December 31, 2016 and March 31, 2017.  Defendants also filed the delayed FY17 Form 10-K which contained financial results that differed from: (i) the Company's unaudited preliminary financial information for the year

---

[16]    GAAP are those principles recognized by the accounting profession as the conventions, rules, and procedures necessary to define accepted accounting practice at a particular time.  SEC Regulation S-X (17 C.F.R. §210.4-01(a)(1)) ("Regulation S-X") states that financial statements filed with the SEC that are not prepared in compliance with GAAP are presumed to be misleading and inaccurate, despite footnotes and other disclosure.  Regulation S-X requires that interim financial statements must also comply with GAAP, with the exception that interim financial statements need not include disclosures that would be duplicative of disclosures accompanying annual disclosures, pursuant to 17 C.F.R. §210.10-01(a).  On June 30, 2009, the Financial Accounting Standards Board ("FASB") issued the Statement of Financial Accounting Standards No. 168, *The FASB Accounting Standards Codification and the Hierarchy of Generally Accepted Accounting Principles – a replacement of FASB Statement No. 162*.  FASB Accounting Standards Codification ("ASC") became the source of authoritative U.S. accounting and reporting standards for nongovernmental entities, in addition to guidance issued by the SEC, effective for financial statements issued for reporting periods that ended after September 15, 2009.  The ASC did not change existing U.S. GAAP.

ended June 30, 2017, previously included as an exhibit to the Company's August 3, 2017 Form 8-K; and (ii) the ranges previously included in the Restatement Announcement.  The FY17 Form 10-K also included restated financial results for each of the fiscal years ended June 30, 2015, and June 30, 2016 as well as quarterly financial information for the three months ended June 30, 2016.   In addition, the Company's FY17 Form 10-K also disclosed that the Company had misstated its financial results for each of the fiscal years ended June 30, 2013 and June 30, 2014, for the same inventory and revenue recognition issues requiring FY15 through FY17 to be restated.  ***In other words, for five consecutive years, Super Micro had prematurely recognized revenue and misstated its financial results***.  At Attachments 1-4, Plaintiffs have shown Super Micro's adjustments to its originally reported false financial results for the Company's income statement from FY13 through FY15, FY16 (including interim periods), FY17 (including interim periods) and the Company's balance sheet for FY16 and FY17 (including interim periods).

156.    As seen at Attachments 1-4, the Restatement adjusted nearly every financial account on the income statement and the majority of financial accounts on the balance sheet.  In total, from FY13 to FY17, Super Micro overstated revenues by $104.7 million (or 1.1%), overstated net income by $20.3 million (or 6.8%) and overstated EPS by $0.41 (or 6.8%).  Further, from FY13 to FY15, Super Micro overstated net income by $17.9 million (11.2%) and EPS (GAAP) by $0.36 (10.9%).

157.    At the start of the Class Period (4Q16), Super Micro overstated net income by 27.2% ($1.5 million overstatement) and EPS (GAAP) by 30% ($0.03 overstatement).  During 3Q17, Super Micro misrepresented having made $0.38 in EPS (non-GAAP) thereby meeting consensus of the same amount. In fact, Super Micro should have reported EPS (non-GAAP) of $0.36, which would have missed 3Q17 consensus by $0.02.  And in 4Q17, the last financial quarter of the Class Period, Super Micro overstated revenues by $39.7 million (5.9%), net income by $3.9 million (29.2%) and EPS (GAAP) by $0.08 (32%) allowing the Company to exceed, what in reality was a miss, of consensus estimates.  In addition, Super Micro falsely reported its financial condition by materially misstating items on its balance sheet, including, among other items, accounts receivable, inventory, prepaid expenses and other current assets, accounts payable, accrued liabilities and retained

1   earnings.[17]  For example, during the Class Period, Super Micro overstated its accounts receivable

2   each quarterly period, including by 65% at 4Q16, 52% at 1Q17, 47% at 2Q17, 45% at 3Q17 and

3   49% at 4Q17.  Finally, contrary to Defendants' representation in the Restatement Announcement

4   that total cash flows were likely to not be restated, the Company has restated its statements of cash

5   flows.

6   **Super Micro's Restatement Is an Admission of Falsity**

7       158.    The fact that Super Micro has now restated its financial results, including revenues,

8   net income and EPS, is an admission that its prior financial statements were false, not prepared in

9   accordance with GAAP and that the misstated financial statements were material.  Under ASC Topic

10  250, *Accounting Changes and Error Corrections*, the type of restatement and revisions announced

11  by Super Micro were to correct for material errors in previously issued financial statements.  Further,

12  a restatement of previously issued financial statements is only allowed when a Company makes

13  "[a]n error in recognition, measurement, presentation, or disclosure in financial statements resulting

14  from mathematical mistakes, mistakes in the application of generally accepted accounting principles

15  (GAAP), or oversight or misuse of facts that *existed at the time the financial statements were*

16  *prepared*." ASC 250-10-20.  Thus, GAAP provides that financial statements should only be restated

17  in limited circumstances, *i.e.*, there is a change in reporting entity, there is a change in accounting

18  principles used, or *to correct an error in previously issued financial statements*.  Super Micro's

19  restatement was not due to a change in reporting entity or a change in accounting principle, but

20  rather to correct errors in previously issued financial statements approved by Defendants.  Thus, the

21  restatement is an admission by Defendants that Super Micro's previously issued financial results and

22  Defendants' public statements regarding those results were false and misleading.

23

---

24  [17]   In addition, Super Micro also disclosed its transactions and the nature of its relationship with
    related parties Ablecom Technology, Inc. ("Ablecom") and Compuware Technology, Inc.
25  ("Compuware"), which required restatement as well.  *See* Attachments 1-4.  Ablecom is one of
    Super Micro's major contract manufacturers and its Chief Executive Officer, Steve Liang, is a
26  brother of Defendant Liang.  As of June 30, 2017 Liang and his spouse Sara Liang, together owned
    approximately 10.5% of Ablecom's capital stock.  Compuware is both a distributor of Super Micro's
    products and a contract manufacturer to Super Micro.  The Chief Executive Officer of Compuware,
27  Bill Liang, is also a brother to Defendant Liang.  Bill Liang is a member of the Board of Directors of
    Ablecom.
28

**Defendants' GAAP Violations Required Restatement of Its Financial Statements**

159.    Defendants manipulated their financial results through a host of improper accounting practices that violated GAAP resulting in the Restatement.  These improper accounting practices primarily related to: (i) premature revenue recognition on product revenue and service revenue; (ii) expenses related to certain inventory used for engineering and marketing purposes; and (iii) expenses related to defective products under warranty not returned by customers.  Additionally, errors were identified whereby the Company had derecognized inventory while control over such inventory was retained because the Company was obligated to buy it back.  These improper accounting practices are described further below.

*Premature Revenue Recognition in Violation of GAAP*

160.    During the Class Period, Super Micro violated basic revenue recognition rules facilitated by senior management's ineffective tone at the top that aggressively focused on maximizing quarterly revenue without sufficient GAAP compliance.  Super Micro was required to follow the revenue recognition rules found in FASB Accounting Standards Codification Topic 605, *Revenue Recognition*, ("ASC 605"), but failed to do so.  Under ASC 605, revenue can only be appropriately recognized under GAAP when it is both: (a) "realized" ("or realizable") and (b) "earned."[18]  ASC 605-10-25-1.  Critically, ASC 605 lists four criteria that *all* must be met before revenue can be appropriately recognized under GAAP.  The four criteria necessary for revenue to be "realized" and "earned" are: (i) "Persuasive evidence of an arrangement exists"; (ii) "Delivery has occurred or services have been rendered"; and (iii) "The seller's price to the buyer is fixed or determinable"; and (iv) "Collectability is reasonably assured." ASC 605-10-S99-1.

161.    Defendants have admitted that Super Micro prematurely recorded revenue in violation of GAAP by contravening *all* four criteria.  As stated in the Company's FY17 Form 10-K:

---

[18]   Pursuant to ASC 605, "revenue and gains are ***realized*** when products (goods and services), merchandise, or other assets are exchanged for cash or claims to cash," while "revenue and gains are ***realizable*** when related assets received or held are readily convertible to known amounts of cash or claims to cash." ASC 605-10-25-1.  Similarly, revenue is "earned" when an "entity has substantially accomplished what it must do to be entitled to the benefits represented by the revenues."  *Id.*

As a result of the information gathered in the Investigation, Procedures and Analysis, it was determined that there was an aggressive focus on quarterly revenue without sufficient focus on compliance by an appropriate number of competent resources, and all relevant information was not communicated among the Company's internal functions as well as the management to both the Audit Committee and the independent auditors that resulted in the inappropriate recording of revenue with insufficient documentation or rigorous assessment of revenue transactions. The Company found instances where (i) title and risk of loss had not transferred to the customer, (ii) persuasive evidence of an arrangement with the customer consistent with the Company's customary business practices was not present, (iii) the distributor's price was not fixed or determinable, or (iv) collectability was not reasonably assured, all of which resulted in premature recognition of revenue.

162.     Super Micro's premature revenue recognition was driven by material weaknesses in internal controls, including an ineffective control environment and ineffective tone at the top, where Super Micro: (i) shipped products before customers had requested them; (ii) shipped products to storage facilities at quarter-end for later delivery to customers[19]; (iii) entered side agreements with customers that disallowed revenue recognition; (iv) shipped products to customers before manufacturing was completed; (v) altered source documents to facilitate improper sales; and (vi) officers and managers failed to raise, disclose or obscured facts with material accounting consequences from the Company's Audit Committee and Deloitte. As a result of these improper actions, Super Micro recognized revenue from numerous sales transactions in the incorrect period for at least five years.[20]

163.     Defendants' false and misleading statements during the Class Period disclosing and certifying to the accuracy of the Company's financial results is egregious given the blatant misconduct utilized to improperly inflate sales. For example, altering source documents on

---

[19]   Super Micro shipping products to a storage facility for later delivery to a customer is an example of a classic bill and hold scheme. ASC 605 warns this type of transaction is likely to prohibit revenue recognition because the "delivery" criterion is not considered to have been met because the buyer has not taken title and assumed the risk and rewards of ownership of the products. ASC 605-10-S99-1.

[20]   Super Micro also admitted to inappropriate revenue recognition related to consideration paid to customers under the Company's cooperative marketing arrangements for which the Company did not receive an identifiable benefit. These transactions were incorrectly recorded as sales and marketing expense and have now been corrected and recorded as a reduction of revenue. *See* ASC 605-50-45-2 ("cash consideration (including a sales incentive) given by a vendor to a customer is presumed to be a reduction of the selling prices of the vendor's products or services and, therefore, shall be characterized as a reduction of revenue when recognized in the vendor's income statement").

1   transactions is a tell-tale sign that the Company knew the sales were improper.[21]  Further, officers

2   and managers' efforts to conceal information from the Company's Audit Committee or external

3   auditors evidences an expectation that no reasonable accountant would have approved recording

4   these sales.

5          164.    Super Micro also recognized services revenue prematurely in violation of GAAP

6   through inaccurate allocation of contract consideration for multiple element arrangements and

7   misalignments of the revenue recognition period and the contractual requisite service period.  As a

8   result, certain contracts were incorrectly and prematurely recorded as revenue at the time of sale in

9   violation of GAAP instead of being deferred and amortized over the contractual warranty or service

10  period.  Notably, in November 2015, Super Micro had previously identified revenue errors related to

11  this issue (*i.e.*, extended warranty service contracts) and recorded a prior period adjustment of $9

12  million in 1Q16 and amended its 2015 Form 10-K to report a material weakness.  Yet, despite

13  Defendants stating in the FY16 Form 10-K that revenues were recorded in compliance with GAAP

14  and the material weakness related to the extended warranty misstatements had been remediated, the

15  Restatement has shown Defendants continued to misstate revenues on these extended warranty

16  service contracts and never properly remediated the material weakness.

17        *Inventory Misstatements*

18         165.    Super Micro's Restatement included material misstatements of inventory as a result

19  of multiple accounting errors.  First, inventory was misstated due to the premature revenue

20  recognition violations that are discussed above.  Consequently, inventory was increased and

21  accounts receivable was reduced in the periods the violations occurred.

22        166.    Second, Super Micro overstated inventories whereby materials issued from inventory

23  to research and development projects and marketing with no alternative use were included as

24  inventory and expensed upon completion of a project rather than being expensed upon consumption.

25  To correct the errors related to this inventory overstatement, the Company recorded the materials as

26

27  ――――――――――――――

[21]  Public Company Accounting Oversight Board ("PCAOB") Auditing Standard, AS 2401:

28  *Consideration of Fraud in a Financial Statement Audit* ("AS 2401"), ¶2401.09.

1   a research and development expense, or a marketing expense, in the period that inventory was

2   consumed.

3       167.    Third, Super Micro understated inventories whereby: (i) inventory of materials

4   transferred to certain contract manufacturers was improperly derecognized upon transfer that the

5   Company retained control over the materials because it was obligated to buy them back; and (ii) in-

6   transit inventory was not being recorded in the appropriate period due to improper cut-off

7   procedures.  To correct the errors related to these inventory understatements, the Company adjusted

8   the carrying value of inventory in the periods in which the errors took place.

9       *Other Accounting Misstatements*

10       168.    Super Micro identified additional accounting misstatements that were corrected as

11   part of the Restatement in connection with its failure to correctly record accounts receivable from

12   suppliers as prepaid expenses and other current assets, record payments for certain payroll tax related

13   liabilities, and accrue certain withholding tax liabilities.

14   **Defendants Had Material Weaknesses in Internal Controls and Ineffective Disclosure
Controls During the Class Period**

15       169.    The Restatement disclosed that Super Micro had material weaknesses in its internal

16   control over financial reporting ("ICFR") and that its disclosure controls and procedures were

17   ineffective during the Class Period, which led to the Company's Restatement:

18
19         Based on this evaluation of our disclosure controls and procedures, our CEO and
CFO have concluded that our disclosure controls and procedures were not effective
20         as of June 30, 2017 because of certain material weaknesses in our internal control
over financial reporting.

21             In connection with management's assessment of the Company's internal
control over financial reporting described above, management has identified the
22         deficiencies described below that constituted material weaknesses in our internal
control over financial reporting as of June 30, 2017.[22]  ***These deficiencies led to***
23         ***material errors in our previously issued financial statements, which in turn led to
the restatement of those previously issued financial statements***…

24
25

26   _____

[22]  Similar admissions of ineffective ICFR and disclosure controls were made for the quarterly
27   periods ended September 30, 2016, December 31, 2016 and March 31, 2017 in the Company's
amended quarterly reports on Forms 10-Q/A.  *See* 1Q17 Form 10-Q at 49-50, 2Q17 Form 10-Q at
28   53-54 and 3Q17 Form 10-Q at 54-55.

170.    A material weakness, as defined in the PCAOB, Auditing Standard No. 5 ("AS 5") is a:

> [D]eficiency, or a combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of the company's annual or interim financial statements will not be prevented or detected on a timely basis.[23]

171.    Control deficiencies that are determined to be a material weakness must be disclosed in management's annual report on its assessment of the effectiveness of ICFR.  Management may not disclose that it has assessed ICFR as effective if there is one or more control deficiencies determined to be a material weakness in ICFR.[24]

172.    AS 5.69 also provides indicators of material weaknesses in ICFR that includes the following:

> *Identification of fraud, whether or not material, on the part of senior management*;
>
> *Restatement of previously issued financial statements to reflect the correction of a material misstatement*;
>
> Identification by the auditor of a material misstatement of financial statements in the current period in circumstances that indicate that the misstatement would not have been detected by the company's internal control over financial reporting; and
>
> Ineffective oversight of the company's external financial reporting and internal control over financial reporting by the company's audit committee.

173.    During the Class Period, Defendants made repeated assurances that Super Micro's internal controls functioned properly to prevent or detect material misstatements in its financial statements.  Specifically, the FY16 Form 10-K, and Forms 10-Q for 1Q17, 2Q17 and 3Q17 falsely stated that the Company's ICFR and its disclosure controls were effective when they were not and ultimately contributed to a material restatement of its financial statements.

174.    The Restatement also evidences that the SOX certifications signed by Defendants Liang and Hideshima during the Class Period were false and misleading because of the Company's failure to disclose the existence of material weaknesses in ICFR.  Specifically, the Defendants'

---

[23]   An Audit of Internal Control Over Financial Reporting That Is Integrated with An Audit of Financial Statements, AS 5.A7.

[24]   Management's Report on Internal Control Over Financial Reporting, Exchange Act Release No. 34-54976 at 41 (Dec. 20, 2006).

certifications were false and misleading because they failed to disclose to the Company's auditors and Audit Committee the following:

> "*[A]ll significant deficiencies and material weaknesses* in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information."

Super Micro's disclosures in the FY17 Form 10-K and Forms 10-Q/A for 1Q17, 2Q17 and 3Q17 regarding the existence of material weaknesses are an admission that Super Micro's ICFR and disclosure controls were ineffective during the Class Period.

175.    As opposed to Defendants' false and misleading statements that Super Micro's ICFR and disclosure controls were effective, the Company has now admitted to seven separate material weaknesses in ICFR as part of the Restatement.  Those material weaknesses are in the areas of revenue recognition accounting, all five interrelated components of internal control and information technology ("IT") general controls, which are described further below.

**Defendants' Material Weaknesses in Revenue Recognition Accounting**

176.    Super Micro identified a material weakness in its revenue recognition accounting. Specifically, internal control deficiencies in the revenue recognition area resulted in material revenue errors that contributed to the Restatement, including the premature revenue recognition described herein.  Consequently, Super Micro disclosed as part of the Restatement, a material weakness in ICFR over the accurate recording, presentation and disclosure of revenue and related costs.

177.    Super Micro disclosed specific revenue recognition internal control failures, which contributed to the material weakness in its revenue recognition accounting.  *See, e.g.*, ¶¶132-133, 135-137.  Super Micro's lack of internal controls over the revenue recognition area allowed instances of sales to be improperly recorded with insufficient documentation and where: (i) title and risk of loss had not transferred to the customer; (ii) persuasive evidence of an arrangement with the customer was not present; (iii) the price was not fixed or determinable; or (iv) collectability was not reasonably assured.  Further, the premature revenue recognition described herein was facilitated by senior management's ineffective control environment and a lack of revenue controls over quarter-end sales including, failing to lock the shipping dock at the close of the quarter and a deficient sales

sub-certification process that did not include sales sub-certification participation from Super Micro's global sales force.  The Restatement has demonstrated the failure to lock the shipping dock at quarter-end was part of a business culture established by senior management that aggressively focused on quarterly revenue without sufficient focus on compliance and was inconsistent with integrity and ethical values.

**Defendants' Material Weaknesses in the Five Internal Control Components Established by the COSO Framework**

178.    During the Class Period, Super Micro's management represented it used the criteria set forth by the Committee of Sponsoring Organization of the Treadway Commission in *Internal Control – Integrated Framework (2013)* (the "COSO Framework") in assessing the Company's ICFR.  The COSO Framework is the internal control framework used by public companies for evaluating ICFR as required by SOX.  The COSO Framework consists of the following five interrelated components of internal control:

1.   **Control Environment**:  The control environment is the set of standards, processes, and structures that provide the basis for carrying out internal control across the organization.

2.  **Risk Assessment:**  Risk assessment involves the dynamic and iterative process for identifying and analyzing risks to achieving the entity's objectives, forming a basis for determining how risks should be managed.

3.  **Control Activities:** Control activities are the actions established by policies and procedures to help ensure that management directives to mitigate risks to the achievement of objectives are carried out.

4.  **Information and Communication:**  Information is necessary for the entity to carry out internal control responsibilities in support of achievement of its objectives. Communication occurs both internally and externally and provides the organization with the information needed to carry out day-to-day controls.

5.  **Monitoring:**  Ongoing evaluations, separate evaluations, or some combinations of the two are used to ascertain whether each of the five components of internal control, including controls to effect the principles within each component, is present and functioning.[25]

179.    The effectiveness of these five components is necessary and vital for a properly functioning system of internal controls.  For example, a material weakness in only one of the five

---

[25]    COSO Framework at 12-14.

components results in ineffective ICFR.  Super Micro reported material weaknesses in ***all five components*** as part of their Restatement, as described below.

*Control Environment*

180.    Defendants reported a material weakness in the Company's control environment. According to the COSO Framework, the control environment includes the integrity and ethical values of the organization and has a pervasive impact on the overall system of internal control.[26]  A key component to an effective control environment is an appropriate tone at the top of the organization, established by the board of directors and senior management regarding the importance of internal control and expected standards of conduct.[27]  The COSO Framework states:

> Tone at the top and throughout the organization is fundamental to the functioning of an internal control system.  Without a strong tone at the top to support a strong culture of internal control, awareness of risk can be undermined, responses to risks may be inappropriate, control activities may be ill defined or not followed, information and communication may falter, and feedback from monitoring activities may not be heard or acted upon.  Therefore tone can be either a driver or a barrier to internal control.[28]

The COSO Framework also states that "[m]ore than any other individual, the CEO sets the tone at the top that affects the control environment and all other components of internal control."[29]

181.    The control environment Super Micro's senior management promoted during the Class Period was one that contravened integrity and ethical values and fostered a culture of maximizing quarterly revenue without sufficient focus on GAAP compliance and appropriate internal controls.  This resulted in premature revenue recognition as described at ¶¶132, 135, 155, 159-161, which violated GAAP, the Company's Code of Conduct and its accounting policies and procedures.  The ineffective control environment included ***officers*** and managers failing to raise, minimized or obscured facts with material accounting consequences from the Audit Committee and Deloitte.  The Company also lacked sufficient appropriately skilled and trained personnel, which

---

[26]   *Id.* at 31.

[27]   *Id.*

[28]   *Id.* at 35.

[29]   *Id.* at 149.

1  contributed to deficiencies in establishing and maintaining policies and procedures, establishing and

2  enforcing standards for maintaining documents for revenue recognition purposes and establishing

3  accountability for internal controls.  Critically, Super Micro disclosed in the Company's FY17 Form

4  10-K that "[d]ue to the interdependencies between the [five] COSO Framework components, the

5  weaknesses in our control environment contributed to other material weaknesses within our system

6  of internal control over financial reporting."

7  *Risk Assessment*

8  182.  Defendants FY17 Form 10-K reported a material weakness in risk assessment.  The

9  deficiencies related to the principles associated with the risk assessment component of the COSO

10  Framework, namely: (i) identifying, assessing and communicating appropriate control objectives; (ii)

11  identifying and analyzing risks to achieve these objectives; (iii) contemplating fraud risks; and (iv)

12  identifying and assessing changes in the business that could impact our system of internal controls.

13  *Control Activities*

14  183.  Control activities includes actual internal controls put in place, such as authorizations

15  and approvals, verifications, reconciliations and business performance reviews to help achieve

16  effective ICFR and ensure financial statements are prepared in accordance with GAAP.[30]

17  Segregation of duties is a key input to the control activities component and typically built into the

18  selection and development of control activities.

19  184.  Defendants reported a material weakness in the control activities, specifically, the

20  Company did not adequately select and develop control activities to mitigate risks, failed to deploy

21  the necessary control activities, had control deficiencies with IT controls across multiple applications

22  relevant to financial reporting and lacked segregation of duties.  Defendants admitted the Company

23  did not design or operate certain control activities to sufficiently respond to potential risks of

24  material misstatement in the area of revenue recognition.  Defendants' Restatement admits that

25  Super Micro's control activities were so deficient that they contributed to ***material accounting***

26

27

28  [30] *Id.* at 87.

*errors* and the potential for additional material accounting errors in substantially ***all the Company's financial statement account balances and disclosures***.

*Information and Communication*

185.    Defendants also reported a material weakness with the information and communication component of internal control as part of the Restatement.  Specifically, Defendants admitted to deficiencies in generating and using relevant quality information, internally communicating information necessary to support the functioning of internal control and communicating with external parties regarding matters affecting the functioning of internal control.  Defendants also admitted as part of the material weakness that ***officers and managers*** of the Company withheld information from both the Audit Committee and Deloitte.

*Monitoring of Controls*

186.    Defendants reported a material weakness in monitoring of controls as part of the Restatement, specifically, Defendants admitted the Company lacked controls to determine whether components of internal control were present and functioning, to mitigate the risk of management overriding internal controls and to detect incorrect accounting practices.  Further, consistent with its failure to remediate the prior material weakness related to the revenue recognition of contracts with extended product warranties, Defendants admitted the Company did not always ensure that control deficiencies were remediated thoroughly and timely.

**Defendants' Material Weaknesses in Information Technology General Controls**

187.    Super Micro identified a material weakness related to its IT general controls.  IT general controls are controls that can be applied to IT systems and "include control activities over the technology infrastructure, security management and technology acquisition, development and maintenance."[31]

188.    As part of the disclosure of Super Micro's material weakness in the IT general controls, the Company identified the following contributing factors to the material weakness:

---

[31]    COSO Framework at 98.

[I]nternal procedures for granting and monitoring employee access, and managing changes to various applications and infrastructure layers relevant to our financial reporting are not consistent across those applications and infrastructure layers;

[S]ome of our internally-developed applications relevant to financial reporting lack logging capabilities to monitor access changes or application changes;

[A]uthorized certain users with broad access, both as a user and as an administrator, to all parts of our primary accounting system without adequate monitoring or recording of how they used that access.

189.    As a result of the above factors, Super Micro had material weaknesses related to access controls and change management, which made it possible that Super Micro's business process controls that depend on the affected IT systems could be adversely affected.

**Super Micro's Remediation Plans for Its Material Weaknesses in ICFR**

190.    The depth and breadth of Super Micro's Restatement and material weaknesses in ICFR are illustrated by the Company's remediation plan for its ineffective ICFR.  For example, Super Micro's remediation plan includes developing and implementing an ongoing compliance training program regarding significant accounting and financial reporting matters, as well as broad compliance matters, for accounting, financial reporting, sales and operations personnel, ***as well as for the Company's CEO***, other corporate executives and the Board.  Some of the areas where Super Micro has conducted training includes the following:

- Revenue recognition training for its global sales force, various operations personnel, and certain other senior executives, ***including Super Micro's CEO***, which includes detailed examples of acceptable and unacceptable sales practices;

- Reviewing with the senior management team Super Micro's amended Code of Conduct;

- ***Reviewing with Super Micro's CEO*** enhanced processes for periodic evaluations by the CEO and the CFO of the effectiveness of our disclosure controls and procedures, and the periodic assessments by the CEO and the CFO of the effectiveness of the Company's internal control over financial reporting, and other compliance matters, and

- Shipping and cut-off training for accounting and operations personnel that included new requirements for quarter-end procedures.

191.    The remediation plan demonstrates a major deficiency existed during the Class Period in regards to the sales sub-certification process.  The Company has admitted the SOX certification

process Liang and Hideshima utilized during the Class Period was severely lacking. The Company admitted that it was enhancing the sales sub-certification document to support the CEO's and CFO's financial statement certifications. Further, the remediation plan includes expanding the sales sub-certification to cover the global sales force and using a new organization-wide quarterly sales certification process. The fact Super Micro's quarterly sales certification process had to be expanded to cover the global sales force means it did not previously require (or even cover) the global sales force completing sales sub-certifications to identify any unusual, non-standard revenue transactions at quarter-ends. This further demonstrates Liang's and Hideshima's reckless approach in falsely certifying Super Micro's effective internal controls over revenue recognition during the Class Period.

192.    In addition, Super Micro's remediation plan provides significant evidence regarding the Company's inappropriate control environment during the Class Period, which included an ineffective tone at the top. For example, Super Micro's remediation plan included the following steps:

•    Restructured our sales organization, which resulted in the resignations of the Senior Vice President of International Sales [Liaw], the Senior Vice President of Worldwide Sales [Chou], the Vice President, Strategic Accounts, the Vice President, Strategic Sales, the Vice President, Business Development and certain other sales personnel.

•    Appointed experienced professionals to key accounting and finance and compliance leadership positions, including the appointments of a ***new Chief Financial Officer*** and a new Corporate Controller in January 2018, and ***the creation of, and appointments to, two newly established roles of Chief Compliance Officer and Vice President of Internal Audit*** in May 2018 and August 2018, respectively.

•    Reviewed and amended our Code of Conduct to align with the organizational changes described above and to strengthen certain provisions regarding compliance and reporting.

\*       \*       \*

•    Changed our organizational structure to narrow the scope of responsibilities of certain of our senior executives and to revise various reporting relationships, which included the appointment of a new Senior Vice President of Worldwide Sales, and a new Senior Vice President of Operations.

**Defendants' GAAP Violations and Restatement Were Material**

193.    Defendants' false and misleading Class Period statements and omissions regarding Super Micro's accounting were material. The SEC Staff Accounting Bulletin: Codification of Staff

Accounting Bulletins' Topic 1-M, *Materiality* ("SEC Topic 1-M"), sets forth the generally accepted methods for accountants to evaluate materiality as it relates to the financial statements of SEC registrants:

> The omission or misstatement of an item in a financial report is material if, in the light of surrounding circumstances, the magnitude of the item is such that it is probable that the judgment of a reasonable person relying upon the report would have been changed or influenced by the inclusion or correction of the item.

194. SEC Topic 1-M also stresses that materiality requires qualitative, as well as quantitative, considerations: "[T]here are numerous circumstances in which misstatements below 5% could well be material. Qualitative factors may cause misstatements of quantitatively small amounts to be material." SEC Topic 1-M also notes that assessing materiality solely on a quantitative basis "has no basis in the accounting literature or the law." It notes that the FASB "has long emphasized that materiality cannot be reduced to a numerical formula."

195. Defendants' misstatements, by their own admission, were material from both a quantitative and qualitative perspective. For example, the fact that Super Micro has restated its financial statements reported every quarter during the Class Period demonstrates the Company's admission that the misstatements were material, as only ***materially*** misstated financial statements need to be corrected and reissued on a retroactive basis.[32] Further, CFO Bauer admitted on November 15, 2018 that "***[t]he number and breadth of the adjustments, coupled with their aggregate magnitude was significant enough for us to conclude that restating prior periods was necessary***." Similarly, Bauer admitted he was reviewing "thousands of transactions" as part of the Restatement process to determine when revenue was recognized inappropriately in violation of GAAP, further demonstrating quantitative materiality.

196. In addition, Super Micro's Restatement resulted in material misstatements to key financial metrics including revenues, net income, EPS and accounts receivable. For example, in FY13, FY14 and FY15, Super Micro overstated net income by 13.6%, 12.6%, and 10.1%, respectively and EPS by 11.6%, 12.6% and 9.7%, respectively. Similarly, Super Micro overstated

---

[32] *See, e.g.,* ASC Topic 250, *Accounting Changes and Error Corrections*, SEC Topic 1-M, and SEC Staff Accounting Bulletin Topic 1-N, *Considering the Effects of Prior Year Misstatements when Quantifying Misstatements in Current Year Financial Statements*.

1   net income and EPS by 5.1% from FY15 through FY17 and 6.8% from FY13 through FY17.  On a

2   quarterly basis, the impact of the Restatement had an even more pronounced impact.  For example,

3   in 4Q16, Super Micro overstated net income by 27.2%, EPS by 30% and accounts receivable by

4   65%.  Further, in 3Q17, Super Micro overstated net income by 8.6%, EPS by 6.7% and accounts

5   receivable by 44.5%.  Also, in 4Q17, Super Micro overstated revenues by 5.9%, net income by

6   29.2%, EPS by 32% and accounts receivable by 49.2%.  Critically, all of these overstatements

7   exceeded the 5% rule of thumb quantitative materiality threshold referenced in SEC Topic 1-M.

8          197.    Each of Super Micro's accounting misstatements and omissions were qualitatively

9   material as well.  For example, SEC Topic 1-M states a misstatement may be material if it "hides a

10  failure to meet analysts' consensus expectations for the enterprise."  As discussed herein, the

11  Restatement has demonstrated that Super Micro would not have met or exceeded its own financial

12  guidance or consensus estimates in revenue or EPS in multiple fiscal years (FY13, FY14, FY15 and

13  FY17) and quarterly periods (4Q16, 3Q17, 4Q17) without its improper revenue recognition.

14         198.    In addition, SEC Topic 1-M notes that quantitatively small misstatements may be

15  material if management has intentionally violated GAAP.  Here, Super Micro's investigation

16  determined certain employees had violated the Company's Code of Conduct and discovered

17  accounting and financial reporting errors and certain *irregularities*.  The term irregularity in

18  accounting parlance typically refers to intentional misstatements of financial statements.  For

19  instance, the PCAOB auditing standard on fraud (AS 2401) notes the requirement of auditors to

20  communicate possible fraud to management and the Audit Committee, but that "the communication

21  may use terms other than fraud – for example, irregularity, intentional misstatement,

22  misappropriation or defalcations – if there is possible confusion with a legal definition of fraud or

23  other reason to prefer alternative terms."  AS 2401 n.37.

24         199.    Also, SEC Topic 1-M states "[W]here management has intentionally misstated items

25  in the financial statements to *'manage' reported earnings* . . . it presumably has done so believing

26  that the resulting amounts and trends would be significant to users of the registrant's financial

27  statements."  Here, Super Micro has acknowledged the premature revenue recognition was

28  intentional.  For example, Super Micro admitted the Restatement resulted from, in part, "officers"

1   who were aware of, condoned, or were involved in blatant premature revenue recognition that

2   included shipping unordered products to customers, shipping to storage facilities at quarter-end for

3   later delivery to customers, entering in to undisclosed side agreements with customers, shipping

4   products to customers before manufacturing was complete, altering source documents on certain

5   sales transactions and failing to raise issues with material accounting consequences to Super Micro's

6   Audit Committee and Deloitte.  In addition, the Restatement disclosed that these egregious revenue

7   violations occurred "in the pursuit of quarterly revenue":

8       [i]n the pursuit of quarterly revenue, certain of our sales, finance and operations
        personnel, including **officers** and managers, were aware of, condoned or were
9       involved in actions that reflected an inappropriate tone at the top, that **violated our
        Code of Conduct** and our **accounting policies and procedures**, and that were
10      **inconsistent with a commitment to integrity and ethical values**.

11      200.    Further, whether or not the misstatement arises from an item capable of precise

12  measurement or whether it arises from an estimate is a qualitative materiality factor that must be

13  considered under SEC Topic 1-M.  There was no judgment required to know the methods by which

14  the Company inflated sales were improper and needed to be reversed under GAAP.  Consequently,

15  the premature revenue violations arose from misstatements "capable of precise measurement," as

16  easily determined by the sales price for each Super Micro product, and were not inherently, complex

17  accounting estimates requiring judgment.

18      201.    SEC Topic 1-M states: "the demonstrated volatility of the price of a registrant's

19  securities in response to certain types of disclosures may provide guidance as to whether investors

20  regard quantitatively small misstatements as material."  Super Micro's ineffective internal controls

21  and multiple material weaknesses led to an inability to timely file SEC filings, investigation into its

22  historical financials, resignations and a stock delisting.  The market's negative reaction to these

23  events supports qualitative materiality.

24      202.    Finally, SEC Topic 1-M states "[w]hether the misstatement concerns a segment or

25  other portion of the registrant's business that has been identified as playing a significant role in the

26  registrant's operations or profitability" is another qualitative factor to consider in assessing

27  materiality.  It's undisputed that the Restatement, primarily related to premature revenue recognition

28  and inventory misstatements, materially impacted Super Micro's business in its one reporting

1  segment, server solutions.  For example, the Restatement has shown that Super Micro each quarter

2  during the Class Period misstated virtually every financial account on its income statement and

3  misstated the majority of its accounts on its balance sheet.  *See* Attachments 2-4.

4  **Defendants' Violations of SEC Regulations Related to Super Micro's Inadequate Internal Controls**

5

6  203.    Section 13(b)(2) of the Exchange Act states, in pertinent part, that every reporting

company must:

7

8  (A)    make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the issuer; [and]

9

10  (B)    devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that-

11  *        *        *

12  (ii)   transactions are recorded as necessary . . . to permit preparation of financial statements in conformity with [GAAP].

13

14  15 U.S.C. §78m(b)(2)(A), (B).  These provisions require a reporting company to employ and

15  supervise reliable personnel, to maintain reasonable assurances that transactions are executed as

16  authorized, to record transactions on an issuer's books and, at reasonable intervals, to compare

17  accounting records with physical assets.

18  204.    Notably, Defendants recognized the importance for Super Micro's senior officers to

19  maintain an effective internal control system as evidenced by the Company's "Code of Business

20  Conduct and Ethics" accessible on its website.[33]  Super Micro's Code of Conduct required its senior

21

22  ────────────

[33]   The Code of Conduct in effect during the Class Period stated that "Super Micro's Senior Officers," which included the CEO and CFO "are also responsible for establishing and maintaining adequate internal control over financial reporting to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles.  The Senior Officers will take all necessary steps to ensure compliance with established accounting procedures, the Company's system of internal controls and generally accepted accounting principles."  As part of its remediation measures, Super Micro adopted a new Code of Business Conduct and Ethics which no longer has the foregoing language but does state that: "The Company's CEO and CFO are responsible for designing, establishing, maintaining, reviewing and evaluating on a quarterly basis the effectiveness of the Company's disclosure controls and procedures (as such term is defined by applicable SEC rules)."  Super Micro, Code of Business Conduct and Ethics, https://ir.Super Micro.com/static-files/6dedc126-3312-40a8-97c6-79d6b18b572d.

1    officers to follow the SEC regulations of §13(b)(2), which they failed to do.  *Compare* ¶52 *with*

2    ¶203.  In fact, Defendants have now admitted that the Company's senior management did not

3    promote an appropriate tone of compliance, including *officers* and managers were aware of,

4    condoned or were involved in actions that reflected an inappropriate tone at the top, *that violated the*

5    *Code of Conduct* and that were inconsistent with a commitment to integrity and ethical values.

6    These deficiencies constituted material weaknesses in ICFR that Defendants failed to disclose to

7    investors during the Class Period.

8         205.    As a result, Defendants violated §13(b)(2)(A),(B) of the Exchange Act and its own

9    Code of Conduct by failing to ensure that the Company maintained adequate internal controls in

10   order to ensure that Super Micro's financial statements were prepared in conformity with GAAP and

11   that its public filings were accurate.  Super Micro's lack of adequate internal controls (including its

12   undisclosed material weaknesses) rendered the Company's Class Period financial reporting

13   inherently unreliable and precluded the Company from preparing financial statements that complied

14   with GAAP.  Nonetheless, throughout the Class Period, Defendants Liang, Hideshima and Liaw

15   knowingly or recklessly caused the Company to issue quarterly or annual financial statements that

16   did not disclose the existence of significant and material deficiencies in the Company's internal

17   accounting controls and falsely asserted that Super Micro's financial statements complied with

18   GAAP.

19                          **ADDITIONAL SCIENTER ALLEGATIONS**

20        206.    Defendants acted with scienter in that they knew, or were deliberately reckless in not

21   knowing, that: (i) the public documents and statements issued or disseminated in Super Micro's

22   name, or their own name, were materially false and misleading; (ii) that such statements or

23   documents would be issued or disseminated to the investing public; and (iii) substantially

24   participated or acquiesced in the issuance of such statements or documents as primary violations of

25   the federal securities laws.

26        207.    By virtue of their participation, condoning, receipt or deliberate disregard of

27   information reflecting the true facts regarding Super Micro, their control over, receipt or

28   modification of Super Micro's materially misleading statements, or their other actions and

associations with the Company, each Defendant was privy to confidential information concerning Super Micro and knowingly or with deliberate recklessness participated in the fraudulent scheme, acts, practices, course of business and conduct alleged herein.

**The Restatement Directly Implicates Defendants Super Micro, Liang, Hideshima and Liaw in Misconduct**

208.   Super Micro's FY17 Form 10-K describes pervasive and deliberate sales and accounting misconduct, flagrant internal control failures, as well as reckless disregard for the truth, that repeatedly implicates "officers and managers" and "senior management" – this includes the Individual Defendants Liang, Hideshima and Liaw.  The Company publicly identified "Senior Management" on its website as limited to five individuals:  Defendants Liang, Hideshima, and Liaw, as well as Sara Liang and Phidias Chou.  The Company's SEC Form 10-K and Def14A proxy statements identified the same five individuals as the Company's "Executive Officers."  Liang and Hideshima are further implicated by their duties and responsibilities with respect to reporting to the Audit Committee and external auditors. (¶¶222-224; *see also* ¶¶50-54)  Each has also been implicated by the remediation plan set forth in the Restatement:  Hideshima, Liaw and Chou's departures on January 30, 2018 were part of Super Micro's remediation of the misconduct identified in the Restatement (¶¶94, 96-97, 142); immediately thereafter, in February 2018, Sara Liang – lost her title as Senior Vice President of Operations, a position she held since May 2014;  when Super Micro issued its Restatement, the Company revealed that Sara Liang also lost her position as Chief Administrative Officer and Treasurer (¶¶24, 192); and Liang was singled out for retraining on proper sales practices, effective internal controls and revenue recognition compliance  (¶¶142, 190, 231).  Through its senior management, acting within the scope of their employment duties and responsibilities, Super Micro is implicated as well, and possesses corporate scienter. *See* ¶¶242-245.

**The Restatement Admits to Deliberate and Unethical Misconduct Intended to Inflate Quarterly Revenue – Not Innocent or Negligent Behavior – Establishing Scienter**

209.   The FY17 Form 10-K admits that Super Micro sales, finances and operations employees, including officers and managers, were aware of or engaged in actions that violated the Company's accounting policies, Code of Conduct and a commitment to integrity, which constitutes deliberate conduct manifesting an intent to deceive, *i.e.*, scienter:

*In the pursuit of quarterly revenue, certain of our sales, finance and operations personnel, including officers and managers, were aware of, condoned or were involved in actions that reflected an inappropriate tone at the top, that violated our Code of Conduct and our accounting policies and procedures, and that were inconsistent with a commitment to integrity and ethical values.*

210.    The deliberate, flagrant and pervasive misconduct that violated the Company's accounting policies, GAAP and the Company's Code of Conduct detailed in the FY17 Form 10-K, such as prematurely shipping products to the Company's own storage facilities at quarter end for later delivery to customers, shipping products before manufacturing was completed or before the date they were requested by customers, obscuring material facts about sales, and altering sales documents, all in pursuit of quarterly revenues is inconsistent with innocent or negligent explanations:

*(i) shipping products in advance of customer requested delivery dates, (ii) shipping products to storage facilities at the end of a quarter for later delivery to customers, (iii) in certain cases entering into side agreements with customers, (iv) in certain cases, shipping products before manufacturing was completed, (v) altering source documents related to some sales transactions and (vi) failing to disclose or obscuring material facts about sales transactions.*

211.    The resulting accounting violations of clearly defined revenue recognition rules and the Company's critical accounting policies further supports knowledge or, at minimum, deliberate recklessness, as to the Individual Defendants and Super Micro.

212.    The duration of the Restatement – impacting at least five straight years of false financial results – and the length of time it took Super Micro to complete its investigation and finalize the Restatement evidences the enormity of the problems with the Company's accounting and internal controls that the Individual Defendants knew of or were deliberately reckless in not knowing about.  After 20 months of investigation, including $109 million in professional fees, Defendants ultimately revealed a Restatement of five straight years of financial results, demonstrating that the scheme was not innocent one-off mistakes made by a few lower-level employees, but rather a top-down driven culture that prioritized achieving quarterly targets above GAAP compliance.

213.    The presence of significant material weaknesses in Super Micro's ICFR which affected nearly every account support scienter.   The pervasive, aggressive, unethical and

inappropriate nature of the internal control failures indicate that Defendants knew of or willfully

turned a blind eye to the material weaknesses in all five interrelated components of internal control.

214.    Defendants admitted to creating an ineffective control environment, including

through an inappropriate tone at the top, which implicates Liang as the Company's CEO, as the SEC

has made clear:

> First and foremost, Sarbanes-Oxley makes clear that ***a company's senior officers are responsible for the culture they create***, and must be faithful to the same rules they set out for other employees.  One goal of the Commission's recent rules requiring that the CEO ultimately be responsible for the quality of a company's disclosure controls and financial reporting is to ensure that "'tone at the top'" has real meaning.[34]

215.    Similarly the COSO Framework states that "[m]ore than any other individual, the

CEO sets the tone at the top that affects the control environment and all other components of internal

control."  During the Class Period, Liang and the other Defendants, promoted a tone at the top that

contravened integrity and ethical values, including the Company's Code of Conduct, and fostered a

culture of maximizing quarterly revenue without sufficient focus on GAAP compliance and

appropriate internal controls.

**The Impact of Defendants' Misconduct and Accounting Violations on Super Micro's Financial Results, Guidance and Consensus Supports a Strong Inference of Scienter**

216.    The quantitative impact of Defendant's deliberate and improper revenue recognition

scheme supports an inference of scienter as the Company reported significantly overstated results on

key metrics including quarterly EPS (GAAP) by as much as 30% in 2016 during 4Q16 and 32% in

2017 during 4Q17; quarterly revenues by as much as $40 million (or 6%) in 4Q17 and accounts

receivable by $114 million, or 65% in 4Q16.[35]

217.    The qualitative impact of Defendants' accounting violations strongly supports an

inference of scienter.  Defendants' accounting manipulations formed the basis of their repeated false

claims that the Company met or beat its own financial estimates and Wall Street consensus

expectations.  These overstatements are highly suspicious and strongly indicative of scienter as the

---

[34]  https://www.sec.gov/news/speech/spch586.htm.

[35]  Defendants overstated Super Micro's accounts receivable in each quarterly period, including 52% at 1Q17, 47% at 2Q17, 45% at 3Q17 and 49% at 4Q17.

1    Company claimed to precisely meet or barely beat expectations on multiple occasions, only to later

2    reveal in the Restatement that the numbers had been inflated and, if accurately reported, would have

3    missed expectations.

4         218.    At the start of the Class Period, Super Micro was under pressure to deliver at or above

5    its disappointing preannouncement, announced three weeks prior; the Company delivered.  For

6    4Q16, Defendants reported EPS (non-GAAP) of $0.20, falsely claiming to have exceeded the high

7    end of their preannouncement by $0.03, in truth, the Company only met their preannounced range.

8    Defendants reported gross margin of 14%, claiming to meet the preannouncement; in truth the

9    restatement revealed gross margin was 13.1% and had missed.

10        219.    For 3Q17, Defendants falsely claimed to exactly achieve consensus EPS (non-GAAP)

11   guidance of $0.38; in truth, the Restatement revealed the Company earned $0.36 and missed

12   consensus EPS by $0.02.  Defendants also falsely reported $631 million in revenue, just beating the

13   high-end of their issued guidance of $630 million – a point called out by Liang to investors: "We are

14   pleased to report third quarter revenues that exceeded our guidance."  In truth, Defendants' improper

15   revenue recognition scheme overstated revenue by $16 million at $615 million, well below the high-

16   end of guidance.

17        220.    For 4Q17, Defendants also falsely reported beating EPS (non-GAAP) consensus,

18   reporting $0.39 against expectations of $0.36; in truth, Super Micro missed guidance, earning only

19   $0.31 per share and overstating earnings by 26%.  Defendants also falsely reported Super Micro's

20   4Q17 quarterly revenue of $718 million, claiming to beat both the Company's high-end revenue

21   guidance of $715 million as well as consensus of $709 million.  In truth, Super Micro overstated

22   quarterly revenues by $40 million (or 6%) – the Company recorded only $678 million in revenue

23   which would have missed consensus and the $685 million mid-point of Super Micro's guidance.  For

24   full-year FY17 results, Super Micro falsely reported annual FY17 EPS (non-GAAP) of $1.57,

25   beating consensus of $1.56 by a penny. In fact, Super Micro earned FY17 EPS (non-GAAP) of

26   $1.52, which would have missed FY17 consensus by $0.04.

27        221.    These Class Period overstatements followed three fiscal years – FY13, FY14 and

28   FY15 – in which Defendants' improper accounting changed the Company's performance relative to

THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATION OF THE
FEDERAL SECURITIES LAWS - 4:18-cv-00838-JST                                                    - 94 -
4838-8753-1962.v1-4/22/20

expectations which was not disclosed until the issuance of the Restatement:  (i) For FY13, the Company reported EPS (GAAP) of $0.48, claiming to beat consensus of $0.45; in truth, the Company had earned just $0.43, which missed consensus; (ii) For FY14, the Company falsely reported EPS (non-GAAP) of $1.34, beating consensus estimates of $1.33 by a penny; in truth, the Company earned just $1.21, missing consensus estimates by $0.12; (iii) For FY15, the Company claimed to exactly meet EPS (non-GAAP) consensus estimates of $2.15; in truth the Company had missed consensus, earning just $1.97 per share.  Also, the Company falsely claimed revenues of $1.99 billion, beating consensus estimates of $1.97 billion; in truth, the Company should have recorded $1.95 billion and missed estimates.

**The Admitted Efforts to Conceal Misconduct from the Audit Committee and External Auditors Establishes Scienter as to Liang and Hideshima**

222.    The FY17 Form 10-K also admits that "officers and managers" at Super Micro deliberately concealed material accounting information from the Audit Committee and the Company's external auditor, Deloitte – conduct which strongly supports scienter:

> Some employees, ***including officers*** and managers, also ***failed to raise issues with material accounting consequences to the Audit Committee and our external auditors***, and with respect to one transaction, appear to have ***attempted to minimize material facts about a sales transaction to, or obscure those facts from, the Audit Committee and our external auditors***.

223.    Defendants' Liang and Hideshima, as CEO and CFO, respectively, were "officers" responsible for providing relevant financial information to the Audit Committee.  As set forth in its "Audit committee requirements and governance topics" published by Deloitte's Center for Board Effectiveness:

> Executive sessions allow the audit committee to meet privately with ***key members of executive management (e.g., the CEO and CFO)***, the independent auditor, the internal auditors, and the general counsel or chief legal officer.

224.    In addition, Defendants' Liang and Hideshima are responsible for signing the quarterly management representation letter to Deloitte, as set forth in Auditing Standard PCAOB AS 2805:

> The letter should be signed by those members of management with overall responsibility for financial and operating matters whom the auditor believes are responsible for and knowledgeable about, directly or through others in the organization, the matters covered by the representations. Such members of

management normally include the ***chief executive officer and chief financial officer*** or others with equivalent positions in the entity.

225.    Super Micro's Audit Committee Charter provides Liang and Hideshima are responsible for reviewing significant deficiencies and material weaknesses in internal controls as well any fraud, irrespective of materiality, involving management:

> Review with the chief executive officer and chief financial officer of the Company any report on significant deficiencies in the design or operation of the Internal Controls that could adversely affect the Company's ability to record, process, summarize or report financial data, any material weaknesses in the Internal Controls identified to the auditors, and any fraud, whether or not material, that involves management or other employees who have a significant role in the Internal Controls.

**Defendant Liang's Improper Margin Loan Provides Motive and Supports a Strong Inference of Scienter**

226.    On December 19, 2019, in its 2019 Form 10-K, Super Micro disclosed that two personal margin loans of at least $12.9 million from two financial institutions obtained by Defendant Liang had been called in October 2018 following delisting and the decline in Super Micro's stock price.  To cover and prevent the sale of his stock, Defendant Liang borrowed approximately $12.9 million from Chang Chien-Tsun ("Chien-Tsun"), the spouse of his brother Steve Liang.[36]  These loans appear to have been both not timely reported to investors and taken out in violation of the Company's insider trading policy.  Moreover, as the loans were subject to being called if the price of Super Micro common stock declined, Liang possessed motivation both to maintain the inflation in the price and to conceal the wrongdoing set forth in the Restatement.[37]

---

[36]    Steve Liang is also CEO of Ablecom, a related party; the substantial majority of Ablecom's sales are to Super Micro.  According to the FY 2018 annual statement, Defendant Liang and his wife own approximately 10.5% of Ablecom. Defendant Liaw also owns 11.7% of Ablecom.  The $12.9 million personal from Chien-Tsun has a favorable interest rate, is not secured and it appears that no payments have been made as the outstanding amount is now $14.5 million.

[37]    Liang's loans were in apparent violation of Super Micro's Insider Trading Policy which stated that "directors [and] officers . . . are ***prohibited*** from holding Company securities in a margin account or pledging Company securities as collateral for a loan." (emphasis in policy).  In addition, the policy required pre-clearing of all trades with the "Compliance Officer," – *i.e.*, CFO and Defendant Hideshima.  All "Insiders," which included Defendant Liang and Hideshima, were required to execute a document certifying that they read, understood and agreed to comply with the Insider Trading Policy.

**The Departures of Individual Defendants Hideshima and Liaw Supports a Strong Inference of Scienter**

227.     The Company's 2017 SEC Form 10-K refers to the January 30, 2018 departures of individual Defendants Hideshima and Liaw as ***"terminations of employment"*** – which is indicative of firing for cause – further supporting the inference that they were aware of, engaged in or attempted to conceal the misconduct described in the Restatement.  To the extent that the departures were also labeled as "resignations" by the Company, such "resignations" were both uncharacteristic and suspicious.   There are no indications that these departures were voluntary or scheduled, particularly since as analysts noted that the Company elected to not comment on the reasoning of these resignations due to their connection with the Audit Committee investigation.  With respect to Defendant Hideshima, the FY17 Form 10-K states that the appointment of a new CFO was part of Super Micro's remediation plan:

> Our management believes that these remediation actions, along with additional actions, when fully implemented, will remediate the material weaknesses we have identified and strengthen our internal control over financial reporting. . . .
>
> To date, we have taken the following remediation actions: . . .
>
> *          *          *
>
> • Appointed experienced professionals to key accounting and finance and compliance leadership positions, ***including the appointments of a new Chief Financial Officer***

228.     With respect to Defendant Liaw, who was also Corporate Secretary and member of the Board of Directors, the FY17 Form 10-K makes clear that his "resignation" of his role as Senior Vice President of International Sales was the result of "restructuring" the sales organization.  Under the heading "Remediation Plan and Status" the Form 10-K stated:

> Our management believes that these remediation actions, along with additional actions, when fully implemented, will remediate the material weaknesses we have identified and strengthen our internal control over financial reporting. . . .
>
> To date, we have taken the following remediation actions:
>
> • Restructured our sales organization, ***which resulted in the resignations of the Senior Vice President of International Sales, [i.e. Defendant Liaw]*** . . .

229.     The departures on January 30, 2018 of Defendants' Hideshima and Liaw, as well as Phidias Chou, constituted three of the five members of Super Micro's senior management who

collectively worked at the Company for over 45 years, and cannot be attributed to ordinary personnel turnover, further supporting an inference of scienter.[38]  The departures of Hideshima and Liaw were announced as immediate despite their long careers and senior positions – there would be no transition periods or training of replacements.[39]  In addition, Hideshima was not terminated when Super Micro announced a prior restatement of its FY15 internal controls and disclosure controls from effective to ineffective without admitting to intentional misconduct; nor was Hideshima terminated in 2008 when Super Micro reported a material weakness in internal control over financial reporting related to the classification of amounts associated with new transactions which did not admit to intentional misconduct, further strengthening the inference that Hideshima's departure was both uncharacteristic and attributable to the intentional misconduct set forth in the Restatement. Expectedly, analysts reacted negatively to the departures, finding them "disturbing."

**The Breadth and Magnitude of the Remediation Plan Supports a Strong Inference of Scienter**

230.    The extensive remediation efforts undertaken by Super Micro to address the accounting violations, material weaknesses, ineffective and absent internal controls, and inappropriate tone at the top further support an inference of scienter – in particular training programs on unacceptable sales practices and internal controls specifically for Defendant Liang:

> – ***Revenue recognition training*** for our global sales force, various operations personnel, and ***certain senior executives, including our CEO, which included detailed examples of acceptable and unacceptable sales practices***,
>
> – ***Reviewing with our senior management team our amended Code of Conduct***,
>
> – ***Reviewing with our CEO enhanced processes for periodic evaluations by the CEO and the CFO of the effectiveness of our disclosure controls and procedures, and the periodic assessments by the CEO and the CFO of the effectiveness of our internal control over financial reporting***, and other compliance matters.

---

[38]    Because the Restatement admits to deliberate and intentional sales and accounting misconduct – including but not limited to shipping product to warehouses, altering source documents and concealing these actions from auditors –  the  departures detailed in the Restatement occurred as a result of these individuals knowing, condoning or engaging in these intentional and deceptive acts.

[39]    Liaw, a co-founder, had been a part of Super Micro since September 1993; Hideshima had been with the Company since May 2006; and Phidias Chou had been at Super Micro since September 2008.

231.    In addition to the remediation efforts announced on November 15, 2018, including locking the shipping dock at quarter end, new revenue personnel and internal audit teams, the FY17 Form 10-K revealed that significant remediation efforts remained for Defendant Liang, alongside other executives and Super Micro's Board: Some of the more significant remaining remediation activities include:

> •    Developing and implementing an ongoing compliance training program regarding significant accounting and financial reporting matters, as well as broad compliance matters, for accounting, financial reporting, sales and operations personnel, ***as well as for our CEO***, our other corporate executives and the Board.

232.    The 2019 SEC Form 10-K disclosed the Company's internal controls as of June 30, 2019, were still ineffective, and that actions remained ongoing to remediate the material weaknesses.

**False SOX Certifications Support a Strong Inference of Scienter**

233.    Defendants' false SOX certifications attached to Super Micro's Forms 10-Q and Form 10-K also support scienter.  Defendants Liang and Hideshima certified that they had personally reviewed Super Micro's financial statements, had designed, established, maintained and evaluated Super Micro's disclosure controls and procedures, and had designed Super Micro's ICFR. Defendants Liang and Hideshima also certified that the financial statements "[do] not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading" and "fairly present in all material respects the financial condition, results of operation and cash flows of [Super Micro]."  Such reviews and evaluations, if performed as represented, would have alerted them to the problems with Super Micro's financial results, disclosure controls and ICFR.  For example, Liang and Hideshima certified Super Micro's revenue results despite the fact that they must have known Super Micro's sales employees did not complete sub-certifications to identify any unusual or non-standard quarter-end transactions.

**Defendants Super Micro, Liang and Hideshima's False Claim that the Prior FY15 Material Weakness was Remediated Supports a Strong Inference of Scienter**

234.    The prior material weaknesses – and their purported remediation by the Individual Defendants – provided notice of improper revenue recognition issues and internal control failures which constituted red flags and support a strong inference that, at a minimum, defendants were

deliberately reckless in their false and misleading statements concerning the FY15 material weakness and the adequacy of the Company's internal controls during the Class Period.

235.    In 2015, Defendants twice delayed filing financial statements (FY15 Form 10-K and 1Q16 Form 10-Q) due to accounting issues – first, because of "certain irregularities" related to marketing expenses and second, because of contracts with extended warranties.  *See* ¶¶134, 186, 198, 234-237.  The Company represented in its 2016 Form 10-K that "with the oversight of our management and audit committee" the Company had put controls in place to remediate the material weakness:

> Our management believes the foregoing efforts have effectively remediated the material weakness as these procedures have been implemented for a sufficient period of time beginning in the first half of fiscal year 2016 and we have completed our testing of the design and operating effectiveness of these above procedures as of June 30, 2016.

Liang and Hideshima also signed certifications during the Class Period attesting the Company had remediated its material weakness concerning revenue recognition on extended warranties.

236.    The 2017 Form 10-K disclosed that the extended warranties material weakness was never appropriately remediated, and as part of the remediation process established an internal audit function and hired a Vice President of Internal Audit.  Further, Super Micro admitted in its FY17 Form 10-K that it was "[r]eevaluating and revising our Sarbanes-Oxley compliance program (our 'SOX Program'), and making improvements to our SOX Program governance, risk assessment processes, testing methodologies and corrective action mechanisms."

237.    Defendants' representation of direct involvement in, and testing of, the remediation of the prior material weakness, combined with the directly contradicting disclosures, and the clear indication that the prior material weakness was never remedied at any point in time, supports an inference that defendants knew or were deliberately reckless in not knowing that their statements were false and misleading.

**Enforcement Actions Support a Strong Inference of Scienter**

238.    The inference of scienter is further strengthened by the existence and concealment of SEC enforcement activities at Super Micro.  On August 31, 2015, Super Micro disclosed that it was investigating a marketing expense matter.  However, Defendants concealed an investigation by the

1  SEC that began in late 2015 and the receipt of a Formal Order of Investigation on October 25, 2016,

2  pursuant to which the SEC obtained documents and took testimony of a number of individuals.

3  These key details were only disclosed on May 17, 2019 in a contract attached as an exhibit to the

4  FY17 Form 10-K.

5      239.  Super Micro's Form 10-K for FY17 states that "we have received subpoenas from the

6  SEC in connection with the matters underlying our inability to timely file our Form 10-K for the

7  fiscal year ending June 30, 2017."  As detailed in an exhibit to Super Micro's FY17 Form 10-K, the

8  Company has admitted that the SEC's investigation was ongoing and the SEC acted under its

9  October 25, 2016 formal investigation to cover the FY17 revenue recognition issues, showing that

10  the SEC also deemed the two potential violations as necessarily similar.[40]

11      The Securities and Exchange Commission ("SEC") commenced an investigation of
the Marketing Expense Matter, and a formal order of investigation issued on October
12  25, 2016 pursuant to which the SEC has obtained documents and taken testimony of
a number of individuals.  The Company has cooperated with the investigation, which
13  is ongoing.

14      [A]s the Company has previously publicly announced, in connection with the
in-process audit of the Company's financial results for the year ended June 30, 2017,
15  a sales transaction was subject to additional inquiry and review (the "Revenue
Recognition Matter").  The transaction in question, representing approximately $8.8
16  million in revenue, was originally recorded as revenue during the quarter ended
December 31, 2016. . . .  Acting under the authority of its investigation of the
17  Marketing Expense Matter, the SEC has expanded its investigation to include the
Revenue Recognition Matter.  The Company has produced documents relating to the
18  Revenue Recognition Matter and is continuing to cooperate with the SEC
investigation.

19
20      240.  In Super Micro's 2019 SEC Form 10-K, the Company warned investors to be
cautious because regulators could still launch a "broad range of potential actions" in connection to
21  the Company's delays in filing its required SEC forms, stating:
22

23  [40]  According to the SEC's Enforcement Manual, a Formal Order of Investigation is issued "when a
formal investigation is appropriate and necessary to determine whether a violation of the federal
24  securities laws may have occurred or may be occurring," and "describes the nature of the
investigation that has been authorized."  SEC, Division of Enforcement, *Enforcement Manual* 17-18
25  (2017), https://www.sec.gov/divisions/enforce/enforcementmanual.pdf.  It is based on an Action
Memorandum prepared by the staff of the SEC "that sets forth a Division recommendation and
26  provides a comprehensive explanation of the recommendation's factual and legal foundation," and
sent to the Commission requesting that a Formal Order of Investigation be issued.  *Id*. at p. 22-23.
27  Super Micro's admission that the SEC had issued a Formal Order of Investigation on October 25,
2016, and continued that investigation to include revenue recognition issues further strengthens
28  scienter.

Our company and certain of our current and former executive officers are defendants in certain legal proceedings and putative class actions. . . . the circumstances that led to the delay in the filing of our 2017 10-K and our continued SEC filing delays have created the risk of additional litigation and claims by investors and examinations, investigations, proceedings and orders by regulatory authorities. These include a broad range of potential actions that may be taken against us by the SEC or other regulatory agencies, including a cease and desist order, suspension of trading of our securities, deregistration of our securities, sanctioning of our officers and directors and/or the assessment of possible civil monetary penalties.

241. Most recently, in Super Micro's Form 10-Q for 2Q20, filed with the SEC on February 7, 2020, Super Micro confirmed that they are still "cooperating" with the SEC's investigation, "cannot predict the outcome" at this time and gave "no assurance" that the investigations "will not have a material adverse effect on [Super Micro's] financial position or results of operations."

**The Restatement Establishes Corporate Scienter as to Super Micro**

242. In addition to the scienter of the Individual Defendants being attributed to Super Micro, the Company also possessed corporate scienter through the actions of its "officers and managers" and "senior management" who are identified as responsible for the improper revenue recognition, sales and accounting violations, and other misconduct disclosed in the Restatement. The Restatement reports that high-level Super Micro employees were aware of, condoned or engaged in actions inconsistent with integrity and that violated the Company's accounting policies, GAAP, and its Code of Conduct:

In the pursuit of quarterly revenue, certain of our sales, finance and operations personnel, ***including officers and managers***, were aware of, condoned or were involved in actions that reflected an inappropriate tone at the top, that violated our Code of Conduct and our accounting policies and procedures, and that were inconsistent with a commitment to integrity and ethical values. These actions included (i) shipping products in advance of customer requested delivery dates, (ii) shipping products to storage facilities at the end of a quarter for later delivery to customers, (iii) in certain cases entering into side agreements with customers, (iv) in certain cases, shipping products before manufacturing was completed, (v) altering source documents related to some sales transactions and (vi) failing to disclose or obscuring material facts about sales transactions.

243. Scienter is also imputed to the Company by high ranking employees concealment of material information from its audit committee and external auditor – which again is conduct intended to deceive investors through the reporting of false financial results and is incompatible with innocent or negligent intent:

Some employees, ***including officers and managers***, also failed to raise issues with material accounting consequences to the Audit Committee and our external auditors, and with respect to one transaction, appear to have attempted to minimize material facts about a sales transaction to, or obscure those facts from, the Audit Committee and our external auditors.

244.    Scienter is further imputed to the Company through senior management's responsibility for creating an inappropriate tone at the top that prioritized quarterly revenue at the expense of compliance:

We had a culture of aggressively focusing on quarterly revenue without sufficient focus on compliance. ***Senior management*** did not establish and promote a control environment with an appropriate tone of compliance and control consciousness throughout the entire Company.

245.    The above makes clear that the misconduct engaged in by Super Micro's sales, finance and operations employees was within the scope of their authority and intended to advance the Company's interests as set forth by its highest ranking employees – namely to inflate quarterly revenue irrespective of its consistency with GAAP, the Company's accounting policies, Code of Conduct or integrity or ethics.  There is no indication that any misconduct identified in the Restatement was attributable to rogue employees acting outside their authority or by lower level employees unknown to management.  Indeed, the Restatement is explicit that officers and managers were aware of, condoned, engaged in and sought to conceal the misconduct set forth in the Restatement.

**Core Operations Supports a Strong Inference of Scienter**

246.    Each of the Individual Defendants was a senior executive involved in Super Micro's daily operations with access to all material information regarding the Company's core operations. Each of the Individual Defendants is presumed to have knowledge of all material facts regarding Super Micro's core business.  Given the importance of the Company's financial results including revenues and earnings, internal controls and maintaining compliance with NASDAQ listing requirements, the inference of scienter is strong.  Moreover, the SOX certifications make clear Super Micro's CEO and CFO supervised and analyzed the Company's disclosure controls and internal controls over financial reporting.

247.   The core operations inference establishes scienter as to Liang, Hideshima and Liaw. Liang is known to obsess over every detail of Super Micro's business and is the chief operating decision maker at the Company.  According to a former Super Micro sales manager, Liang "'is the person who approves and looks at everything the company is doing – every new product, marketing effort, sales effort, anything you want to do or promote.'"  The same article notes: "'As an individual, Charles [Liang] is very aggressive and motivated,' said Patrick P. Gelsinger, Intel's senior vice president in charge of server chips.  'Every once in a while, he appears on the verge of reckless, but if you're going up against the big guys, you have to be willing to take risks.'"  Super Micro's FY16 Form 10-K reads: "Charles Liang, our President, Chief Executive Officer and Chairman of the Board, is critical to the overall management of our company . . . . His experience in running our business and his personal involvement in key relationships with suppliers, customers and strategic partners are extremely valuable to our company."  Liang, as CEO, and Hideshima, as former CFO, had responsibility over internal control and financial reporting.  Given the magnitude and extent of material weaknesses admitted to in the FY17 Form 10-K, it would be absurd to suggest that Liang and Hideshima did not know about the weaknesses when they assured investors that Super Micro had effective internal controls, complied with GAAP, the Company's accounting policies and procedures, and the Code of Conduct.  Similarly, it would be absurd to suggest that Liaw, Senior Vice President of Internal Sales until his purported resignation, did not know that sales personnel including officers and managers were engaged in the sales misconduct described herein, including altering source documents related to sales transactions or obscuring facts about sales transactions in an effort to increase quarterly revenue.

**LOSS CAUSATION AND ECONOMIC LOSS**

248.   During the Class Period, as detailed herein, Defendants made false and misleading statements and omissions regarding Super Micro's financial results and operations, the sufficiency of its internal controls and consistency with GAAP of its revenue recognition practices, as well as the status of its investigation and ability to become current on its delinquent reports.  This artificially inflated Super Micro's stock price and operated as a fraud or deceit on all persons who purchased Super Micro's common stock during the Class Period (the "Class").  When Defendants' prior

1    misrepresentations, omissions and fraudulent conduct became apparent to the market, Super Micro's

2    stock price fell precipitously, as the prior artificial inflation came out of the stock price over time.

3    As a result of their purchases of Super Micro common stock during the Class Period, Plaintiff and

4    other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

5    The timing and magnitude of the declines in Super Micro's stock price negates any inference that the

6    loss suffered by Plaintiff and other Class members was caused by changed market conditions,

7    macroeconomic or industry factors or Company-specific facts unrelated to Defendants' fraudulent

8    conduct.

9          249.    Defendants' false or misleading statements and omissions had their intended effect,

10   causing Super Micro's common stock to trade at artificially inflated prices throughout the Class

11   Period, reaching as high as $31.75 per share on January 27, 2017.  The economic loss, *i.e.*, damages,

12   suffered by Plaintiff and other members of the Class was a direct and proximate result of

13   Defendants' misrepresentations artificially inflating Super Micro's common stock price and the

14   subsequent significant declines in the value of Super Micro common stock as the true state of the

15   Company's operations was revealed to the market in a series of partial disclosures correcting the

16   misrepresentations or revealing the economic impact thereof.

17         250.    Defendants' false and misleading statements and omissions were revealed to the

18   market through a series of partial disclosures – some mitigated by further false or misleading

19   statements or omissions that caused the price to remain artificially inflated – which caused Super

20   Micro's stock price to decline as a result, including but are not limited to: (i) the August 29, 2017

21   disclosure that the Company was unable to timely file its FY17 Form 10-K; (ii) the September 14-

22   15, 2017 disclosures that the Company was unable to meet the 15-day extension for filing its FY17

23   Form 10-K; (iii) the October 26, 2017 disclosure of an internal investigation stemming from a

24   review of a single transaction; (iv) the January 30, 2018 announcement that Defendants Hideshima

25   and Liaw had resigned and that further investigations into the Company's historical financials were

26   being conducted; (v) the February 20, 2018 disclosure that the Company could not file its 2Q18

27   Form 10-Q and received a non-compliance letter from NASDAQ; (vi) the March 16, 2018 disclosure

28   that the Company was subject to delisting by NASDAQ; and (vii) the August 21, 2018 disclosure

1  that the Company faced delisting proceedings.  Even after delisting, further revelations concerning

2  Defendants' Class Period misconduct continued to emerge, for example, via the Restatement

3  Announcement and the Restatement.

4  **NO SAFE HARBOR**

5  251.  Super Micro's verbal "safe harbor" warnings accompanying its oral forward-looking

6  statements ("FLS") issued during the Class Period were ineffective to shield those statements from

7  liability.

8  252.  Defendants are also liable for any false or misleading FLS plead because, at the time

9  each FLS was made, the speaker knew the FLS was false or misleading and the FLS was authorized

10  or approved by an executive officer of Super Micro who knew that the FLS was false.  None of the

11  historic or present tense statements made by Defendants were assumptions underlying or relating to

12  any plan, projection or statement of future economic performance, as they were not stated to be such

13  assumptions underlying or relating to any projection or statement of future economic performance

14  when made, nor were any of the projections or forecasts made by Defendants expressly related to or

15  stated to be dependent on those historic or present tense statements when made.

16  253.  Super Micro's purported cautionary language is inadequate to insulate Defendants'

17  false statements under the statutory safe harbor because each of the disclosures is vague and

18  boilerplate language.  And, in multiple instances, the purported risks were referenced as potential or

19  contingent outcomes when in fact, the purported risks warned of had already come to fruition and

20  were negatively impacting the Company.  For example, warning that "[b]ecause of the inherent

21  limitations in all control systems, no evaluation of controls can provide absolute assurance that all

22  control issues and instances of management override or improper acts, if any, have been detected"

23  and that "[t]hese inherent limitations include the realities that judgments in decision making can be

24  faulty, and that breakdowns can occur because of simple errors or mistakes" applies to virtually any

25  company.  The language is so vague as to be meaningless.  Similarly meaningless are the universally

26  applicable and contingent statements that:

27  • "If we are unable to favorably assess the effectiveness of our internal control over
financial reporting, or if our independent auditors are unable to provide an

28

THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATION OF THE
FEDERAL SECURITIES LAWS - 4:18-cv-00838-JST                                                              - 106 -
4838-8753-1962.v1-4/22/20

unqualified attestation report on our internal control over financial reporting, our stock price could be adversely affected."

- "If we identify such issues or if we are unable to produce accurate and timely financial statements, our stock price may be adversely affected and we may be unable to maintain compliance with Nasdaq listing requirements."

- "If we fail to maintain effective internal controls in future periods, our operating results, financial position and stock price could be adversely affected."

### APPLICABILITY OF PRESUMPTION OF RELIANCE:
### FRAUD ON THE MARKET

254.    Plaintiff will rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

(a)    Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b)    The omissions and misrepresentations were material;

(c)    The Company's stock traded in an efficient market;

(d)    The misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's stock; and

(e)    Plaintiff and other members of the Class purchased Super Micro common stock between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

255.    At all relevant times, the market for Super Micro's common stock was efficient for the following reasons, among others:

(a)    As a regulated issuer, Super Micro filed periodic public reports with the SEC with the exception of its delinquent reports (*i.e.*, its annual reports on Forms 10-K for FY17 and FY18 ended June 30, 2017 and 2018, respectively, and its quarterly reports on Forms 10-Q for 1Q18 ended September 30, 2017, 2Q18 ended December 31, 2017, 3Q18 ended March 31, 2018, 1Q19 ended September 30, 2018, 2Q19 ended December 31, 2018, 3Q19 ended March 31, 2019);

(b)    Super Micro's stock traded on the NASDAQ until August 22, 2018, and thereafter its shares were quoted on the over-the-counter ("OTC") Markets under the trading symbol SMCI; and

1          (c)     Super Micro regularly communicated with public investors via established

2     market communication mechanisms, including through regular dissemination of press releases on the

3     major   news   wire   services   and   through   other   wide-ranging   public   disclosures,   such   as

4     communications with the financial press, securities analysts and other similar reporting services.

5                              **CLASS ACTION ALLEGATIONS**

6          256.    Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules

7     of Civil Procedure on behalf of all members of the Class.  Excluded from the Class are Defendants

8     and their families, and directors and officers of Super Micro and their families and affiliates.

9          257.    The   members   of   the   Class   are   so   numerous   that   joinder   of   all   members   is

10    impracticable.  The disposition of their claims in a class action will provide substantial benefits to

11    the parties and the Court.  Super Micro has 48.69 million shares of common stock outstanding.

12         258.    There   is   a   well-defined   community   of   interest   in   the   questions   of   law   and   fact

13    involved in this case.  Questions of law and fact common to the members of the Class which

14    predominate over questions which may affect individual Class members include:

15         (a)     Whether the Exchange Act was violated by Defendants;

16         (b)     Whether Defendants omitted or misrepresented material facts;

17         (c)     Whether Defendants' statements omitted material facts necessary in order to

18    make   the   statements   made,   in   light   of   the   circumstances   under   which   they   were   made,   not

19    misleading;

20         (d)     Whether Defendants knew, or were deliberately reckless in not knowing, that

21    their statements were false and misleading;

22         (e)     Whether the price of Super Micro's common stock was artificially inflated;

23    and

24         (f)     The   extent   of   damage   sustained   by   Class   members   and   the   appropriate

25    measure of damages.

26         259.    Plaintiff's claims are typical of those of the Class because Plaintiff and the Class

27    sustained damages from Defendants' wrongful conduct.

28

260.     Plaintiff will adequately protect the interests of the Class and has retained counsel who are experienced in class action securities litigation.  Plaintiff has no interests which conflict with those of the Class.

261.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## COUNT I

### For Violation of §10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants

262.     Plaintiff incorporates ¶¶1-261 by reference.

263.     During the Class Period, Defendants disseminated or approved the false statements specified above, which they knew, or were deliberately reckless in not knowing, were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

264.     Defendants violated §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder in that they:

(a)     Employed devices, schemes, and artifices to defraud;

(b)     Made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)     Engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Plaintiff and others similarly situated in connection with their purchases of Super Micro common stock during the Class Period.

265.     Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Super Micro's common stock.  Plaintiff and the Class would not have purchased Super Micro common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

266.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of Super Micro common stock during the Class Period.

## COUNT II

### For Violation of §20(a) of the Exchange Act
### Against All Defendants

267.    Plaintiff incorporates ¶¶1-266 by reference.

268.    The Individual Defendants acted as controlling persons of Super Micro within the meaning of §20(a) of the Exchange Act.  By virtue of their positions and their power to control public statements about Super Micro, the Individual Defendants had the power and ability to control the actions of Super Micro and its employees.  Super Micro controlled the Individual Defendants and its other officers and employees.  By reason of such conduct, Defendants are liable pursuant to §20(a) of the Exchange Act.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

A.    Determining that this action is a proper class action and certifying Plaintiff as Class representatives under Rule 23 of the Federal Rules of Civil Procedure and Plaintiff's counsel as Lead Counsel;

B.    Awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.    Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.    Such equitable, injunctive or other relief as may be deemed appropriate by the Court.

1

**JURY DEMAND**

2

      Plaintiff demands a trial by jury.

3

DATED:  April 22, 2020

                          ROBBINS GELLER RUDMAN

4

                             & DOWD LLP
                          SHAWN A. WILLIAMS
                          DANIEL J. PFEFFERBAUM

5

                          ARMEN ZOHRABIAN
                          PATTON L. JOHNSON

6

7

                                    s/ Daniel J. Pfefferbaum

8

                             DANIEL J. PFEFFERBAUM

9

                          Post Montgomery Center
                          One Montgomery Street, Suite 1800

10

                          San Francisco, CA  94104
                          Telephone:  415/288-4545

11

                          415/288-4534 (fax)

12

                          Lead Counsel for Plaintiffs

13

                          PITTA LLP
                          VINCENT F. PITTA

14

                          120 Broadway, 28th Floor
                          New York, NY  10271

15

                          Telephone: 212/652-3890
                          212/652-3891 (fax)

16

17

                          Additional Counsel for Plaintiffs

18

19

20

21

22

23

24

25

26

27

28

THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATION OF THE
FEDERAL SECURITIES LAWS - 4:18-cv-00838-JST
4838-8753-1962.v1-4/22/20

- 111 -

1

<u>CERTIFICATE OF SERVICE</u>

2

I hereby certify under penalty of perjury that on April 22, 2020, I authorized the electronic

3

filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send

4

notification of such filing to the e-mail addresses on the attached Electronic Mail Notice List, and I

5

hereby certify that I caused the mailing of the foregoing via the United States Postal Service to the

6

non-CM/ECF participants indicated on the attached Manual Notice List.

7

s/ Daniel J. Pfefferbaum

8

DANIEL J. PFEFFERBAUM
ROBBINS GELLER RUDMAN

9

& DOWD LLP
Post Montgomery Center

10

One Montgomery Street, Suite 1800
San Francisco, CA  94104

11

Telephone:  415/288-4545
415/288-4534 (fax)

12

E-mail:  dpfefferbaum@rgrdlaw.com

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

4838-8753-1962.v1-4/22/20

# Mailing Information for a Case 4:18-cv-00838-JST Hessefort v. Super Micro Computer, Inc. et al

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Daniel Scott Carlton**
  scottcarlton@paulhastings.com,melmanahan@paulhastings.com,lisavermeulen@paulhastings.com,nicolasmorgan@paulhastings.com

- **Richard Martin Heimann**
  rheimann@lchb.com

- **Stephen D. Hibbard**
  jctang@jonesday.com,cdelacroix@jonesday.com,ecf-9d8e07160ff2@ecf.pacerpro.com,jvallette@jonesday.com,sdhibbard@jonesday.com

- **J Alexander Hood , II**
  ahood@pomlaw.com,tcrockett@pomlaw.com,abarbosa@pomlaw.com

- **Lester Rene Hooker**
  lhooker@saxenawhite.com,e-file@saxenawhite.com,cwallace@saxenawhite.com

- **Patton L. Johnson**
  pjohnson@rgrdlaw.com,PJohnson2019@ecf.courtdrive.com

- **Jeremy A Lieberman**
  jalieberman@pomlaw.com,tcrockett@pomlaw.com,disaacson@pomlaw.com,abarbosa@pomlaw.com,lpvega@pomlaw.com

- **Katherine Collinge Lubin**
  klubin@lchb.com,rtexier@lchb.com

- **Tricia Lynn McCormick**
  triciam@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Nicolas Morgan**
  nicolasmorgan@dlapiper.com,jette.brasher@dlapiper.com

- **Dennis Francis Murphy**
  dennismurphy@jonesday.com

- **Jennifer Pafiti**
  jpafiti@pomlaw.com,jalieberman@pomlaw.com,ahood@pomlaw.com,egoodman@pomlaw.com,disaacson@pomlaw.com,abarbosa@pomlaw.com

- **Daniel Jacob Pfefferbaum**
  DPfefferbaum@rgrdlaw.com,smorris@rgrdlaw.com,MBurch@rgrdlaw.com,dpfefferbaumRGRD@ecf.courtdrive.com,e_file_sd@rgrdlaw.com

- **Laurence Matthew Rosen**
  lrosen@rosenlegal.com,larry.rosen@earthlink.net

- **Shawn A. Williams**
  shawnw@rgrdlaw.com,ShawnW@ecf.courtdrive.com,kmccarty@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Armen Zohrabian**
  AZohrabian@rgrdlaw.com,azohrabian@ecf.courtdrive.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)